UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA                                    11 Cr. 800 (WFK)

       v.

SEMYON BUMAGIN

---------------------------------------------------X


Defendant's Memorandum Of Law

Concerning Competency Proceedings


Zoë Dolan
154 Grand Street
New York, NY 10013
(347) 301-5180
zdolan@gmail.com

Table Of Contents

Table Of Contents…………………………………………………………………i

Table Of Authorities……………………………………………………………ii

Memorandum Of Law

    I.     Background……………………………………………………………..1

    II.    Legal Framework………………………………………………………9

    III.   Due Process Prohibits Further Custodial Hospitalization.

          A.  Mr. Bumagin's Continued Incarceration Violates Due Process……………..11

          B.  Mr. Bumagin's "Treatment" Falls Short Of Due Process…………………..15

    IV.   Title 18 U.S.C. § 4241(d) Is Unconstitutional As Applied………………………17

    V.    Conclusion……………………………………………………………18

Table Of Authorities

Cases

*Cooper v. Oklahoma*,
    517 U.S. 348 (1996) ........................................................................................................... 15

Drope v. Missouri,
    420 U.S. 162  (1975) .......................................................................................................... 16

*Jackson v. Indiana*,
    406 U.S. 715 (1972) ........................................................................................................... 11

*United States v. Magassouba*,
    44 F.3d 387 (2d Cir. 2007) ................................................................................. 10, 11, 17, 18

Statutes

18 U.S.C. § 4241 ...................................................................................................... passim

The defendant Semyon Bumagin submits this memorandum of law in connection with the proceedings concerning whether he is competent to stand trial.  For the reasons that follow, due process prohibits further custodial hospitalization, and the operative statute, 18 U.S.C. § 4241, is unconstitutional as applied here.

I.      Background

Mr. Bumagin has been evaluated by mental health professionals three times ∽ first by Dr. Monica Rivera-Mindt, a neuropsychologist retained by the defense; second by Dr. Dana Brauman, a forensic psychologist at the Metropolitan Correctional Center ("MCC") in Manhattan; and finally by a team at the Federal Medical Center ("FMC") in Butner, North Carolina, led by Dr. Jill Grant.  The reports of Dr. Rivera Mindt and Dr. Brauman are attached to a letter to the court from counsel dated September 29, 2014 ("Sealed Exhibit Letter") as Exhibits 1 and 2, respectively.  As further discussed below, the findings of all three evaluators are consistent with a memory deficit that is neurodegenerative in nature.

Dr. Rivera-Mindt was retained to address two questions, namely whether Mr. Bumagin: "(1) [wa]s experiencing neuropsychological impairment; 2) and if so, the extent of this impairment, possible etiology,[1] and approximate length of time that such problems have been ongoing."  Rivera-Mindt Report at 1.  Dr. Rivera-Mindt's evaluation of Mr. Bumagin included a medical, psychiatric and psychosocial history; behavioral observations and a mental status examination; a battery of 18 neurological tests designed to assess a variety of aspects including intellectual functioning, dementia, motor functioning, speed of information processing, visuospatial functioning, language/verbal skills, attention/concentration and working memory,

---

[1]  Etiology is the cause or source of a physiological or medical condition.  *See* July 21, 2014 Hearing Transcript at 27.

verbal and visual learning and memory, executive functioning, and emotional/personality

functioning.  *Id.* at 4-11.

      Based on the information she gathered during the course of her evaluation, Dr. Rivera-

Mindt opined:

> Given the available history, Mr. Bumagin's clinical presentation, and the results of
> neuropsychological testing, it is my opinion, to a reasonable degree of
> neuropsychological certainty, that Mr. Bumagin has a significant degree of cognitive
> impairment, and this appears to have been ongoing for at least over one year.  However,
> the results of [a prior] MRI study suggest neurologic involvement since at least 2010.
> [*See* discussion, *infra*.]  Given the complexity of Mr. Bumagin's neurologic and
> substance use history, the etiology of his cognitive impairment is equivocal.  The pattern
> of the neuropsychological findings, in concert with the MRI findings, provide some
> support for a possible diagnosis of Dementia due to Alzheimer's Disease.  However, the
> potential contributions of repeated head traumas and extensive substance abuse cannot be
> ruled out.

