1  function have potential impact on performance on any of these

2  particular tests?

3  A    It is possible.

4  Q    And how could you explain the relationship?

5  A    Certainly.  So if somebody has a very low blood sugar,

6  or, you know, if they are having some difficulty with hepatic

7  function, that could certainly impact their cognitive and

8  mental status.

9            THE COURT:  With which function?

10           THE WITNESS:  Liver function.

11           THE COURT:  Go ahead.

12           THE WITNESS:  So, you know, temporarily from one

13  time to another it can impact their function.  And then if the

14  person, you know, returned to normal blood sugar, or if they

15  were treated, they could go back to normal.

16  Q    Now I would like to put all of that aside just for the

17  moment, Dr. Rivera-Mindt, and let's focus on the education

18  factor.

19           How does the education factor play into the

20  effort measures?

21  A    Well, the education factor I think plays a role in the

22  neuropsychological evaluation, maybe not so much as measures

23  per se, but the way we interpret the neuropsychological data,

24  you might think of each person being like a test case.  So we

25  provided all of these.  We administered all of these cognitive

1   tests.  We have all of these data and need to interpret these

2   data to try to understand if their performance is normal or

3   impaired.

4           So we take the performance of the person being

5   evaluated and compare that performance to a normative sample

6   of groups for measures.  And it's important that those norms

7   are appropriate in terms of the demographics of the normative

8   samples.  What I mean is, if you had a person who was, you

9   know, had 12 years of education and was 50 years old, you

10  would want to compare them to a similar demographic group,

11  because we know that cognitive neuropsychological tests are

12  significantly impacted by age, education, and there's some

13  other factors as well, like gender, at times, and Grace adds

14  my city rather times and cultural factors at times, too.  So

15  it's important that you have a good comparison group to be

16  able to interpret the data that you collect.

17  Q    So if you had had a history where Mr. Bumagin had

18  14 years of education, would that have affected your report?

19  A    Yes.

20  Q    And how so?

21  A    So it would change the interpretation of the findings.

22  Because we would expect better performance with somebody say

23  ten years of education -- 14 years of education, excuse me,

24  versus ten years of education, in general.  So, the issue of

25  years of education is very important in computing the norms to

1   interpret the data.

2   Q    Does that specifically apply to the effort measures as

3   well?

4   A    With the effort measures, not as much.  It's more the

5   neuropsychological test measures of cognition.

6   Q    So that's the general interpretive framework that

7   applies?

8   A    Yes.

9   Q    Is that sort of general interpretive framework that

10   applies to the evaluation and the report as a whole?

11   A    Yes.

12   Q    Did I ask you to review some records of phone calls of

13   Mr. Bumagin with others, possibly family members, that were

14   recorded at the Metropolitan Detention Center?

15   A    You did.

16   Q    Did you review transcripts or recordings?

17   A    I reviewed the transcripts.

18   Q    The English translations of the Russian?

19   A    Hm hmm.

20               THE COURT:  Was that a yes?

21               THE WITNESS:  Yes.

22               THE COURT:  Okay.

23   Q    Do you recall approximately how many transcripts I asked

24   you to review?

25   A    Approximately somewhere in the neighborhood of eight.

M. Rivera-Mindt - Direct/Dolan                    198

1  Q    Was Mr. Bumagin discussing his case in those transcripts?

2  A    Yes.

3  Q    And was he discussing his medical condition and

4  specifically dementia?

5  A    Yes.

6  Q    And how his dementia may relate to his legal case?

7  A    Yes.

8  Q    And do those calls in any way change or impact your

9  evaluation of Mr. Bumagin?

10  A    No.

11  Q    Now, I'm asking you to have a look at what is in evidence

12  as DX-2.

13              Do you recognize this?

14  A    Yes.

15  Q    And did you have an opportunity -- well, what is this?

16  A    So, this was the competency questionnaire administered at

17  Butner.

18  Q    Were you in court yesterday when Dr. Grant testified

19  about this questionnaire?

20  A    Yes.

21  Q    Have you had an opportunity to review this questionnaire?

22  A    Yes.

23  Q    And going back to your interactions with Tracy Pennuto.

24              Did you request the raw data from Butner?

25  A    I did.

M. Rivera-Mindt - Direct/Dolan                    199

1   Q    Were you provided with this particular questionnaire?

2   A    I was not, and I actually asked the question explicitly,

3   after getting the initial raw data for the neuropsychological

4   data.  I asked about this and didn't receive a response.

5   Q    When did you receive this questionnaire?

6   A    Earlier today.

7   Q    Did you and I discuss it?

8   A    Yes.

9   Q    Do you have a professional opinion on this questionnaire?

10          MR. TROWEL:  Objection, your Honor.

11          THE COURT:  Yes.

12  Q    What is your opinion?

13  A    My concern about this questionnaire is that it is not a

14  validated questionnaire.  It's not supported by the science,

15  and it's have -- it appears to be very rudimentary in terms of

16  the four choice questions.

