1          MS. DOLAN:  Nothing further.

2               THE COURT:  Your witness.

3          MR. TROWEL:  Very briefly, your Honor.  Thank you.

4   RECROSS-EXAMINATION

5   BY MR. TROWEL:

6   Q    Dr. Rivera-Mindt, I'm showing you what has been --

7   withdrawn.

8               I'm showing you what has been admitted as

9   Defense Exhibit 1.

10              Is this a copy of Dr. Brauman's report, Dr.

11  Brauman at the MCC?

12  A    I believe so, yes.

13  Q    And you reviewed this report, correct?

14  A    Yes.

15  Q    I'm turning to page 13.  This is the final page of the

16  report.

17              Is this the page that has Dr. Brauman's

18  diagnosis?

19  A    Yes.

20  Q    What was her diagnosis?

21  A    I will read from my copy.

22  Q    Sure.  It is in subparagraph one.

23  A    Regarding the issue of mental disease or defect,

24  Mr. Bumagin currently meets the criteria for dementia not

25  otherwise specified.

1   Q    Did Dr. Brauman diagnose the defendant with Alzheimer's,
2   yes or no, please?

3   A    No.

4   Q    I'm showing you what has been marked for identification,
5   but not admitted, as Government Exhibit 1.

6              Is this a copy of Dr. Grant's report?

7   A    Yes.

8   Q    And did you review this report?

9   A    I did.

10  Q    I'm turning to page --

11             THE COURT:  Why are you referring to a document that
12  the court expressly kept out of evidence?  What are you doing?

13             MR. TROWEL:  She testified about the contents a
14  moment ago, your Honor.

15             THE COURT:  No, you are not going to do it by
16  putting in a report that I kept out.

17  BY MR. TROWEL:

18  Q    Did Dr. Grant diagnose the defendant with Alzheimer's, if
19  you recall?

20  A    No.

21  Q    So, Dr. Brauman -- do you recall what Dr. Grant's
22  diagnosis was?

23             THE COURT:  The question is:  Do you recall it,
24  without referring to any document?

25             Do you recall what the diagnosis was, yes or

1    no?

2              THE WITNESS:  Yes.

3    Q    What was it?

4    A    In part I do, and there was mention of a possible

5    diagnosis of dementia, but it wasn't confirmed.

6    Q    So, is it fair to say that neither Dr. Brauman, nor Dr.

7    Grant, diagnosed the defendant with Alzheimer's?

8    A    Correct.

9    Q    And you, in fact, did not diagnose the defendant with

10   Alzheimer's either, correct?

11   A    Correct.

12   Q    You testified on direct, and also on redirect, that you

13   believed that it would be unethical for the defendant to stand

14   trial; is that correct?

15   A    Correct.

16   Q    Are you an ethicist?

17   A    No.

18   Q    Are you an expert in judicial ethics?

19   A    No.

20   Q    Are you an expert in legal ethics?

21   A    No.

22   Q    What is the basis for your opinion?

23   A    Based on my understanding of the level of cognitive

24   impairment that he has, and --

25   Q    Is that an ethical opinion?

1          THE COURT:  Have you finished your answer?

2          THE WITNESS:  No.

3          THE COURT:  Why don't you allow the witness to

4    finish the answer, rather than interrupting the answer.

5               Why don't you read the question and answer

6    back.

7          THE COURT REPORTER:  Yes, your Honor.

8          (The previous question and answer are read back.)

9          THE WITNESS:  And the likely complexity

10   required to be part of the trial.

11   Q    So is that a competency evaluation or an ethical

12   evaluation?

13             THE COURT:  You were asked the question about

14   your ethical view, right?

15             THE WITNESS:  Yes.

16        THE COURT:  You gave the answer to the question?

17        THE WITNESS:  I did.

18        THE COURT:  Okay, that's fine.  I'm the expert on

19   ethics.  Let's go on.

20        MR. TROWEL:  Nothing further, your Honor.

21        MS. DOLAN:  Nothing further.

22             THE COURT:  Doctor, you may step down.

23             THE WITNESS:  Thank you.

24             THE COURT:  Please call your next witness.

25        MS. DOLAN:  The defense rests.

T. Pennuto - Direct/Trowel                239

1          THE COURT:  The government wish to call a witness?

2          MR. TROWEL:  Yes, your Honor.  The government calls

3    Dr. Tracy Pennuto.

4    T R A C Y      P E N N U T O,

5          called as a witness, having been first duly

6       sworn, testifies as follows:

7          THE COURT:  Doctor, please state your name clearly

8    into the microphone.  If you state it clearly, you will sound

9    like this (indicating.)  If you don't, you will sound like

10   this (indicating), and spell it for the reporter, and then

11   counsel will inquire.

12         THE WITNESS:  Dr. Tracy O'Connor Pennuto, T-r-a-c-y,

13   O'C-o-n-n-o-r, P-e-n-n-u-t-o.

14          MR. TROWEL:  May I proceed, your Honor?

15          THE COURT:  You may.

16         MR. TROWEL:  Thank you.

17   DIRECT EXAMINATION

18   BY MR. TROWEL:

19   Q    Dr. Pennuto, where are you employed?

20   A    I'm employed at FMC Butner.

21   Q    What does FMC stand for?

22   A    Federal Medical Center.

23   Q    What is your title at FMC Butner?

24   A    Staff Neuropsychologist.

25   Q    Briefly, what are your responsibilities at FMC Butner?

T. Pennuto - Direct/Trowel                    240

1    A    Seventy-five percent of my job duties entail providing

2    neuropsychological consultation, and 25 percent of my job

3    duties entail supervision of mental health services for the

4    general population.

