1    Q    How often did that happen?

2    A    I don't know exactly, maybe once every other week while

3    he was at Butner.

4    Q    Did he remember you when he saw you?

5    A    He appeared to.

6    Q    Could you describe the defendant's demeanor, generally,

7    when you saw him at Butner?

8    A    He appeared to be happy, very talkative, expressive, told

9    a lot of stories, sometimes he was flirtatious, even.

10   Q    In your interactions with him, did you see any evidence

11   of him forgetting conversations that you had had with him?

12   A    That didn't happen in my interactions with him.

13   Q    Now, in the course of your participation in the

14   evaluations that you referred to earlier, have you conducted

15   interviews of defendants as part of the evaluation --

16   withdrawn.

17              In addition to the testing that you did in this

18   case, in other cases have you done interviews with defendants?

19   A    Yes.

20   Q    What is the purpose of the interviews, generally?

21   A    Interviews are conducted for a number of different

22   reasons.  A clinical interview can be where you obtain

23   somebody's version of relevant background history, medical,

24   psychiatric history, things like that.  There are also more

25   specialized forensic interviews that I conducted using

1   standardized measures, some just using just open-ended

2   questions.

3   Q    In the course of those interviews, have you asked the

4   defendant about the charges in the case?

5   A    Ever?

6   Q    Yes?

7   A    Yes.

8   Q    Why?

9   A    Well, I was discussing how in the course of some

10  interviews we use standardized forensic tests.  Now, some of

11  these tests which are routinely used in evaluations and have

12  been published and are highly researched, well-validated

13  tests, some of them have questions on there that directly

14  relate to the defendant's charges, especially on the issue of

15  competency, because that's one of the important factors that

16  we as psychologists have to assess for.

17  Q    Why is it relevant to your evaluation?

18  A    To this evaluation or in general?

19  Q    In general, why is it relevant to a competency

20  evaluation?

21  A    Well, one of the things we have to assess for is the

22  defendant's rational understanding of the legal system, and of

23  their case in particular.  So some of those questions can

24  allow us to learn about the person's decision-making process,

25  how they are taking in and thinking about information.  And in

1   many situations that's important, because that's how we learn

2   if people are making not necessarily good decisions that we

3   agree with, it's not about that, but it's about how they are

4   thinking, and is it logical?  Does it make sense, or if

5   influenced by some sort of paranoid or perhaps delusional

6   process.  We have to rule that out.

7                THE COURT:  Do you ask questions about the

8   underlying facts beyond the charges?

9           THE WITNESS:  The questions are very general and

10  open-ended.  So, I would say not routinely.

11               THE COURT:  Ever?  If I tell you I have been

12  accused of robbery and you say, what does it mean to be

13  accused of robbery?  And I give you a textbook definition, and

14  you ask me, well, tell me about the robbery you committed?

15               THE WITNESS:  No, it would be sufficient that

16  you understand robbery.

17               THE COURT:  What if I start to volunteer

18  details about the robbery I allegedly committed?

19           THE WITNESS:  Many inmates do.

20           THE COURT:  So you take that down.  Let me tell you

21  about the details of the robbery that I'm accused of

22  committing, are you going to take that down?

23           THE WITNESS:  Do you mean --

24           THE COURT:  Details, I said let me tell you about

25  the details?

A. Correa - Direct/Trowel                    278

1           THE WITNESS:  It is not always relevant to know

2    that.

3           THE COURT:  Well, how do you determine relevance?

4    I'm assuming you don't have a law degree either.

5           THE WITNESS:  I don't.

6                THE COURT:  So why is it relevant if I have a

7    discussion about the details of the alleged robbery, once I

8    told you I understand what it means to be accused of robbery

9    in a federal court?

10                THE WITNESS:  I would say for competency, it's

11   important to know that the person has a rational reasonable

12   way of thinking about their case.  They don't necessarily need

13   to discuss the details for us to be able to assess that.

14          THE COURT:  I'm asking you a question about that.

15   Look at me when I ask you the question, because I'm the one

16   who will be deciding which way this goes.

17                So, here's the point:  I tell you what robbery

18   is, and I give you the textbook definition and I say, you want

19   me to tell you about the crime, you want me to tell you about

20   the facts?  What do you say in response to that hypothetical?

21          THE WITNESS:  I would say that's not necessary.

22                THE COURT:  You'd stop me from doing it or

23   would  you say, tell me all about it?

24                THE WITNESS:  I would not say tell me all about

25   it.

1          THE COURT:  Would you stop me from telling you

2     about it?

3               THE WITNESS:  At some point --

4          THE COURT:  At what point?  I say, you want to

5     hear about the gruesome details of the robbery?  Let me tell

6     you all about it.

7               THE WITNESS:  For a competency evaluation?

8          THE COURT:  Yes?

9               THE WITNESS:  No.

10          THE COURT:  You will stop me or will you let me

11     roll on?

12       THE WITNESS:  In the interest of not making the

13     person feel interrupted, I might let them get something off

14     their chest, if they needed to.

15       THE COURT:  To let them get it off their chest.

16       THE WITNESS:  Yes.

17          THE COURT:  If they feel the need to confess to

18     you that they killed the Lindberg baby, you will let them go

19     on with that, or if they are feeling flirtatious and they want

20     to tell you all about it.  I'm trying to get a sense of when

21     you stop them and when you encourage them with respect to the

22     facts, not the legal description of the crime, but the

23     underlying facts.

24       THE WITNESS:  It's hard to come up with -- it's hard

25     to articulate a specific cutoff.

A. Correa - Direct/Trowel              280

1          THE COURT:  Try, try very hard, because it

2   matters in this case.

3          THE WITNESS:  Okay.  I would say that a large number

4   of details are not necessary to determine competency.  Some

5   things we do need to understand, such as the person's

6   knowledge about their charges.

7          THE COURT:  Not the charges.  I'm talking about the

8   underlying facts.

9              Assume for my hypothetical you are here as an

10  expert.  I give you a textbook definition of the crime of

11  robbery, and then I say to you, would you like me to tell you

12  about the facts of my case?  What do you say to me when I make

13  that proffer to you, for whatever reason, what do you say?

