Exhibit 5

1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
 2
     - - - - - - - - - - - - - - X
 3   UNITED STATES OF AMERICA,   :
                                 : 11-CR-800
 4                               : (WFK)
                                 :
 5        -against-              :
                                 :
 6                               : United States Courthouse
                                 : Brooklyn, New York
 7
     SEMYON BUMAGIN,             :
 8                               :
              Defendant.         : Monday, July 21, 2014
 9                               : 2:00 p.m.
                                 :
10                               :
                                 :
11   - - - - - - - - - - - - - - X

12        TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
        BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
13          UNITED STATES DISTRICT COURT JUDGE

14                  A P P E A R A N C E S:

15   For the Government:    LORETTA E. LYNCH, ESQ.
                            United States Attorney
16                          BY: KEVIN M. TROWEL, ESQ.
                                JAMES DONALD GATTA, ESQ.
17                              JACQUELYN M. KASULIS, ESQ.
                                Assistant United States Attorneys
18
     For the Defendant:   BY: ZOE JAYDE DOLAN, ESQ.
19                            RUSSIAN LANGUAGE INTERPRETERS:
                              YANA AGOUREEV and ANDREW TARUTZ
20   Also Present:            JOHN PENZA,
                              Special Agent - FBI
21
     Courtroom Deputy: Andrew Jackson
22
     Court Reporter:   Mary Agnes Drury, RPR
23                     Official Court Reporter
                       Telephone: (718) 613-2615
24                     E-mail:  Mad78910@yahoo.com

25   Proceedings recorded by computerized stenography.  Transcript
     produced by Computer-aided Transcription.
```

```
                       PROCEEDINGS                        2
```

 1              (In open court.)

 2              (Defendant present in open court.)

 3         COURTROOM DEPUTY:  All rise, the United States

 4    District Court for the Eastern District of New York is now

 5    in session, the Honorable William F. Kuntz, II is now

 6    presiding.

 7              (Honorable William F. Kuntz, II takes the bench.)

 8         COURTROOM DEPUTY:  Calling Criminal Cause for

 9    Hearing in Docket No. 11-CR-800, *United States of America*

10    *against Semyon Bumagin*.

11              Will counsel please state their appearances for

12    the record, including the Russian interpreters.

13         MR. TROWEL:  Good afternoon, your Honor, Kevin

14    Trowel with the United States; and with me at counsel table

15    is Jim Gatta and Jacquelyn Kasulis; from the US Attorney's

16    office, and also John Penza from the FBI.

17         THE COURT:  Good afternoon, you may be seated.

18         MS. DOLAN:  Zoe Dolan for the Defendant Semyon

19    Bumagin who is here with me.  Good afternoon.

20         THE COURT:  Good afternoon.  You may be seated.

21         INTERPRETER:  Russian interpreters, your Honor,

22    Yana Agoureev and Andrew Tarutz.

23         THE COURT:  Permission granted.  Thank you.

24    You've been previously sworn I take it?

25         INTERPRETER:  Yes.

PROCEEDINGS                                    3

1          THE COURT:  You have been or have not been?

2          MS. AGOUREEV:  Not today.

3          THE COURT:  Well then, let's swear you in today.

4          (Interpreters were sworn.)

5          THE COURT:  Any preliminary statements before we

6     begin?

7          MR. TROWEL:  Just, your Honor, I suppose there is

8     an issue to resolve in terms of how we proceed today for the

9     order.

10          The Government's prepared some 3500 and the

11     discovery -- the exhibits rather, of course, this is the

12     Court's hearing at this point to make the decision the Court

13     has to make, so the Government is prepared to proceed with

14     calling witnesses.

15          THE COURT:  Ms. Dolan?

16          MS. DOLAN:  This question of competency has arisen

17     at the behest of the defense, so I would like to proceed.

18          THE COURT:  You may.

19          MS. DOLAN:  Thank you.

20          THE COURT:  I asked my law clerks who goes first

21     and they said, it's up to you.  And I said well, I guess I

22     have to decide.  So you folks told me it's up to me and I've

23     decided.  Please proceed.

24          MS. DOLAN:  Thank you.  The defense would like to

25     call Dr. Dana Brauman.

PROCEEDINGS                                    4

1           MR. TROWEL:  Your Honor, I apologize for

2    interrupting briefly; one issue we discussed before is we

3    have all the witnesses in the room, because they're all

4    expert witnesses, I think we're going to offer them as

5    experts, we don't see an issue with keeping them in there,

6    but I wanted to raise it with your Honor.

7           THE COURT:  I assume there was not going to be an

8    exclusion of witness issue, since we're all dealing with

9    experts.

10          MS. DOLAN:  My hope is that it will even expedite

11   the subsequent questioning -- the questioning of subsequent

12   witnesses rather.

13          THE COURT:  Excellent.  That will go as an agreed

14   upon ruling to my friends from the 17th floor.

15          All right, let's go.  Please swear the witness.

16

17   **DANA BRAUMAN, M.D.**, called by the Defense, having been first

18   duly sworn, was examined and testified as follows:

19

20          THE COURT:  Please state and spell your name

21   clearly slowly and carefully into the microphone so court

22   reporter and the witnesses and even the Court can hear you,

23   fair enough?

