D. BRAUMAN - CROSS/MR. TROWEL                    40

1   in her father; is that right?

2   A    Correct.

3   Q    Were you able to verify that in any way?

4   A    Verify her?

5   Q    Her experience?

6   A    No.

7   Q    So did you incorporate that into your report?  Did you

8   sort of take her at her word when she told you that?

9   A    Well, you take all of the pieces of data and you fit

10  them together, so you don't make a conclusion based on just

11  one piece of data, it was consistent with other pieces of

12  data I already heard from --

13  Q    I'm sorry to interrupt.

14  A    I already heard that same or similar information from

15  defense counsel and had been provided with a medical record

16  indicating a diagnosis of dementia prior to his arrest.

17  Q    Were you able to -- when defense counsel told you about

18  issues she was having, were you able to confirm that those

19  had occurred?

20  A    I never witnessed their interactions myself.

21  Q    So were you using two unverifiable pieces of evidence

22  to verify each other -- to verify the other?  In other words

23  -- I'm sorry to interrupt.

24  A    I would say that I look at all the data together, not

25  one independent of the others.  So it's not just two

D. BRAUMAN - CROSS/MR. TROWEL                    41

1    independent of everything else.

2    Q    So just step back for a moment.  When we talk about --

3    when you discussed the defendant's memory, is it fair to say

4    that you relied on the number of sources in concluding that

5    he may have some issues retaining information?

6    A    Yes.

7    Q    And was one of those sources the report from his

8    family?

9    A    Yes.

10   Q    And was one the report from his lawyer?

11   A    Yes.

12   Q    And then was another some of the testing that he did?

13   A    Right.

14   Q    And were there others?

15   A    Yes.  There was a medical record that indicated that he

16   had been receiving treatment for dementia and was prescribed

17   Aricept.

18   Q    Did that tell you anything about -- did the medical

19   records tell you anything about how the dementia was

20   affecting him?

21   A    I don't believe there were many details.

22   Q    And so my question is:  To the extent that the

23   collateral reports you were getting could not be verified,

24   were you using them in the course of your conclusion to

25   support the conclusion, even though you couldn't verify

D. BRAUMAN - CROSS/MR. TROWEL                    42

1   them?

2   A    Yes.

3   Q    You also mention that the daughter told you

4   specifically that he, on occasion, confabulated, I think was

5   the word you used, confabulated events, correct?

6   A    Correct.

7   Q    Did you, yourself, see that in the course of your

8   evaluation?

9   A    I don't recall specifically.

10  Q    Would you have noted it if you -- in your report, if

11  you had seen it?

12  A    Most likely, yes.

13  Q    On direct, defense counsel asked you a series of

14  questions about etiology.  Do you remember those?

15  A    Yes.

16         MR. TROWEL:  Etiology.

17  Q    Etiology.  And in the course of your testimony, I

18  believe you discussed with the defense counsel possible

19  physiological factors that could result in symptoms of

20  dementia; is that correct, or that could result in a

21  diagnosis of dementia?

22  A    I believe she presented some possible etiologies, yes.

23  Q    And was it your testimony that those possible these

24  etiologies, hypothetically speaking, could result in

25  dementia?

1   A     Can you repeat that one more time?

2   Q     Sure.  Was it your -- do you recall, was it your

3   testimony that those physiological etiologies --

4           MS. DOLAN:  I'm going to object to this

5   characterization of my direct, it's not even in the

6   ballpark.

7           THE COURT:  I'm going to overrule it and the

8   witness is certainly capable of correcting

9   mischaracterization of counsel.  So why don't you put the

10  question again, counsel.

11          MR. TROWEL:  I'll try to rephrase, your Honor, to

12  make it clear as well.

13          THE COURT:  Okay.

14  Q    Defense counsel asked you about fatigue; is that right,

15  whether that could have -- whether that could cause

16  dementia?

17          MS. DOLAN:  I don't ask about -- objection.

18          THE COURT:  Well, maybe she'll say you didn't ask

19  about it, so let's let her answer the question.

20  A    I recall offering fatigue could be one factor in terms

21  of someone's performance on testing.

22  Q    Were there other factors that you discussed with

23  defense counsel that could also effect an individual's

24  testing, physiological effects?

25  A    Yes.  Generally speaking, substance use or if someone

D. BRAUMAN - CROSS/MR. TROWEL                    44

1   is under the influence of medication or if they have other

2   medical conditions.

3   Q     Even assuming though that a defendant had a

4   physiological problem that resulted in lower test scores,

5   isn't it nevertheless true that the test scores would

6   underestimate their actual abilities?

7   A     Can you rephrase that question?

8   Q     Sure.  If it is -- hypothetically speaking, if you have

9   a hypothetical defendant who is suffering from a

10  physiological problem that results in lower test scores, is

11  it not nevertheless true -- isn't it nevertheless true that

12  the test scores will underestimate the defendant's actual

13  abilities?

14            THE COURT:  Could you read that question back,

15  please.

16            (Question was read back.)

17            THE COURT:  Do you understand the question?

18            THE WITNESS:  I'm sorry, it's --

19            THE COURT:  Why don't you put in another question,

20  it seems a little bit confusing.

21            MR. TROWEL:  Could I give it one more shot?

22            THE COURT:  You can give it five more shots.

23            MS. DOLAN:  Well, objection to that.

24            THE COURT:  But perhaps straighter shots, narrower

25  shots, clearer shots might be appropriate.