*Id.* at 12.

      With regard to the definition of terms, at a two day hearing last summer, Dr. Mindt

explained that dementia "typically involves significant impairment in memory, and at least one

other cognitive domain, along with significant functional impairment.  So, for instance, ability to

complete activities of daily living, work, taking medications . . . a number of different things

could be part of that functional impairment…"  Transcript of July 22, 2014 Hearing ("7/22/14

Hearing Tr.") at 162, attached to Unsealed Exhibit Letter as Exhibit 3.  As for neurodegenerative

disease, she explained, it "is one cause of dementia, and it's insidious [in] course.  So there is no

cure for it, and it causes significant neuropsychological impairment across a lot of domains."  *Id.*

      Among the material that Dr. Rivera-Mindt reviewed in connection with her evaluation

were Mr. Bumagin's prior medical records from 2011, attached to Sealed Exhibit Letter as

Exhibit 4.  These records indicated a diagnosis of dementia and treatment with medication for

Alzheimer's.  *Id.*  In addition, Dr. Rivera-Mindt examined prior MRI results from 2010.  7/22/14

Tr. at 173-76.  The imaging in these records was consistent with Alzheimer's.  *Id.* at 176.

In light of this background information and her own evaluation, Dr. Rivera-Mindt drew

the following conclusion:

> From a neuropsychological perspective, [Mr. Bumagin's] residual impairments in
> cognition appear chronic and possibly insidious in nature.  They will likely prevent him
> from ever returning to a work capacity consistent with someone of his premorbid
> intellectual ability, and negatively affect his ability to fulfill many other important
> functional roles for the remainder of his life.

*Id.* at 12-13.

Following Dr. Rivera-Mindt's evaluation, Mr. Bumagin was transferred to the MCC for

an evaluation pursuant to 18 U.S.C. § 4241(b).  Dr. Brauman conducted the evaluation, which

encompassed developmental, marital, educational, employment, criminal, psychiatric, substance

abuse and medical histories; behavioral observations; a psychological assessment including a

battery of tests; and mental status analysis.  Brauman Report at 1-8.  Mr. Bumagin's performance

on effort measures ∽ that is, tests designed to measure the validity of test results overall ∽ gave

Dr. Brauman reason to consider all indicators with caution.  July 21, 2014 Hearing Transcript

("7/21/14 Hearing Tr.") at 22-25, attached to letter from defense counsel dated September 29,

2014 ("Unsealed Exhibit Letter") as Exhibit 5.

Dr. Brauman met with Mr. Bumagin seven times for a total of approximately eight hours

over the course of a month.  7/21/14 Tr. at 31, 54.  During the competency interview, Dr.

Brauman asked Mr. Bumagin a variety of open-ended questions about a range of subjects, such

as: why he was there; the charges; legal concepts such as oath, perjury, evidence, sentencing, and

plea bargains; the roles of individuals in court including the judge, attorneys and jurors;

3

courtroom behavior; Mr. Bumagin's working relationship with counsel; how Mr. Bumagin would assist in his own defense; and how realistic he thought that was. *Id.* at 12, 14-17.

      With regard to Mr. Bumagin's memory, Dr. Brauman noted:

> Mr. Bumagin reported significant memory problems, including having difficulty retaining instructions, recalling where he parked his car, and remembering on which unit he belongs.  These memory impairments were corroborated by his daughter, who noted a significant decline in his cognitive functioning over the past year, marked by odd behaviors such as repeated or random questioning and a total lack of awareness for previous conversations that had taken place only a short time earlier.  In line with these concerns, Ms. Dolan, his defense attorney, questioned Mr. Bumagin's ability to retain information previously explained to him and participate effectively in his defense, since he has repeatedly demonstrated very limited ability to recall conversations that they have had in previous meetings.