17  Q    When you say not validated, what do you mean by that?

18  A    So typically for the test that we administer in

19  evaluations, they have gone through extensive development peer

20  review.  We know by the psychometric characteristics like

21  reliability and about the measures and how they work.  And to

22  the best of my knowledge, this questionnaire has not been

23  validated.

24  Q    Even if it had been, you mentioned that it was

25  rudimentary and force choice?

1   A    Yes.

2   Q    Could you address each one of those in turn?

3            THE COURT:  What did you mean by rudimentary?

4            THE WITNESS:  So it seems very simple issues around

5   competency are rather complex, and this seems very simple.

6   And also it doesn't address or doesn't seem to address very

7   much the issue around the relationship with the attorney, as

8   well as it is overly simplified.

9            THE COURT:  What do you mean by force choice?

10            THE WITNESS:  Force choice, a person can provide an

11   answer from a limited set of response choices.

12               THE COURT:  Go ahead.

13            MS. DOLAN:  If I can have just one moment.

14            THE COURT:  You could, to complete the five-minute

15   examination of this witness that you where asking for

16   yesterday.

17            MS. DOLAN:  Can you believe it.

18            THE COURT:  As I said, I used to do this for a

19   living.

20            THE WITNESS:  Ms. Dolan --

21               MS. DOLAN:  Actually, I have to ask the

22   questions, unfortunately.

23               THE COURT:  I can ask.  Is there something you

24   would like to say?

25               THE WITNESS:  Thank you, yes.

1          When we were talking about education, the years

2  of education with regard to the Butner report, there's one

3  thing that I forgot to mention.

4          THE COURT:  What was that?

5          THE WITNESS:  In my review of the raw data related

6  to that report, there were different recordings of years of

7  education across different tests.  So not only is there a

8  difference between the reported years of education in the

9  Butner report versus my report and the MCC report, number one,

10  so 14 years of education versus ten years of education, but

11  actually within the raw data there are different reports of

12  years of education.  On one test it reports that it was 11

13  years of education; on another test it says ten years of

14  education; on another one it says 14 years of education.  So

15  there was lot variability within the report.

16          THE COURT:  Thank you.  Go ahead.

17  BY MS. DOLAN:

18  Q    That reminds me.  Were you here for Dr Grant's testimony

19  about inconsistent performance or responses to different

20  evaluators that Mr. Bumagin presented?

21  A    Yes.

22  Q    And earlier we had discussed physiological symptomology,

23  could physiological variations also affect those variations as

24  well?

25  A    Can I clarify the question?

1   Q    Please.

2   A    So are you asking with regard to the behavioral

3   observations when he was on the unit and the date from an

4   observer to observer, he was observed to have different mental

5   statuses essentially?

6   Q    Yes?

7   A    It's possible that these metabolic issues can change

8   mental status from one time to another.

9   Q    Finally, based on your evaluation of Mr. Bumagin and your

10  review of all of the records and reports that you discussed in

11  your testimony today, do you have an opinion on whether it

12  would be ethical for Mr. Bumagin to be forced to stand trial?

13  A    I do have an opinion about that.

14  Q    What is your opinion?

15             MR. TROWEL:  Objection?

16          THE COURT:  Overruled.

17             THE WITNESS:  May I proceed?

18             THE COURT:  That's what overruled means.

19          THE WITNESS:  In my ethical opinion, I do not

20  believe that it would be ethical for Mr. Bumagin to stand

21  trial.

22             THE COURT:  Why not?

23             THE WITNESS:  Based on his cognitive

24  functioning.  When I evaluated him at that time, he would not

25  have been competent, I do not believe.

1          THE COURT:  Do you believe that another

2  evaluation would yield any different result?

3          THE WITNESS:  No -- let me clarify that.  It could

4  be worse.

5          THE COURT:  Could it be better?

6          THE WITNESS:  Unlikely.

7          THE COURT:  Could it be the same?

8          THE WITNESS:  Yes.

9          THE COURT:  But it could not be better, in your

10  view?

11          THE WITNESS:  I believe that it would be

12  unlikely that it would be better.

13          THE COURT:  Do you think the court should order

14  another examination?

15          THE WITNESS:  In terms of thoroughness, because

16  it's been two years.

17          THE COURT:  Because of thoroughness, because it's

18  been two years.

19          THE WITNESS:  It would be a reasonable thing to do.

20  But, again, I wouldn't expect to see significant improvement

21  from two years ago.

22          THE COURT:  Any downside in ordering another

23  examination?

24          THE WITNESS:  I'm not sure/ perhaps prolonging

25  the process for him one way or another, but I'm not sure that

1   there would be a significant downside.

2           THE COURT:  Okay.  Go ahead.

3   BY MS. DOLAN:

4   Q    You had the opportunity to review Dr. Brauman's report in

5   connection with your testimony today, did you not?

6   A    Yes.

7   Q    And in terms of how Mr. Bumagin performed in the

8   evaluation, do you have an opinion whether he performed better

9   or worse during her evaluation?

10  A    In terms of his neuropsychological performance, it was

11  generally consistent.

12  Q    Did you ultimately draw a conclusion specifically

13  relating to whether Mr. Bumagin was competent to stand trial?