5    Q    Can you just briefly describe -- withdrawn.

6                   In the course of your employment at Butner,

7    have you participated in evaluations to determine if an inmate

8    can be restored to competency?

9    A    I have.

10   Q    Approximately how many have you participated in?

11   A    Approximately 150.

12   Q    What was your role in those evaluations?

13   A    I provided neuropsychological consultation.

14   Q    Did you do that in each of those approximately 150 exams?

15   A    Yes.

16   Q    Have you been qualified as an expert in federal courts

17   previously?

18   A    Yes, I have.

19   Q    How many times?

20   A    Nine times.

21   Q    In what courts, if you know?

22   A    Alabama, Arizona, Utah, D.C.

23   Q    Always in federal courts?

24   A    Yes.

25   Q    What was the purpose of that testimony, when you

1    qualified as an expert?

2    A    To provide my opinion regarding the neuropsychological

3    assessments.

4    Q    With respect to competency evaluation or restoration

5    evaluation?

6    A    Yes.

7    Q    Are you licensed?

8    A    Yes.  I'm licensed in North Carolina.

9    Q    Did there come a time when you participated in an

10   evaluation of the defendant Semyon Bumagin to determine if he

11   could be restored to competency?

12   A    Yes.

13   Q    Could you describe, generally, what your role was with

14   respect to Mr. Bumagin's evaluation?

15   A    Yes.  I was brought in as a consultant to provide

16   neuropsychological assessment.

17   Q    What does that mean?

18   A    That means there were questions about his cognitive

19   abilities, so I was brought in to evaluate them.

20   Q    How do you do that?

21   A    I do testing to assess his cognition, his thinking

22   skills, and his cognitive abilities.

23   Q    In your role as a neuropsychologist participating in a

24   restoration evaluation, do you do anything differently than

25   you would do in a competency evaluation?

1   A    No.

2   Q    Showing you what has been marked for identification as

3   Government's Exhibit 1-A.

4              Do recognize that?

5   A    I do.

6   Q    What is that?

7   A    That's the Butner neuropsychological report.

8   Q    Is this the report that contains your analysis of the

9   defendant Mr. Bumagin?

10  A    It is.

11             MR. TROWEL:  The Government moves to admit

12  Government Exhibit 1-A into evidence.

13             MS. DOLAN:  May I have a brief voir dire on this,

14  your Honor?

15             THE COURT:  Sure.

16  VOIR DIRE

17  BY MS. DOLAN:

18  Q    Ms. Pennuto, what sources did you rely upon to generate

19  this report?

20  A    I'm not sure I understand your question.

21  Q    What did you rely on to generate this report?

22  A    What sources meaning what collateral information?

23  Q    Well, you asked me to repeat the question, so I did, and

24  I rephrased it and I left out sources.  I'm asking you what

25  you relied on to generate this report?

1  A    I'm not sure I understand your question.

2  Q    What did you use to generate this report?

3          THE COURT:  You really got to be kidding the court.

4  You don't understand, when she says what sources did you rely

5  upon to generate a report, you are telling this court that you

6  don't understand that question, when you have been an expert

7  in federal court?

8              When a lawyer asks you what did you rely on,

9  what sources did you rely upon to generate a report, you can't

10 answer that question?  Are you really telling me that?

11         THE WITNESS:  Your Honor --

12         THE COURT:  Are you really telling me you can't tell

13 her what you relied upon?  Because if you are telling me that

14 now, I will not let you testify as an expert.

15             So let's try it again.  I will ask you, what

16 sources did you rely upon in generating this report?  Can you

17 answer my question?  Because if you can't, you can go sit down

18 out there.

19         THE WITNESS:  Your Honor, the sources -- the

20 collateral sources that I relied upon would be medical

21 records, prior neuropsychological evaluations, his medical --

22         THE COURT:  I knew you can do it.  Keep going.  What

23 other sources did you rely upon?  What other sources, however

24 defined, collateral, incollateral, direct, indirect.  What

25 sources did you rely upon in generating the report?

1            THE WITNESS:  My clinical interview with Mr.

2    Bumagin.

3                    THE COURT:  What else?

4                    THE WITNESS:  All of the testings that I

5    participated in with Mr. Bumagin.

6                    THE COURT:  What else?

7                    THE WITNESS:  Interaction with staff.

8            THE COURT:  What else?

9            THE WITNESS:  That may be all of them.

10           THE COURT:  Okay.

11   BY MS. DOLAN:

12   Q    Did you rely on any information or reports from Dr.

13   Grant?

14   A    No.

15   Q    Did you speak to Dr. Grant about this individual, before

16   you generated this report?

17   A    Yes.

18   Q    Did Dr. Grant provide you any information about this

19   individual at that time?

20   A    She provided -- yes, she did.

21   Q    What information did she provide you?

22   A    She provided me with some medical records, and her

23   concerns about his cognition.  She provided me with the two

24   prior neuropsychological evaluations -- the one prior

25   neuropsychological evaluation, and the one prior forensic

1  evaluation.

2  Q    And what were her concerns?

3  A    Her concerns were that he had -- the prior evaluations

4  had mentioned rule out or a diagnosis of dementia, so she was

5  concerned about the potential that he may have cognitive

6  impairments.