14  Tell me all about it, shut up, or something in between?

15         THE WITNESS:  I would do something in between.

16             THE COURT:  Tell me what you would do at that

17  point?

18         THE WITNESS:  I would be curious about whether that

19  person has a realistic understanding of the sentence that they

20  could be facing, so I could evaluate whether that's delusional

21  or based on reality.

22         THE COURT:  I'm talking about the facts.

23         THE WITNESS:  The facts don't necessarily factor

24  into that.

25         THE COURT:  Are you going to ask me for them or ask

1    me to stop?

2              THE WITNESS:  I wouldn't ask for them.

3         THE COURT:  What if I start to volunteer it?

4         THE WITNESS:  I think if it were not relevant for me

5    understanding whether the person knows their charges, whether

6    they know their --

7              THE COURT:  Is it relevant to know the

8    underlying facts?

9         THE WITNESS:  I would stop them at some point.

10             THE COURT:  At what point would you stop them?

11        THE WITNESS:  If I already gathered enough

12   information to know that the person -- how the person was

13   thinking about them.

14        THE COURT:  Here is my textbook question to you.

15        THE WITNESS:  Okay.

16             THE COURT:  I give you a textbook definition of

17   robbery word for word from the statute.  I then say to you,

18   Doctor, would you like me to tell you about the underlying

19   facts of this alleged crime?  What do you say to me at that

20   point?

21        THE WITNESS:  I would likely say no, Mr. So and So,

22   that's not necessary.  Do you understand what potential

23   sentences you could be facing?  And then sort of switch gears

24   with the interview.

25             THE COURT:  You would stop me and preclude me from

1   going into the facts, or would you say, tell me a little bit

2   about the Lindberg baby, a little bit about the robbery?

3                    THE WITNESS:  I would say that it is different

4   for every person, but overall it's not necessary to know

5   details for us to make a judgment, even though it's something

6   that we ask about.

7                    THE COURT:  Go ahead.

8   BY MR. TROWEL:

9   Q    Dr. Correa, you mentioned that there are occasions where

10   a defendant will just volunteer facts about the case; is that

11   right?

12   A    Yes.

13   Q    And in some cases is the fact that they have done that

14   relevant to your analysis?

15   A    The fact that they volunteered information?

16   Q    And that they begun talking about the case, yes?

17   A    It doesn't impact -- it doesn't impact the analysis.  The

18   things that they are saying don't impact the analysis.  It's

19   more of the way they are saying it.  Is this person giving me

20   a story that seems plausible based on logic, based on reality,

21   or is the story delusional?  I mean, I have had people tell me

22   all sorts of mystical stories about why they believe they are

23   charged with things, and that's something I need to know

24   about.  Sometimes people do launch into an explanation why

25   they believe they are in this situation.  I'm not looking for

A. Correa - Direct/Trowel                    283

1   the facts or things they tell me to assess the validity.  I'm

2   looking at their logic and reasoning and thought process

3   behind the thoughts they are conveying.

4   Q    So in some instances is the way a defendant discusses the

5   facts of the case relevant to that assessment of logic and

6   thinking?

7   A    Yes, it can be.

8   Q    And is it fair to say that you stop a defendant when what

9   he's telling you is no longer relevant to your assessment?

10  A    Right.  If I made my assessment, then it's not necessary

11  to continue talking about it.

12  Q    But you wouldn't stop until you reached a point where it

13  was no longer relevant?

14  A    Right.

15  Q    Now, are you familiar with the evaluation of competency

16  to stand trial, the ECSTR Test?

17  A    Yes.

18  Q    What is that?

19  A    The evaluation of competency to stand trial or ECSTR,

20  ECSTR, as we call it, is a standardized published forensic

21  testing measure.  It's routinely used in forensic evaluations

22  for competency to stand trial.  It's well-researched.  It has

23  high validity.  It is a structured interview for the

24  assessment of competency.

25  Q    I'm showing you what has been marked for identification

A. Correa - Voir Dire/Dolan                284

1   as Government Exhibit 11.

2              What is this?

3   A    This is a copy of the ECSTR.

4   Q    I will flip through so you can see the individual pages.

5              Is this the test that you are familiar with

6   that you just described?

7   A    Yes.

8   Q    Does this test advise the psychologist conducting the

9   competency evaluation to ask questions about the charges?

10  A    Yes, it does.

11             MR. TROWEL:  The government moves to admit

12  Government Exhibit 11?

13             MS. DOLAN:  May I have voir dire, please?

14             THE COURT:  You may.

15  VOIR DIRE

16  BY MS. DOLAN:

17  Q    Dr. Correa, correct me if I'm wrong, but you were

18  involved in administering the tests for Mr. Bumagin and then

19  generating your report with Dr. Pennuto based on those tests,

20  correct?

21  A    Based on the tests administered, yes.

22  Q    Were you involved in the competency questionnaire or the

23  competency evaluation, other than what we just discussed?

24  A    Not in its evaluation.

25  Q    Did you use this booklet in connection with any of your

1    testing?

2    A    For this case or in the past?

3    Q    For this case?

4    A    For this case, no.  This was not administered.

5                    MS. DOLAN:  I think this is irrelevant, Judge.

6    I'm happy to deal with it in evidence, but I don't think it's

7    relevant.

8                    THE COURT:  I don't think it comes in through

9    this witness.  She didn't use it, so I will sustain the

10   objection.

11            MR. TROWEL:  Your Honor, the government was offering

12   it just for your Honor's interest, to the extent it is

13   relevant.

14                    THE COURT:  I'm very interested, but if you

15   don't have a viable witness to put it into evidence through.

16   I'm also interested in the Federal Rules of Evidence.

17            MR. TROWEL:  Well, your Honor, it's being offered as

18   something that she recognized as a test used in the field in

19   which she's an expert, that's the basis on which it is being

20   offered.

21            THE COURT:  It is not being offered probably through

22   this witness, when you learn a bit more about evidence, you

23   will realize that.  You will put it in through a witness it

24   should come in through, not this witness.  You may have other

25   witnesses you may want to put it in through, but not this

A. Correa - Direct/Trowel                          286

1  witness.