24          THE WITNESS:  Yes.

25          THE COURT:  Thank you.

D. BRAUMAN - DIRECT/MS. DOLAN                    5

1              THE WITNESS:  My name is Dr. Dana Brauman, D-a-n-a

2    B-r-a-u-m-a-n.

3              THE COURT:  Thank you.  You may proceed, counsel.

4              MS. DOLAN:  Thank you.

5    DIRECT EXAMINATION

6    BY MS. DOLAN:

7    Q    Dr. Brauman, I know we're all familiar, but could you

8    just briefly state where you work, what your position is and

9    how long you've been there?

10   A    Sure.  I work at the Metropolitan Correctional Center

11   in Manhattan.  I am employed there as a forensic

12   psychologist.  I've been in that position since March of

13   2010, and I've been at the MCC since about September of

14   2008.

15   Q    And in your role as a forensic psychologist at the MCC

16   what do you do generally?

17   A    My primarily responsibilities include court-ordered

18   evaluations, mostly competency to stand trial, criminal

19   responsibility and sentencing recommendations.

20   Q    And did you evaluate for competency, the defendant,

21   Semyon Bumagin, who is here in court?

22   A    Yes, I did.

23   Q    Approximately when was that?

24   A    That was July through August of 2012.

25   Q    Okay.  And could you describe generally what you did

1  for that evaluation?

2  A    Sure.  I initially went over a confidentiality

3  disclosure with the defendant, and proceeded with

4  interviews, testing, I contacted collateral sources, such as

5  yourself, the prosecution, the defendant's daughter.  I

6  reviewed some of the medical records that were provided for

7  me.  And after obtaining all the information, I then wrote a

8  report.

9  Q    Okay.  And let's talk about me, which I love to do.

10        In our conversations and discussions, what

11  information did I provide you?

12  A    You provided for me the information regarding his

13  purported inability to assist you in preparing his defense,

14  and you had concerns about his ability to retain information

15  that you had previously discussed with him, and you informed

16  me you had done a neuropsychological evaluation prior to him

17  coming to me.

18  Q    And did I provide you with any medical records?

19  A    I believe you did provide me with the neuro care

20  medical record.

21        THE COURT:  I'm going to ask you to keep your

22  voice up just a bit and speak a little more clearly into the

23  microphone.  You can move the mic to you.

24  Q    And with respect to the prior competency examination

25  that was done before you examined Mr. Bumagin, I did not

1    share that report with you, did I?

2    A    That's correct.

3    Q    By I did give you the names of the tests that were

4    administered, right?

5    A    Yes.  The names, yes.

6    Q    But not any of the results or any of the findings and

7    conclusions based on those particular tests?

8    A    Correct.

9    Q    And could you inform us why you asked for that

10   information; the names of the tests?

11   A    I had actually asked to review the entire report and

12   the results of those tests, that would help to inform my own

13   decision-making process, and it would have been helpful for

14   me to conduct a thorough examination.

15   Q    Right, but the question was:  Why did you ask me for

16   the names of the tests that were administered during the

17   previous evaluation?

18   A    The names of the specific tests?

19   Q    Yes.

20   A    Yes.  I requested those for -- to be in the interest of

21   not re-testing something that had just be been given a short

22   time earlier due to concerns of practice effects.

23   Q    What did you do mean by practice effects in this

24   context?

25   A    A defendant who had recently completed some tests, if

1   they're then expressed to the same test within a short

2   period of time, just merely having been exposed to it

3   previously could help change their answers or make them

4   perform in a different way if they would have if they had

5   seen it the first time.

6   Q    So, in other words, you wanted to start with a clean

7   slate?

8   A    Right.

9   Q    And I provided you the names of the tests in order for

10  you to do that?

11  A    Yes.

12  Q    Now, you mention that you discussed confidentiality

13  concerns with the defendant.  Approximately -- did you do

14  that more than once?

15  A    I don't recall specifically many of the things that

16  happened in this case from two years ago.  It would be

17  atypical that I would have gone over it more than once.

18         According to my record, I only went over it

19  initially at the beginning.

20  Q    And what was the nature of the admonishments that you

21  gave him?

22  A    The same disclosures that I give to all defendants who

23  come in for an evaluation; I inform them that I'm a licensed

24  psychologist appointed by the Court to conduct an

25  evaluation, the purpose of the evaluation was for his

1  competency to stand trial.

2          I informed him anything that happened in the

3  course of the evaluation through interviews, testing or any

4  other information I gather during his stay would not remain

5  private or confidential between us.

6          I informed him I would be writing a report for the

7  Judge, and the court could also elicit oral testimony, if

8  required.

9  Q    From you?

10 A    Correct.

11 Q    And now what was Mr. Bumagin's overall presentation or

12 what was his overall demeanor throughout your evaluation of

13 him?

14 A    He was fairly pleasant, cooperative, overly-friendly,

15 to the point where he was almost flirtatious in nature at

16 times.  He did not appear to be overly depressed or anxious;

17 although, he did have some concerns about his physical

18 health.  Can you be more specific?

19 Q    I think that covers it.

20 A    Okay.

21 Q    And you also mentioned prior medical records that I

22 provided you?

23 A    Correct.

24 Q    And what was the upshot of those medical records?

25 A    He had been under care for some spinal issues, and one

1   page indicated that he had been diagnosed with dementia and

2   is being treated with Aricept.