1        MR. TROWEL:  Thank you, your Honor.

2   Q    The question I'm asking, Dr. Brauman, is:  Does it

3   matter, does the etiology matter when you're talking about

4   lower test scores?  Isn't the result still --

5        THE COURT:  Wait.  Wait.  One question at a time.

6   Does the etiology matter when you're talking about test

7   scores?

8        THE WITNESS:  It matters in terms of the ultimate

9   diagnosis, but the test score is the test score.

10  Q    And no matter the etiology, a test score that's

11  effected, even by a physiological problem, still

12  underestimates the defendant's actual ability, isn't that

13  right?

14  A    Say that one more time, please?

15        THE COURT:  Read it back, listen to the question.

16        (Question was read back.)

17        THE WITNESS:  I'm still confused by your question.

18        THE COURT:  Put another question, counsel.

19        MR. TROWEL:  I really am sorry.  I do think this

20  is an important point.

21        THE COURT:  That's why I keep letting you go at

22  it.  Break it down.  Go ahead.

23  BY MR. TROWEL:

24  Q    Let's suppose hypothetically that the defendant was

25  suffering from fatigue.  And because he was suffering from

1   fatigue, he did poorly on a test.

2   A    Okay.

3   Q    Okay.  Even though that's a physiological etiology,

4   isn't it still true that the lower test scores underestimate

5   his actual ability?

6   A    In some cases it could be an underestimate.  If it's a

7   function of something that might change over time, like

8   fatigue, one might be fatigued when you meet with them on

9   Monday, but Tuesday they may not be fatigued, or something

10  that's more -- that's not dynamic, something that's more

11  static as in the case of dementia, it might be something

12  that you expect to see over time, so it wouldn't necessarily

13  be an underestimate.

14           THE COURT:  Let me ask the witness this question,

15  it goes back to an old WC Fields joke:  A woman comes up to

16  WC Fields and says, you are drunk.  And he says, yes, I am,

17  ma'am, but you're ugly, and tomorrow I'll be sober, okay?

18  That's the joke.  Not PC, but that's the joke.

19           Now, he's trying to get a sense of whether or not

20  you go from a fatigue platform on the test and that's locked

21  in or whether the next day he might or might not be sober,

22  okay?

23           So could you try to put a simple-minded, for the

24  poor District Court Judge here, put on your WC Fields hat,

25  answers his questions and then we'll have a re-direct, okay?

1    That's the issue, okay?  Are we clear now on what we're

2    trying to get at?

3              MR. TROWEL:  I think so, your Honor.

4              THE COURT:  Okay.

5    BY MR. TROWEL:

6    Q    So in this case, Dr. Brauman, the defendant scored

7    poorly on certain tests, right?

8    A    Yes.

9    Q    And there are a number of reasons -- there are a number

10   of potential reasons for that, correct?

11   A    Yes.

12   Q    And I believe on Ms. Dolan's direct she suggested that

13   maybe there could be a physiological reason for that.

14   That's a possibility, right?

15   A    I believe I suggested that's one possibility.

16   Q    And even if it was a physiological reason, the lower

17   results would nevertheless be an underestimate of his actual

18   abilities?

19   A    Still no, not if it's something that's a static

20   condition.  It's not an underestimate if that is his true

21   functioning.

22   Q    Let's say he had low blood sugar and he did poorly on

23   the test.

24   A    Well, blood sugar is not static, that's dynamic.

25   Q    So if his blood sugar condition improved, would you

D. BRAUMAN - CROSS/MR. TROWEL                    48

1   expect him to do better on a subsequent test?

2   A    Sure.

3   Q    Thank you.

4        MR. TROWEL:  I apologize that that took as long as

5   it did.

6        THE COURT:  It's okay.  I've got lots of old

7   fashioned jokes to get us to the resolution, if we have to

8   go down that road.  Come on.

9   Q    On direct you discussed with Ms. Dolan a

10  neuropsychological exam that was done before you evaluated

11  the defendant; is that correct?

12  A    Correct.

13  Q    And you testified that -- or I'll -- withdrawn.

14       Did you request that neuropsychological exam from

15  Ms. Dolan?

16  A    I did.

17  Q    And why did you request it?

18  A    Because considering those findings would be very

19  important for my own conclusions and also reviewing that

20  testing data might be helpful.

21  Q    Did Ms. Dolan permit you to review the report?

22  A    No.

23  Q    Did you specifically ask her for a copy of it by E-mail

24  and by phone?

25  A    Yes.

D. BRAUMAN - CROSS/MR. TROWEL                    49

1   Q    And did she give you a copy of it?

2   A    No.

3   Q    Now, when you began testing the defendant, did you

4   communicate with defense counsel?

5   A    I --

6   Q    As you began the evaluation?

7   A    I communicated with her early within the evaluation,

8   yes.

9   Q    And did she make any requests of you at that point?

10  A    It appeared she wanted to have a little bit more

11  control or influence over what testing I would be giving to

12  the defendant.

13  Q    And what did you do, if anything, about that?

14  A    I told her I was not comfortable with that.

15  Q    Why not?

16  A    Because I thought it might influence my findings.

17  Q    Did you have a concern about not seeing the

18  neuropsychological exam also?

19  A    Yes.

20  Q    What was your concern?

21  A    Not having those results was, in my opinion,

22  withholding information that was pertinent in my evaluation.