*Id.*

      In addition, Dr. Brauman noted, Mr. Bumagin "evidence[d] minor difficulties navigating the facility and occasionally required assistance to return to his unit and his cell." *Id.* at 6; 7/21/14 Hearing Tr. at 21.

      In light of the foregoing, Dr. Brauman arrived at this clinical formulation: "Given Mr. Bumagin's history and current presentation, he appears to meet the criteria for the following diagnoses: Dementia NOS [Not Otherwise Specified], Cannabis Abuse, and Adult Antisocial Behavior." *Id.* at 9.  As to a prognosis, Dr. Brauman wrote:

> Dementia NOS usually follows a progressive course unless the underlying pathology is reversible (i.e., in the case of dementia due to an untreated medical condition that is amenable to treatment).  That is, no improvement in functioning can be expected other than brief periods of improved orientation and awareness.  A more accurate prognosis can be offered when a specific etiology is identified.[2]  Additionally, it is important to note, as the dementia progresses, individuals are prone to accidents and infectious diseases which can be fatal.  Additionally, the defendant's tendency to resort to unlawful activities and a means of supporting himself may complicate his progress.  Therefore, his prognosis is guarded.

---

[2]  Dr. Brauman was not able to determine the etiology of Mr. Bumagin's condition. 7/21/14 Hearing Tr. at 26.

*Id.* at 10.

Dr. Brauman elaborated on dementia and its effect on an individual's cognitive abilities at the hearing:

> There are various types of dementia.  For instance, in one case, someone may have very good recollection of more remote information or background data, and might be able to recall phone numbers and details of their history, but *they may be more impaired for learning new information as is the case here*. . . .  Each type of dementia has its own specific course, but generally speaking, there wouldn't be an improvement.

7/21/14 Hearing Tr. at 62 (emphasis supplied).

All things considered, Dr. Brauman concluded, "with a reasonable degree of psychological certainty, Mr. Bumagin has a rational and factual understanding of the proceedings against him, but suffers from cognitive impairments which preclude him from participating effectively in his defense."  Brauman Report at 12.  Accordingly, Dr. Brauman opined, Mr. Bumagin was "Not Competent to Stand Trial."  *Id.*

Dr. Brauman further explained the reasoning underlying her impression of Mr. Bumagin's lack of competency at the hearing:

> I think taking all of the data together and trying to form a reasoned opinion, you need to have not just the factual and rational understanding, but also the ability to assist counsel. So one who has difficulty retraining information, may have a difficult time from one meeting to the next recalling the strategies that have been discussed, and I felt that that was at play in this case.

7/21/14 Hearing Tr. at 28-29.

Following the evaluation by Dr. Brauman, Mr. Bumagin was transferred to FMC Butner "to determine whether there is a substantial possibility that in the foreseeable future [he] [would] attain the capacity to permit criminal proceedings to go forward against him[,]" in accordance with 18 U.S.C. § 4241(d).  November 6, 2012 Order, docket entry no. 37.

At Butner, Dr. Grant discussed the offense conduct with Mr. Bumagin and incorporated the discussion into her evaluation; the Court has excluded her report. 7/21/14 Tr. at 100-05. Nevertheless, Dr. Grant did testify at length at the hearing about a variety of issues and background information including medical records from Butner, personal observations from the period in which Mr. Bumagin was at Butner, tests conducted to assess the status of Mr. Bumagin's cognitive abilities, and a range of aspects of her opinion concerning Mr. Bumagin's competency. *See generally id.* at 68-152.