14  A    Specific to competency, no, but I believe that the

15  results of my evaluation have, you know, very significant

16  implications for this question of competency.

17  Q    And I'm drawing your attention to page 13 of your report.

18           Could you elaborate on the final full paragraph

19  of that report?

20  A    So in the final full paragraph, I note that his residual

21  impairments and cognition appear chronic and possibly

22  insidious in nature.  They would likely prevent him from ever

23  returning to a work capacity consistent with someone with his

24  premorbid intellectual capacity and negatively affect his

25  ability to fulfill many other important functional roles for

1    the remainder of his life.

2    Q    Did you see anything in the Brauman report that would

3    cause you to amend or change that conclusion in any way?

4    A    No.

5    Q    Did you see anything in Dr. Pennuto's report, or any of

6    the raw data, or any of the other reports or papers that you

7    reviewed from Butner, that would cause you to change or amend

8    that conclusion?

9    A    No.  If anything, the more recent MRI study bolsters that

10   opinion, I think.

11   Q    So, with respect to the medical records from Butner,

12   which were more recent, specifically, could you talk about how

13   those might impact your conclusion here?

14   A    Yes.  Well, again, we have -- now we have two independent

15   MRI examinations of Mr. Bumagin, and both point to, you know,

16   to brain atrophy, and ischemic changes in white matter, that

17   would be consistent with Alzheimer's.

18   Q    So when the court asked you when there would be any

19   downside to ordering another evaluation, would there be any

20   real purpose to it, based on the documents that you've

21   reviewed in connection with your preparation for this hearing?

22   A    In my opinion, it would be likely to find similar results

23   or worse performance, so I just don't know how helpful it

24   would be.

25   Q    Was there anything in the records or in Dr. Pennuto's

1    report that would cause you to believe that it would be a

2    productive exercise?

3    A    No.

4              MS. DOLAN:  Nothing further.

5              THE COURT:  Your witness.

6    CROSS-EXAMINATION

7    BY MR. TROWEL:

8    Q    Good afternoon, Dr. Rivera-Mindt.

9    A    Hello.

10   Q    You testified on direct about a report that you wrote

11   following an evaluation that you did in May 2012; is that

12   right?

13   A    Right.

14   Q    In the report, you wrote that you were asked to

15   determine - I'm reading from page 1 of the report - whether

16   Mr. Bumagin is experiencing neuropsychological impairment,

17   and, if so, the extent of this impairment, possible etiology

18   and possible length of time that such problems have been

19   ongoing; is that correct?

20   A    Correct.

21   Q    Is that what you evaluated?

22   A    Yes.

23   Q    Your report does not reach an opinion on his competency,

24   correct?

25   A    Correct.

1  Q     You weren't asked to render an opinion on his competency;

2  is that correct?

3  A     My report is broader than the one single question on

4  competency, that is correct.

5  Q     So in your view, neuropsychological testing is broader

6  than competency?

7  A     The question of competency is a very specific question.

8  Q     Correct.  But even assuming that's true, a competency

9  determination would often have neuropsychological testing as a

10  portion of the data to be considered; is that correct?

11  A     It could.

12  Q     In your experience -- you are professor; is that right?

13  A     Yes.

14  Q     Approximately what percentage of time do you spend --

15  have you done forensic cases in the past?

16  A     I have.

17  Q     About how many, do you think?

18  A     Somewhere -- I would guess probably somewhere between 20

19  and 30 forensic cases.

20  Q     And in those forensic cases, what role do you typically

21  play?

22  A     Doing neuropsychological evaluations.

23  Q     Did you render competency opinions?

24  A     Prior to this case, it has been within the competency, I

25  have done another specific competence to stand trial

1    evaluation, and I also dealt with competency issues broadly

2    related if people are able to manage --

3    Q    That's a different question.

4              Have you rendered competency opinions in prior

5    cases?  So, have you rendered an opinion that somebody is or

6    is not competent to stand trial?

7    A    Within court or in a report?

8    Q    In a report, have you been asked to render that opinion?

9    A    Yes.

10   Q    About how many times?

11   A    Once, prior to this.

12   Q    At Fordham, is it fair to say your research topic

13   generally encompassed Latino population, HIV population; is

14   that fair to say?

15   A    That's part of what my research is on.

16   Q    Have you ever researched inmate populations?

17   A    So actually many of the -- in my research with --

18             THE COURT:  You know, that one really called for a

19   yes or no answer.

20             Have you done inmate populations, yes or no?

21             THE WITNESS:  I worked with individuals who

22   have been incarcerated.

23   Q    I have what I think is your resume, which I took from the

24   Fordham University website.

25             Could you show me where on here relates to

1    inmates?  Is it listed on here?

2    A     Maybe we had a misunderstanding.

3               In my research, which focuses a great deal on

4    issues of culture and people living with substance abuse

5    disorders, and people living with HIV.  Many of those

6    individuals have histories of being incarcerated and have

7    legal histories.

8    Q     First question is:  Would there be any in your resume

9    that shows research in inmate populations?