7  Q    And did she discuss the nature of her concerns any

8  further?

9  A    I don't recall.

10 Q    Did she -- you said you discussed the staff's

11 interactions with Mr. Bumagin in generating this report?

12 A    Yes.

13 Q    And that includes Dr. Grant?

14 A    Yes.

15 Q    And so Dr. Grant provided you information about her

16 interactions with Mr. Bumagin, and you used that information

17 to generate this report?

18 A    Potentially, I don't remember.

19 Q    Did Dr. Grant tell you that she had spoken to

20 Mr. Bumagin?

21 A    Sure.

22 Q    Did she tell you that she had administered a competency

23 questionnaire?

24 A    I don't recall.

25 Q    Did she provide you with that competency questionnaire?

1  A    She did not.

2  Q    Did she discuss -- do you recall whether she discussed

3  that competency questionnaire, or anything relating to it with

4  you?

5  A    I don't recall.

6  Q    Did she discuss the charges of the case?

7  A    I knew what his charges were.

8  Q    Did she discuss that with Dr. Grant?

9  A    I believe she did tell me what his charges were.

10 Q    Did you discuss any statements that Mr. Bumagin made

11 about his case with Dr. Grant?

12 A    No.

13 Q    Did Dr. Grant provide you any notes about any

14 conversations that she had with Mr. Bumagin about his case?

15 A    No.

16 Q    Would those have been part of the medical records?

17 A    Potentially?

18             THE COURT:  In the ordinary course, would the

19 notes be part of the medical records, if there were notes

20 generated, in the ordinary course, in your experience?

21             THE WITNESS:  Sometimes, yes, your Honor.

22             THE COURT:  Go ahead.

23 BY MS. DOLAN:

24 Q    Can you describe the process-- what exactly do you

25 review?  Do you review a file?

1   A    I am provided with information, which I compile into a

2   file.

3   Q    And here Dr. Grant referred this particular client to

4   you, correct?

5   A    Correct.

6   Q    And did she provide you with a file?

7   A    No.

8   Q    Who provided you with a file?

9   A    I was not provided with a file.  I was provided with

10  specific pieces of information, which I then made my own file.

11  Q    And did you review the file otherwise?

12  A    No.

13  Q    But you don't recall specifically whether the

14  questionnaire or anything regarding it was within the file?

15  A    No.  I know the questionnaire was not in the file.  I

16  only requested information that was relevant to his cognitive

17  functioning.  I did not take part in the competency

18  evaluation.

19  Q    Didn't you say earlier that you didn't recall whether

20  that information or anything relating to it was in the file?

21  A    I don't believe I said that.

22  Q    Well, did you say earlier that sometimes that information

23  would be in the file?

24  A    I don't recall.

25               MS. DOLAN:  Your Honor, I'm going to make an

1    objection based on this witness' inability to completely

2    exclude the tainted portions of the Grant evaluation.

3              THE COURT:  The objection is sustained.  The

4    document does not come in.  Proceed with your examination.

5    The document is out.

6    DIRECT EXAMINATION (Cont'd.)

7    BY MR. TROWEL:

8              THE COURT:  The document is out.  Take it off the

9    elmo.  Out means out.

10   Q    Now, Dr. Pennuto, over the course of the evaluation that

11   you did of Mr. Bumagin, did you meet with him?

12   A    I did.

13   Q    How many times?

14   A    Three times.

15   Q    For how long?

16   A    Approximately three and a half hours.

17   Q    Could you describe his demeanor, when you interacted with

18   him?

19   A    Sure.  When I met with him, I always went to escort him

20   from his unit to the testing room and he was quite gregarious

21   and boisterous.  He was greeted in the hallway by other

22   inmates.  They called him, hey, Russian, and he would say,

23   hey.  He was have talkative in his interactions with me, very

24   polite and cooperative, at times irritable when some of the

25   tests were difficult, but cooperative with the evaluation.

T. Pennuto - Direct/Trowel                     249

1    Q    In the course of the testing you did, were you also

2    working with an intern?

3    A    I was.

4    Q    Who was that?

5    A    Dr. Correa.

6    Q    Do you know how often she met with the defendant?

7    A    She met with him twice.

8    Q    What was your role with respect to Dr. Correa, if any?

9    A    I supervised her administration of her psychological

10   testing.

11   Q    What does that mean, generally?

12   A    That means I met with her in advance to determine what

13   tests she was competent to give.  And then after she had

14   administered those tests, I met with her again to oversee the

15   scoring and interpretation of those tests.

16   Q    Were you present when Dr. Correa administered the tests

17   to the defendant?

18   A    No, I was not.

19   Q    Why not?

20   A    Because there's literature that shows that there are

21   third-party effects, if there's a third person in the room

22   with the testing.  That can negatively impact the person's

23   performance on the test.

24   Q    When you administered the test yourself, was there anyone

25   else in the room, other than Mr. Bumagin?

T. Pennuto - Direct/Trowel                    250

1   A    No, there was not.

2   Q    Approximately how many tests did you and Dr. Correa

3   perform on the defendant?

4   A    I believe 15.

5   Q    And what generally were the tests intended to measure?

6   A    It was a comprehensive test battery designed to test

7   executive function, language, facial skills, intellect,

8   effort.

9   Q    Did you also -- and you did test for effort, you said?

10  A    I did test for effort.

11  Q    With respect to the memory tests, how did Mr. Bumagin

12  perform?