2  DIRECT EXAMINATION (Cont'd.)

3  BY MR. TROWEL:

4  Q    Now, the defendant is currently housed at MDC in

5  Brooklyn; is that correct?

6  A    Yes.

7  Q    That's where you work, right?

8  A    Yes.

9  Q    Have you interacted with him there?

10 A    On one occasion.

11 Q    Can you describe that for the court?

12 A    Yes.  In about November 2013, we in the Psychology

13 Department were notified by Religious Services, as is typical,

14 that Mr. Bumagin's mother had passed away.

15            Now, when inmates that are in the institution

16 learn of news like that, it's typical that Psychology Services

17 will follow up with them.  So I went to see Mr. Bumagin to see

18 how he was handling the news and offered a brief counseling

19 session.

20 Q    When was this again?

21 A    This was November 2013.

22 Q    So that was -- how long was that after you last saw him

23 at Butner?

24 A    I last saw him at Butner in April of 2013.

25 Q    When you saw him at MDC, did he recognize you?

1  A    He appeared to.

2  Q    In your role at MDC, are you alerted when an inmate has a

3  psychological issue?

4  A    Yes.

5  Q    And if a defendant has been referred for a psychological

6  issue, would you be aware of it?

7  A    Yes.

8  Q    Has Mr. Bumagin been referred?

9  A    No.

10  Q    Has he requested psychological services while at MDC?

11  A    No.

12              MR. TROWEL:  Nothing further.

13              THE COURT:  Your witness.

14  CROSS-EXAMINATION

15  BY MS. DOLAN:

16  Q    Dr. Correa, Mr. Trowel asked you a number of questions

17  about discussing the charges that the defendant is facing in

18  the context of a competency evaluation.

19              Do you recall most of those questions?

20  A    Yes.

21  Q    Now, in preparing for this hearing -- Dr. Grant is your

22  supervisor, is she not, or she was?

23  A    She was while I was at FMC Butner.

24  Q    And you communicated with her about Mr. Bumagin, correct?

25  A    Yes.

1  Q     And did you communicate with her about Mr. Bumagin --

2  when were you transferred or when did you come to the MDC?

3  A     In September 2013.

4  Q     Did you communicate with Dr. Grant after that about Mr.

5  Bumagin?

6  A     No, not about his case.

7  Q     When was the last time that you communicated with Dr.

8  Grant about Mr. Bumagin?

9  A     About Mr. Bumagin's case results or about scheduling the

10 hearing?

11 Q     Anything substantively relating to this hearing?

12 A     When the evaluation was completed.

13 Q     And you met with her.  And you met with her in person,

14 correct?

15 A     Yes.

16 Q     How many times?

17 A     She was my supervisor while I was at FMC Butner, so I

18 would meet with her regularly for supervision at least twice a

19 week.

20 Q     And you discussed the tests you administered?

21 A     Yes.

22 Q     And the results of those at the time?

23 A     Yes.

24 Q     And you discussed his IQ?

25 A     Yes.

A. Correa - Cross/Dolan                    289

1    Q      And his mood?

2    A      Yes.

3    Q      And his executive function?

4    A      Yes.

5    Q      And did Dr. Grant engage in that discussion or was it one

6    way?

7    A      What do you mean?

8    Q      Were you provided information or was it an active

9    discussion on both sides?

10   A      I provided the information, because I conducted and

11   scored and wrote up the results of the testing.  I'm sure she

12   asked me follow-up questions about my opinions about the

13   interpretation, but I don't recall her exact discussions.

14   Q      And do you recall whether she provided you any

15   information for her perspective at all?

16   A      On the tests that I administered?

17   Q      Yes?

18   A      She did not offer much feedback on those tests, because

19   my primary supervisor for the testing in this case was Dr.

20   Pennuto.

21   Q      With respect to the IQ and the mood and the executive

22   function, did she engage in a discussion with you about those

23   three considerations?

24   A      I primarily discussed those results with Dr. Pennuto, the

25   neuropsychologist.

A. Correa - Cross/Dolan                    290

1  Q    Did you not discuss them with Dr. Grant?

2  A    I reported them to her at the end, once Dr. Pennuto and I

3  had interpreted all of the tests and scored them and

4  synthesized them into the neuropsychological report.

5  Q    Then you reported them.

6                    Did you discuss them?

7  A    Like I said, I am sure that she asked me some follow-up

8  questions about my opinions on the testing, but I don't recall

9  her exact discussions.

10  Q    Did she provide you any information about her own

11  opinion?

12  A    On the tests or on competency?

13  Q    On IQ, mood, and executive function?

14  A    It's possible that she did as one of my supervisors, but

15  I don't recall.

16  Q    Do you recall whether she discussed any statements that

17  Mr. Bumagin made about his case with you?

18  A    Not formally, because I didn't conduct the competency

19  portion of this evaluation.

20                THE COURT:  How about informally?

21                THE WITNESS:  It is possible, but I don't

22  recall exactly.

23                THE COURT:  How about generally?  Do you recall

24  generally having a conversation about that topic?

25                THE WITNESS:  Not as insofar as it applies to

A. Correa - Cross/Dolan                    291

1    Mr. Bumagin, but in other allegations it was typical.

2              THE COURT:  Go ahead.

3    Q    You don't have any specific recollection about whether

4    she did or didn't --

5    A    No, not in this situation.

6                   THE COURT:  You have to let her finish.

7    Q    You said not in this situation?

8    A    Right, not in this case.

9    Q    And executive function would encompass that particular

10   topic, would it not?

11   A    Which topic?

12   Q    In the context of a competency evaluation, executive

13   function would involve consideration of whether the individual

14   can assist in his defense, correct?

15   A    It's one component of that, yes.

16   Q    And that falls, generally speaking, under the rubric of

17   executive function, right?

18   A    Yes.

19              MS. DOLAN:  Nothing further.

20                   THE COURT:  Your witness.

21              MR. TROWEL:  Nothing further, your Honor.

22              THE COURT:  You may step down, Doctor.  Thank you.

23              Next witness, please.

24              MR. TROWEL:  The government has finished with the

25   live witnesses.  There are just a couple of other issues that

1   I would like to raise, before I finish the hearing.

2                THE COURT:  I'm all ears.

3                MR. TROWEL:  The first issue is, as far as I'm

4   aware, Ms. Agoureev and the other translator - I would just

5   like to make a record - that neither has translated, as far as

6   I can tell, a single word at the hearing, and I don't know if

7   it would be useful to call Ms. Agoureev to the stand, or just

8   make a record of it, but it is relevant to the defendant's

9   understanding of the proceedings.