3   Q    And what is Aricept?

4   A    That is not my area of expertise.  I do know that it's

5   prescribed for individuals with dementia, but I'm not sure

6   of the particular type of medication.

7   Q    So you can't testify about its effectiveness?

8   A    No, it's outside my area of expertise.

9   Q    Fair enough.  And were there also results from an MRI

10  in those prior medical records?

11  A    There were.

12  Q    Did you have an opportunity to review those?

13  A    I did at the time of the evaluation, yes.

14  Q    And do you recall what they indicated?

15  A    Not specifically.

16  Q    Okay.  We'll come back to that.

17        Now, initially you did -- did you do an intake

18  interview of Mr. Bumagin?

19  A    Yes.

20  Q    And can you describe what an intake interview is?

21  A    It's just a basic assessment of one's general

22  background information and it assists us in determining

23  housing placement and stability and it also serves for a --

24        THE COURT:  I'm going to ask you to slow it down

25  for the reporter.  I almost did it before, but she did it.

1  So would you repeat your answer?

2  A    Yes.  An intake screening is a general assessment of

3  one's overall functioning, mental health functioning, and

4  general background information to assist with housing

5  placement, and also to serve as a screen for suicide risk

6  assessment.

7  Q    And you have a form for this, correct?

8  A    I have a general script for it, yes.

9  Q    And do you ask open-ended questions of individuals or

10 forced-choice questions when you're doing the intake

11 interview?

12 A    Generally, open-ended questions.

13 Q    Okay.  Now that we're on the topic, can you describe

14 what the difference is between an open-ended question and a

15 forced-choice question in the context of an evaluation, a

16 mental health evaluation?

17 A    Sure.  An open-ended question doesn't provide a prompt

18 for the individual to select from, it gives them the

19 opportunity to elicit a response, however they chose fit;

20 versus a closed question or a forced-choice question that

21 would provide two or three or four options that a person

22 could choose from and not go outside of those potential

23 answers.

24 Q    So an essay question would be an example of an

25 open-ended question?

1    A    That's right.

2    Q    And true, false and multiple and choice questions would

3    be examples of forced-choice questions?

4    A    That's right.

5    Q    And turning back to the intake and review as an

6    open-ended method of inquiry, could you give us just some

7    examples of the types of questions that you ask during that

8    intake interview?

9    A    I generally start by asking for general demographic

10   data; such as age, place of birth, prior employment.  I also

11   inquire about if they're aware of their charges, any prior

12   convictions, general mental health history, suicide history,

13   substance abuse history, and conclude with a brief mental

14   status exam.

15   Q    And you also ask about mood and various indicators of

16   mood?

17   A    Yes.

18   Q    And demeanor?

19   A    Right.

20   Q    Now, turning to -- did you do a competency interview of

21   Mr. Bumagin?

22   A    Yes, I did.

23   Q    And was that a forced-choice or open-ended inquiry?

24   A    It's also open-ended.

25   Q    Okay.  Do you recall all of the questions on that form?

1   A    From memory, no, I don't remember all of them.

2   Q    Would it help to see the form?

3   A    It would.

4   Q    Okay.  Is this the form?

5   A    Yes.

6           MR. TROWEL:  Objection, your Honor, could we

7   identify that.

8           THE COURT:  Would you identify the form through

9   the witness, what is it?

10          MS. DOLAN:  I thought we just did.

11          MR. TROWEL:  I mean, mark it for identification so

12  we have a record of what it is we're looking at.

13          MS. DOLAN:  We're looking at 3500-DB-15, which was

14  disclosed by the government.

15          THE COURT:  All right.  If you want to make it an

16  exhibit--

17          MS. DOLAN:  I don't think I do.  And the reason

18  is, your Honor, this has the notations on it, so

19  unfortunately, I think I have to go through the painful

20  exercise of asking Dr. Brauman the questions, so that the

21  questions, not the answers, are reflected in the record.

22          THE COURT:  You could just say no, you don't have

23  to go into it.  It's just a friendly question.  Go ahead.

24          MS. DOLAN:  Okay.

25  BY MS. DOLAN:

D. BRAUMAN - DIRECT/MS. DOLAN                    14

1    Q     So what's the first -- what are the first couple of

2    questions that you ask?

3    A     What are you here for?  What does competency mean to

4    you?

5    Q     And the second question?

6    A     What are you charged with?  Is it a serious charge, and

7    what are the possibility penalties.

8    Q     Let's talk about that question for a minute.

9          That question ask not ask the defendant to

10   describe his version of the offense conduct, does it?

11   A     It doesn't, but this is a general form that I use, that

12   I have come up with myself, it's not a standardized

13   administration by any means.  I often will elicit the

14   defendant to provide their story of the offense to see if

15   they can articulate that in a way that make sense.

16   Q     And it doesn't ask about any particular legal

17   strategies or legal defenses, does it?

18   A     That's right.

19   Q     Do you ask about any particular legal strategies or

20   legal defenses?

21   A     It depends on the case; sometimes I do and sometimes it

22   doesn't seem relevant.

23   Q     And then what is the next question that you ask?

24   A     When someone goes to court, what are the available

25   pleas.