23  Q    Now, you mentioned earlier, a moment ago, that you

24  conducted some effort testing of the defendant, right?

25  A    Yes.

1   Q    Were there other effort tests that you could have done

2   on the defendant?

3   A    Yes.

4   Q    Why didn't you do them?

5   A    Ms. Dolan -- Ms. Dolan did provide me a list of the

6   tests that were administered by the neuropsychologist, and

7   some of the tests that I would given would have just been

8   administered.

9   Q    So you were unable to do the testing that you thought

10  was appropriate because of the prior neuropsychological

11  exam?

12  A    Correct.

13  Q    But you were not permitted to see that exam?

14  A    Correct.

15  Q    In your report you wrote, I'm quoting page 11 of what's

16  been admitted as Defense Exhibit 1, that "The defendant was

17  similarly unable to identify the AUSA and --

18             THE COURT:  Slow it down please for the reporter.

19  Q    "The defendant was similarly unable to identify the

20  AUSA and even misidentified him as a female."  Do you recall

21  that writing that in the report?

22  A    I did write that.  I subsequently came to understand

23  that there was also a female assigned to this case, so that

24  line in that report should be stricken.

25  Q    What relevance did your original understanding -- what

1   relevance did it have to your conclusion when you thought

2   the defendant was mistaken about the AUSA?

3   A    It was just one piece of data; however, overall, I

4   still found that he had a factual understanding of the

5   proceedings.

6   Q    When you met with the defendant, did he -- when you

7   discussed with the defendant what he was doing at your

8   facility, did he mention another federal facility by name,

9   do you recall?

10  A    He was -- he -- let me start over.

11       He expressed some shock, I would say, in terms of

12  having to come to a detention center.  He thought that he

13  was going to be going to FMC Devens.

14  Q    And did he mention FMC Devens to you?

15  A    Yes.

16  Q    Had you mentioned it to him before that?

17  A    No.

18  Q    So he had learned that, the name of that facility

19  elsewhere?

20  A    Yes.

21  Q    And retained it until he discussed it with you?

22  A    Right.

23  Q    In the course of that interview, did he -- did you ask

24  him for contact information for family members?

25  A    I did.

1   Q    Did he provide you with phone numbers, if you recall?

2   A    He provided two of the three phone numbers I asked for.

3   Q    Did he provide a phone number for one Alex Shapiro?

4   A    That sounds familiar, yes.

5   Q    Did he provide that phone number to you from memory?

6   A    I believe so.

7   Q    Did he have anything on him where he could have, you

8   know, stored that phone number?

9            MS. DOLAN:  Objection.

10           THE COURT:  Sustained as to whether he could have.

11  Q    Did he, in fact, have that phone number on his person,

12  do you remember?

13           MS. DOLAN:  Objection.

14           THE COURT:  If you know.

15  A    I don't remember.

16  Q    Did he provide you with a phone number for his son?

17  A    Yes.

18  Q    And do you recall whether he provided that from memory?

19  A    I don't remember.

20  Q    Again, do you recall him having that on a document with

21  him?

22  A    I don't recall.

23  Q    And then he provided with you a number that he said was

24  for his wife, but it was, in fact, for his daughter; is that

25  correct?

1    A    Yes.

2    Q    You mentioned on direct that your conclusion was based

3    in large part on your concerns that he had a limited ability

4    to retain information; is that correct?

5    A    Yes.

6    Q    And that as a result of that, he couldn't make an

7    informed decision about legal issues in this case; is that

8    right?

9    A    Right.

10   Q    You testified though a few moments ago, I think on

11   direct and on cross, that he was able to recite to you facts

12   of his case.  Do you recall testifying that way?

13   A    Yes.

14   Q    And you also testified that he described his

15   relationship with his lawyer with you; is that right?

16   A    Yes.

17   Q    And he had -- do you know when the last time that he

18   had met with his lawyer?

19   A    I don't know.

20   Q    You also testified on direct that you were concerned

21   about whether he could work with his lawyer, right?

22   A    Right.

23   Q    But you also testified that he said they had a friendly

24   relationship, right?

25   A    Yes.

1   Q     And that he believed she listened to him, right?

2   A     Right.

3   Q     And that he felt like they were a team; is that right?

4   A     Yes.

5   Q     Is it fair to say that your primary concern was his

6   ability to retain information?

7   A     My primary concern was his ability to collaborate with

8   defense on a strategy, given the difficulty with retaining

9   information.

10  Q     In the course of your -- how long is your evaluation

11  that you conducted of the defendant?

12          MS. DOLAN:  Objection, already asked and answered.

13          THE COURT:  Eight meetings, seven hours, eight

14  hours.

15          MR. TROWEL:  Over what period of time, your Honor,

16  that's what I'm asking.

17          THE COURT:  You may answer it again.

18          THE WITNESS:  It was just short of four weeks.

19  BY MR. TROWEL:

20  Q     Now, your ultimate diagnosis, I think you said on

21  direct, was that the defendant had dementia not otherwise

22  specified; is that correct?

23  A     Yes.

24  Q     In your experience and based on your expert opinion is

25  it possible for someone with that diagnosis to be found

1    competent?

2    A    It's possible, yes.

3    Q    Did your report recommend that the defendant should be

4    further evaluated to determine if his competency could be

5    restored?

6    A    Yes, that's standard language in our reports when

7    someone is opined not competent.