The evaluation by Dr. Grant included administration of a "forced choice" questionnaire comprising 25 "very basic" questions and a choice between two answers. 7/21/14 Tr. at 72-74. Only one question dealt with the examinee's relationship with counsel: "[W]hat does your lawyer do? Choice A, solves the crime or Choice B, takes your side?" *Id.* at 74. Dr. Grant testified that she did not know how far gone someone would have to be before getting that question wrong. *Id.* at 78.

Dr. Grant also testified that she asked some open-ended questions in addition to the forced choice questionnaire, however, she did not write those questions down, and instead "typed them into [her] report from memory…" *Id.* at 75.

During her testimony at the hearing, Dr. Grant identified nine exhibits comprising a number of Mr. Bumagin's medical records from FMC Butner. *Id.* at 79. The exhibits, which came into evidence as Defense Exhibits A through I, are attached to the Sealed Exhibit Letter as Exhibits 6 through 14. The records were made at various points throughout Mr. Bumagin's stay at FMC Buter. 7/21/14 Tr. at 79. Each one contains information consistent with a memory deficit:

Exhibit 6:

[Mr. Bumagin] continues to have problems with memory and confusion. In particular, he believes he has terrible medical illnesses, including malignancy which requires surgery. Despite multiple conversations with the medical service to reassure him, he cannot remember these conversations and perseverates on these issues.

Exhibit 7:

In the past, [Mr. Bumagin] has had multiple somatic complaints, and many of them were not based on realty.  For example, he continues to say he has liver cancer despite this writer, the MD, his attorney, and him having a conference call in which his medical problems were discussed in detail.

Exhibit 8:

Mr. Bumagin has a history and diagnosis of Alzheimer's [disease] and a family [history of] Alzheimer's [disease].  Mr. Bumagin also has evidence of atrophy and vascular disease. He also a [history of] substance abuse.

Exhibit 9:

[Mr. Bumagin] will likely need some assistance with remembering his [physical therapy] program due to dementia…

Exhibit 10:

[Mr. Bumagin] continues to have problems with memory and confusion.

Exhibit 11:

…[Mr. Bumagin] will frequently forget things.

Exhibit 12:

[Mr. Bumagin] has dementia and needs to be reminded repeatedly about what is being done…

Exhibit 13:

[Mr. Bumagin] has a history of diagnosis of Alzheimer's [disease] and family [history of] Alzheimer's [disease].  . . . He is currently experiencing [signs] of Alzheimer's [disease] particularly with memory problems (cannot find his cell).  His MRI showing atrophy is also [consistent with] Alzheimer's [disease].

7

Exhibit 14, which Dr. Grant explained at the hearing as follows:

Q        Finally, December 18, 2012, you noted Mr. Bumagin is adjusting well on the open housing unit and no longer meets criteria for the vulnerable patient protocol. What is vulnerable patient protocol?

A        It's a protocol we put patients on when they first enter our institution to make sure they're monitored closely, to make sure that they're adjusting okay. They go to a specific inpatient mental health housing unit where a nurse and various staff, not only observe them 24/7, but they actually call them in and ask them a line of questions every single day to monitor their mental status.

Q        And then you note, he should remain on 2G however, due to his dementia. Familiar surroundings may facilitate his ability to negotiate. Is 2G a floor at FMC Butner?

A        It's a unit on the second floor, yes.

Q        Is it a special unit in any way?

A        It's not special in any way, other than I felt it was best for his ability to navigate and adjust if he just stayed on the same unit. I thought it would help his adjustment.

Q        Was he having some difficulty adjusting?

A        Initially, he was not having trouble adjusting, but he was having trouble finding his cell; they all look alike.

Q        Do all of the inmates have trouble finding their cells?

A        No, they do not.

*Id.* at 89-90.

Mr. Bumagin's evaluation at FMC Butner included something called a "treatment plan," which was generated upon his arrival and reflected "areas to work on." *Id.* at 93. The treatment plan, attached as Exhibit 15 to the Sealed Exhibit Letter, contains three objectives relevant to the discussion here:

- Mr. Bumagin will correctly state the pending legal charges against him for 30 days by 90 days.