10   A     No.

11   Q     Have you held a position at a correctional facility?

12   A     No.

13   Q     Now, when you say you have done about 20 forensic -- you

14   worked on 20 forensic cases; is that fair to say -- not cases

15   in a court sense, but where you were hired to do some portion

16   of a forensic examination?

17   A     Right.  Somewhere between 20 and 30.

18   Q     And you rendered one competency opinion to date?

19   A     Correct.

20   Q     You did not render a competency opinion in this case?

21   A     Correct.

22   Q     In the other cases, what role did you play?  So there's

23   one case where you rendered a competency opinion, there's this

24   case where you did neuropsychological testing.  And the

25   remainder of the cases that you worked on, what role did you

1   play?

2   A    As a neuropsychologist, working with people where there

3   were questions about their competency to -- their legal

4   competency to make medical decisions, or to handle other

5   aspects of their lives.

6   Q    What about -- first of all, that didn't answer my

7   question.

8               What role did you play?  What did you do in the

9   course of your evaluation?

10  A    Conducted neuropsychological evaluations.

11  Q    Do you know the standard for competency to stand trial?

12               THE COURT:  Put the question again, counsel.

13  Don't talk over each other.

14  Q    When you are conducting a competency or

15  neuropsychological evaluation --

16               MS. DOLAN:  Objection.  Could the question be read

17  back?

18               THE COURT:  He's putting a new question.  He's

19  withdrawing the old question and putting a new question.

20      Wait for him to finish the question.

21               MR. TROWEL:  I withdraw that question and will

22  start again, your Honor.

23               THE COURT:  Go ahead.

24  Q    You mentioned that you work on competency issues,

25  including competency to make medical decisions; is that right?

1   A    Where there have been concerns about those kinds of

2   issues.

3   Q    Have you previously -- among those cases, were any of

4   those related to the issue of competency to stand trial?

5   A    One.

6   Q    Prior to this day, you worked on -- you rendered one

7   competency opinion and you have done neuropsychological

8   testing in one case where the issue was competency to stand

9   trial?

10  A    That's correct.

11  Q    Do you know what the standard is or what the you are

12  evaluating, when you are conducting --

13             THE COURT:  Counsel, counsel, you have

14  conflated two questions.  Ask one at a time, then you won't

15  get a botched up answer.  So, you started with one point

16  asking her that, then you asked the second one.

17  Q    Do you know the legal standard for competency to stand

18  trial?

19  A    Yes.

20  Q    What is it?

21  A    Essentially it has to do with an individual having no

22  rational or factual knowledge and understanding of the charges

23  against him or her, and that person -- at the present time,

24  and their ability to work or cooperate with their legal

25  counsel in the preparation of their case, and ability to make

1   decisions, legal decisions around that.

2   Q    And is it fair to say that that standard, certainly

3   neuropsychological testing, is relevant to that standard; is

4   that correct?

5   A    It could be, yes.

6   Q    And there's other data that also could be relevant; is

7   that correct?

8   A    Yes.

9   Q    In this case, however, you did neuropsychological

10  testing; is that correct?

11  A    Correct.

12  Q    And you did it over the course of two meetings with the

13  defendant, correct?

14  A    Correct.

15  Q    You did that on an outpatient basis; is that correct?

16  A    He was, you know, incarcerated at MDC.

17  Q    Correct.  He was not under your 24/7 care?

18  A    Correct.

19  Q    At the time of the evaluation; is that right?

20  A    That is correct.

21  Q    So your evaluation began when he was pulled into the room

22  and it ended when he was sent back to the cell?

23  A    That is correct.

24  Q    So, did you have from staff at the facility, or any other

25  source in the facility information about his behavior in the

1  facility?

2  A    No.

3  Q    Now, you mentioned that you have done one -- you have one

4  prior competency opinion and one prior set of neurological

5  exams in the competency to stand trial context, correct?

6          MS. DOLAN:  Your Honor, I think that question has

7  been answered four or five times.

8          THE COURT:  I know.  Let's see if we get the same

9  answer and maybe he will get tired out.

10         THE WITNESS:  Could you clarify the question?  I

11 just want to make sure I understand what you are asking.

12              THE COURT:  Read the question.

13              (The question is read back at this time.)

14              THE WITNESS:  Could you clarify the question?

15 I just want to make sure I understand what you are asking.

16              MR. TROWEL:  Withdrawn.

17 Q    Dr. Rivera-Mindt, is it fair to say that you have limited

18 experience in competency to stand trial -- in the context of

19 competency to stand trial determinations?

20 A    Yes.

21 Q    And is it right, just to clarify, that you worked on

22 three cases, including this one that are in the context of

23 competency to stand trial?

24 A    I would say I worked with other competence-related

25 issues, but two cases, including this one, that is somewhat

1    related to competence to stand trial.

2    Q    So two cases related to competency to stand trial?

3    A    I would say yes.

4    Q    In this case, although you did not render a competency

5    opinion at the time of your evaluation --

6    A    Hm hmm.

7    Q    And you were not asked to do --

8                THE COURT:  Let him finish.  You are hm hmming and

9    yes'ing in the middle of his question.  You don't know where

10   the question is going.  You may not want to answer it until

11   you hear it all.  Okay?