13  A    Generally, he performed poorly.

14  Q    Was there anything notable about the way he performed on

15  those tests or how he undertook them?

16  A    He was quick to give up during the memory tests.  Rather

17  than persevering in what seemed to be trying hard, he would

18  answer immediately and then quickly give up.

19  Q    Was that significant to you?

20  A    Yes.  It indicated that he may not be putting forth good

21  effort.

22  Q    In your experience working with Mr. Bumagin, did you see

23  that he behaved inconsistently, depending on who he was with?

24  A    I did.

25  Q    Could you describe that a little bit for us?

1  A    Sure.  When he met with me, he was not able to give me

2  the correct date.  He incorrectly stated his age.  So there

3  was some disorientation about him.  When he met with Dr.

4  Correa, he was fully oriented.

5            MS. DOLAN:  Objection.

6            THE COURT:  Overruled.

7  A    Fully oriented, was able to give the correct date, his

8  age, date of birth, all of the relevant information.  But then

9  later that same day when he was involved with group testing,

10 he presented as confused and wandering, and needing direction.

11 So there was quite a range of his behavior presentation.

12 Q    What, if anything, did that indicate to you?

13 A    It indicated inconsistency in his presentation, which was

14 consistent with the inconsistency that was in his testing as

15 well.

16 Q    Why is inconsistency relevant, or is it relevant?

17 A    It is relevant.

18 Q    Why?

19 A    Inconsistency indicates that he was not consistently

20 giving good effort, and that can impact the testing.

21 Q    Was his inconsistent behavior with employees at Butner,

22 could it have been consistent with the medical condition?

23 A    It could have, but that's unlikely, because Mr. Bumagin

24 was very vocal about his medical needs, and always sought out

25 help when it was needed.  And also because he likely would

1   have demonstrated other symptoms that would have indicated

2   that he was having medical issues.

3   Q    Did you see other symptoms that were consistent with a

4   medical condition?

5   A    I did not.

6   Q    Could the inconsistent behavior have been -- withdrawn.

7              Could it have been consistent with dementia?

8   A    It could been consistent with some forms of dementia.

9   Q    Which forms of dementia?

10  A    More like a frontal temporal dementia, has a confusional

11  state, but the type of dementia that has been suspected for

12  Mr. Bumagin, an Alzheimer's type of dementia, which does not

13  typically present with that confusional state in which he

14  would present so differently within a couple of hours.

15  Q    As a neuropsychologist and clinical psychologist and

16  correctional psychologist, was his inconsistent behavior

17  manipulative?

18  A    Yes.

19  Q    What does that mean to you?

20  A    That means that Mr. Bumagin was very invested in showing

21  that he had memory impairment.  And so it seems as though he

22  would be exaggerating with the impairments from the testing,

23  which was evident in the inconsistencies in the test results,

24  but also it seemed apparent in his behavioral presentation as

25  well.

T. Pennuto - Direct/Trowel                    253

1    Q     Now, you mentioned that you conducted tests of the

2    defendant's effort; is that correct?

3    A     That's correct.

4    Q     Why did you do that?

5    A     It's important to assess someone's effort to ensure that

6    the test results are valid.

7    Q     Can you explain that, why are those two linked?

8    A     If someone is not putting forth their best effort during

9    a test evaluation, then the test results do not reflect the

10   optimal abilities, which means that the test results would

11   then likely underestimate their actual abilities.

12   Q     What did you find with respect to Mr. Bumagin, the test

13   that you did on his effort?

14   A     The test results were inconsistent.

15   Q     What do you mean by that?

16   A     He passed, if you will, some of the effort tests;

17   whereas, as other effort tests he did not.

18   Q     When you say passed, do you mean he showed sufficient

19   effort?

20   A     Yes.

21   Q     And when you say on other tests he did not, what do you

22   mean by that?

23   A     That means he scored below the cutoff, which would

24   indicate that he was getting good effort.

25   Q     When you say cutoff, who establishes that?

T. Pennuto - Direct/Trowel                254

1   A    The test publishers.

2   Q    Is that part of the test itself, part of the instructions

3   for administering the test, or how do you learn -- withdrawn.

4              How do you learn of the cutoff?

5   A    For standardized tests, the cutoff is in the manual.  For

6   other effort entities that are derived from traditional

7   measures, those are found in the research literature.

8   Q    What was your conclusion, if any, with respect to these

9   tests -- withdrawn.

10             What was your conclusion, if any, about

11  Mr. Bumagin's effort?

12  A    My conclusion was that Mr. Bumagin's effort was

13  inconsistent.

14  Q    What did that in turn mean to you, if anything?

15  A    That means that he was not consistently giving good

16  effort throughout the testing evaluation.  So that means that

17  the test results likely don't reflect his optimal abilities,

18  which means that the test results underestimated what he was

19  actually able to do.

20  Q    Did you administer to Mr. Bumagin the WMS-IV Test?

21  A    I did.

22  Q    What is that?

23  A    That's the Wechsler Memory Scale --

24             THE COURT:  Would you spell that for the

25  reporter, please.

T. Pennuto - Direct/Trowel                255

1           THE WITNESS:  W-e-c-h-s-l-e-r Test.

2    Q    You were referring to the WMS-IV Test, correct?

3    A    Yes.

4    Q    What does that test measure?

5    A    That is a memory test, and the specific subtest that I

6    administered are called the Logical Memory Subtests.