10               THE COURT:  Do you want to call them as witnesses?

11  I wouldn't want to put you in a position giving testimony at

12  the trial.  So if you want to call them as witnesses and have

13  them make that statement, I think that's probably the better

14  way to do it, if that's what you wish to do.

15               MR. TROWEL:  Well, I mean, if your Honor is so

16  inclined.

17               THE COURT:  Well, I'm just inclined from

18  keeping you putting yourself in a position where technically

19  you are being a witness at a proceeding where you as counsel

20  could lead to your disqualification.  So let's not go down

21  that road.

22               If you would like to call them as witnesses,

23  just indicate that that's the case, or if you would like to

24  have Ms. Dolan make a statement on the record, so that avoids

25  the necessity of calling the interpreters to the stand, we can

1  do it that way.

2          MR. TROWEL:  The government will call Ms. Agoureev

3  to the stand.  I notice defense counsel is speaking with her

4  right now.

5          MS. DOLAN:  I was trying to cut straight to the

6  chase, but that's fine.

7          MR. TROWEL:  I will just call her briefly.  It will

8  only take a moment, your Honor.

9              THE COURT:  Come to the stand, please, for

10 swearing in.

11             I will ask you to swear her in in English,

12 Mr. Jackson.

13 Y A N A     A G O U R E E V,

14         called as a witness, having been first duly sworn,

15     testifies as follows:  /EUPLTD /KWRAPB in an ago first

16 name is Y-a-n-a.  Last name is A-g-o-u-r-e-e-v.

17         THE COURT:  Counsel has questions.

18         You may proceed.

19         MR. TROWEL:  Thank you, your Honor.

20 DIRECT EXAMINATION

21 BY MR. TROWEL:

22 Q    Ms. Agoureev, were you present yesterday when the hearing

23 began?

24 A    Yes, I was.

25 Q    Were you the first interpreter sitting with Mr. Bumagin?

Y. Agoureev - Cross/Dolan                    294

1   A    Yes, I was.

2   Q    At the beginning of the hearing, did you begin to

3   translate the proceedings in Russian?

4   A    I did.

5   Q    Did he say something to you at that point?

6   A    He did.

7   Q    What did he say?

8   A    That he understand.

9   Q    Did he ask you to continue translating?

10  A    No.  He said he will only need my services when he

11  doesn't understand.

12  Q    Did he ask you for clarification at any point during the

13  hearing?

14  A    No, but he addressed me in English, sometimes.

15          MR. TROWEL:  Nothing further, your Honor.

16          THE COURT:  Thank you.

17              Any cross-examination?

18  CROSS-EXAMINATION

19  BY MS. DOLAN:

20  Q    Did you speak to Mr. Bumagin this morning?

21  A    In what way did I speak to him?

22              THE COURT:  In any way?  Did you talk to him

23  today, this morning?

24  A    I said hello to Mr. Bumagin, yes.

25  Q    Did you ask him whether he remembered anything that

Y. Agoureev - Cross/Dolan                    295

1   happened yesterday?

2   A    I did not.

3   Q    Did you ask him whether he knew what was happening today?

4   A    I did not.

5   Q    Did you have any further conversation with him?

6   A    No.

7   Q    Did you have any conversation with the other Russian

8   translator about whether he would translate for Mr. Bumagin?

9   A    I did.

10  Q    And do you know -- what was the substance of that

11  conversation, without repeating the actual words?

12  A    I basically told the other interpreter that we are going

13  to be on standby.

14  Q    Okay.  So far as you know, were you on standby?

15  A    Yes, we were.

16  Q    Is there a reason that you didn't ask Mr. Bumagin whether

17  he wanted you to translate anything today?

18  A    No reason.

19            MS. DOLAN:  Nothing further.

20            THE COURT:  Any further examination?

21        MR. TROWEL:  No, your Honor.

22            THE COURT:  You may step down, ma'am.  Thank

23  you.

24            THE WITNESS:  Thank you.

25            THE COURT:  You have another witness to call?

1          MR. TROWEL:  I apologize for not knowing his name.

2          I would like to call the interpreter, Andrew Tarutz.

3    A N D R E W    T A R U T Z,

4          Called as a witness, having been first duly sworn

5       testifies as follows:

6          THE COURT:  Please be seated, sir.

7          I will ask you to state your name in English, and to

8    spell it for the record, then counsel will inquire.

9          THE WITNESS:  Andrew Tarutz.

10          THE COURT:  Spell it, sir.

11          THE WITNESS:  A-n-d-r-e-w, T-a-r-u-t-z.

12          THE COURT:  Please inquire, sir.

13   DIRECT EXAMINATION

14   BY MR. TROWEL:

15   Q    Mr. Tarutz, am I pronouncing it correctly?

16   A    Yes.

17   Q    Were you present for the hearing yesterday?

18   A    Yes.

19   Q    Were you present for the entirety of the hearing today?

20   A    Yes.

21   Q    At any point, did you translate part of the hearing for

22   Mr. Bumagin?

23   A    No.

24   Q    Did you speak with him about his needs for translation?

25   A    No.

A. Tarutz - Cross/Dolan                    297

1   Q    Why didn't you translate?

2   A    I was informed by Yeboah, who was the nurse yesterday,

3   that we are working in a standby mode.

4   Q    What did that mean to you?

5   A    It means that I have to follow whatever is said in the

6   courtroom, and I maintain my ability to interpret that.

7   Q    Did you in fact interpret any part of the proceedings?

8   A    No.

9            MR. TROWEL:  Nothing further.  Thank you, your

10  Honor.

11           THE COURT:  Your witness.

12  CROSS-EXAMINATION

13  BY MS. DOLAN:

14  Q    Did you ask Mr. Bumagin at any point whether he did in

15  fact understand everything that was being said in court?

16  A    Yesterday and today I never talked to Mr. Bumagin, and

17  Mr. Bumagin never talked to me.

18  Q    Do you know every Russian word for every English word

19  that was used in court today and yesterday, and particularly

20  some of the medical terms?