1   Q    And next?

2   A    What is an oath.

3   Q    I'll just let you proceed.

4   A    What is perjury; why is it a problem?  What could

5   happen if you committed perjury?  What is testimony?  What

6   is a witness?  What is evidence, give examples?  What is a

7   verdict?  When does the verdict happen?  What is a sentence?

8   What type of verdict would result in a sentence?  How is the

9   sentence calculated in the federal system?  What other

10  factors could be considered and give examples?

11          What is a plea agreement or plea bargain?  What is

12  an advantage of accepting a plea bargain?  What rights would

13  you give up if you entered into a plea agreement?  What is a

14  defendant?  Who is the defendant in this case, in your case?

15  Who is the Judge in your case and what is the role or the

16  job of the Judge?  Who is the prosecutor in your case, what

17  is the role or job of the prosecutor and how does he or she

18  accomplish this?  Who is your defense attorney, what is the

19  role or the job of the defense attorney and how does he or

20  she accomplish this?

21  Q    And the last page?

22  A    What is the role or job of the jury, and how do they

23  arrive at the decision?  What kind of behavior would be

24  expected of you in court?  What would be inappropriate

25  behavior in court?  What would happen if you engage in this

1    appropriate behavior?  Do you feel you are able to work with

2    your defense counsel?  How is your relationship with her?

3    In parenthesis, any paranoia or delusions?  It's not a

4    question I ask outright, it's something that I'm observing.

5    I do ask what kind of questions will you need to ask your

6    attorney?

7    Q    Now, let me just pause you.  With respect to that

8    question, did Mr. Bumagin respond to that question?

9    A    According to my notes, it looks like --

10   Q    I don't need know what he said, but did he respond to

11   that question?

12   A    Yes.

13   Q    And did he engage in a discussion with respect to that

14   question?

15   A    I don't remember how lengthy of a discussion it was.

16   It looks like he did provide some response.

17   Q    So it was more than just a yes or no answer?

18   A    I don't remember specifically, but based on the

19   notation there, it looks like it was a little bit beyond yes

20   or no.

21   Q    Well, did you ask -- let's go through this.

22            Did you ask him if he trusts me?

23   A    I did.

24   Q    And the did he answer that?

25   A    He did.

D. BRAUMAN - DIRECT/MS. DOLAN                17

1  Q    And did you ask him how the meetings go or whether they

2  were friendly?

3  A    I generally ask how the meetings go, yes.

4  Q    And did he answer that?

5  A    Yes.

6  Q    And did you ask him whether I listen to him and discuss

7  the case with him?

8  A    Yes.

9  Q    And did you ask him whether he understands what I say

10 to him?

11 A    Yes.

12 Q    And did you ask him -- oh, did he respond to those

13 questions?

14 A    He did.

15 Q    Okay.  And did you ask him whether he ever disagreed

16 with me or we ever disagreed with one another?

17 A    I did.

18 Q    And did he respond to that question?

19 A    He did.

20 Q    And the final two questions?

21 A    How do you plan to assist in your defense in this case?

22 What would you like to see as the outcome?  How realistic do

23 you think that is?  How will you decide whether you should

24 testify?  And the last question is really only relevant for

25 someone that's taking medication for something along the

1    lines of a psychotic disorder, I don't typically ask that

2    question of all defendants.

3    Q    And a psychiatric disorder does not include dementia?

4    A    Correct.

5    Q    And with respect to that second to last question, the

6    last question, did you ask with respect to assisting in his

7    defense in this case, did he answer that question?

8    A    He did.

9    Q    And did he engage in something, at least something of a

10   discussion about that question?

11   A    Yes.

12   Q    And so is it fair to say that you asked him each one of

13   those individual questions on that main question there?

14   A    It would appear as though I did, yes.

15   Q    And did he respond each time?

16   A    Yes.

17   Q    And then did there come a time when you synthesized all

18   of this preceding information into a competency report?

19   A    Yes.

20   Q    Or a competency evaluation report.  And is this it?

21   A    Yes.

22   Q    Let's -- showing the -- is that your signature and

23   Dr. Miller's signature at the end?

24   A    That's my signature, and one of my colleagues signed

25   for Dr. Miller who must have been out the day I mailed the

D. BRAUMAN - DIRECT/MS. DOLAN                    19

1    report.

2            MS. DOLAN:  It's pre-marked as Defense Exhibit 1,

3    and I would move it into evidence.

4            MR. TROWEL:  No objection.

5            THE COURT:  Any objection?

6            MR. TROWEL:  No, your Honor.

7            THE COURT:  It's admitted into evidence.

8            (Defense Exhibit 1, was admitted into evidence.)

9            MS. DOLAN:  Okay.  Your Honor, with the Court's

10   permission, I think generally these reports speak for

11   themselves.  I have a few highlighted questions that I'd

12   like to go through.  I would prefer to just go through those

13   highlighted questions rather than painstakingly go through

14   the report itself.

15           THE COURT:  Oh, sure, that's fine.

16           MS. DOLAN:  Okay.

17   BY MS. DOLAN:

18   Q    Now, on page five, with respect to the substance abuse

19   history, did you discuss substance abuse with Mr. Bumagin?

20   A    Yes.

21   Q    And what was your impression of his substance abuse

22   history?