8    Q    Based on your examination of the defendant and your

9    expert opinion, would it surprise you to learn that

10   following a subsequent restoration evaluation, his

11   competency was, in fact, restored?

12   A    I would not be surprised.

13   Q    Why is that?

14   A    That's common.

15   Q    Can you expand on that?  Why, why in your experience?

16   A    When an individual goes to a medical center such as

17   Butner, they're there for an extended period of time, they

18   may be able to educate him or provide other neruo behavioral

19   interventions or accomodation strategies for whatever

20   deficits may exist.

21   Q    Do they also just see him for a longer period of time?

22   A    Yes.

23   Q    Do they do additional testing?

24   A    Correct.

25   Q    Do they have additional opportunities to observe him?

1   A    Yes.

2   Q    And are all of those relevant to a subsequent

3   determination?

4   A    They are relevant, yes.

5            MR. TROWEL:  Okay.  Nothing further, your Honor.

6            THE COURT:  Your witness.

7   REDIRECT EXAMINATION

8   BY MS. DOLAN:

9   Q    Dr. Brauman --

10           MS. DOLAN:  I'm going to ask permission to

11  approach the witness with my laptop here, Judge.

12           THE COURT:  Maybe Mr. Jackson can help you.  You

13  don't have the -- the Elmo doesn't do it?

14           MS. DOLAN:  I just want to put something up on the

15  Elmo -- or up on the screens from my laptop directly and I

16  don't see a USB port.

17           THE COURT:  All right.  Mr. Jackson will do that

18  for you.  We don't allow counsel to encroach upon witnesses,

19  it's too frightening.

20           COURTROOM DEPUTY:  She doesn't have an updated

21  laptop, Judge.

22           MS. DOLAN:  I actually do.

23           THE COURT:  I was going to say, you probably have

24  the updated one, I know where the tech fault line lies in

25  this courtroom.

1          MS. DOLAN:  I'm afraid to say.

2          THE COURT:  Do you have it in terms of what you

3    want to present to the witness?

4          MS. DOLAN:  Yeah, but I've only got it on the

5    laptop.  Let me see what I can do from here.

6          THE COURT:  Well, why don't you read it to the

7    witness and then ask the witness to respond, just so we'll

8    do it old school, line-by-line.

9          MS. DOLAN:  I'll do the best I can.

10         THE COURT:  Thank you.  Sorry for the horse and

11   buggy.

12   BY MS. DOLAN:

13   Q    Now, Dr. Brauman, Mr. Trowel just talked to you about

14   my -- well, that I declined to provide you with the reports

15   that had been generated by the neuropsychologist that the

16   defense had retained?

17   A    Correct.

18   Q    And he also mentioned a report from defense counsel, I

19   think that's how -- the exact word that he used, as to

20   Mr. Bumagin's -- as to Mr. Bumagin?

21   A    I don't recall specifically.

22   Q    Well, did I ever give you a report?

23   A    No.

24   Q    Did I send you an E-mail on -- I sent you an E-mail

25   with a variety of information, correct?

1    A    Yes.

2    Q    And that was in -- on or about August 2nd of 2012,

3    correct?

4    A    That sounds about right.

5    Q    And I listed 18 -- the names of 18 tests that the

6    defense neuropsychologist administered, correct?

7    A    Yes.

8              (Document handed to Ms. Dolan.)

9              MS. DOLAN:  Oh, good, Mr. Trowel is saving the

10   day.

11             If I could pass what's been pre-marked as

12   3500-DB-11 up to the witness?

13             THE COURT:  Yes.  Mr. Jackson, would you put that

14   in front of the witness?

15             COURTROOM DEPUTY:  Sure, Judge.

16             (Document handed to the witness.)

17   BY MS. DOLAN:

18   Q    Now, Mr. Trowel also characterized, if you're not being

19   able to do certain tests that you're being prohibited from

20   doing certain tests.

21             You weren't able to do those tests because they

22   had already been given, correct?

23   A    Well, I was concerned about practice effects and repeat

24   administrations.

25   Q    And it's fair to say the tests that were given were

1  pretty standard ones, correct?

2  A    Yes.

3  Q    In fact, they were ones that you, yourself, wanted to

4  give, correct?

5  A    Right.

6  Q    And with respect to the quote, unquote report that I

7  gave you, there are three sentences concerning information

8  about Mr. Bumagin and his family that I gave you, correct?

9  A    Which one are you referring to specifically?

10  Q    Paragraphs four and five.

11  A    Okay.  Yes.

12  Q    And drawing your attention to paragraph five, what is

13  it that I told you about Mr. Bumagin's family?

14  A    That he experienced situations consistent --

15         THE COURT:  Whoa, whoa, whoa, slow it down,

16  cowgirl, nice and slow, okay?  Let's go.

17         THE WITNESS:  He experienced situations consistent

18  with disorientation or another condition relating to his

19  cognitive process in the period prior to his arrest.

20  Q    Did I give you any specific examples of disorientation?

21  A    Based on the family's recollection or your own?

22  Q    My own.

23  A    Yes.  You, in our telephone conversation, I believe.

24  Q    And what did I tell you?

25  A    That he had difficulty recollecting information that

1   had been previous discussed.

2   Q    But going back to the family, did I give you any

3   specific examples of anything that his family had said?

4   A    I would have to look in my file.

5   Q    Did I give you any specific examples -- did I try to

6   force a diagnosis on you?