- Mr. Bumagin will discuss clearly *and realistically* the evidence against him and possible legal defense strategies by 90 days.

- Mr. Bumagin will explain the pros and cons of legal options by 90 days.

*Id.* (emphasis supplied).

According to Dr. Grant, the first two goals were achieved, *id.* at 91-92, though her conclusions are questionable, for the reasons discussed below. In any event, it remains unclear whether the third goal ∽ explaining the pros and cons of legal options ∽ was ever achieved. *Id.* at 92-95.

The team at Butner diagnosed Mr. Bumagin with "rule out dementia." *Id.* at 142. Dr. Grant explained the diagnosis as follows: "[We] believe there is a cognitive decline, we don't know how extent -- how extensive it is, simply because he provided inconsistent information to us, and so we weren't able to say definitively if he had dementia." *Id.* Dr. Grant also stated, "[W]e didn't have enough information because test results indicated it's inconsistent effort," and she noted that the team's conclusions were based on a feeling: "[W]e didn't *feel* like he was being truthful with us." *Id.* (emphasis supplied).

II.    Legal Framework

Competency proceedings are governed by Title 18 U.S.C. § 4241 *et seq.* The statute provides, in pertinent part:

> (d) Determination and disposition.--If, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility—
>
> > (1) for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the

9

foreseeable future he will attain the capacity to permit the proceedings to go forward; and

(2) for an additional reasonable period of time until—

(A) his mental condition is so improved that trial may proceed, if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward; or

(B) the pending charges against him are disposed of according to law; whichever is earlier.

If, at the end of the time period specified, it is determined that the defendant's mental condition has not so improved as to permit proceedings to go forward, the defendant is subject to the provisions of sections 4246 and 4248.

18 U.S.C. § 4241(d).

On its face, this statutory scheme statute contemplates two periods of custodial hospitalization: first, under (d)(1), to determine whether there is a substantial probability that the defendant will become competent to stand trial in the foreseeable future; and second, under (d)(2), for an additional reasonable period of time until the defendant's condition is improved, *provided there is a substantial possibility that it will be*, or the charges are disposed of, whichever happens earlier.  *See United States v. Magassouba*, 544 F.3d 387, 405 (2d Cir. 2007) (discussing procedure under § 4241(d)).

Due process safeguards against the unlimited custodial hospitalization in connection with competency determinations and treatment:

A person charged by a State with a criminal offense who is committed solely on account of his incapacity to proceed to trial cannot be held more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain that capacity in the foreseeable future.  If it is determined that this is not the case, then the State must either institute the customary civil commitment proceeding that would be required to commit indefinitely any other citizen, or release the defendant.  *Furthermore, even if it is determined that the defendant probably soon will be able to stand trial, his continued commitment must be justified by progress toward that goal*.

10

*Jackson v. Indiana*, 406 U.S. 715, 738 (1972) (emphasis supplied).

Accordingly, "[t]o avoid constitutional concerns with the prospect of indefinite commitment, federal appeals courts [have] imposed a 'rule of reasonableness' on [§ 4241 and its predecessor], construing them to allow commitment 'only for a "reasonable period of time" necessary to determine whether there is a substantial chance of [the defendant] attaining the capacity to stand trial in the foreseeable future.'" *Magassouba*, 544 F.3d at 403 (quoting *Jackson,* 406 U.S. at 733).

III.   Due Process Prohibits Further Custodial Hospitalization.

A.  Mr. Bumagin's Continued Incarceration Violates Due Process.

Mr. Bumagin's continued incarceration violates due process, as there can be no genuine dispute that he suffers from cognitive deficits negatinghis ability to work with counsel, and this condition is degenerative in nature.  Mr. Bumagin has been diagnosed with dementia by at least one prior physician, the defense neuropsychologist Dr. Rivera-Mindt, and the MCC forensic psychologist Dr. Brauman.  The Butner team arrived at the same diagnosis, with the qualification of "rule out" status, finding no reason why the diagnosis should not be applied.  *See* 7/22/14 Tr. at 142.  Further, the diagnosis of dementia is consistent with MRI results prior to Mr. Bumagin's arrest, *see* Rivera-Mindt Report at 12, and more recent MRI results from Butner, *see* 7/22/14 Tr. at 183.