12   Q    You didn't render a competency opinion at the time of

13   your exam?

14   A    Correct.

15   Q    And you weren't asked to do that?

16   A    Correct.

17   Q    But you have done it 26 months later here today in court?

18   A    Are you done asking the question?

19   Q    Yes.

20   A    I have opined about the implications of the

21   neuropsychological findings as they relate to competency.

22   Q    I guess the question I'm asking you is, where in your

23   report did you discuss that?

24   A    So can you put the report back up, please?

25   Q    Sure.

1  A    So the last paragraph, towards the end, before the

2  diagnoses.

3           MS. DOLAN:  Page 13.

4  A    So that last paragraph, again I discussed the fact that

5  his residual impairments and cognition appear chronic and

6  insidious in nature.

7           THE COURT:  That is not -- look, think Lord Vader,

8  not Diane Keaton, really slow, so that the court reporter

9  doesn't start throwing things.  I know you are reading.

10 People tend to speed up when they read.  Read it slowly.  Go

11 ahead.

12          THE WITNESS:  His residual impairment and cognition

13 appear chronic and possibly insidious in nature.  Then they go

14 on to talk about how that could impact or negatively affect

15 his ability to fulfill many important functional roles for the

16 remainder of his life.

17 Q    Where in there is the competency to stand trial

18 evaluation?

19 A    As I said earlier, I believe that the neuropsychological

20 findings have implications for competency, but this was not a

21 competency evaluation.

22 Q    And you did not render an opinion?

23 A    At that time, specifically competency.

24 Q    And my question to you is:  Is it appropriate to render

25 an opinion on competency 26 months after you last saw the

1  defendant?

2  A    I would leave that for the Judge to determine.

3         THE COURT:  Do you have a view as to whether it is

4  appropriate?

5         THE WITNESS:  I think it's my role to opine about

6  the implication of the neuropsychological evaluation.

7         THE COURT:  Does that mean yes or no to his cross --

8  examination question?

9          THE WITNESS:  I guess could you repeat the

10  question to make sure I understand.

11  Q    Is it appropriate to render an opinion that you didn't

12  give at the time of the evaluation, is it appropriate to

13  render that opinion 26 months after you last saw the

14  defendant?

15  A    As I'm asked the question today about this, because again

16  at that time this wasn't --

17         THE COURT:  It's a simple question.  Do you think

18  it's appropriate for you to render this opinion today,

19  26 months after you last examined Mr. Bumagin?

20         MS. DOLAN:  Well, actually --

21         THE COURT:  Sit down, Ms. Dolan, please.

22          Yes, it is; no, it's not; or I can't answer the

23  question as you asked it.  Those are your options, yes, no, or

24  I can't answer the question as you asked it, which is it?

25         THE WITNESS:  Well, I guess from those options,

1  probably --

2          THE COURT:  It's a forced answer, I know, but that's

3  the kind of business I'm in.  Go ahead.

4          THE WITNESS:  It's a forced answer.

5          I guess I'm having difficulty answering that

6  question as you asked it.

7          THE COURT:  Put another question.

8  BY MR. TROWEL:

9  Q    Do you have an opinion about the defendant's competency

10 to stand trial, as you sit here today?

11 A    Well, competence has to do with --

12         THE COURT:  Do you have an opinion as to this

13 defendant's competence to stand trial, as you sit here today

14 in that witness stand and he sits before you, and the

15 prosecutor asked you the question, do you have an opinion,

16 yes, you do, or no, you don't?

17         THE WITNESS:  Yes.

18         THE COURT:  What is your opinion?

19         THE WITNESS:  I have significant concerns about his

20 ability to stand trial.

21           THE COURT:  Next question.

22 BY MR. TROWEL:

23 Q    What data in the last 26 months have you considered to

24 reach that opinion?

25 A    I have the database on the prior reports.

M. Rivera-Mindt - Cross/Trowel                218

1   Q    Now, in your report --

2        MS. DOLAN:  Your Honor, I'm going to object to this

3   lining of questioning.

4        THE COURT:  Overruled.

5   BY MR. TROWEL:

6   Q    In your report, Dr. Rivera-Mindt, you diagnosed the

7   defendant with rule out dementia of the Alzheimer's type; is

8   that correct?

9   A    Correct.

10  Q    You also mentioned -- you wrote in your report that - I'm

11  quoting from page 12 - the pattern of neuropsychological

12  findings in concert with the MRI findings provide some support

13  for a possible diagnosis of dementia due to Alzheimer's

14  disease, correct?  Is that yes or no?

15  A    Yes.

16  Q    Now, a rule out dementia -- a rule out diagnosis is note

17  a statement of the defendant's condition, correct?

18  A    Correct.

19  Q    It's a statement that further evaluation would be needed

20  to determine whether that condition was present, correct?

21  A    Correct.  So I did a diagnosis --

22       THE COURT:  No, no, just answer the question.  Ms.

23  Dolan on redirect will let you make your speeches.  Right now

24  answer his questions.  Go ahead.

25  Q    So you diagnosed the defendant with dementia not

1  otherwise specified?