7    Q    Did you, yourself, administer this test to Mr. Bumagin?

8    A    I did.

9    Q    Sorry to interrupt.

10   A    And the subtests, I will read a short story to

11   Mr. Bumagin and ask him to repeat back as much of the story as

12   he can recall, and there are two stories.

13   Q    And what was the result of the tests?

14   A    Well, the results showed poor.  He showed impairment.  He

15   performed poorly.

16   Q    In what way?

17   A    He was unable to give back very much of the information

18   immediately or after a delay.

19   Q    And what was his score on the test, if you recall --

20   withdrawn.

21              Were the test results significant to you?

22   A    Yes.

23   Q    Why?

24   A    Because after the immediate and the delayed recall, there

25   is a recognition subtest in which 30 questions are read to

1    Mr. Bumagin, and they are yes/no questions.  He was only able

2    to get ten out of those 30 correct.

3    Q    And what, if anything, did that mean to you?

4    A    Well, because they are yes/no questions, that means that

5    someone who had never even heard the stories at all could

6    guess and get 50 percent of them correct.  So we would expect

7    at least 15 out of the 30 correct, and he was only able to get

8    ten out of the 30.

9              But what was more important than that is that

10   on the second set of questions, the last 15 which dealt with

11   the second story that I read to him, he only got three out of

12   the 15 correct.  It's statistically very improbable that

13   someone would only get three out of the 15 just from guessing.

14   Q    What, if anything, does that mean to you?

15   A    Well, that means to me that he correctly knew the correct

16   answers and purposely chose the wrong ones to exaggerate his

17   cognitive ability.

18   Q    What, if anything, does that tell you about his cognitive

19   ability?

20   A    That tells me that he has a cognitive wherewithal to

21   think in his best interest, and to try and feign.  That showed

22   that there was a purposeful and intentionality to his

23   exaggeration.

24              MS. DOLAN:  I am going to move to strike that as too

25   speculative.

T. Pennuto - Direct/Trowel                  257

 1          THE COURT:  Overruled.

 2   BY MR. TROWEL:

 3   Q    Did you find that Mr. Bumagin's performance on the test

 4   was consistent with known patterns of brain dysfunction?

 5   A    No.

 6   Q    Can you explain that?

 7   A    On that test in particular or --

 8   Q    Or just even in general?

 9   A    Well, there were other memory tests in which there were

10   several trials, which means that I would present him with the

11   information more than once to see how much he could improve

12   with repetition, and there were times where the first trial he

13   would get several bits of information correct, then on the

14   second trial he couldn't remember any of it at all.  There

15   were other instances like that where his pattern of

16   performance would be inconsistent with what we know about how

17   the brain functions.

18   Q    What, if anything, did that tell you?

19   A    Again, that he was likely exaggerating.

20   Q    Did you find that Mr. Bumagin had memory or other

21   cognitive deficits?

22   A    In what way?

23   Q    Did you find that he had cognitive deficits?

24   A    I believe that it's possible that he may have cognitive

25   deficits, yes.

T. Pennuto - Direct/Trowel                 258

1    Q    Why would you say it is possible?

2    A    Because he didn't give good effort on the tests, and the

3    inconsistency of his efforts limits the interpretation I can

4    make from those results.

5    Q    Now, in the course of your analysis, did you review the

6    evaluation completed by Dr. Brauman?

7    A    I did.

8    Q    And did she do some effort testing on the defendant as

9    well?

10   A    She did.

11   Q    Were your test results consistent with hers?

12   A    Yes.

13   Q    What does that mean, generally?  When you say that they

14   were consistent, what do you mean?

15   A    Her test results found that he was also giving

16   inconsistent effort at MCC New York, just as he did at Butner.

17   Q    Did you also review an analysis completed by Dr.

18   Rivera-Mindt?

19   A    I did.

20   Q    What kind of testing did Dr. Rivera-Mindt conduct?

21   A    She conducted a comprehensive neuropsychological

22   evaluation.

23   Q    And prior to today's hearing, did you exchange raw data

24   with Dr. Rivera-Mindt?

25   A    I did.

1  Q    Could you just describe generally what raw data means for

2  a neuropsychologist?

3  A    Sure.  Raw data means the actual test protocol with the

4  questions and the answers that were obtained.

5  Q    Is the competency questionnaire that was discussed during

6  the previous witness, is that part of your raw data?

7  A    No, it is not.

8  Q    Did you administer that questionnaire?

9  A    No, I did not.

10 Q    So, you reviewed Dr. Rivera-Mindt's raw data and she also

11 had yours for review; is that correct?

12 A    That's correct.

13 Q    Did Dr. Rivera-Mindt's test the defendant's effort?

14 A    She did.

15 Q    After reviewing Dr. Rivera-Mindt's raw data, did you

16 determine whether your test results were consistent with hers?

17 A    They seemed to be, yes.

18 Q    So, is it fair to say that in your evaluation of Dr.

19 Rivera-Mindt's raw data, you saw the same lack of effort in

20 her results as you saw in your own?

21 A    I saw the same inconsistency in his performance on the

22 effort tests as I did in mine, yes.

23 Q    Did Dr. Rivera-Mindt interpret the results of her testing

24 differently than you interpreted the results of the test that

25 you administered?

1    A    She did.

2    Q    Can you elaborate on that?

3    A    Sure.  She interpreted her test results with Mr. Bumagin

4    as being valid.  She felt he did give good effort.