21  A    There were three or four medical terms which I had to

22  check in the dictionary.

23  Q    So you didn't -- are you a native Russian speaker?

24  A    Yes.

25  Q    Were you educated in the Soviet Union?

A. Tarutz - Cross/Dolan                              298

1    A    Yes.

2    Q    Were you educated in Russia or did you come here before

3    that?

4    A    I was educated in the Soviet Union.

5    Q    And approximately how many words were there that you

6    didn't recognize in English?

7    A    I recognized all of the words in English.

8    Q    You said there were some that you needed to look up?

9    A    Yes.

10   Q    Did you know what those words meant, before you had to

11   look them up?

12   A    In general, yes, but if you look in the dictionary, you

13   may find out that certain words have many meanings.

14   Q    What is the translation for ischematic,

15   i-s-c-h-e-m-a-t-i-c

16            MR. TROWEL:  Objection, your Honor.

17            THE COURT:  Overruled.

18   A    Do you want me to say that in Russian?

19   Q    Yes?

20   A    Ischemia (ph).

21   Q    What does that mean?

22   A    Ischematic.

23   Q    And what are the terms that you had to look up?

24   A    I may have to look at my notebook in which it would be

25   in.

A. Tarutz - Redirect/Trowel                    299

1    Q    Is your notebook in this bag here?

2    A    Yes.

3           THE COURT:  Mr. Jackson, would you give it to the

4    witness, please.

5    Q    Do you have an independent recollection?

6    A    I'm sorry, I have it in my pocket now.

7                 THE COURT:  All right.

8    Q    Before that let me do this, do you have an independent

9    recollection of those words that you had to look up?

10                THE COURT:  Without looking at your notepad, do

11   you know what the words were, sir?

12                THE WITNESS:  No?

13                THE COURT:  Why don't you look at your notepad

14   and tell us what the words were, please.

15                (Pause)

16                THE COURT:  And I'm hope flirtatious was not

17   one of them.

18   A    Ventricular system means the context of the human brain.

19   Q    Anything else?

20   A    There's one word which I have difficulty pronouncing

21   correctly.

22                THE COURT:  Can you spell it out?

23                THE WITNESS:  S-u-p-r-a-t-e-n-t-o-p-i-l-l-y.

24   Q    Based upon your conversations with the other translator,

25   do you have any idea whether Mr. Bumagin understood, for

1  example, those terms?

2  A    I did not discuss that with the other translator.

3          MS. DOLAN:  I have nothing further.

4          THE COURT:  Any further examination of this

5  witness?

6          MR. TROWEL:  One quick question, your Honor.

7  REDIRECT EXAMINATION

8  BY MR. TROWEL:

9  Q    At any point, did Mr. Bumagin indicate to you that he

10  didn't understand the proceedings?

11  A    He never talked to me.

12          MR. TROWEL:  Nothing further, your Honor.

13          MS. DOLAN:  Nothing further.

14          THE COURT:  You may step down, sir.

15          THE WITNESS:  Thank you.

16          THE COURT:  Any other witnesses in any

17  language?

18          MR. TROWEL:  No, your Honor, just one very last

19  thing.

20          THE COURT:  Yes, sir.

21          MR. TROWEL:  In the binder of exhibits that we

22  provided yesterday, there are Exhibits 3 through 10, which are

23  excerpts of phone calls made by the defendant from the

24  Metropolitan Detention Center in Brooklyn, New York, between

25  November 9, 2011 and February 9, 2012.  Each of those disks

1    contains a true and accurate excerpt from the MDC reports.

2    Exhibits 3-T through 10-T are transcriptions and translations

3    of those call excerpts; whereas, 3-T contains both the Russian

4    transcription and English translation of Government Exhibit 3.

5    Exhibit 4-T has them for 4, and so on.  Those transcriptions

6    and translations were completed by court certified Russian

7    interpreter Isabelle Avrutin, and those are true and accurate

8    transcriptions and translations of the call excerpts.

9              The government would move to introduce

10   Government's Exhibits 3 through 10 and 3-T through 10-T.

11             THE COURT:  Please tell me none of them involve

12   communications between counsel and the defendant?

13             MR. TROWEL:  They don't, your Honor.  They generally

14   involve calls between this defendant and his family.

15             THE COURT:  All right.

16             Ms. Dolan, your response.

17             MS. DOLAN:  No objection, subject to further

18   verification for accuracy, in the event that they were ever

19   introduced for any subsequent purpose, including trial.

20             THE COURT:  With that qualification, they are

21   admitted.

22             (Whereupon, Government's Exhibits 3 through 10

23   and 3-T through 10-T were received and marked into evidence,

24   as of this date.)

25             Anything else?

1          MR. TROWEL:  Nothing from the government, your

2    Honor.

3          MS. DOLAN:  In light of those transcripts, I have a

4    brief rebuttal case.  I'm putting on the elmo those premarked

5    for identification as Defendant's Exhibit A a, and it would be

6    much better heard if you use the microphone like everybody

7    else, even yours truly.  Go ahead.  This is a transcript that

8    I received from the government and printed out this morning in

9    connection with the investigation in this case.  It has the

10   test number and date completed, it indicates October 25, 2011,

11   Maxim K-o-v-a-l-s-k-y, and then NYO, which I believe is New

12   York Office.  I would indicate, also, this is source file name

13   of audio file or CD-4884. This is a 12-page document, draft

14   transcript, which I will move into evidence.

15          THE COURT:  Any objection?

16          MR. TROWEL:  Your Honor, this transcript was

17   provided to Ms. Dolan pursuant to a draft transcript

18   stipulation.  She didn't make the government aware she was

19   going to use it today.

20          THE COURT:  She's said it's in rebuttal.

21             So the question to you is, any objection to it

22   coming into evidence?

23          MR. TROWEL:  There is.  She agreed not to use this.

24

25             THE COURT:  She's using it in rebuttal.

1           What is the basis for the objection?

2           MR. TROWEL:  That she signed the stipulation

3  agreement agreeing not to use it.

4           THE COURT:  May I see it?

5           MR. TROWEL:  She didn't tell us she was doing this,

6  so I don't have it with me.