23   A    He has significant history as a younger adult.  He

24   reported that he had ceased his cocaine and heroin use and

25   cut back on his drinking while his marijuana use was

D. BRAUMAN - DIRECT/MS. DOLAN                    20

1   constant throughout the time he had been in this country.

2   Q    And you note speed balls here.  What exactly are speed

3   balls?

4   A    It's a combination of heroin and cocaine.

5   Q    And how are they self-administered, generally?

6   A    I believe that's through intravenous injections.

7   Q    And did you have an understanding of whether

8   Mr. Bumagin had become addicted to these substances in the

9   past?

10  A    It appeared as though he had in the past.

11  Q    And do you have a professional opinion as to whether

12  substance abuse history can impact cognitive function over

13  time?

14  A    Sure.  It can over time, yes.

15  Q    Now, on page five and six you discuss medical history,

16  and as a part of that did you speak with Mr. Bumagin's

17  daughter?

18  A    I did not speak with her myself, I had a graduate

19  student working with me who did that interview herself.

20  Q    And what was your team's understanding of that

21  conversation with Mr. Bumagin's daughter?

22  A    She indicated that he was fairly well functioning until

23  about a year prior to the time we conducted the evaluation

24  when she noted a shift, and he began to exhibit some unusual

25  behaviors, such as asking the same lines of questioning

D. BRAUMAN - DIRECT/MS. DOLAN                21

1   repeatedly, even after it had been discussed and clarified

2   for him, not retaining that information.  And she also noted

3   that he would confabulate details of events that he had no

4   awareness of.

5   Q    And are those symptoms consistent with an individual

6   suffering from some form of dementia?

7   A    It can be.

8   Q    Page six, in the middle of the page, behavior

9   observations, you note that Mr. Bumagin did evidence minor

10  difficulties navigating the facility and occasionally

11  required assistance to return to his unit and cell.

12           Could you elaborate on that?

13  A    I don't remember specifically, again, from two years

14  ago; however, I always ask the unit officers when I -- for

15  instance, call the unit to request that they send the

16  defendant down into my office which is on a different floor.

17  I always inquire how the individual is functioning on the

18  unit and anything noteworthy.

19           So for me to have put that in the report, there

20  must have been a correctional officer that noted that he had

21  difficulty remembering where his cell was or how to get to

22  back to his housing unit.

23  Q    Now, on page seven you discuss a validity indicator

24  profile.  What is that?

25  A    It's a self-report measure, forced-choice, and it

1  measures response style that can be used to determine

2  whether other cognitive tests should be considered valid or

3  reliability.

4  Q    So it's basically an effort measure?

5  A    Yes.

6  Q    And is it designed to detect potential malingering?

7  A    It can detect malingering, although, it's not a direct

8  malingering measure.

9  Q    In layman's terms, is it one potential indicator of

10 whether somebody is faking it or not?

11 A    It could be one, yes.

12 Q    And what was the result of your validity indicator

13 profiler, VIP test?

14 A    I only administered the nonverbal section, given that

15 his English is not the first language, I did not administer

16 the verbal section.  On that non-verbal section his effort

17 came out to be inconsistent based on the test results.

18 Q    And how did that affect your evaluation?

19 A    It's something that I would need to consider cautiously

20 when looking at other indicators or other testing results or

21 even in my interactions with him just to be aware of the

22 inconsistency noted on that measure.

23           THE COURT:  Would you read that answer back,

24 please?

25           (The Last answer was read back.)

1  Q    Was it a significant discrepancy with what you might

2  consider to be average or normal or was it minor?

3  A    I'm not sure I follow the question, can you rephrase

4  it?

5  Q    Was it an indicator of a significant problem or a minor

6  problem or somewhere in between, how would you characterize

7  it?

8  A    I'm not sure I would characterize it in those terms.

9  It's --

10  Q    How would you characterize it?

11  A    It wasn't as though he responded irrelevantly or

12  randomly, so there was some effort he gave in trying to

13  answer the evidence honestly.  But if his effort was more

14  sustained, he probably would have gotten more of the answers

15  correct.

16  Q    Now, are there other physiological factors that can

17  bear upon effort?

18  A    Yes.

19  Q    And what are some of those factors?

20  A    If someone is fatigued or if they're distracted by

21  external or internal stimuli, if they're under the influence

22  of drugs; there are a number of factors.

23  Q    And what about other health issues such as, for

24  example, diabetes?

25  A    I suppose diabetes could effect, although I'm not a

1  medical doctor, so I would be hesitant to draw that

2  conclusion myself.

3  Q    Liver function?

4  A    I'm not a medical doctor.

5  Q    Well, somebody going through renal failure, for

6  example, isn't the most rational person around, correct?

7  A    I feel that's outside my area of expertise to comment

8  on that.

9  Q    Okay.  So as a result of your validity indicator

10 profile, how did you ultimately view the findings and

11 conclusions that you drew?

12 A    Are you inquiring as to that test specifically or

13 overall conclusions?

14 Q    Well, let's split it into two parts; that test

15 specifically and then overall.  Well, I withdraw that.

16        How did it affect your findings and conclusion and

17 how you do them?