7   A    Force a diagnosis?  No.

8   Q    And could you read what I told you about my concerns

9   relating to Mr. Bumagin, the so-called report from defense

10  counsel?

11          THE COURT:  Slowly read, please.

12  A    Are you referring to number four?

13  Q    Yes.

14  A    As we discussed on the phone, I'm concerned whether

15  Mr. Bumagin is able to assist in his own defense due to

16  issues relating to his memory.  This concern arises from the

17  questions regarding his ability to remember our discussions

18  of his case over the course of time.

19  Q    Now, we're done with that.

20          We had a kind of painful discussion about the

21  difference between etiology and physiology.  Etiology and

22  physiology.  And etiology of a condition is totally

23  different from physiology, is it not?

24  A    Yes.

25  Q    And could you distinguish the two for us, please?

1  A    Physiology refers to the actual physical process.

2  Etiology refers to the cause of a process or the cause of a

3  diagnosis.

4  Q    And then all those questions about doing the

5  hypothetical about doing better on the tests, that was as to

6  the validity indicator profile, was it not?

7  A    Right.

8  Q    So if Mr. Bumagin had, in fact, done better on those

9  tests, then you wouldn't have scrutinized the findings and

10 conclusions with that heightened degree of scrutiny that you

11 applied, correct?

12 A    Correct.

13 Q    Now, Mr. Trowel also asked you about Mr. Bumagin's

14 relationship --

15         THE COURT:  Please use the microphone.

16 Q    -- with me, correct?

17 A    Yes.

18 Q    Now, Mr. Bumagin did not volunteer -- when you asked

19 those questions, Mr. Bumagin did not volunteer any potential

20 defenses to you, did he?

21 A    No.

22 Q    For example, he didn't say talk about entrapment, did

23 he?

24 A    I don't recall that, no.

25 Q    And he didn't discuss any particular defense strategies

1   or legal approaches to his case, correct?

2   A     Not that I recall.

3   Q     Okay.  And finally, Mr. Trowel asked you about

4   Mr. Bumagin's rational understanding of the proceedings

5   against him, correct?

6   A     Yes.

7   Q     And his rational understanding of his specific case,

8   correct?

9   A     Yes.

10  Q     And finally, his reliability as a historian, including

11  his memory of telephone numbers, correct?

12  A     Correct.

13  Q     Can you explain how dementia operates on a human being

14  and what it does?

15  A     There are various types of dementia.  For instance, in

16  one case, someone may have very good recollection of more

17  remote information or background data, and might be able to

18  recall phone numbers and details of their history, but they

19  may be more impaired for learning new information as is the

20  case here.

21  Q     Is there a general course of decline for short-term

22  memory in dementia patients?

23  A     Each type of dementia has its own specific course, but

24  generally speaking, there wouldn't be an improvement.

25  Q     Would you, in dementia patients, differentiate between

1  long-term memory and short-term memory?

2  A    Yes.

3  Q    And is that distinction important in making --

4  A    Yes.

5  Q    And why is it important?

6  A    Short-term memory may have more to do with daily

7  functioning over time on their ability to learn new

8  information, retain it and incorporate it.  Versus long-term

9  memory, the usefulness of his childhood data during a court

10  case, for instance, is not quite as relevant as information

11  pertaining to the more recent timeframe.

12  Q    And is there a -- generally speaking, I understand

13  there are exceptions, but generally speaking, do dementia

14  patients lose their short-term memory first or their

15  long-term memory?

16  A    Generally, it is a short term functioning issue first.

17  Q    So even if a dementia patient is presenting short-term

18  memory problems, they may still be able to recollect

19  long-term memory with ease, correct?

20  A    Yes.

21        MS. DOLAN:  I actually thought it was Winston

22  Churchill, not WC Fields, but other than that, I don't have

23  anything further.

24        THE COURT:  My guess is they stole from each

25  other, but either way.

D. BRAUMAN - RECROSS/MR. TROWEL                    64

1          Your witness.

2          MR. TROWEL:  I have a very brief recross, your

3   Honor.

4          THE COURT:  Yes, absolutely.

5   RECROSS-EXAMINATION

6   BY MR. TROWEL:

7   Q    Dr. Brauman, Ms. Dolan referred to an E-mail she sent

8   to you that listed a number of tests that a previous

9   neuropsychologist had done on the defendant; is that right?

10  A    Yes.

11  Q    And she sent you the names of the tests, correct?

12  A    Yes.

13  Q    Did she send you the results of the tests?

14  A    No.

15  Q    So did you know how the defendant had done on those

16  tests?

17  A    I did not.

18  Q    Did the fact that he had already been -- did the fact

19  that those tests had already been administered to him limit,

20  in your professional judgment, your ability to --

21          MS. DOLAN:  Objection.

22          THE COURT:  Let my him finish the question and

23  then you can object.

24  Q    Did the fact that the defendant had already been

25  administered those tests, limit you, in your professional

1   opinion, from administering them again?

2           MS. DOLAN:  Your Honor, I believe these specific

3   questions were posed on cross.

4           THE COURT:  They were not, but I'll allow it.

5   There is no jury here.  Why don't you answer the question.

6           THE WITNESS:  I was limited, yes.

7   Q    Would have you done them if you could have?

8   A    Not all of them, but some of them, yes.

9   Q    And would they have been relevant to your

10  determination?