The effects of Mr. Bumagin's dementia, including memory deficits, have been noted by Dr. Rivera-Mindt and Dr. Brauman.  The medical records from Butner also contain notations of deficits by various staff throughout Mr. Bumagin's stay at that facility.  Perhaps the only individual who has interacted with Mr. Bumagin in connection with the competency proceedings and did not perceive a manifestation of his memory problems was Dr. Grant: "I *personally* did

not see [memory problems] during my interactions with him." 7/21/14 Tr. at 118 (emphasis supplied).

This testimony is of no moment for two reasons. First, Dr. Grant knew that Mr. Bumagin required assistance to locate his cell in the enclosed, one-floor facility where he was housed at Butner, while other inmates have no trouble doing so.

Second, to the extent that her own memory is credible, Dr. Grant admitted to observing an instance of Mr. Bumagin's memory problem during a conference call with Mr. Bumagin's medical team and defense counsel:

Q      Do you recall the conversation that we had?

A      I don't recall many details, no.

       THE COURT: Do you recall it at all?

       THE WITNESS: Yes.

       THE COURT: What do you recall?

       THE WITNESS: I recall that we sat around the table and discussed – [Mr. Bumagin] had concerns about his -- I think a growth on his neck, and he had -- he had been diagnosed with hepatitis and it probably came up during that conversation; although, I can't say for sure. I know that the physician notes it in the medical records later. And then Ms. Dolan asked us questions and asked the defendant questions, and I was really an observer, because I'm not a medical expert, but our team physician provided information to Ms. Dolan and to the defendant about his medical conditions as he understood them, what tests they were going to order, and what they were planning to do in terms to treat him.

Q      And Mr. Bumagin was concerned that he had a carcinogenic growth on his liver, correct?

A      Yes.

Q      But it was benign, correct?

A      Correct.

Q      And, in fact, Butner medical staff told him it was benign previously, correct?

A I don't know if they told him previously to that conversation, but I believe they had.

7/21/14 Tr. at 81-82.

Indeed, Dr. Grant noted this very issue in an administrative note on March 1, 2013. Exhibit 7, *supra* ("[Mr. Bumagin] continues to say he has liver cancer despite this writer [Dr. Grant], the MD, his attorney, and him having a conference call in which his medical problems were discussed in detail.").

Furthermore, even putting Dr. Grant's inconsistencies aside, the team at Butner observed evidence of Mr. Bumagin's memory deficit: although sometimes he remembered information, other times he forgot.  7/21/14 Tr. at 119.

To be sure, Dr. Grant interpreted these fluctuations in Mr. Bumagin's memory as a "pattern" indicating that he was exaggerating his symptoms.  7/21/14 Tr. at 135-36.  But such a conclusion deserves no credit.  The example of this "pattern" that Dr. Grant provided was that Mr. Bumagin complained of medical symptoms yet purportedly never followed up.  As just noted above, however, Mr. Bumagin's concerns culminated in a conference call with his medical team, defense counsel and Dr. Grant, *see* 7/21/14 Tr. at 81-82, and he continued to follow up with Dr. Grant herself, *see* Exhibit 7.

In any event, Mr. Bumagin's prognosis is that his condition will decline.  Dr. Rivera-Mindt explained at the hearing, "[T]he probable etiologies of this type of impairment [from which Mr. Bumagin suffers] are likely to be neurodegenerative in nature.  So at this point my hypothesis would be that he's either stable and consistent to where he was last time I saw him, or more likely that he has been declining."  7/22/14 Tr. at 182-83.  She elaborated on the basis for this opinion as follows:

…the MRI findings suggests, you know, brain damage, and that can impact on the more recent MRI findings from Butner are consistent with the earlier 2010, I believe, findings. So that brain pathology, that disease in the brain, is still there, and the findings seem very conclusive. So that's one reason I would not expect to see improvement.