2  A    Correct.

3  Q    And a rule out diagnosis of dementia of the Alzheimer's

4  type?

5  A    Correct.

6  Q    So you did not diagnose the defendant with Alzheimer's;

7  is that correct?

8  A    Correct.

9  Q    Now, you spoke on direct with Ms. Dolan about the

10 etiology of the dementia, correct?

11 A    Correct.

12 Q    And is it fair to say at the time of your report, you did

13 not know what the etiology was; is that correct?

14 A    Specifically, that's correct.

15 Q    So you gave him a rule out diagnosis of Alzheimer's,

16 correct?

17 A    Correct.

18 Q    Because that's a possibility, correct?

19 A    Correct.

20 Q    And there are other possibilities as well, correct?

21 A    Correct.

22 Q    Okay.

23          In the 26 months since your evaluation, have

24 you done any additional testing to determine or to give you a

25 better view of the etiology?

M. Rivera-Mindt - Cross/Trowel                220

1   A    I have not personally done any additional testing.

2   Q    So the opinion that -- withdrawn.

3               You discussed with Ms. Dolan on direct the

4   likelihood that the defendant's condition would have

5   deteriorated; is that correct?

6   A    Correct.

7   Q    And in the course of your discussion, you discussed with

8   Ms. Dolan that Alzheimer's disease typically has an effect, it

9   deteriorates over time; is that correct?

10  A    Correct.

11  Q    You never diagnosed the defendant with Alzheimer's

12  disease, correct?

13  A    Correct.

14  Q    Is there any medical records -- withdrawn.

15              You reviewed the MCC report, correct?

16  A    Correct.

17  Q    And you've reviewed the Butner reports, correct?

18  A    Correct.

19  Q    Did any doctor whose examined Mr. Bumagin diagnose him

20  with Alzheimer's disease?

21  A    No.

22  Q    You reviewed the records that were submitted prior to

23  that -- withdrawn.

24              You reviewed Mr. Bumagin's medical records from

25  before you first met with him, correct?

1  A    Correct.

2  Q    Did any of those documents diagnose him with Alzheimer's

3  disease that you recall?

4  A    That I recall, no.

5  Q    And you testified that there are a number of possible

6  etiologies for dementia, correct?

7  A    Correct.

8  Q    Some of those etiologies would result in somebody's

9  condition remaining stable for at least some period of time,

10 correct?

11 A    Correct.

12 Q    Others could deteriorate over time, correct?

13 A    Correct.

14 Q    And others could potentially improve over time?

15 A    Correct.

16 Q    As you sit here today, do you know the etiology of

17 Mr. Bumagin what you diagnosed as dementia?  That's a yes or

18 no answer, please?

19 A    The specific etiology, no.

20 Q    Now, you discussed on direct, and we discussed a little

21 bit already, about the neurological testing that you

22 conducted, correct?  You spent a good amount of time talking

23 with Ms. Dolan about that, correct?

24 A    Yes.

25 Q    And you discussed that with another individual; is that

1    right?

2    A    Yes.

3    Q    Who administered the tests?

4    A    So both myself and my assistant did.

5    Q    Did you divide them or did you do them together?

6    A    Divided.

7    Q    So, when you conducted -- so there were some tests that

8    you conducted yourself, right?

9    A    Correct.

10   Q    When you conduct the test yourself, were you alone in the

11   room with Mr. Bumagin?

12   A    Yes.

13   Q    So in each case you excluded your examiner from the room

14   when you conducted the test?

15   A    Yes.

16   Q    And when your examiner conducted tests, were you present

17   in the room?

18   A    Sometimes I was and sometimes I was not.

19   Q    Are you aware of the possibility that having an

20   additional person in the room could affect the outcome of the

21   test?

22   A    Yes.

23   Q    But you, nevertheless, remained in the room during the

24   testing?

25   A    At some point, yes.

1  Q    In the course of your interaction with Mr. Bumagin, did
2  you do sort of an interview with him?
3  A    Yes.
4  Q    Did you take notes of that?
5  A    Yes.
6  Q    And did you turn those over to defense counsel?
7  A    The notes, no.
8  Q    Why not?
9  A    I wasn't asked for notes.  I was asked for
10 neuropsychological data.
11 Q    Did you take notes of the conversation, as opposed to the
12 data?
13 A    Correct.
14 Q    And defense counsel never asked you for those notes?
15 A    Not specifically that I recall.
16 Q    Do you know if those notes were ever provided to the
17 government?  Did you provide them to the government?
18 A    No.
19 Q    And you didn't provide them to defense counsel either?
20 A    No.
21 Q    Now, you mentioned on direct that you had some concerns
22 about this discrepancy about the number of years of education;
23 is that right?
24 A    Correct.
25 Q    And you testified that if Mr. Bumagin had more education,

1   you would expect him to perform better, correct?

2   A    Yes.

3   Q    Do you have any familiarity with the Soviet education

4   system?

5   A    No.

6   Q    Do you know where Mr. Bumagin went to school?

7   A    He reported that he was educated in Russia.

8   Q    So when you are discussing the relevance of years of

9   education, what basis do you have to determine the difference

10  between 10 and 14 years in Russia?