5    Q    You mentioned earlier you used the phrase cutoff; is that

6    right?

7    A    That's correct.

8    Q    Were there tests in Dr. Rivera-Mindt's raw data where the

9    defendant fell below the cutoff?

10   A    Yes.

11   Q    Did you review her report?

12   A    I did.

13   Q    Did she nevertheless conclude that he gave sufficient

14   effort?

15   A    Overall, she did.

16   Q    Did you disagree with her analysis of the results of

17   those effort tests?

18   A    I did.

19   Q    How, if at all, is that disagreement about the results of

20   the effort tests relevant to your report or to the comparison

21   between the two reports?

22   A    Can you repeat that question?

23              THE COURT:  Why don't you read it back.

24          MR. TROWEL:  May I withdraw it, your Honor?

25              THE COURT:  Why don't you read it back first.

1              (The question is read back.)

2              THE COURT:  Why don't you withdraw the

3    question, put another one, and break it into two parts, that's

4    the problem.

5              MR. TROWEL:  Thank you.  Withdrawn.

6    Q    How is that disagreement relevant, if at all?

7    A    It is very relevant.  Dr. Rivera-Mindt again felt that he

8    was giving good effort, but then she was able to fully

9    interpret.  She felt that she was able to fully interpret her

10   results, then diagnosed dementia.  On the other hand, I felt

11   that he was giving inconsistent effort, which limits our

12   ability to say much about his cognitive functioning because of

13   the inconsistent effort.

14   Q    And with respect to the cutoffs, is it fair to say that

15   the cutoff applies every time the test is administered, that a

16   test that has a cutoff -- withdrawn.

17             THE COURT:  You got to ask one question, not two.

18   It will help you.

19             MR. TROWEL:  Thank you.

20             THE COURT:  You're welcome.

21   BY MR. TROWEL:

22   Q    You administered the -- you said earlier you administered

23   the WMS-IV Test, correct?

24   A    Correct.

25   Q    Did Dr. Rivera-Mindt administer the WMS-IV Test, the same

1   version of that test?

2   A    No, she did not.

3   Q    What test did she administer?

4   A    She also administered the WMS-IV, but she used the older

5   adult version.

6   Q    When you say WMS-IV, is that the WMS-IV?

7   A    It is, yes.

8   Q    Was that notable to you that she used the older adult

9   test?

10  A    It was --

11  Q    Why?

12  A    -- notable, because Mr. Bumagin was not currently in the

13  age range for that test that she administered.

14  Q    Why is that significant, if all?

15  A    Because that means that inappropriate norms were used to

16  score his results.

17  Q    What is the possible result of that inappropriate norm,

18  in this case, if you know?

19  A    Well, because she used a test that would be used for

20  older adults.  They would not be expected to perform as well,

21  which means that that it would actually -- it would actually

22  help his score.  He would have performed better on that one.

23  Q    Were there other tests administered by Dr. Rivera-Mindt

24  that you disagreed with?

25  A    There were other tests that I have concerns about.

T. Pennuto - Direct/Trowel                    263

1    Q    Can you give us an example of that?  Give the court an

2    example?

3    A    Sure.  The Boston Naming Test was one of them.

4    Q    Why were you concerned about the use of that test?

5    A    That test in particular there's a lot of concern in the

6    literature about the cultural bias in that test, even in other

7    English-speaking countries, but particularly for those who

8    speak English as a second language.

9    Q    And what does the research say about the test, generally?

10   A    It says that it may not be appropriate for use.

11   Q    Why is that, if you know?

12   A    It unnecessarily penalizes the examinee for not being

13   able to name culturally biased items.

14   Q    Is it fair to say that the defendant's performance on

15   that would underestimate his true abilities?

16   A    Yes.

17   Q    Did Dr. Rivera-Mindt administer the WAIS-III Test?

18   A    She did administer two subtests from that.

19   Q    And was that a cause of concern for you?

20   A    Well, I was surprised for one that a full intelligence

21   measure was not used.  She instead opted to use an abbreviated

22   measure, which was the WASI.

23   Q    When you say WASI, is that W-A-S-I?

24   A    It is, which is an abbreviated measure includes four

25   subtests.  Instead of ten, then, she supplemented that with

T. Pennuto - Direct/Trowel                    264

1   the processing speed, subtests, from the WASI-III, which is an

2   earlier version of an intelligence test, which is now in its

3   fourth edition.

4   Q    When you say earlier version, what do you mean?

5   A    That means that a new version has come out.

6   Q    Is it appropriate protocol to use a replaced version of a

7   test?

8   A    Repeat that question, please.

9              THE COURT:  Is it appropriate protocol to use a

10  replaced version of that test?

11  Q    Or outdated version of the test.  It is much more

12  appropriate to use the current version, and that test was

13  updated in 2008.

14  Q    And Dr. Rivera-Mindt conducted her test in 2012; is that

15  right?

16  A    That's my understanding, yes.

17  Q    Now, when you looked at the raw data that you received

18  from Dr. Rivera-Mindt, did you compare her test results

19  overall to your test results?

20  A    I did.

21  Q    And I think you just mentioned this, but she conducted

22  her testing in May 20, 2012, as far as you know?

23  A    Correct.

24  Q    When did you conduct your testing, generally?

25  A    In March 2013.

1  Q    Over that period between Dr. Rivera-Mindt's testing and

2  your testing, did the defendant's performance improve or

3  deteriorate?