7           MS. DOLAN:  Your Honor, I specifically had a

8  discussion with Mr. Trowel over the weekend, in fact on Sunday

9  when I was at the airport, indicating that I wanted to

10 introduce these transcripts which discuss Mr. Bumagin memory

11 and his discussion with the confidential human source that

12 investigated this case.

13          THE COURT:  Well, did you sign a stipulation that

14 said you wouldn't use it in the case or did you not?

15          MS. DOLAN:  I believe that was in the case in chief

16 at trial.

17          THE COURT:  You don't believe that it addresses

18 the issue here?

19          MS. DOLAN:  That's not my recollection.  If it does

20 encompass these, I will withdraw it.

21          MR. TROWEL:  Your Honor, maybe we can move it in,

22 subject to checking that.

23          MS. DOLAN:  What I will do is this, perhaps we can

24 stipulate as to the content of the portions that I want to --

25          THE COURT:  Tell you what I will do, I will take it

1    for the purposes of resolving the issues that are before the

2    court with respect to this hearing.  So I will take it.

3         Now, whether it can be used later or not, that will be

4    governed, if there is a stipulation, by the other stipulation.

5              MS. DOLAN:  Let me consult with the government to

6    see.  I don't want to infringe upon any stipulation that I

7    have signed.

8              (Pause)

9              THE COURT:  One of the reasons in federal court

10   stipulations are to be so-ordered by the court so we don't

11   have these sorts of last minute discussions.  They are called

12   stipulations and orders for a reason.

13             MS. DOLAN:  The stipulation is that the parties

14   agree that in at least two recordings compiled or made by a

15   confidential human source in this case, the confidential human

16   source and Mr. Bumagin discussed Mr. Bumagins memory problems.

17             MR. TROWEL:  No objection from the government to

18   that language, your Honor.

19             THE COURT:  All right.  That's the stipulation.

20             Anything else?

21        MS. DOLAN:  Defense rests again.

22        MR. TROWEL:  Nothing from the government.

23             THE COURT:  Okay.  I will allow each side to

24   submit a post-hearing memorandum of law.

25             How long do you think you will need, Ms. Dolan,

1    to submit your post-hearing memorandum of law?

2              MS. DOLAN:  May I just consult my calendar?

3                   THE COURT:  You may.

4                   (Pause)

5              MS. DOLAN:  So, in the interest of avoiding my own

6    competency evaluation for the vacation I need in August, I

7    would propose September 12th for the defense submission.

8                   THE COURT:  You have it.

9                   And how long would you like to reply?

10             MR. TROWEL:  Your Honor, I start trial September

11   22nd.  Could we not do this in the next two or three weeks?

12             THE COURT:  You know, I ask lawyers how much time

13   they want.  It's not a negotiation.  You can tell me.  You can

14   tell me six months.  You can tell me six weeks.  I asked Ms.

15   Dolan how much time.  She said September 12th.  I granted it.

16                  Now, I ask you, how much time do you want?

17             MR. TROWEL:  I would like to respond to Ms. Dolan's

18   submission.

19             THE COURT:  Well, of course.  Let me back up.

20                  She's going to do -- because I didn't want to

21   have 20 minutes of argument who is going to go first.  I asked

22   Ms. Dolan how long she would need to put in her submission.

23   She said September 12th.  I said fine.  Then I turn to you,

24   sir, and I say to you, how much time after September 12th

25   would you like to put in your submission?  You can tell me a

1   week, a month, a year.  Then I will turn to Ms. Dolan, how

2   long would you like to respond?

3               MR. TROWEL:  So she will lead and I will go

4   second?

5               THE COURT:  What do you not understand about

6   this?

7           MS. DOLAN:  I actually don't have an objection to

8   the government going first, if Mr. Trowel wants to get in his

9   in.

10              THE COURT:  I thought you might not, but,

11  nonetheless, in the interest of not having a 20-minute debate

12  about whose going to go first, about your place or mine, about

13  the shape of the table, Ms. Dolan, you had said you would like

14  until September 12th.

15              Does that still work for you?

16          MS. DOLAN:  It still does.

17          THE COURT:  Now, on September 12th Ms. Dolan is

18  going to give you a memorandum of law.

19              Question:  How long would you like to have to

20  respond to that memorandum of law?  How many weeks?  September

21  12th, by the way, is a Friday.

22          MR. TROWEL:  I guess what I'm proposing, your Honor,

23  is that we go first in two weeks.

24          THE COURT:  No, that's not happening.

25              MR. TROWEL:  Okay.  So my response will have to

1  follow September 12th, is that Your Honor's scheduling order?

2         THE COURT:  You can submit your brief at the

3  same time she submits her brief, if you would like to do so.

4  Why?  A sophisticated advocate would not like to have the

5  opportunity to look at the submission of her or his adversary

6  --

7         MR. TROWEL:  Because I have a trial before Judge

8  Vitaliano.

9         THE COURT:  But you don't understand what I'm

10 telling you, counsel.  You can have six months to put in your

11 response.

12        How long is your trial before my colleague,

13 Judge Vitaliano?

14        MR. TROWEL:  Probably about three weeks, your Honor.

15

16        THE COURT:  Well, there you go.  Now, factor

17 that into your world, how much time would you like after

18 September 12th to respond to Ms. Dolan's brief?

19        MR. TROWEL:  How about the first Monday in November.

20        THE COURT:  Just tell me the date and you have it.

21        MR. TROWEL:  November 10th, the first Monday.

22        THE COURT:  You have it. It's probably not the first

23 Monday, but you have it.

24        Now, Ms. Dolan, how much time would you like to

25 reply to his response?

1           MS. DOLAN:  Well, I just need two weeks, but I do

2    have a little bit of an issue with the briefing schedule.  And

3    I know that I have asked for additional time, because I

4    scheduled my own vacation, which always starts out to be three

5    or four weeks, and ends up to be 36 hours.

6                Anyway, this case is 2011 case, and I am

7    concerned about Mr. Bumagin's health, and I'm concerned that

8    he receive adequate and proper treatment, and I maintain that

9    concern.  And I have been voicing that concern at the status

10   conferences I think throughout, and particularly dating back

11   to May 29th of last year.  And I'm also concerned, as I said

12   before, that Mr. Bumagin is not receiving adequate medical

13   attention and supervision at the MDC.  I don't believe that

14   anybody thinks that the MDC is adequately staffed to provide

15   adequate medical attention, particularly for someone with

16   special needs.  And I also maintain the position that Butner

17   did not actually treat Mr. Bumagin.