18 A    Again, the overall conclusions or just this test?

19 Q    Yeah, okay, both.

20 A    Okay.  I'm sorry.

21        So on this test the conclusions would lead me to

22 be cautious in interpreting subsequent testing, not

23 necessarily to conclude that he was feigning or malingering,

24 but to be aware there were some inconsistencies in effort,

25 and so with that in mind on this measure, I also have to

1  consider that and other measures that have been given and

2  even in his interactions with me, whether he was providing

3  consistent effort throughout the whole evaluation.

4  Q    And you also administered a variety of other tests to

5  Mr. Bumagin, correct?

6  A    Yes.

7  Q    And what's the upshot of those tests?

8  A    His reading level and English is around fifth grade,

9  given instructions.  Cognitively, he had generally average

10 functioning across nonverbal -- excuse me, processing

11 perceptual reasoning indexes and his working memory or his

12 attention appeared to be average for considering his peers;

13 however, there was some borderline or mildly impaired

14 performance on the processing speed index of the

15 intellectual measure, which can indicate some personal

16 difficulties or personal weaknesses in that area of

17 processing speed.  Which, for me, it seemed as though it was

18 a declining function as compared to his other scores.

19 Q    Let's get to that now.

20        On page nine here, current mental status.  Can you

21 sort of take us through the conclusions that you do -- that

22 you drew with respect to Mr. Bumagin's cognitive abilities?

23 A    Sure.  Are you asking me to walk through the mental

24 status or just skip to the end of the cognitive abilities?

25 Q    I think go straight to the cognitive abilities.

1  A    Okay.

2         There was no evidence of any psychotic

3  disturbance; so no hallucinations and delusions and those

4  kinds of processes; but he did complain about memory lapses.

5  He had some difficulty remembering dates in specific details

6  during interviews.  He denied being confused or disoriented,

7  but there was the collateral information that he had some

8  difficulty in navigating the facility.

9         I think that pretty much sums it up.

10  Q    Now, in addition to being -- to denying being confused,

11  did you also ask him -- did you also talk to him about what

12  would happen if he were found competent versus not

13  competent?

14  A    I typically do have that conversation; although, I

15  don't remember in this case whether I did specifically.

16         MS. DOLAN:  If you could just give me one moment,

17  your Honor?

18         THE COURT:  Yes, ma'am.

19         (Pause.)

20  BY MS. DOLAN;

21  Q    I'll come back to that maybe.

22         Did you also formulate a prognosis in your report?

23  A    Yes.

24         THE COURT:  Push that button down to get the water

25  out.  Go ahead.

1  Q    And what was the prognosis?

2  A    Given the diagnosis of dementia, its typically

3  progressive course, unless the underlying etiology can be

4  identified and treated in some way.

5  Q    What is etiology?

6  A    The cause or the source, the physiological condition,

7  the medical condition.

8  Q    Were you able to determine the etiology of

9  Mr. Bumagin's condition?

10  A    No.

11  Q    So in other words, you were not able to formulate a

12  positive prognosis?

13  A    My prognosis was limited by the fact that I did not

14  know the etiology.

15  Q    And what was your ultimate conclusion whether

16  Mr. Bumagin was competent or not competent to stand trial?

17  A    I opined that he was not competent to stand trial.

18  Q    And again, that conclusion was subject to the increased

19  scrutiny that we discussed earlier as a result of the VIP

20  test, correct?

21  A    Correct.

22         THE COURT:  In layman's terms, tell me why you

23  concluded he was not competent to stand trial.

24         THE WITNESS:  Sure.  Although he had some factual

25  understanding of the proceedings against him, he was limited

D. BRAUMAN - DIRECT/MS. DOLAN                28

1   in his ability to retain and recall information and discuss

2   his case in the way that I felt he would be able to make

3   informed decisions regarding his strategy and legal defense.

4           THE COURT:  And have you seen defendants who,

5   despite having mental disabilities, were, in fact, able to

6   assist counsel in defense?

7           THE WITNESS:  Yes, I have.

8           THE COURT:  And you have also seen, I take it,

9   defendants who were not able to assist counsel in presenting

10  a defense; is that correct?

11          THE WITNESS:  That's correct.

12          THE COURT:  What is sort of the breakpoint in

13  terms of -- I know it's not an exact science, but what's the

14  breakpoint between those who can give effective assistance

15  to their counsel and those who cannot?

16          Put it again in layman's terms for a working

17  District Court Judge here who doesn't know etiology from

18  idiopathic.  Go ahead.

19          THE WITNESS:  It's very hard to put into words or

20  to define where a cutoff exists.

21          THE COURT:  You know it when you see it, but I've

22  got to make a determination, so help me out here.

23          THE WITNESS:  I think taking all of the data

24  together and trying to form a reasoned opinion, you need to

25  have not just the factual and rational understanding, but

1   also the ability to assist counsel.  So one who has

2   difficulty retraining information, may have a difficult time

3   from one meeting to the next recalling the strategies that

4   have been discussed, and I felt that that was at play in

5   this case.

6               THE COURT:  Anything else?

7               MS. DOLAN:  Nothing from the defense at this time.

8   Thank you.

9               THE COURT:  Thank you.  You may step down.

10              MR. TROWEL:  May I proceed, your Honor, with

11  cross-examination?