11  A    Yes.

12  Q    Now, you --

13          THE COURT:  Let me just be clear:  You could have

14  given the test, you elected not to because of what you

15  described as the practice effect; is that correct?

16          You were not precluded from giving those tests,

17  you elected in your professional judgment, with which I'm

18  not quarreling, not to give them?

19          THE WITNESS:  Correct.

20          THE COURT:  So you could have given them?

21          THE WITNESS:  I elected not to give them.

22          THE COURT:  Because of the practice effect.

23          THE WITNESS:  Right, and the concern of the

24  reliability.

25          THE COURT:  And it would have challenged the

1    reliability, it would have undermined the reliability in

2    your view, but there was nothing that precluded you from

3    giving the test; is that correct?

4            THE WITNESS:  Correct.

5            THE COURT:  And could you have waited a particular

6    period of time to try to mitigate the practice effect, or is

7    that a genie out of the bottle, you can't get it back in; if

8    you've taken the LSATS once, it doesn't matter how long you

9    wait before you take them again.

10           THE WITNESS:  Each test is different, but

11   generally speaking, my evaluation was only a 30-day period,

12   so the effects would have not been mitigated enough by the

13   end of that period to give these tests.

14           THE COURT:  If you had a longer period of time,

15   and again, I'm asking low-rank questions being a low-rank

16   sort of Judge, but if you had a longer period of time, would

17   you have given those tests and mitigated the -- or

18   ameliorated the practice effect in your professional

19   judgment?

20           THE WITNESS:  I belive some of them could have

21   been given, if they were a longer period, yes.

22           THE COURT:  Go ahead.

23           MR. TROWEL:  Thank you, your Honor.

24   BY MR. TROWEL:

25   Q    You have testified obviously about the report and your

D. BRAUMAN - RECROSS/MR. TROWEL                    67

1    opinion on the defendant's competency as of the date of your

2    report, correct?

3    A    Yes.

4    Q    Do you have an opinion about the defendant's competency

5    as you sit here today?

6    A    No.

7    Q    Why is that?

8    A    I have not seen him in almost two years.

9    Q    And you also discussed with Ms. Dolan short-term memory

10   issues just a moment ago, right?

11   A    Yes.

12   Q    Did you, in your personal interactions with the

13   defendant, see that he had -- he was having short-term

14   memory difficulties?

15   A    He had difficulty retaining my direction to him not to

16   inquire of me personal questions.  And also, his ability or

17   seeming inability to navigate the facility and finding his

18   own housing unit and his cell were concerns for me in terms

19   of his memory, yes.

20   Q    You mentioned in your report that he had minor

21   difficulty in navigating the facility; is that right?

22   A    Yes.

23   Q    Had he just been transferred there from another

24   facility?

25   A    He had.

68

1   Q    Did --

2              MR. TROWEL:  Nothing further, your Honor.  Thank

3   you.

4              THE COURT:  Your witness.

5              MS. DOLAN:  I'm done.

6              Oh, I have I new witness.  I'm done.  Thank you.

7              (Witness leaves the witness stand.)

8              MS. DOLAN:  The defense calls Dr. Jill Grant.

9              THE COURT:  Thank you, ma'am.

10

11  **JILL GRANT**, called by the Defense, having been first duly

12  sworn, was examined and testified as follows:

13             THE COURT:  Please sit down, Doctor.  And I'm

14  going to ask you to speak clearly and distinctly into the

15  microphone as I ask people to channel their inner Lord Vader

16  and not their inner Diane Keaton; keep your voice up and

17  please state and spell your name, and then counsel will have

18  some questions.

19             THE WITNESS:  Okay.  My name is Dr. Jill R. Grant.

20  That's J-I-L-L, Middle initial "R", G-R-A-N-T.

21             THE COURT:  Thank you, Doctor.  You may proceed,

22  counsel.

23  DIRECT EXAMINATION

24  BY MS. DOLAN:

25  Q    Good afternoon, Dr. Grant.

J. GRANT - DIRECT/MS. DOLAN                    69

1    A    Good afternoon.

2    Q    Have you and I ever spoken before?

3    A    We have.

4    Q    And how many times have we spoken?

5    A    I can't recall.  We have exchanged E-mails and spoke on

6    the phone at least once, maybe more than that.

7    Q    Was that the time that Mr. Bumagin was also on the

8    telephone?

9    A    Yes.  One of those times he was, and it may be the only

10   time we've spoken on the phone.

11   Q    We'll get back to that in a minute.

12        And you and I have corresponded back and forth via

13   E-mail, correct?

14   A    Yes.

15   Q    And did I make a variety of requests to you for

16   procedures and protocol of the BOP in terms of questioning

17   defendants undergoing competency evaluations about the

18   underlying defense conduct?

19   A    Yes, you did.

20   Q    And did you ultimately provide any such documentation?

21   A    Yes.  I exchanged a few E-mails with you regarding my

22   understanding of what you wanted.  And then I consulted with

23   our legal counsel and my supervisor, and I believe -- I

24   don't know if I sent them directly or our legal counsel sent

25   you federal guidelines, and then I responded to your request

1    as best as I could as my understanding of my role.

2    Q    And after the guidelines were provided, I indicated

3    that they did not touch upon the subject matter that I

4    inquired about and I inquired further, correct?

5    A    Yes.  I believe I directed you to our legal team.

6    Q    Okay.  And other than that, have you and I communicated

7    any further?