Second of all, the probable contributory factors in his impairment are not likely to result in improvement over time. So the developmental trajectory with Alzheimer's would indicate to me that he would be declining and not improving. So with Alzheimer's, I would expect decline. Then the other contributory factors are traumatic brain injury, history of substance abuse, not to mention hepatitis C, which in more recent records it indicates it's chronically activated. So there's a metabolic component. And then he has a number of cardiovascular risk factors as well. So all of those issues are likely to continue to be contributory. Even the substance abuse, because one of my areas of research of substance abuse as well, and his history includes extensive cocaine use and heroin use, as well as marijuana, and benzodiazepines, as well. And certainly with opiates like heroin, cocaine, as well, there are long-term effects of those substances, even in the context of being clean at the time.

So in particular with heroin, there are significant impacts in terms of executive -- long-term effects on executive functioning, as well as memory as well.

So, all of those factors together make his brain quite vulnerable to impairment, and it's unlikely that he would be improving. Some of the more dynamic factors could be he has experienced an acute infection or something like that. If it was treated, maybe he would get better, but these other things are more chronic in nature to me.

7/22/14 Tr. at 183-84.

In sum, there is no reason to believe in any likelihood that Mr. Bumagin's condition will improve. *See also*, *e.g.*, Rivera-Mindt testimony, 7/22/14 Tr. at 205 (imaging findings in Butner MRI results bolsters Rivera-Mindt's conclusion that Mr. Bumagin's impairments are "chronic and possibility insidious in nature" and will negatively affect his "ability to fulfill many other important functional roles for the remainder of his life"); and *id.* at 205-06 (nothing in Brauman Report or Butner records that would provide any reason to believe additional evaluation would be a productive exercise). Accordingly, further custodial hospitalization exceeds the rule of reasonableness and violates due process.

14

B.  Mr. Bumagin's "Treatment" Falls Short Of Due Process.

Mr. Bumagin was transferred to FMC Butner pursuant to an Order of the Court "to determine whether there is a substantial possibility that in the foreseeable future the defendant will attain the capacity to permit criminal proceedings to go forward against him[,]" in accordance with 18 U.S.C. § 4241(d).  November 6, 2012 Order, docket entry no. 37.  The statute provides for treatment in a suitable facility.  *Id.*  The "treatment" Mr. Bumagin received at Butner fell short of due process for three reasons.

First, the coaching in reciting criminal charges and legal defense strategies to which inmates are subjected at FMC Butner makes George Orwell's nightmare of humanity seem naïve.  The techniques and methodology Dr. Grant described are not a "restoration" to competency; they are, rather, Pavlovian exercises in memorizing responses to prompts over time.  But even assuming *arguendo* that such "treatment" is appropriate, it remains unclear that Mr. Bumagin ever achieved proficiency in the goal at the heart of Butern's competency "restoration" ～ explaining the pros and cons of legal strategies.

Second, even if that goal was met, the determination of the Butner team that Mr. Bumagin is competent to stand trial is a negative conclusion.  That is, the team concluded that Mr. Bumagin was competent because they could find no proof to the contrary.

The Butner team's conclusion is based on the premise that they "didn't feel like [Mr. Bumagin] was being truthful…"  7/22/14 Tr. at 142.  Insofar as this "feeling" can be neither proven nor disproven, it gives rise to an irrebuttable presumption of competency.  Such methodology is, if not unscientific, constitutionally impermissible.  *Cooper v. Oklahoma*, 517 U.S. 348, 369 (1996) ("The *prohibition* against requiring the criminal defendant to demonstrate incompetence by clear and convincing evidence safeguards the fundamental right not to stand

15

trial while incompetent.  Because Oklahoma's procedural rule allows the State to put to trial a

defendant who is more likely than not incompetent, the rule is incompatible with the dictates of

due process.") (emphasis in original).