11  A    Specific to Russian education -- could you repeat the

12  question.

13  Q    Sure.

14              You testified on direct, I think, that it was

15  significant whether Mr. Bumagin had ten years of education or

16  14 years; is that correct?

17  A    Correct.

18  Q    And that presumes, I think -- vis it fair to say that

19  that presumes that you have an understanding of the education

20  system that would allow you to determine what 14 years in a

21  particular system means against ten years in that system,

22  correct?

23  A    I think I understand what you are saying, correct.

24  Q    Do you have any understanding of the Soviet education

25  system?

1   A    No.

2   Q    You also testified on direct about what you described as

3   the pattern of impairment.

4              Do you recall using that phrase?

5   A    Yes.

6   Q    So you met with the defendant on only two occasions,

7   correct?

8   A    Yes.

9   Q    So the pattern of impairments that you are describing,

10  the data for that conclusion came from self reports in part;

11  is that right?

12  A    In part.

13  Q    Did you testify on direct that he told you about losing

14  things --

15  A    Yes.

16  Q    Correct?

17            THE COURT:  You have to wait until he finishes.  He

18  may begin the question by saying what's your favorite color,

19  and ends it by saying when you shot President Lincoln?  Okay?

20  It's a bad idea to answer questions before you hear the whole

21  question.

22            All right.  So put the question again, we'll

23  get an answer, then we'll take five minutes.

24  Q    So, in part, the pattern of impairments that you saw was

25  based on self reports from Mr. Bumagin, correct?

1  A     Yes.

2                    THE COURT:  Five minutes.

3                    You are still under oath, so don't talk to

4  anybody about your testimony, Dr. Rivera-Mindt.

5                    (A brief recess is taken at this time.)

6                    (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (Judge Kuntz enters the courtroom at this

2     time.)

3                  THE COURT:  Ma'am, did you speak with anyone

4     about your testimony during the break?

5                  THE WITNESS:  No.

6                  THE COURT:  All right.  Let's proceed.

7     CROSS-EXAMINATION (Cont'd.)

8     BY MR. TROWEL:

9     Q    Dr. Rivera-Mindt, before the break I believe you said

10    that the pattern of impairments that you discerned was based

11    in part upon self reports from the defendant; is that correct?

12    A    Correct, it was based on numerous points of data.

13    Q    In part based on his self reports?

14    A    Correct.

15    Q    And in part based on reports from the family or from

16    members of his family; is that correct?

17    A    No, not directly, because I received that information

18    from Ms. Dolan.

19    Q    So, it was based on self reports from the defendant and

20    information from Ms. Dolan in part, also?

21    A    Correct.

22    Q    And it was also based on the tests that you did, right?

23    A    Yes.

24                 THE COURT:  You can't nod, you can't hm hmm.  You

25    have to say yes or no.

1                THE WITNESS:  Yes.

2    Q    Was there anything else that it was based upon?

3    A    The review of Butner's at that time.

4    Q    Were you able to independently verify any of the

5    information in the records?

6    A    I did not.

7    Q    Now, on direct, Ms. Dolan showed you a copy of a

8    questionnaire, forced choice questionnaire.

9                Do you recall that?

10   A    Yes.

11   Q    And it was one that was completed by Dr. Grant or

12   administered by Dr. Grant; is that correct?

13   A    I believe so, yes.

14   Q    She told you that she gave it to you this morning; is

15   that correct?

16   A    That questionnaire?  Yes, I looked at it this morning.

17   Q    But she gave it to you this morning; is that correct?

18   A    She did not give it to me, but I reviewed it with her.

19   Q    How did you get it?

20   A    She showed it to me.

21   Q    At some point she gave it to you?

22   A    Yes, to review.

23               THE COURT:  Did she provide it to you for your

24   review this morning?

25               THE WITNESS:  Yes.

1          THE COURT:  Did she provide it to you prior to this

2     morning?

3          THE WITNESS:  No.

4          THE COURT:  Did anyone provide it to you prior to

5     this morning?

6               THE WITNESS:  I only saw what was available --

7               THE COURT:  Did anyone provide it to you prior

8     to this morning?

9               THE WITNESS:  No.

10         THE COURT:  Okay.  Let's go.

11    Q    Were you aware that defense counsel had provided it to

12    Ms. Dolan on July 17th?

13    A    No.

14    Q    Now --

15         MS. DOLAN:  What was the question?

16              MR. TROWEL:  I asked her if she was aware that

17    the government provided you with that questionnaire on July

18    17th.

19         THE COURT:  Now, really, if you two are going to

20    have a conversation amongst yourselves, you are going to take

21    it outside.

22              MS. DOLAN:  I'm sorry, what I heard, your Honor --

23              THE COURT:  You can object, and I will ask for

24    a readback.  Let's not have any direct colloquy between

25    counsel, because I really feel left out.

1          Read the question back, please.

2               (The previous question is read back.)

3               THE COURT:  Are you aware of that alleged fact,

4     yes or no?

5          THE WITNESS:  No.

6               MR. TROWEL:  I obviously misspoke, your Honor,

7     and I apologize.