4  A    On some tests he performed more poorly, and on some tests

5  there was some improvement.

6  Q    When you say on some tests there was some improvement,

7  can you describe that a little bit for us?

8  A    Yes.  There were some tests that were similar to the ones

9  that were given by Dr. Rivera-Mindt in which Mr. Bumagin

10 performed better on the tests that I administered.

11 Q    Could you give an example to the court?

12 A    Sure.  Similarities subtests.

13       THE COURT:  Would you spell that for the reporter

14       THE WITNESS:  S-i-m-i-l-a-r-i-t-i-e-s, I believe.

15 Q    Can describe what you saw, the results -- withdrawn.

16       Is that the test you administered?

17 A    We both administered a similarity subtest.

18 Q    What did you see in the results?

19 A    He performed better, in my evaluation.

20 Q    What does that test test for?

21 A    Verbal abstract reasoning.

22 Q    Could you draw any conclusions from the fact that he

23 improved on some tests over that period?

24 A    I can.  It could indicate that he was simply not giving

25 good effort with Dr. Rivera-Mindt, because if he was

1  performing at his optimal ability during her evaluation, he

2  wouldn't have shown improved abilities a year later.

3  Q    Is an improvement in some tests consistent with the

4  dementia increasing in severity?

5  A    Not usually, no.

6  Q    You mentioned that there were some tests that were given

7  that were the same or roughly the same when Dr. Rivera-Mindt

8  gave them and you gave them, right?

9  A    Correct.

10  Q    Did you have any concerns about the practice effect?

11  A    I didn't because of the time frame, and I gave alternate

12  versions when available.

13          MR. TROWEL:  Nothing further, your Honor.

14          THE COURT:  Your witness.

15  CROSS-EXAMINATION

16  BY MS. DOLAN:

17  Q    Dr. Pennuto --

18  A    Yes?

19  Q    I believe you testified that the overall results of the

20  Rivera-Mindt tests and Brauman tests and Butner tests,

21  generally speaking, were consistent across the board?

22  A    Primarily Dr. Rivera-Mindt and Butner's psychological

23  results, yes.

24  Q    Mr. Trowel asked you to say out loud three or four tests

25  that you had discrepancies with the second to last edition of

1  the current edition.  How many tests did Dr. Rivera-Mindt

2  administer in total?

3  A    I'm not sure.  Roughly about the same total I did, 15 or

4  so.

5  Q    Let's count them?

6  A    Okay.

7  Q    Showing you what's in evidence as DX-7, page 7.

8            How much do you see on that page?

9  A    Six.

10  Q    Page 8?

11  A    Total of 18.

12  Q    And, in fact, a number of those tests were the same ones

13  that you, yourself, administered, correct?

14  A    Several, yes.

15            THE COURT:  You may continue.

16  BY MS. DOLAN:

17  Q    Do any of the tests administered by anyone have any

18  impact on the MRIs?

19  A    No.

20            MS. DOLAN:  Nothing further.

21            THE COURT:  Your witness.

22  REDIRECT EXAMINATION

23  BY MR. TROWEL:

24  Q    Dr. Pennuto, there came a time -- did there come a time

25  when consulted with Dr. Grant and provided the results of your

A. Correa - Direct/Trowel                    268

1  testing to her?

2  A    I did.

3           MS. DOLAN:  Beyond the scope.

4           THE COURT:  It's sustained.

5  BY MR. TROWEL:

6  Q    Is it possible, Dr. Pennuto, for an individual who has

7  dementia to become competent?

8  A    Yes.

9           MS. DOLAN:  Beyond the scope.

10          THE COURT:  Sustained.

11          MR. TROWEL:  Nothing further, your Honor.

12            THE COURT:  Any further questions?

13          MS. DOLAN:  No, I don't think so.  Everything was

14  sustained.

15            THE COURT:  It was.  I'm just asking if you

16  have any further questions.

17          MS. DOLAN:  No.  Thank you.

18          THE COURT:  All right.  You may step down.

19      Next witness, please.

20            MR. TROWEL:  The government calls Dr. Amor

21  Correa. A M O R      C O R R E A,

22            called as a witness, having been first duly

23  sworn,

24            testifies as follows:

25            THE COURT:  Doctor, good afternoon, almost good

A. Correa - Direct/Trowel                    269

1    evening.  Please be seated.

2              Please state your name clearly into this

3    microphone and spell it for the record, then counsel will have

4    some questions for you.

5              THE WITNESS:  I am Dr. Amor Correa.  First name

6    is A-m-o-r.  My last name is C-o-r-r-e-a

7              THE COURT:  You may proceed.

8              MR. TROWEL:  Thank you, your Honor.

9    DIRECT EXAMINATION

10   BY MR. TROWEL:

11   Q    Good afternoon, Dr. Correa.

12   A    Good afternoon.

13   Q    Where do you work?

14   A    I'm currently employed as a staff psychologist at MDC

15   Brooklyn.

16   Q    And what is your title there?  I'm sorry, you just said

17   that, withdrawn.

18              How long have you worked at MDC Brooklyn?

19   A    I have worked there since September of 2013.

20   Q    And before you worked at MDC Brooklyn, where did you

21   work?