18               So, for all of those reasons, I'm a little bit

19   concerned about Mr. Bumagin's welfare and condition in the

20   interim.  What I would propose is that the court transfer him

21   to Ft. Devins, or a facility like that, so that he can receive

22   adequate medical attention at a BOP facility that is

23   specifically set up for that purpose.

24               THE COURT:  Now, are you going to answer my

25   question, then we'll deal with the question of Devins.

1           MS. DOLAN:  Two weeks.

2               THE COURT:  All right.  What is the date that

3    brings us to, Ms. Dolan?  Two weeks after the 10th is probably

4    the 24th, which is probably the day after Thanksgiving; is

5    that right, Mr. Jackson?

6               THE COURT CLERK:  It's actually the week of

7    Thanksgiving.

8               THE COURT:  The week of Thanksgiving.  So it's

9    the day after Thanksgiving, right?

10              THE COURT CLERK:  The 24th.

11              THE COURT:  Is that a Friday?

12          THE COURT CLERK:  That's the Monday.

13              THE COURT:  You want to do it that Monday?

14          MS. DOLAN:  That's fine.

15              THE COURT:  That Monday.

16              Now, let's talk about Ft. Devins.

17              Do I have the power to send him there?  Lyndon

18   Johnson once said, it's a bad idea to tell a man to go to hell

19   unless you can send him there.  So the question is, do I have

20   the power over the Bureau of Prisons to send him to Ft.

21   Devins?

22              MS. DOLAN:  I only had one other case where the

23   court ordered it.  I believe that it is possible.  I can look

24   into it and submit a letter.

25              THE COURT:  Let me ask the government, do you

1   believe that I have the power to order him to Ft. Devins?

2          MR. GATTA:  I'm not certain, Judge.  In the pretrial

3   posture that we are in, I think you probably do, if there is a

4   record that is required.  Actually, I think that the BOP might

5   move a pretrial incarcerated defendant in the circumstance

6   where that person has to be treated, though I think in most

7   instances if you are in the MDC or MCC in the pretrial

8   condition --

9          THE COURT:  But what I'm asking you is a much

10  narrower question.  If you don't know the answer --

11         MR. GATTA:  I don't know the answer.

12         THE COURT:  I take it, Ms. Dolan, you are not a

13  hundred percent sure of the answer to the question, are you?

14    MS. DOLAN:  I only had one question where my client was

15  at FMC Deviants for a period of time.

16         THE COURT:  Here's what I will do, I will order

17  this defendant to be transferred to an appropriate security

18  facility for continued treatment.  If there's a problem with

19  that order, I'm sure someone will let me know.  So I will

20  enter that order, and if there's a problem with it, someone

21  will let me know.  And if they don't follow it, and there's no

22  problem with it, and I have the authority to do it, and they

23  don't do it, I will let them know.  So either they do it,

24  because I have the power to order it, or because it's in

25  everyone's enlightened self-interest that it goes down that

1   way, or they don't do it, and they tell me to pound sand.  And

2   I will react as I always do when people tell this Article III

3   Judge to pound sand, which is to say if it's the Second

4   Circuit I say, thank you for the correction, and if they are

5   not, I say, you have a problem.

6               MR. GATTA:  Judge, I think we had two instances

7   where at the defendant's request we had and then followed up

8   by your Honor's request.

9           THE COURT:  My order, requests are for other people,

10  judges issue orders, which may or may not be be followed, but

11  it will be an order.  It's an order; it's not a request.  You

12  understand the difference?

13              MR. GATTA:  I do.

14              THE COURT:  Okay, good.  It's really important

15  that people understand the difference.  Now, judges, military

16  people, others give orders, okay.

17              MR. GATTA:  The medical staff at the MDC have given

18  reports to the court about the care that Mr. Bumagin is

19  receiving for both the -- about the specific complaints that

20  he's raised, the physical complaints, liver issue, throat,

21  things of that nature, and your Honor has considered those.  I

22  just want to understand the record that we have of sort of

23  Mr. Bumagin's medical care right now between the last report

24  and now,  Ms. Dolan's statement that she has concerns that

25  he's not getting the proper care, I would suggest that we have

312

1  the MDC give you a report.

2          THE COURT:  No, sorry.  Been there, done that.

3      MR. GATTA:  Okay.

4          THE COURT:  The order is he goes to Ft. Devins.

5          What is the reasonable time period for that to

6  be carried out, before I start holding people in contempt for

7  not following my orders?

8          MR. GATTA:  Again, if I can figure out what the

9  procedure would be, if we call up the BOP.

10         THE COURT:  I have an idea as to how long it

11  should take them to do it, but I was wondering if the

12  government would suggest a reasonable time period to get this

13  done.

14         MR. GATTA:  I don't have one, Judge.

15         THE COURT:  You don't have one.

16         Ms. Dolan, do you have one?

17     MS. DOLAN:  The BOP doesn't like to give an exact

18  range, so I believe a range of two to three weeks.

19         THE COURT:  I'm a generous guy, I give them a

20  month to do it.  If they don't, they will be in contempt.

21     MR. GATTA:  Also for consideration purposes, I don't

22  know given the fact that defendant is incarcerated pretrial,

23  whether I will consult with the marshal, I believe that the

24  Marshal's Service may actually be the entity and part of the

25  Department of Justice that is going to do the transfer.  I'm

1   not a hundred percent sure.

2           THE COURT:  I'm giving the order and giving

3   them a month from this Friday, and if they can't do it a month

4   from this Friday, I'm sure Ms. Dolan will be back here before

5   me and there will be an explanation as to why they can't do

6   it.  But I think a month is plenty of time to get it done.

7   It's one guy, and it's part of the system, that's what the

8   order would say.

9           Mr. Jackson, I would like you to call out the

10  briefing dates, explain the bundling rule, and set forth the

11  date by which this time this defendant has to be transferred

12  to Ft. Devins.