12              THE COURT:  Sure.

13              MR. TROWEL:  Thank you.  May I proceed?

14              THE COURT:  You may.

15              MR. TROWEL:  Thank you, your Honor.

16  CROSS-EXAMINATION

17  BY MR. TROWEL:

18  Q    Now, Dr. Brauman, I believe you testified on direct

19  that you conducted an evaluation of Mr. Bumagin at MCC; is

20  that correct?

21  A    Correct.

22  Q    And at MCC was he -- did you evaluate him on an

23  inpatient or outpatient basis?

24  A    We are considered an outpatient site.

25  Q    Can you describe for the Court what it means to be an

1   outpatient site?

2   A    Generally speaking, I work in a detention center that's

3   a highrise.  The housing units are separate from where the

4   mental health offices are located, from where my office is

5   specifically located.

6            In doing my evaluation, I'm the primary evaluator,

7   I don't have anyone assisting me, unless I have a graduate

8   student who may participate in some of the testing.

9            That's different from an inpatient site where

10  typically there is a team of experts that are working

11  together, and they also get collateral information from the

12  medical facility stuff, such as nurses and other medical

13  practitioners that might be around observing the defendant

14  more on a 24/7 basis.

15  Q    So in this case when you evaluated him, he was at MCC;

16  is that correct?

17  A    Yes.

18  Q    And was he housed in general population?

19  A    When he initially arrived he was placed in the locked

20  housing unit until we could determine that he was stable for

21  release to general population; but the majority of his stay

22  was in general population.

23  Q    So he was housed with regular prisoners; is that

24  correct?

25  A    Correct.

1   Q    He wasn't on a medical floor?

2   A    That's right.

3   Q    He wasn't on a special psych floor or anything like

4   that?

5   A    That's right.

6   Q    In the course of your evaluation of the defendant, how

7   many times did you meet with him, do you recall?

8   A    I believe it was seven times.

9   Q    And for a total of how many hours, if you recall?

10  A    Approximately eight hours.

11  Q    Can you describe for the Court the how those -- how and

12  where they occurred?

13  A    Generally speaking, all of the meetings would have

14  taken place in my office, which is private, no one else

15  would have been in the room, unless my graduate student was

16  with me at the time.

17  Q    Is it fair to say when you met with the defendant, you

18  pulled him from the general population and brought him to

19  your office?

20  A    Yes.

21  Q    And is it fair to say that you met with him in your

22  office and then returned him to general population?

23  A    Correct.  He would have to navigate himself from the

24  housing unit to the elevator, off the elevator to my office,

25  and then back again.

1  Q    When the defendant was housed in general population at

2  MCC, was he under observation of mental health professionals

3  when you were not meeting with him?

4  A    No.

5  Q    When you met with the defendant, I believe you

6  testified on direct that his demeanor tended to be -- it was

7  cooperative; is that right?

8  A    Yes.

9  Q    And he was compliant with your requests generally; is

10 that right?

11 A    Right.

12 Q    Was he friendly with you?

13 A    I would characterize him as being overly friendly

14 almost flirtacious in manner.

15 Q    When you met with him, you said you met with him on

16 seven occasions; is that right?

17 A    Yes.

18 Q    Did he remember who you were from meeting-to-meeting?

19         MS. DOLAN:  Objection.

20         THE COURT:  If you know.

21 A    I don't remember specifically, but I would have

22 reported -- noted it in my record had he not remembered.

23 Q    Did you note it in your record?

24 A    I did not.

25 Q    Did he remember -- when he came to your office for a

1  meeting, did he, in your estimation, understand why he was

2  there?

3  A    I don't recall specifically, but again, I would have

4  noted it otherwise, and I didn't note anything in my report

5  -- or, I'm sorry, in my file.

6  Q    Now, you mentioned on direct, I believe, that you asked

7  the defendant -- you conducted interviews with the defendant

8  in addition to tests; is that right?

9  A    Correct.

10  Q    And defense counsel drew your attention to a document

11  marked 3500-DB-15, that's this competency interview.  Do you

12  remember that?

13  A    Yes.

14  Q    One of the questions that you discussed with defense

15  counsel was the second one, what are you charged with?  Do

16  you remember that discussion?

17  A    I don't remember it specifically aside from the

18  notations I have there.

19  Q    I mean, do you remember discussions you had with the

20  defense counsel about it a few moments ago?

21  A    Yes.

22  Q    And in the course of your discussion with the defendant

23  at the time of that interview, you asked him what you

24  describe as an open-ended question; is that right?

25  A    Right.

1  Q    And that question was about what he was charged with;

2  is that correct?

3  A    Yes.

4  Q    When he answered your question, did he tell you about

5  his version of the facts of the case?

6  A    He did give some version of the facts, yes, it appears

7  that way.

8  Q    Did you ask him for that information?

9  A    I don't specifically recall asking for it.

10 Q    When you asked the open-ended question that you, in

11 fact asked, why did you ask that question, why is it

12 relevant?

13 A    Why is the question of his charge relevant?

14 Q    Exactly, yes?

15 A    It's relevant to know whether the defendant even has an

16 understanding as to how he became detained or why he's

17 incarcerated and why he needs to go through a court process.

18 Q    And you also testified that sometimes you do have a

19 discussion with defendants about the facts of their case; is

20 that right?