8    A    Not to my recollection.

9    Q    Have you communicated with the government about this

10   case?

11   A    Yes.

12   Q    Approximately how many times?

13   A    I don't recall.  I don't recall.

14   Q    More than two?

15   A    Yes.

16   Q    More than ten?

17   A    No.

18   Q    And what was the substance of those discussions?

19   A    I was contacted about the potential competency hearing.

20          So over a period of several months I've been

21   contacted periodically about scheduling a hearing, and then

22   that was changed over time.

23   Q    And did the government discuss your report with you at

24   all?

25   A    They did, recently.

J. GRANT - DIRECT/MS. DOLAN                    71

1  Q    And how many times did that happen?

2  A    I believe we talked on the phone twice.

3  Q    And have I contacted you about your report?

4  A    You have not.

5  Q    Could you briefly tell us where you work and how long

6  you've been there and what you do.

7            MS. DOLAN:  And if I can ask for a stapler?

8  A    Sure.  I currently work at the federal medical prison

9  in Butner, North Carolina.  I'm employed as a forensic

10 psychologist.  I've been employed at that facility since

11 November of 2000.

12           Prior to that, I've worked in other bureau of

13 prisons facilities, and within the department of corrections

14 with a Master's level degree at that point.

15 Q    And what exactly is your role and what does it entail

16 generally at FMC Butner?

17 A    My role is to conduct evaluations, court-ordered

18 evaluations; pretrial primarily, but not exclusively for

19 competency to stand trial, competency restoration, insanity

20 at the time of the offense, and dangerousness.

21           I also supervise predoctoral interns in conducting

22 those evaluations, and I testify as needed.

23 Q    For the government or for the defense?

24 A    Both.

25 Q    Now, in connection with this case you -- well, how many

1    times have you testified on behalf of the defense?

2    A    I don't know, exactly.  I've testified in total over

3    100 times.  I would say that most of those I'm called either

4    by the prosecution or just called to testify in general; and

5    a handful of times by the defense specifically.

6    Q    For example, like I called you, in a case like this?

7    A    Yes.  I was called in general for this hearing and

8    didn't know who was actually calling me as a witness.

9    Q    Now, you administered a sort of competency to stand

10   trial questionnaire with 25 specific questions on it,

11   correct, to Mr. Bumagin?

12   A    Correct.

13   Q    And that was a -- was this an open-ended for

14   forced-choice?

15   A    This was a forced-choice questionnaire.

16   Q    I'm putting on the screen what's been pre-marked for

17   identification as DX-2.

18        Do you recognize this?

19   A    Yes.

20   Q    And what is it?

21   A    It is a questionnaire that we derived in-house to help

22   us come to some conclusions about a defendant's factual

23   understanding of the legal system.

24        It can be used for educational purposes to help

25   educate if an individual does not understand that system or,

J. GRANT - DIRECT/MS. DOLAN                73

1    you know, the roles of the courtroom personnel and such.

2            It can also be used as a symptom validity test to

3    see if a person is exerting effort and answering questions

4    to the best of their ability.

5            And it can also be used just to gain factual

6    information to see if they know the factual information

7    related to the legal system.

8    Q    And is this a copy of the test that you administered to

9    Mr. Bumagin?

10   A    Yes.  It's actually a questionnaire, it's not a test,

11   it's not been --

12   Q    Dr. Grant, it's a yes or no question.

13   A    I administer a questionnaire, not a test.

14   Q    Is this the questionnaire that you administered?

15   A    Yes, it is.

16           MS. DOLAN:  Okay.  I move this into evidence.

17           MR. TROWEL:  No objection, your Honor.

18           THE COURT:  Admitted.

19           (Defense Exhibit DX-2 was admitted into evidence.)

20   Q    Now, this is a true/false questionnaire, right?

21   A    No, it's not.

22   Q    It's got two choices for each question, correct?

23   A    Correct.

24   Q    Now, in terms of gradations of a forced-choice

25   questionnaire, this is about as basic as it gets, is it not?

J. GRANT - DIRECT/MS. DOLAN                    74

1  A    It's very basic, yes.

2  Q    So this doesn't even have multiple possible answers,

3  just two?

4  A    Correct.

5  Q    And how many questions deal specifically with the

6  person's relationship with the lawyer?

7  A    I believe there is one question relating to that.

8  Q    And that question is, what does your lawyer do?

9  Choice A, solves the crime or choice B, takes your side?

10 A    Yes.

11 Q    Those are the only options?

12 A    Yes.

13 Q    Now, is there a reason that you didn't administer an

14 open-ended questionnaire?

15 A    Yes.  I asked open-ended questions in addition to this.

16 I did not base my decision on this questionnaire alone.

17 Q    Okay.  Where are those questions?

18 A    They were in -- conducted in the course of the clinical

19 interview.  And I believe I took some notes on the back of

20 this questionnaire that reflect his answers to some of my

21 questions.

22 Q    Did you write down the questions?

23 A    I did not.

24 Q    Why not?

25 A    I just did not.  I didn't feel it was necessary.  I was

J. GRANT - DIRECT/MS. DOLAN                    75

1    able to -- I typed them into my report from memory the same

2    day, so I didn't feel it was necessary.

3    Q    Now, does this questionnaire test current executive

4    function or long-term memory of the criminal justice system?