Third, the standards of evaluation employed at Butner defy common sense.  For example,

Dr. Grant did not contact defense counsel because she "didn't feel it was necessary to reach an

opinion." 7/21/14 Tr. at 96-97.  This view is, at best, outside the norm.  *See*, e.g., *Drope v.*

*Missouri,* 420 U.S. 162, 177 n .13  (1975) ("Although we do not, of course, suggest that courts

must accept without question a lawyer's representation concerning the competence of his client,

... an expressed doubt in that regard by one with 'the closest contact with the defendant' ... is

unquestionably a factor which should be considered.").

Moreover, in analyzing a defendant's answer to questions about the facts of a case to

evaluate or restore to competency, as she did here, Dr. Grant apparently invokes an "appropriate

defense" standard that she herself cannot determine:

> …it's important for me to be able to reach an opinion about someone's rational
> understanding in the case; and that means being able to give events as they see them, to
> know that they would have to develop an appropriate defense. . . .

7/21/14 Tr. at 129.

Q   You don't recall saying ["appropriate defense"]?

A   I don't. I could have said that, I don't recall my exact words.

Q   What –

A   I think it's possible that I said that.

Q   What is an appropriate defense?

A   I think that would depend on the case, it would depend on an individual
    consulting with their defense attorney, it's variable, it's a case-by-case thing.

Q   Do you have a legal education?

16

A       No.  No, I don't.

Q       And so you've never represented an individual facing criminal charges?

A       No.

Q       So what is your understanding of an appropriate defense based on?

A       It would be -- I don't know that I can make that determination. . . .

*Id.* at 150.

Due process cannot tolerate such deficiencies in logic and protocol, particularly where a defendant's medical condition is at issue.  The "treatment" at FMC Butner failed to meet the Court's Order and was conducted outside the applicable constitutional parameters.

IV.     Title 18 U.S.C. § 4241(d) Is Unconstitutional As Applied.

To the extent that the government seeks to utilize § 4241 to prolong the cycle of competency evaluations and custodial hospitalizations here, the statute is unconstitutional as applied.  To reiterate, custodial hospitalization is permissible "'only for a "reasonable period of time" necessary to determine whether there is a substantial chance of [the defendant] attaining the capacity to stand trial in the foreseeable future.'"  *Magassouba*, 544 F.3d at 403 (quoting *Jackson,* 406 U.S. at 733).

As discussed above, Mr. Bumagin's condition appears to be neurodegenerative, and there is no basis to believe in any likelihood that he will become competent to stand trial in the future.  Since he has already been subjected to custodial hospitalization, further custodial hospitalization is only available "if the court finds that there is a substantial probability that within such additional period of time he will attain the capacity to permit the proceedings to go forward or the charges are disposed of."  18 U.S.C. § 4241(d)(2)(A).  Such a finding would not be justified on the record in this case.

17

Moreoever, § 4241 fails to provide a mechanism for addressing a prognosis of stasis or inevitable decline following findings of operative cognitive deficits or incompetency.  Where those circumstances prevail and the government continues to pursue charges, as it does here, custodial hospitalization necessarily becomes indefinite in nature.  That result runs afoul of due process and is constitutionally prohibited.  *See Magassouba* and *Jackson*, *supra.*  Thus, the statute is unconstitutional as applied.

V.    Conclusion

For the foregoing reasons, continued prosecution of this case in its current form is unconstitutional.  In the absence of any change, dismissal of the indictment or release of the defendant is appropriate.


Dated: September 29, 2014               _s/_____
       Los Angeles, California          Zoë Dolan
                                        154 Grand Street
                                        New York, NY 10013
                                        (347) 301-5180
                                        zdolan@gmail.com