8               THE COURT:  I don't know that you misspoke.  Why

9     don't we have another question.

10    BY MR. TROWEL:

11    Q    Are you aware that the government provided Ms. Dolan with

12    that document on July 17th?

13    A    No.

14    Q    Now, you were in touch with Dr. Pennuto about the raw

15    data underlying the Butner neuropsychological test; is that

16    right?

17    A    Yes.

18    Q    And Dr. Pennuto contacted you on July 15th; is that

19    right?

20    A    I'm not sure of the date.

21    Q    She e-mailed you early last week; is that correct?

22    A    I did receive an e-mail.

23    Q    And she offered to exchange data with you; is that

24    correct?

25    A    Correct.

1  Q    And you did not respond with an offer to exchange data

2  until this past Friday; is that correct?

3  A    I did respond on Friday, that's correct.

4              MR. TROWEL:  Nothing further, your Honor.

5              THE COURT:  Your witness.

6  REDIRECT EXAMINATION

7  BY MS. DOLAN:

8  Q    Now, Dr. Rivera-Mindt, Mr. Trowel asked you to opine on

9  Mr. Bumagin's competency, did he not?

10 A    Correct.

11 Q    Why were you retained in this case?

12 A    I was initially retained in this case because of your

13 concerns about Mr. Bumagin's neuropsychological functioning.

14 You reported that he was having memory problems, and his

15 sister had also reported that he was having memory problems,

16 and you were concerned about him.  So it was in the context of

17 these concerns, these competency issues.

18 Q    So what is your understanding of why I called you to

19 testify here today?

20 A    You asked me to testify with regard to the results of my

21 neuropsychological evaluation.

22 Q    Did I also ask you to review the reports from Dr. Brauman

23 and Butner, and also the medical records?

24 A    Yes.

25 Q    And I asked you whether you, in your opinion, thought it

1    was ethical for Mr. Bumagin to be forced to stand trial; is

2    that correct?

3    A    Yes.

4    Q    Did I ask you whether he was competent?  Did I ask you

5    whether you have an opinion on whether he was competent to

6    stand trial under the legal standards?

7    A    No, you did not.

8    Q    You mentioned a Dusky (ph) standard -- I'm not sure

9    actually what you said.  You mentioned, when Mr. Trowel asked

10   you about the legal standards for competency, you mentioned

11   Dusky, or something along those lines?

12   A    I did.  I tried to clarify his question.

13   Q    But were you called, in your understanding, to testify

14   about the legal standards of competency?

15   A    No.

16   Q    Or to apply to your findings and your conclusions with

17   respect to Mr. Bumagin?

18   A    No.

19   Q    Now, Mr. Trowel also asked you about the difference

20   between the Soviet educational system and any other

21   educational system, and whether you have an understanding of

22   the Soviet educational system.  Ten to 14 years, safe to say

23   that would reflect education up to 16 years, roundabout, and

24   then up to 20 years roundabout, correct?

25   A    Hm hmm.

1          THE COURT:  I'm sorry?  You said?

2          THE WITNESS:  I said correct.

3          THE COURT:  Go ahead.

4    Q    So, with the specific nature of that four-year difference

5    have a fundamental difference how you would interpret the

6    importance of the time of education or not?

7    A    It depends on the norms.  So it depends on the impact of

8    education on the tests themselves.  But there is extensive

9    literature about how important education is on

10   neuropsychological test performance on cross cultures.  So it

11   is not just an issue here in the United States.

12   Q    So if you were doing the Butner report -- well, the

13   Butner report references your report; is that correct?

14   A    It does.

15   Q    And also Dr. Brauman's report, correct?

16   A    It does.

17   Q    And both your report and Dr. Brauman's report indicated

18   ten years of education?

19   Q    But the Butner report indicates 14 years of education,

20   correct?

21   A    In the report it indicates 14 years of education, but in

22   the raw data there are variable reports of education.

23   Q    So if you saw that type of variation in educational

24   reports, reports with respect to education, would you look

25   into it?

M. Rivera-Mindt - Redirect/Dolan                    234

1   A    Yes.

2   Q    Finally, Mr. Trowel asked you whether you had any

3   specific recollection of whether the Butner medical records --

4   or whether there had been any subsequent diagnosis of

5   Alzheimer's in any context, either at the MCC or at Butner,

6   correct?

7   A    Correct.

8   Q    And you said, I believe, that you did not recall whether

9   there had been such a diagnosis, correct?

10  A    I believe so.

11  Q    I'm showing you what is in evidence as Defense Exhibit A.

12          Does this indicate a diagnosis or probable

13  diagnosis of Alzheimer's?

14  A    It does.

15  Q    I'm showing you Defense Exhibit C.

16          Does this indicate a diagnosis or history of

17  diagnosis of Alzheimer's?

18  A    Yes.

19  Q    Showing you Defense Exhibit E.

20          Does this indicate a history of diagnosis of

21  Alzheimer's?

22  A    It does.

23  Q    Lastly, Defendant's Exhibit H.

24          Does this document reflect the same?

25  A    Yes.