22   A    I was a predoctoral psychology intern at FMC Butner.

23   Q    What were your responsibilities at FMC Butner?

24   A    At Butner I had several different responsibilities.  I

25   conducted therapy with inmates in the general population.  One

A. Correa - Direct/Trowel                    270

1   of my primary duties was to also conduct forensic evaluations.

2   Q    And approximately how many forensic evaluations did you

3   participate in?

4   A    At FMC Butner, I participated in approximately 16.

5   Q    And did you participate in any forensic evaluations at

6   other institutions?

7   A    Yes, I also conducted forensic evaluations at FMS

8   Carswell in Ft. Worth, Texas.

9   Q    What was your role in those evaluations?

10  A    At Butner, I H two different types of roles.  I was the

11  secondary evaluator in some of the evaluations, which means

12  that I was responsible for conducting psychological testing,

13  and interpreting and writing up those test results.  And in

14  some cases I was the primary evaluator, where I had the same

15  responsibilities that I just mentioned; and, in addition, I

16  conducted collateral interviews, reviewed the entirety of the

17  records that were relevant to each case, and drafted the

18  majority of the report.

19  Q    Have you ever been qualified as an expert in federal

20  court?

21  A    Yes.

22  Q    How many times?

23  A    Three times.

24  Q    Do you recall what courts?

25  A    Yes, Beumont, Texas; San Diego, California; and

A. Correa - Direct/Trowel                    271

1   Jacksonville, Florida.

2   Q    Those were all federal courts?

3   A    Yes.

4   Q    Are you currently licensed?

5   A    No.

6   Q    Why not?

7   A    I am in my first post-doctoral year, and generally people

8   spend that year accumulating hours, still under the

9   supervision of licensed psychologists before they, themselves,

10  can be licensed, and they also take the licensing exam.

11  Q    Did you participate in the evaluation of Mr. Bumagin?

12  A    Yes, I did.

13  Q    What role did you play in that evaluation?

14  A    I was the secondary evaluator, so I conducted and scored

15  some of the tests.

16  Q    Did you convey the results of the tests to Dr. Pennuto?

17  A    Yes.

18  Q    And did you convey them to Dr. Grant as well?

19  A    Yes.

20  Q    Were you aware of Dr. Grant's conclusions in this case?

21  A    Yes.

22  Q    Her final opinion, rather?

23  A    Yes.

24  Q    What was it, if you know?

25  A    She determined that he was competent to stand trial.

1  Q     Did you agree with that conclusion?

2  A     Yes.

3  Q     Do you have an opinion about the defendant's competency,

4  as he sits here today?

5  A     Currently, no.

6  Q     Why not?

7  A     It's been more than a year since I evaluated him.

8  Q     Why is that relevant?

9  A     Because competency is a fluid issue, that is, it can

10 change even up to a daily basis.  It very much depends on the

11 point in time when the competency -- let me go back.

12             It depends on the actual point in time that we

13 are talking about.  So someone's competency can be different

14 now from the date of the evaluation.

15             THE COURT:  Have you ever seen a patient whom

16 you considered to be incompetent today, incompetent tomorrow,

17 incompetent forever?

18             THE WITNESS:  That is a possibility.

19             THE COURT:  Have you ever seen such a patient?

20             THE WITNESS:  I don't know that I ever evaluated --

21             THE COURT:  Have you ever seen such a patient?

22             THE WITNESS:  Yes.

23             THE COURT:  What are the criteria by which you

24 would say the patient is not competent today, will not be

25 competent tomorrow, will never be competent, assuming the

A. Correa - Direct/Trowel                    273

1    patient is not dead?

2              It's possible for somebody to be found not

3    competent and not restorable.

4              THE COURT:  Let me stop you right there.

5              Have you ever seen such a person?

6              THE WITNESS:  Yes.

7              THE COURT:  What does that look like when you

8    see it?

9         THE WITNESS:  All right.  Typically that person will

10   have been through already one initial competency evaluation,

11   and in the federal system would have been referred to -- would

12   have been referred for a second competency evaluation, which

13   includes the restoration period.  Some individuals undergo a

14   third competency and restoration period, and if at that point

15   they are determined for whatever the particulars of their case

16   should be, to be found not competent and not restorable, then

17   they go into a different stage where there's a separate

18   evaluation that is conducted whether that person should be

19   civilly committed.

20             THE COURT:  Now, you have seen such people?

21             THE WITNESS:  Yes.

22             THE COURT:  Okay. Go ahead.

23   BY MR. TROWEL:

24   Q    You said earlier that you participated or that you

25   administered testing to the defendant; is that right?

A. Correa - Direct/Trowel                    274

1    A    Yes.

2    Q    How many times did you meet with him?

3    A    I met him on two occasions formally.

4    Q    For how long each time?

5    A    Let's see.  I don't know how long each session was, but I

6    met with him for a total of three and a half hours for

7    testing.

8    Q    And you were supervised by Dr. Pennuto at that time,

9    correct?

10   A    Yes.

11   Q    But when you administered the tests, were you alone with

12   Mr. Bumagin?

13   A    Yes.

14   Q    Why is that?

15   A    That is because there's literature and lot of research

16   that shows that having a third person, or any additional

17   people, in a testing room can affect and change how somebody

18   performs on the test in question, especially for cognitive

19   tests.

20   Q    In addition to the testing sessions that you had with the

21   defendant, did you interact with him in less formal settings?

22   A    Yes.

23   Q    Can you describe those for the court?

24   A    I would see him in the hallways, sometimes, say hello and

25   greet him briefly.