13          THE COURT CLERK:  Okay.  The defendant shall serve

14  the post hearing memorandum of law on or before September 12,

15  2014.  The government's response shall be served on or before

16  November 10, 2014, and defendant's reply shall be served on or

17  before November 24, 2014.  Each party will be responsible for

18  filing their motion papers on ECF electronically by 5:00 p.m.

19  on those dates.

20          In addition, the defendant shall be

21  transferred --

22          THE COURT:  Do you want your courtesy copies or

23  not?  You don't need them?

24          THE COURT CLERK:  I don't need them.

25          THE COURT:  Okay.

314

```
 1            THE COURT CLERK:  The defendant shall be

 2    transferred to the Ft. Devins facility by August 25, 2014,

 3    that's a Monday.

 4            THE COURT:  And if there's some problem with having

 5    that happen, the government and Ms. Dolan will inform the

 6    court by contacting my case manager/courtroom deputy on or

 7    before that date, and we'll have a hearing with the party that

 8    has a problem with it here, not just the lawyers, if it's the

 9    Board of Marshal's Service, I want a principal before me

10    telling me I can't do it or telling me why it doesn't work,

11    not just the lawyers, okay, I want the party behind the

12    lawyers.  Okay?

13            THE COURT CLERK:  Exclude time, Judge?

14            THE COURT:  Sure.

15        THE COURT CLERK:  Okay.  We need another date?

16        MS. DOLAN:  Well, I actually have a motion pending,

17    so I don't think --

18        THE COURT CLERK:  I will need a date.

19        THE COURT:  Shall we exclude time until the next

20    time we are scheduled to be together, which will be sometime

21    after the decision in this case?  We don't really have any

22    holding date now, do we?

23            THE COURT CLERK:  No, Judge.

24        MR. TROWEL:  Does your Honor want to set a date for

25    December, after the briefs are in?
```

315

1              THE COURT:  That's probably a good idea.

2              What is the middle of December, December 15th?

3         THE COURT CLERK:  That's a Monday, Judge.

4         THE COURT:  Monday, December 15th.  Does that work

5    for the people for a status conference?

6         MS. DOLAN:  I actually don't have my California

7    trial schedule input in here.  If it changes, I will let you

8    know.  I could say provisionally yes.

9              THE COURT:  Does it make sense to push it into

10   January?

11             MS. DOLAN:  It might make sense to have that around

12   the time your Honor's decision is issued, rather than prior.

13   I don't have an objection to either month, though.

14              THE COURT:  All right.  Let's schedule it for

15   December 15th.  At what time, Mr. Jackson?

16              THE COURT CLERK:  We can put this on for 1 o'clock

17   p.m.

18              THE COURT:  One o'clock work for the parties?

19             MS. DOLAN:  Yes, it does.

20             MR. TROWEL:  And for the government, yes, your

21   Honor.

22              THE COURT:  We are assuming it will involve

23   getting the defendant back from either Colorado or Denver.

24             MS. DOLAN:  Or Massachusetts.

25              THE COURT:  Somewhere.  Does that work?

```
 1              MS. DOLAN:  Yes.

 2              THE COURT:  As opposed to another time of the

 3    week in terms of travel.

 4              MR. TROWEL:  We'll put something in for his

 5    appearance in advance of that hearing.

 6              THE COURT:  Good.

 7              You will have the transcripts of the proceeding

 8    within two weeks from today.  I just talked to the court

 9    reporter.  They will be e-mailed to you.

10              MS. DOLAN:  I'm sorry, I was engaged in discussion.

11              THE COURT:  Transcript of the proceedings we just

12    had in the last two days, they will be e-mailed to both

13    parties within two weeks, because I'm such a guy.

14              What else do we have?

15              MR. TROWEL:  Nothing from the government, your

16    Honor.

17              MS. DOLAN:  Nothing from the defense.

18              THE COURT:  I'm adjourned.  And I'm signing the

19    order excluding time in the interest of justice from today's

20    date to 12/13 & 14.

21              May I have a motion to have this submitted into

22    evidence, please?

23              MR. TROWEL:  The government moves.

24              THE COURT:  Any objection?

25              MS. DOLAN:  I'm sorry?
```

317

1          THE COURT:  Court's Exhibit 1, the Order of

2    Excludable Delay.

3          MS. DOLAN:  No objection.

4          THE COURT:  Okay. It's in evidence.  Here, you are,

5    Mr. Jackson.

6          We are adjourned.  Thank you all for coming.

7    Safe home, everybody.

8              (The hearing is concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

318

**INDEX**

**M O N I C A   R I V E R A-M I N D T**                 159

DIRECT EXAMINATION BY MS. DOLAN                 159

CROSS-EXAMINATION BY MR. TROWEL                 206

REDIRECT EXAMINATION BY MS. DOLAN                 231

RECROSS-EXAMINATION BY MR. TROWEL                 235


**T R A C Y   P E N N U T O**                 239

DIRECT EXAMINATION BY MR. TROWEL                 239

VOIR DIRE BY MS. DOLAN                 242

DIRECT EXAMINATION BY MR. TROWEL                 248

CROSS-EXAMINATION BY MS. DOLAN                 266

REDIRECT EXAMINATION  BY MR. TROWEL                 267


**A M O R   C O R R E A**                 268

DIRECT EXAMINATION BY MR. TROWEL                 269

VOIR DIRE BY MS. DOLAN                 284

DIRECT EXAMINATION BY MR. TROWEL                 286

CROSS-EXAMINATION BY MS. DOLAN                 287

319

1    <u>Y A N A     A G O U R E E V</u>                     293

2    DIRECT EXAMINATION BY MR. TROWEL                  293

3    CROSS-EXAMINATION BY MS. DOLAN                    294

4    <u>A N D R E W     T A R U T Z</u>                      296

5    DIRECT EXAMINATION BY MR. TROWEL                  296

6    CROSS-EXAMINATION BY MS. DOLAN                    297

7    REDIRECT EXAMINATION BY MR. TROWEL               300

8

9

10                         <u>**EXHIBITS**</u>

11   Defense Exhibits DX-4 through DX-6 are received   171

12   and marked into evidence

13   Defendant's Exhibit DX-7 is received and marked   180

14   into evidence

15   Government's Exhibits 3 through 10 and 3-T        301

16   through 10-T were received and marked into

17   evidence

18

19

20                          ***

21

22

23

24

25