21 A    Yes.

22 Q    And why is that sometimes relevant?

23 A    It's relevant to see whether they're able to

24 communicate in a way that's rational.  They need to be able

25 to provide their defense attorney with their version of

D. BRAUMAN - CROSS/MR. TROWEL                    35

1   events.

2   Q    In the course of asking these questions of the

3   defendant and having this discussion, did you reach a

4   conclusion about his understanding of the legal system?

5   A    I did.

6   Q    What was your conclusion?

7   A    I felt he does have a rational understanding of the

8   proceeding against him.

9   Q    And in the course of his discussion with you or the

10  information he offered about the facts of the case, did you

11  reach a conclusion about his understanding of his specific

12  case?

13  A    Can you repeat that?

14  Q    Sure.  That was a long question.  Sorry.

15          In the course of your discussion with him where he

16  volunteered -- actually, withdrawn.

17          You mentioned that he volunteered some facts about

18  his case; is that right?

19  A    Yes.

20  Q    In the course of that discussion, were you able to

21  reach a conclusion about his understanding about his

22  specific case?

23  A    With regard to his understanding of the charges, yes.

24  Q    But -- did the fact that he was able to discuss the

25  facts with you, was that relevant to your analysis at all?

1   A    Yes.

2   Q    In what way?

3   A    I opined that he does have a factual understanding in

4   addition to a rational understanding of his charges.

5   Q    So he had both a general understanding of the legal

6   system and then also -- is it fair to say he had a general

7   understanding of the legal system and then also a specific

8   understanding of his own case?

9   A    Yes.

10  Q    You also testified on direct, I believe, that the

11  defendant -- or that you asked the defendant a question

12  about his relationship with his attorney; is that right?

13  A    Correct.

14  Q    And you mention some of the things that the defendant

15  told you in the course of that discussion, and I'm putting

16  on the overhead the portion of 3500-DB-15 that reflects your

17  notes; is that right?  Is that what you see here?

18  A    Yes.

19  Q    In the course of your discussion with the defendant, he

20  told you that he trusted his lawyer; is that right?

21  A    Yes.

22  Q    He told you that the meetings were friendly; is that

23  right?

24  A    Correct.

25  Q    And that the meetings feel like they're team; is that

1  right?

2          MS. DOLAN:  Object to the content of Mr. Bumagin's

3  responses.  This is not in evidence.

4          THE COURT:  Well, I'm going to overrule the

5  objection.  And if it becomes appropriate to seal a portion

6  of the transcript for any confidentiality purposes, we'll do

7  that to protect.

8          MS. DOLAN:  Thank you.

9          THE COURT:  Why don't we have the question and the

10 answer back from the point of the objection so you can

11 answer.  Would you read back please.

12          (The last two questions were read back.)

13          THE WITNESS:  Yes, that's right.

14 BY MR. TROWEL:

15 Q    And he told you that when they speak, his counsel

16 listens and they have discussion; is that right?

17 A    Right.

18 Q    In your opinion, did your discussion with the defendant

19 about those issues presuppose his memory of having met with

20 his counsel in the past?

21 A    Yes, I guess it did.

22 Q    So, in other words, because he's describing the

23 meetings with counsel to you, he must remember them; is that

24 fair to say?

25 A    It's fair to say he remembered meeting with her, but

D. BRAUMAN - CROSS/MR. TROWEL                38

1   the content of the meetings, I'm not sure, he was not very

2   descriptive during this discussion.

3   Q    Well, he told you that she listens when they have

4   discussions, right?

5   A    Correct.

6   Q    Does that suggest to you that he remembers having

7   discussions with his lawyer?

8   A    Sure, but whether he remembers the content of the

9   decisions, I'm -- that's not indicated here.

10  Q    Of course, and that's -- nor is it the question, I'm

11  just asking what is presupposed by the comments he made to

12  you.

13  A    Sure.

14  Q    He said that they feel like they're a team, right?

15  A    Yes.

16  Q    Does that presuppose that he's remembering a feeling

17  that resulted from a discussion that they had?

18  A    It could be.

19  Q    But he's reflecting a subjective feeling to you at that

20  point, right?

21  A    Sure.  Or as in the case that his daughter suggested,

22  he does tend to confabulate information if he doesn't

23  specifically recall.

24  Q    But did you have any evidence here that he was

25  confabulating?

1  A    No.

2  Q    So when he told you that they felt like a team, he was

3  expressing a subjective opinion about something that had

4  happened in the past; is that fair to say?

5  A    Yes.

6  Q    And that thing that happened in the past is a meeting

7  with counsel?

8  A    Right.

9  Q    You testified on direct I think, Dr. Brauman, that the

10 defendant discussed with you the history of substance abuse;

11 is that right?

12 A    Correct.

13 Q    Did you consider him a good historian of those issues?

14 A    Generally speaking, he was fairly reliable in the;

15 story some of the details were incontinent.

16 Q    In general, what does it mean to be a good historian?

17 A    That you're able to provide factual information or

18 information that appears to be factual.

19 Q    So when you asked him questions about his past

20 substance abuse, he was able to recall details and give them

21 to you?

22 A    He did.

23 Q    Now, you mentioned a moment ago on direct that -- and I

24 think you mentioned it actually on cross a moment ago, too,

25 that his daughter conveyed to you that she had seen a shift