5    A    Could you repeat that question, please?

6              THE COURT:  Read it back, please.

7              (The last question was read back.)

8              THE WITNESS:  Neither.

9    Q    What does it test?

10   A    It doesn't test anything, but it gives me information

11   about an individual's factual understanding of the court

12   system.

13   Q    Can you tell us what this factual understanding is?

14   A    Well, the first question asks him about a witness and

15   if he has a good understanding of that.  What happens when

16   you go to court, the role of the Judge and the jury, et

17   cetera.

18   Q    So this questionnaire does not inquire into dynamic

19   roles just static roles, correct?

20   A    I'm not sure I understand your question.

21   Q    Well, this questionnaire doesn't inquire into

22   processing information as it's unfolding, does it?

23   A    It does ask about his understanding about the

24   difference between being found guilty and just being

25   arrested.

J. GRANT - DIRECT/MS. DOLAN                    76

1            So I didn't ask him about specific case events.  I

2    did not ask him about specific things unfolding in a

3    situation, but I believe that some of these questions do get

4    his understanding of that general process.

5    Q    Can you give us an example?

6    A    Yes.  We just see right here -- yeah.

7    Q    I can change the page.

8    A    Yes.  For example, what is a crime?  He understood the

9    difference of when you go to jail and when you break the

10   law, and that kind of represents the unfolding of a process.

11           On the next page --

12   Q    Well, when you say "kind of represents the unfolding of

13   a process" what do you mean by that sentence?

14   A    What I mean is that an individual's arrested --

15   typically when an individual is arrested, the next page will

16   reflect this better, but when an individual is arrested, it

17   doesn't mean they're necessarily convicted of a crime, it

18   doesn't mean that they're necessarily guilty of a crime.

19           So the next step that starts the thinking process

20   on that number nine question, but if you flip the

21   questionnaire to the next page --

22   Q    On a scale of one to ten, how bad would a person's

23   cognitive ability have to be before they got this question

24   wrong?

25           MR. TROWEL:  Objection.

J. GRANT - DIRECT/MS. DOLAN                 77

1          THE COURT:  Overruled.  She can answer.

2          THE WITNESS:  A lot of people whom I ask get it

3    wrong?

4          THE COURT:  Can you answer the question in the

5    terms it was asked, on a scale of one to ten.

6          THE WITNESS:  On a scale of one to ten, I could

7    give an percentage perhaps.

8          THE COURT:  Why don't you do it that way, if you

9    can't do it on the scale of one to ten, how about a

10   percentage?

11         THE WITNESS:  I would say approximately -- I don't

12   use this questionnaire with everyone, but I would say with

13   the folks that I do administer it to, 30 to 40 percent.

14         MS. DOLAN:  No, we're asking about --

15         THE COURT:  No.  No.  Let her finish the answer.

16   Go ahead.

17         THE WITNESS:  I answered it incorrectly.

18         THE COURT:  Answer the question, please.  Read the

19   question back -- or if you want, read my questions back and

20   answer my question and then you can go on to another

21   question.

22         (The last question was read back.)

23         THE COURT:  What percentage?

24         THE WITNESS:  Approximately 30 percent.

25         THE COURT:  Next question, counsel.

J. GRANT - DIRECT/MS. DOLAN                 78

1           MS. DOLAN:  Well, that's not the question.

2   BY MS. DOLAN:

3   Q    The question is:  How far gone would somebody have to

4   be before they start getting that question wrong?

5   A    I don't know.

6   Q    Now, how many questions on this questionnaire did

7   Mr. Bumagin answer correctly?

8   A    He answered them all correctly.

9   Q    And is that consistent with somebody who has a rational

10  understanding of the criminal justice system in the United

11  States?

12  A    It could be, but not necessarily.

13  Q    And does that involve a determination of that

14  individual's ability to function effectively with defense

15  counsel in that environment?

16  A    No, I don't believe that that -- that this

17  questionnaire hits on that issue at all.

18  Q    Handing up to the witness what's been marked as Defense

19  Exhibit A through I.

20          THE COURT:  Mr. Jackson?

21          MS. DOLAN:  I'm making a pit stop at the

22  government's table.  Can you have a look at those, please?

23          MR. TROWEL:  Your Honor, just so the record is

24  clear, could defense counsel repeat the numbers, the

25  exhibits numbers?

J. GRANT - DIRECT/MS. DOLAN                    79

1          MS. DOLAN:  Letter A through letter I, as in

2    "imagine."

3    Q    Do you recognize those?

4    A    I do.

5    Q    And what are those?

6    A    These are medical records from his stay at Butner.

7          MS. DOLAN:  I move those into evidence.

8          THE COURT:  Any objection?

9          MR. TROWEL:  No objection, your Honor.

10         Does defense counsel have a copy so that we know

11   what documents we've been talking about.

12         MS. DOLAN:  I can put them on the Elmo.

13         THE COURT:  Why don't you do that.

14         MS. DOLAN:  Thank you.

15         COURTROOM DEPUTY:  Do you need them back?

16         MS. DOLAN:  Yes, please.  Just for clarity, these

17   are in evidence now, correct?

18         THE COURT:  Yes, if you have them properly

19   identified.  There is no objection, right?

20         MR. TROWEL:  No objection.

21         THE COURT:  All right.  They're admitted.  Would

22   you identify them for the record, please?

23         (Defense Exhibits A to I were admitted into

24   evidence.)

25   BY MS. DOLAN: