J. GRANT - DIRECT/MS. DOLAN                    80

1  Q    This is a clinical encounter administrative note from

2  Dr. Jill Volin on March 13, 2013; is that correct?

3  A    Correct.

4  Q    When was March 18th in terms of the evaluation at

5  Butner; the beginning, middle or end?

6  A    He came to us in December, early December, so that's

7  towards the end.

8  Q    And this says, despite multiple conversations with the

9  medical service to reassure him, he cannot remember these

10 conversations and -- well, let me backtrack.

11       The patient continues to have problems with memory

12 and confusion; in particular, he believes he has terrible

13 medical illnesses, including malignancy which requires

14 surgery.

15       Despite multiple conversations with the medical

16 service to reassure him, he cannot remember these

17 conversations and perseverates on these issues.

18       Now, at the beginning of your testimony we

19 discussed the phone call that you and I had, correct?

20 A    Yes.

21 Q    About when was that?

22 A    I don't know.

23 Q    Was that before or after this medical evaluation

24 administrative note?

25 A    I think it was before, but I can't say for certain.

J. GRANT - DIRECT/MS. DOLAN                    81

1   Q    And what happened in that conversation with me?

2   A    We had a conference call with a staff physician, you,

3   me, and the defendant.

4   Q    About what?

5   A    About his medical conditions.

6   Q    And was he concerned?

7   A    Was who concerned?

8   Q    Mr. Bumagin.

9   A    Yes.

10  Q    Why?

11  A    Because he had medical conditions that he was concerned

12  about; I don't know particularly why.

13  Q    Do you recall the conversation that we had?

14  A    I don't recall many details, no.

15         THE COURT:  Do you recall it at all?

16         THE WITNESS:  Yes.

17         THE COURT:  What do you recall?

18         THE WITNESS:  I recall that we sat around the

19  table and discussed -- he had concerns about his -- I think

20  a growth on his neck, and he had -- he had been diagnosed

21  with hepatitis and it probably came up during that

22  conversation; although, I can't say for sure.  I know that

23  the physician notes it in the medical records later.

24         And then Ms. Dolan asked us questions and asked

25  the defendant questions, and I was really an observer,

1   because I'm not a medical expert, but our team physician

2   provided information to Ms. Dolan and to the defendant about

3   his medical conditions as he understood them, what tests

4   they were going to order, and what they were planning to do

5   in terms to treat him.

6   Q    And Mr. Bumagin was concerned that he had a

7   carcinogenic growth on his liver, correct?

8   A    Yes.

9   Q    But it was benign, correct?

10  A    Correct.

11  Q    And, in fact, Butner medical staff told him it was

12  benign previously, correct?

13  A    I don't know if they told him previously to that

14  conversation, but I believe they had.

15  Q    And this is Defendant's Exhibit B.  This is a report by

16  you, is it not?

17  A    Yes.

18  Q    And this is where he talks about a growth on his neck,

19  correct?

20  A    Yes.

21  Q    And you noted that in the past he has had multiple

22  somatic complaints, and many of them were not based on

23  realty.  For example, he continues to say he has liver

24  cancer despite this writer, the MD, his attorney, and him

25  having a conference call in which his medical problems were

1   discussed in detail, correct?

2   A    Yes.

3   Q    And that's on March 1st of 2013, correct?

4   A    Yes.

5   Q    17 days before the report that we were just discussing,

6   correct?

7   A    Yes.

8   Q    Now, Defendant's Exhibit C, this is a report again by

9   Dr. Jill Volin.  It notes Mr. Bumagin has a history and

10  diagnosis of Alzheimer's disease and a family history of

11  Alzheimer's disease.  Mr. Bumagin also has evidence of

12  atrophy and vascular disease; and also substance abuse.

13           THE COURT:  Would you use the microphone, counsel,

14  you're a little hard to hear.  Go ahead.

15  Q    It notes that a particular test was off for not knowing

16  day, date, month, year or season and delayed recall of three

17  objects; correct?

18  A    Yes.  That's what's written here, yes.

19  Q    Now, Defendant's Exhibit D, this is a clinical

20  encounter report by a Dr. Bennett.

21  A    Mr. Bennett.

22  Q    Mr. Bennett.  Evaluation date of February 13, 2013.

23  What is this clinical encounter report have to do with?

24  A    Mr. Bennett works in the physical therapy department

25  and it looks like they took some scans and did some tests to

J. GRANT - DIRECT/MS. DOLAN                    84

1   see why he's having trouble with his shoulder, and he was

2   referring referred for physical therapy for rehab.

3   Q    Now, on the second page of that report, in the

4   assessment portion, it says, he will likely need some

5   assistance with remembering his program due to dementia,

6   correct?

7   A    Correct, that's what it says.

8   Q    Now, this is Defendant's Exhibit E.  This is a report,

9   another report from Dr. Volin or Vo-lynn, I'm not sure if

10  I'm pronouncing it correctly?

11  A    Vo-lynn.

12  Q    Volin.  Dr. Volin, from January 22nd, and it notes that

13  patient continues to have problems with memory and

14  confusion, correct?

15  A    Yes.

16  Q    Just a couple more of these.

17        So Defendant's Exhibit F, this is January 18th,

18  Dr. Karol.  Now, this notes that he has had a hemangioma

19  since at least 2008.  What is that exactly?

20  A    I'm not a medical expert, I'm not sure, but it's a

21  growth.

22  Q    Paragraph four notes he has had a rather clear

23  sensorium, but will frequently forget things, correct?

24  A    That's what it says, yes.

25  Q    And what does a sensorium mean?

Case 1:11-cr-00800-WFK-JO Document 81-7 Filed 09/29/14 Page 6 of 40 PageID #: 936

1    A    Sensorium would be he's not hearing things and seeing

2    things, his senses are not intact, he's not having

3    perception disorder symptoms.

4    Q    But it does note that he frequently forgets things?

5    A    It did not that, yes.

6    Q    Defendant's Exhibit G, this is a report from

7    Dr. Yeboah, January 14, 2013.

8    A    Nurse Yeboah.

9    Q    Nurse Yeboah, pardon me.  Notes inmate has dementia and

10   needs to be repeatedly reminded about what's being done,

11   correct?

12   A    That's what it says here, yes.

13   Q    I have two more.  Defendant's Exhibit H, this is

14   Dr. Volin again, this goes back to December, and it also

15   notes he is currently experiencing signs of Alzheimer's,

16   particularly with memory problems, cannot find his cell.

17   His MRI showing atrophy is also consistent with Alzheimer's,

18   correct?

19   A    That's what it says, yes.

20   Q    And Alzheimer's is a form of dementia, correct?

21   A    Yes.

22   Q    And it's the most common form of dementia, generally

23   speaking?

24   A    I don't know.

25   Q    Why don't you know?

J. GRANT - DIRECT/MS. DOLAN                    86

1   A    I don't know if it's the most common, I don't know if

2   vascular dementia is more common than Alzheimer's dementia.

3   I know it's more difficult to diagnosis.  I don't know what

4   the literature says about if it's common, both of them are

5   common.

6   Q    Are you a neuropsychologist?

7   A    No.

8   Q    Did you have a neuropsychologist on the team?

9   A    I did, yes.

10  Q    And did you consult with her?

11  A    Yes.

12  Q    And do you recall discussing with her Alzheimer's and

13  dementia?

14  A    We discussed dementia, we discussed different types of

15  dementia, we discussed the records that we had previously,

16  we discussed her test results, previous test results, brain

17  scan results, and we discussed those with the psychiatrist

18  as well.

19  Q    I'm showing you Defendant's Exhibit I.  These are all

20  reports by you, correct?

21  A    This report is, yes.

22  Q    Let's go through them.  This second report is by you,

23  is it not?

24  A    Yes.

25  Q    And the third?

1    A    Yes.

2    Q    And the fourth?

3    A    Yes.

4    Q    And the fifth?

5    A    Yes.

6    Q    Sixth, which is I guess part of the fifth, so there is

7    five or six pages?

8              MR. TROWEL:  Your Honor, could we clarify that

9    those six pages are all previously marked as Government

10   Exhibit 3500-JG-04?  I think defense counsel marked them

11   collectively as a defense exhibit, just so we're clear about

12   what pages she's looking at.

13             MS. DOLAN:  Actually --

14             THE COURT:  Is that correct or not correct?

15             MS. DOLAN:  -- to split hairs, Mr. Trowel had

16   provided me a corrected version, this is the previous

17   version of 3500-CR-04, but it was later corrected to be

18   3500-JG-04, but it is otherwise the same document.

19             THE COURT:  So just so my friends on the 17th

20   floor know what I admitted and what was not before the

21   Court, what is the document that's being admitted.  Could we

22   have --

23             MS. DOLAN:  These are the medical evaluations,

24   clinical encounter administrative notes produced by

25   Dr. Grant and produced as 3500 material.

J. GRANT - DIRECT/MS. DOLAN                      88

1          THE COURT:  And they bear what exhibit numbers?

2          MS. DOLAN:  They bear -- this is Defendant's

3    Exhibit I pre-marked for identification as 3500-CR-04, but

4    consistent with and the same documents as 3500-JG-04.

5          MR. TROWEL:  There was a typo, your Honor.  So the

6    volume that your Honor has says 3500-JG-04, and I also

7    submitted the corrected version to Ms. Dolan, but this is

8    the version that has a typo on it.

9          THE COURT:  So with that quibble and jot we are

10   now on the same page, and the document is admitted into

11   evidence.

12         MS. DOLAN:  Thank you.

13         THE COURT:  Please continue.

14         MS. DOLAN:  All right.

15   BY MS. DOLAN:

16   Q    Now, you noted in this report on March 28th -- this is

17   near the end of the evaluation period, correct?

18   A    Yes, I believe his evaluation ended in early April.

19   Q    And you noted that he spontaneously added that he

20   thought he had quote, a little memory problem, unquote, but

21   did not believe it was quote, severe, unquote.  He inquired

22   about the evaluator's opinion in this case, specifically

23   asking if she thought he was competent.  When asked if he

24   wanted to be competent or incompetent, he asked which

25   finding would work better in his favor.  After he was

J. GRANT - DIRECT/MS. DOLAN                    89

1   informed about the difference scenarios of each, he said he

2   would rather be found competent.

3            Is that correct?

4   A    Yes.

5   Q    And page two, I believe that we already discussed this,

6   this one was where in the past -- you reported that

7   Mr. Bumagin said had he had multiple somatic complaints that

8   were not based in reality, correct?

9   A    Correct.

10  Q    Finally, December 18, 2012, you noted Mr. Bumagin is

11  adjusting well on the open housing unit and no longer meets

12  criteria for the vulnerable patient protocol.

13            What is vulnerable patient protocol?

14  A    It's a protocol we put patients on when they first

15  enter our institution to make sure they're monitored

16  closely, to make sure that they're adjusting okay.  They go

17  to a specific inpatient mental health housing unit where a

18  nurse and various staff, not only observe them 24/7, but

19  they actually call them in and ask them a line of questions

20  every single day to monitor their mental status.

21  Q    And then you note, he should remain on 2G however, due

22  to his dementia.  Familiar surroundings may facilitate his

23  ability to negotiate.  Is 2G a floor at FMC Butner?

24  A    It's a unit on the second floor, yes.

25  Q    Is it a special unit in any way?

J. GRANT - DIRECT/MS. DOLAN                    90

1    A    It's not special in any way, other than I felt it was

2    best for his ability to navigate and adjust if he just

3    stayed on the same unit.  I thought it would help his

4    adjustment.

5    Q    Was he having some difficulty adjusting?

6    A    Initially, he was not having trouble adjusting, but he

7    was having trouble finding his cell; they all look alike.

8    Q    Do all of the inmates have trouble finding their cells?

9    A    No, they do not.

10   Q    I'm showing you what's been premarked as Defendant's

11   Exhibit 3.  Do you recognize this?

12   A    I do.

13   Q    And what is this?

14   A    This is the cover sheet of the treatment plan.

15   Q    And I'll try to zoom out.

16        The following pages, is this the balance of the

17   treatment plan?

18   A    Yes.

19        MS. DOLAN:  I move this into evidence.

20        MR. TROWEL:  Just a note, your Honor, this is

21   marked in your Honor's binder as Government

22   Exhibit 3500-JG-05, and the government has no objection to

23   moving it into evidence.

24        THE COURT:  It's admitted.

25        (Defendant's Exhibit 3 was admitted into evidence.)

1    Q    Now, just to summarize, there are three different

2    problems in this treatment plan, correct?

3    A    I don't have it in front of me now.  Problem one, two,

4    and three, yes.

5    Q    Okay.  And what exactly is a problem?

6    A    An area that we are considering ruling out, working on,

7    assessing.

8    Q    And then for each problem, there are goals and

9    objectives and an action plan, correct?

10   A    Yes.

11   Q    So let's have a look at problem number one.

12           Not competent to stand trial as manifested by lack

13   of rational understanding of the charges against him and

14   possible cognitive defects impairing his ability to assist

15   in the preparation of his defense, correct?

16   A    Yes.

17   Q    Let's go through the objectives.

18           The first objective is, Mr. Bumagin will correctly

19   state the pending legal charges against him for 30 days by

20   90 days, correct?

21   A    Yes.

22   Q    And was he able to do that?

23   A    Yes.

24   Q    Was he able to do that when he first came in?

25   A    Yes.

1   Q    The second objective is Mr. Bumagin will clearly and

2   realistically -- pardon me.

3           Mr. Bumagin will discuss clearly and realistically

4   the evidence against him and possible legal defense strategy

5   by 90 days, correct?

6   A    Yes.

7   Q    Now, you testified earlier that our discussions about

8   the case were all there was, correct?

9   A    That our discussion was the only --

10  Q    The ones that you described were the only discussions

11  that we had, correct?

12  A    Yes.

13  Q    So you did not discuss possible legal defense

14  strategies with me, did you?

15  A    No, I didn't feel like that was my place.

16  Q    And lastly, Mr. Bumagin will explain the pros and cons

17  of legal options by 90 days.

18           Was he able to do that?

19  A    Yes, he was able to do that in the competency

20  restoration group.

21  Q    When was that?

22  A    He had attended the group throughout the four-month

23  period.

24  Q    But going back to what's been premarked as Defendant's

25  Exhibit I, this is your March 28, 2013 report, this is where

1  Mr. Bumagin specifically inquired about whether he -- it

2  would be better for him to be found competent or

3  incompetent, correct?

4  A    Yes.

5  Q    Was that report generated before or after your

6  conclusion that Mr. Bumagin was able to explain the pros and

7  cons of legal options by 90 days?

8  A    I don't know when he was able to explain the pros and

9  cons of legal actions.  This treatment plan is generated as

10  soon as he entered our institution, when we had our first

11  team meeting, approximately one week after he arrived.

12        It was an area to work on.  I don't know if he was

13  able to do that within 90 days, but he was able to do that

14  by the end of the evaluation period, according to the

15  facilitator of the competency restoration group.

16  Q    Which was what, within seven days after Defendant's

17  Exhibit I, that report, he was restored to competency?  When

18  did what you just described happen?

19  A    Like I said, I'm not sure when it happened.  I talked

20  -- I consulted with the facilitator of the competency

21  restoration group, as I always do, throughout an

22  individual's evaluation with us, and she reported that he

23  did not attend all of the sessions.  But when he did show up

24  and was asked questions of this matter, that he -- of this

25  manner, excuse me, he was able to answer them correctly.

1   Q    But was that before or after you formed the conclusion

2   that that goal had been met?

3   A    I didn't form that conclusion within a particular time

4   period, this was a goal to work on.  I'm not sure that it

5   occurred within 90 days, I don't have a timeline for that,

6   when she asked specific questions regarding this.

7   Q    Did you not testify three or four minutes ago that

8   Mr. Bumagin was able to explain the pros and cons of legal

9   options?

10  A    Yes, but I don't believe I said it occurred in 90 days.

11  I'm not sure how many days in the group and at which point

12  in the group they discussed that particular subject matter.

13           MS. DOLAN:  Just one moment, your Honor?

14           THE COURT:  Take your time.

15           (Pause.)

16  Q    Your report was generated on April 4th of 2013,

17  correct?

18  A    Yes.

19  Q    Seven days -- six or seven days after Defendant's

20  Exhibit I, the March 28th clinical encounter administrative

21  note, correct?

22  A    Yes.

23  Q    So did Mr. Bumagin, within six or and seven days, come

24  to understand whether it was quote, unquote better, unquote,

25  for him to be found competent or incompetent?

1   A    I'm not sure I understand your question.

2        THE COURT:  Was there a time when Mr. Bumagin,

3   according to your notes, did not understand whether it was

4   better or not better to be found incompetent, according to

5   your notes, was there such a time?

6        THE WITNESS:  It didn't come up prior to this.

7        THE COURT:  No.  But was there such a time in your

8   notes that your notes reflect that?

9        THE WITNESS:  I don't believe so.

10        THE COURT:  Go ahead.

11  BY MS. DOLAN:

12  Q    Correct me if I'm wrong, that was the first time that

13  the question of whether it was better for him to be found

14  competent or incompetent came up in your entire evaluation

15  of him?

16  A    That was the first time he asked me that question

17  directly.

18        THE COURT:  Well, putting aside directly or

19  indirectly, was that the first time it came up?

20        THE WITNESS:  It came up multiple times in the

21  competency restoration group that he attended weekly.

22  Q    Was he provided advice in those discussions?

23  A    No.  It's my -- I did not sit in on the groups, but I

24  know the information that's provided in the groups.  It

25  focuses on the legal process, it doesn't provide any

1  specific advice about any person's particular case; in fact,

2  they steer away from that.

3  Q    So approximately how many times had that topic been

4  discussed in those groups before it was discussed with you?

5  A    I'm not sure.

6  Q    Do you believe it was more than once?

7  A    Yes.

8  Q    Now, you did not contact me to inquire about my working

9  relationship with Mr. Bumagin, did you?

10  A    I did not.

11  Q    Why not?

12  A    I had an example of that when we had our conference

13  call; I felt like he was working well with you.

14  Q    Well, we were discussing a subject that I had already

15  discussed with Mr. Bumagin, isn't that so?

16  A    Yes.

17  Q    And I had already -- and I told Mr. Bumagin in our

18  conversation that we had already discussed it, did I not?

19  A    I don't remember if you said that or not.

20  Q    And I told Mr. Bumagin in that conversation that you

21  had told me that his liver growth was benign, did I not?

22  A    I can't remember what was specifically said.

23  Q    You didn't take notes of that conversation?

24  A    I did not.

25  Q    Did you ever ask me whether Mr. Bumagin remembered our

1    discussions about his case?

2    A    I did not.

3    Q    Why not?

4    A    I had reports from the previous evaluator that you had

5    already reported that he did not.

6    Q    But why didn't you contact me?

7    A    I didn't feel it was necessary to reach an opinion.

8             MS. DOLAN:  Nothing further.

9             THE COURT:  Your witness.

10   CROSS-EXAMINATION

11   BY MR. TROWEL:

12   Q    Good afternoon, Dr. Grant.

13   A    Good afternoon.

14   Q    You testified on direct that you are a you work at FMC

15   Butner, correct?

16   A    Correct.

17   Q    And in the course of your work there you conduct

18   competency evaluations; is that correct?

19   A    Yes.

20   Q    You conduct restoration evaluations; is that correct?

21   A    Yes.

22   Q    And there are other evaluations that you do as well; is

23   that right?

24   A    Yes.

25   Q    What are the other types?

1   A    Sanity evaluations that would be competency at the time

2   of the offense, and dangerousness evaluations.  I have also

3   been involved in evaluating individuals for sentencing

4   purposes or to determine if they need to be housed in an

5   inpatient setting during their incarceration.

6   Q    How long have you been working at FMC Butner in this

7   capacity?

8   A    I've been at FMC Butner since November of 2000, so

9   almost 14 years.

10  Q    And before that, where were you working?

11  A    Prior to that, I worked for five years at a neighboring

12  institution at our complex as a drug use program

13  coordinator.

14  Q    So in the course of your work at Butner and elsewhere

15  that's relevant, approximately how many competency

16  evaluations and restoration evaluations have you undertaken?

17  A    Approximately 500.

18  Q    Does that include restoration plus competency?

19  A    No.  In fact, I did jot down some notes about that.

20  Q    Is that a document that you gave to me?

21  A    Yes.  So I estimated the total number is approximately

22  900 of all the types.  And initial competency and competency

23  restoration cases, as a primary evaluator, approximately

24  440.

25  Q    And is that information that's -- you're refreshing

1    your recollection with a document marked 3500-JG-09 that I
2    now have on the Elmo; is that correct?
3    A    Yes.
4    Q    And have you testified previously in competency
5    evaluations?
6    A    I have.
7    Q    About how many times?
8    A    Total times, over 100.  Competency evaluations are the
9    majority of those, so I would have to estimate 70, 75.
10   Q    And you've mentioned, I think on direct, that you
11   testified for the defense in the past as well?
12   A    I have.
13   Q    In the course of your work at Butner, who do you answer
14   to, who do you serve?
15   A    Well, the evaluations we conduct are court ordered, so
16   the report goes to directly back to the Judge who ordered
17   the evaluation.
18   Q    Do you work for the prosecution?
19   A    I do not.
20   Q    Do you work for the defense?
21   A    No.
22   Q    What's your role in giving a competency opinion?
23   A    We are objective, independent evaluators and we get our
24   referrals directly from the court itself and not from either
25   side.  I would like to think that I'm pretty unbiased in my

1  opinion and objective, and we try to do the best job we can

2  do conduct a comprehensive evaluation.

3  Q    There came a time when you conducted a competency or

4  restoration evaluation of the defendant who is seated in

5  court here; is that correct?

6  A    Yes.

7  Q    What was your role in that evaluation?

8  A    I was the primary evaluator.

9  Q    What does that mean to be the primary evaluator?

10 A    It means that it's my responsibility to write the

11 majority of the report, to go through the collateral data,

12 synthesize that data, consult with teammates who would be

13 composed of our team psychiatrist, neuropsychologist, if

14 necessary, other medical personnel.  I would be consulting

15 with all of those folks.  Also, talking with multiple staff

16 members, looking at records, interviewing the patients,

17 conducting testing, if necessary, and put all of that

18 together into a cohesive report.

19 Q    So the sources you just identified, those are -- that

20 represents all the data you consider in the course of a

21 restoration evaluation; is that right?

22 A    Yes.

23 Q    I'm showing you what's been marked as Government

24 Exhibit 1.  And I'll turn the page here, just so you can see

25 the next few pages.  Do you recognize this?

J. GRANT - CROSS/MR. TOWEL                    101

1  A    I do.

2  Q    What is this?

3  A    This is the report that I wrote.  I wrote the majority

4  of this report.

5  Q    And I'm turning now to the last page, page 27.  Is this

6  your signature on this report?

7  A    It is.

8  Q    Does this report contain your analysis and your

9  ultimate opinion about the defendant's competency?

10  A    It does.

11          MR. TROWEL:  The government -- I don't believe we

12  admitted this, the government moves to admit Government

13  Exhibit 1.

14          MS. DOLAN:  I object.  This has been litigated.

15          THE COURT:  What is the basis of the objection?

16          MS. DOLAN:  The basis of the objection is

17  everything as set forth in my previous papers and previous

18  appearances in court; I'm going from memory, but I believe

19  it was May 29th, 2012 and August 9th of 2012.  My April,

20  2014 letter to the Court, and my most recent letter to the

21  Court last Friday.  Although, I maintain the position that

22  those submissions should not be considered by the Court,

23  because the Court ordered in December of 2013, the parties

24  to submit their proposed discussions regarding the scope of

25  the -- of this hearing, and that was done in April.

1   Nevertheless, the government followed it up.  But insofar as

2   those submissions are considered, I ask that my Friday

3   letter be considered.

4          Essentially, my objection is that Dr. Grant

5   improperly discussed the offense conduct and that this

6   improper literation of the statements from the defendant is

7   inextricably intertwined with her conclusions in the report.

8          MR. TROWEL:  Your Honor, if I may, just very

9   briefly?

10          THE COURT:  Very briefly.

11          MR. TROWEL:  Ms. Dolan called this witness as an

12   expert to testify about her conclusions with respect to the

13   defendant, first of all.  Second of all, your Honor can of

14   course give the report whatever weight your Honor sees fit.

15   I'm asking to admit it as a record of Dr. Grant's

16   conclusions in this case.

17          THE COURT:  It doesn't come in as a business

18   record.  I indicated before that I thought there were

19   serious problems with this report, with the way it was

20   conducted, with what the position did here, with what the

21   doctor did here, not the physician, excuse me, and I

22   continue to have those concerns having heard her testimony

23   here today.  You previously tried to take a premature appeal

24   with respect to this, it wasn't ripe to take the appeal at

25   that time, and you withdrew the appeal, and I'm going to

1    stick by my previous ruling.  I'm not going to admit it.  If

2    the Second Circuit wants to have it admitted, we'll come

3    back and we'll do it again.  But I assure you, I'm not

4    impressed with the report and I'm not impressed with what

5    the doctor did here by using her position to further develop

6    the case against this defendant, when what she was supposed

7    to do was to determine his competence.  That's what was done

8    here.  The Court found it offensive on the papers, and the

9    Court continues to find it offensive.  It wasn't necessary

10   and it was done.  And so I'm keeping the report out for the

11   reasons I previously stated.  By all means take your appeal,

12   it will go up and come back down, and then either I or

13   another Judge will look at it again if I'm reversed.  But I

14   really think it's important that doctors do what doctors are

15   supposed to do in evaluating the competence of witnesses.

16   This wasn't necessary to do here, to go into the elements of

17   the crime and to get the details to push the envelope.  You

18   have plenty of investigators, you have plenty of evidence,

19   it wasn't going to be a problem for you to present this

20   case, but you created a problem by pushing with a physician

21   into areas that you ought not to have pushed.  It is

22   offensive.  And I said it before and I'll say it again, take

23   your appeal, be my guest on a full record, but I think you

24   will find that the Judges of the Court of Appeals take a dim

25   view of what was done here.  I know I take a dim view of

J. GRANT - CROSS/MR. TOWEL                    104

1    what was done here, because you went way further.  Now, go

2    ahead and argue.  Go now, go on, you can get up there and

3    argue.  You argued before.  You don't have to whisper in his

4    ear.

5              MR. TROWEL:  No, I'm happy to argue the legal

6    point, if you want.

7              THE COURT:  No, I'm saying, your colleague is

8    whispering in your ear.  He can get up and argue, you can

9    take the shots directly, go ahead.  You've written it up,

10   you've argued, you took a premature appeal, you got slapped

11   back and you withdrew it.  You want to do it again, that's

12   fine.  It was offensive on paper, it's offense now.  You've

13   made your record, okay?  It's not coming in.

14             MR. TROWEL:  So, your Honor, can I continue with

15   the testimony from Dr. Grant?

16             THE COURT:  Sure.

17             MR. TROWEL:  Okay.

18             MS. DOLAN:  If I may, your Honor, just with

19   respect to that last portion of the discussion, it's not the

20   defense's position that the government utilize Dr. Grant as

21   an instrument per se, but under Federal Criminal Rule 12.2,

22   that it could be used and so...

23             THE COURT:  Right.  Absolutely.

24             MS. DOLAN:  Right.

25             THE COURT:  That's the problem.

1           MS. DOLAN:  Thank you.

2           THE COURT:  That's the problem with what was done

3      here.

4           MR. TROWEL:  Your Honor, her --

5           THE COURT:  Do you understand the problem that

6      you, the prosecutors, created in this case?

7           MR. TROWEL:  Your Honor, with all due respect, we

8      did not create this problem.  You heard testimony from

9      Dr. Brauman a moment ago that she undertook the same

10     procedure.  I think your Honor will hear in the course of

11     this testimony, as I've indicated in previous letters to the

12     Court, as we all have, that Dr. Grant asked open-ended

13     appropriate questions.  The defendant answered those with

14     facts about the case.

15          THE COURT:  I've heard your argument.  Go ahead.

16     Ask a question.

17          MR. TROWEL:  Just to be clear, you're precluding

18     the report, but permitting me to continue the with witness.

19          THE COURT:  I'm precluding the report and I'm

20     going to allow you to ask questions and then there will be

21     objections and then I'll rule on your questions and

22     objections.  Let's proceed in that fashion.

23          MR. TROWEL:  Okay.

24     BY MR. TROWEL:

25     Q    So, Dr. Grant, you drafted a report in this case; is

1  that correct?

2  A    Yes.

3  Q    And that report contained your analysis and your

4  ultimate opinion; is that correct?

5  A    That's correct.

6  Q    And what was your ultimate opinion in this case?

7  A    My opinion was that Mr. Bumagin was competent to stand

8  trial.

9  Q    And just so the record is clear, although the --

10             MS. DOLAN:  Actually, I object to that conclusion.

11             THE COURT:  What's the basis of the objection?

12             MS. DOLAN:  As I said, I believe that -- I believe

13  that the improper elicitation is inextricably intertwined

14  with the analysis and the conclusion, so I don't think the

15  conclusion is admissible.

16             THE COURT:  All right.  I'm going to reserve on

17  whether the conclusion is admissible or not.  The report is

18  out.

19             MR. TROWEL:  So without moving to admit the

20  report, your Honor, just for purposes of identification,

21  Dr. Grant, your report is the one that's been marked as

22  Government Exhibit 1; is that correct?

23             THE WITNESS:  Yes.

24  BY MR. TROWEL:

25  Q    And that's the report that contains your analysis and

1  ultimated opinion?

2  A    Yes.

3  Q    Can you generally describe for the Court what it is

4  that you relied on in reaching your ultimate opinion, the

5  sources of data?

6  A    The sources of data included a prior competency

7  evaluation conducted at MCC New York, some limited medical

8  records we received, and I reviewed those with our

9  physicians.  Also, a neuropsychological evaluation that was

10 conducted previously, which I reviewed with our

11 neuropsychologist.  I conducted individual interviews with

12 Mr. Bumagin.  I conducted multiple informal interactions

13 with him.  I consulted with nursing staff and custody staff

14 who were able to observe him on a 24-hour basis on an

15 inpatient mental health floor.  We conducted psychological

16 testing.  I did not do testing myself in this case, but we

17 -- I consulted with our neuropsychologist who conducted a

18 majority of the testing.

19 Q    Is that -- are you referring to Dr. Tracy Pennuto?

20 A    Yes, Dr. Pennuto.

21 Q    And was there an another doctor who also worked with

22 Dr. Pennuto on the testing?

23 A    Yes, Dr. Correa at that time.  She was a predoctoral

24 intern and working with both of us.

25 Q    So is it fair to say you considered all the data that

1   you just explained in reaching your final opinion?

2   A    Yes.  And I might also add that I also used or

3   considered collateral data that were sent to me, not only

4   the records, but discovery information and that sort of

5   thing.

6   Q    Now, your report, the one that had been marked for

7   identification as Government Exhibit 1, that was issued in

8   April of 2013; is that correct?

9   A    Yes.

10  Q    And that was -- that's approximately 16 months ago; is

11  that right?

12  A    Yes.

13  Q    Roughly.  Do you have an opinion about the defendant's

14  competency as he sits here today?

15  A    I don't know.

16  Q    Why is that?

17  A    A competency is a fluid state.  At the time that I

18  evaluated him it was my opinion that he was competent.  I

19  haven't seen him in many months.

20  Q    Now, you mentioned that in your work at Butner you

21  participated in both competency evaluations and restoration

22  evaluations; is that right?

23  A    Yes.

24  Q    Can you describe for the Court how, if at all, those

25  two are different?

1  A    Yes.  A restoration, a competency restoration

2  evaluation, first of all, is a much lengthier time period.

3  The individuals are sent to us for 120-day evaluation

4  periods.  It's done in an inpatient versus an outpatient

5  setting.  So it's in a federal medical center, and the

6  individual is on an inpatient unit where there are staff,

7  psychiatric nurses, for example, able to observe him

8  24 hours a day, custody staff, various rehabilitation staff,

9  and medical staff in addition to a psychologist,

10 psychiatrist, we typically work as a team.  And then we also

11 consult with a neuropsychologist and we have a social worker

12 on our team.  So it's very comprehensive.  We have a lot of

13 staffing and eyes on the individual during that time.

14         We also, as part of the restoration process, we

15 enroll individuals in a competency restoration group, and

16 they attend that group weekly to learn about general factual

17 information regarding the legal system.  If necessary, we

18 provide medication treatment options if we feel that that's

19 necessary for the restorative process.

20 Q    Okay.

21         THE COURT:  As we sit here today, you do not have

22 an opinion as to whether this man is capable of being

23 competent of standing trial as you said previously?  You

24 don't know, do you, because of the 16-month gap, if anything

25 else?

1          THE WITNESS:  That's correct.

2          THE COURT:  Go ahead.

3   Q    Now, as a forensic psychologist who is acting as a

4   primary evaluator, do you do anything differently in the

5   course of a restoration evaluation than you do in a

6   competency evaluation?

7   A    I think -- well, for one thing, I can do more.  I have

8   more time, I have more individuals I can consult with.

9   Typically, an individual may not present the same way with

10  me during a limited session as he does on the housing unit

11  with his peers, with the staff around him in the evening

12  hours, for example.  So the one thing that's different is I

13  have a lot more individuals I can consult with and take more

14  of a team approach.

15         The other thing is the restoration phase, that's

16  different than an initial competency phase, where treatment

17  medication may not be offered, if necessary.  Mr. Bumagin

18  did not have a psychotic disorder or a severe mood disorder,

19  so medications of that nature were not offered to him or

20  recommended, but we do enroll individuals in a

21  psychoeducational group.

22  Q    Now, in the course of your evaluation, did you

23  personally interact with Mr. Bumagin?

24  A    I did.

25  Q    And can you describe the context in which you

J. GRANT - CROSS/MR. TOWEL                    111

1   interacted with him?

2   A    Yes.  I interviewed him individually or with another

3   member or two of the treatment team on at least five formal

4   occasions.  I saw him multiple times on the housing unit

5   floor walking around the unit where I would go over to see

6   other inmates.  I would always stop to talk to him or he

7   would come and talk to me, he would recognize me and want to

8   talk to me and say hi, and he was very friendly.  I would

9   talk with the nursing staff about him in those situations

10  too.  I met with him with other team members.  So for

11  individual -- individual clinical interviews and interviews

12  with other individuals and then informally was my personal

13  contact with him.

14  Q    How much time did you spend with the defendant in

15  formal interactions?

16  A    I spent approximately four hours with him individually

17  formally.

18  Q    And then how much would you see him informally?

19  A    Typically, a couple of times a week.

20  Q    And when would that happen?

21  A    It would happen when I would go over to his housing

22  unit, it was very close to my office, so I was over there

23  quite a bit.  Often he was on the recreation yard and was

24  not on the unit, but when he was on the unit, I would say

25  hello to him.

J. GRANT - CROSS/MR. TOWEL                    112

1   Q    At any time during your interactions with the defendant

2   did you give him a confidentiality warning?

3   A    I did.

4   Q    When?

5   A    Initially when I first met with him in our receiving

6   and discharge area.

7   Q    What did you tell him, if you remember?

8   A    I don't know the exact words, but I've done this a lot

9   of times; and typically, my wording is that I tell the --

10  first of all, I ask -- I introduce myself and then I ask the

11  individual if they --

12            MS. DOLAN:  I'm going to object to the typical

13  warning.

14            THE COURT:  Do you have a letter, counsel?

15            MR. TROWEL:  I'm sorry?

16            THE COURT:  Do you have the letter that she sent?

17  She said she typically gives a letter.  Do you have a copy

18  of the letter?

19            MR. TROWEL:  I don't think she said that, your

20  Honor.  I didn't hear that.

21            THE COURT:  Did you give him a letter?

22            THE WITNESS:  I did not give him a letter.

23            THE COURT:  Did you read from a letter?

24            THE WITNESS:  I did not.

25            THE COURT:  You just did it from memory?

J. GRANT - CROSS/MR. TOWEL                    113

1          THE WITNESS:  Yes.

2          THE COURT:  Do you remember exactly what you told

3   him?

4          THE WITNESS:  I don't remember the exact words.

5          THE COURT:  Okay.  Then I'm going to sustain the

6   objection.

7          MR. TROWEL:  Can I ask about the --

8   Q    Or, Dr. Grant, what is your typical practice with

9   respect to defendants at intake?

10          THE COURT:  Do have a typical practice?

11          THE WITNESS:  I do.

12          THE COURT:  What is your typical practice?

13          THE WITNESS:  Typical practice is to introduce

14   myself when I meet with them and tell them that I would be a

15   primary evaluator.  I tell them that we have a psychiatrist

16   who will also be meeting with them at some point.  I ask

17   them if they know why they were sent to Butner.  And then if

18   they don't give me the correct information, I tell them why

19   and that would be that they were sent there for an

20   evaluation from the court, if that's the case.  And then I

21   also tell them that one thing, before we go any further,

22   they need to understand that everything that we talk about

23   in the context of that evaluation and everything that I talk

24   to them about and another doctor talks to them about, can go

25   into a report that goes back directly to the Judge, because

1  the Judge has ordered this evaluation.  And that means --

2  and also, I can be called to testify in his case.  And also,

3  that the letter -- or the report goes to the government

4  attorney or the prosecutor and also the defense attorney.

5  And so he needs to understand that the typical

6  patient/doctor confidentiality, if they understand that

7  word.  If they don't understand confidentiality, I'll say

8  nothing stays between us, nothing is a secret, everybody can

9  know about it because the court has ordered this evaluation,

10  and so you need to know that.

11  Q    Did you give Mr. Bumagin a confidentiality warning?

12  A    Yes.

13  Q    And did he appear to understand it?

14  A    He did.

15  Q    What led you to believe that?

16  A    I asked him if he understood what I had said, he said

17  yes.  And I asked him to repeat it back in his own words.

18  Q    And how did he respond to that question?

19  A    I did not unfortunately take notes of what he said

20  exactly, but it's my recollection that he said -- there are

21  no secrets, everybody will know everything.

22  Q    At any point in your interactions with the defendant,

23  did you tell him that he had to answer your questions?

24  A    I did not.

25  Q    When you spoke to the defendant, did it appear that he

1   was speaking to you voluntarily?

2   A    Yes.

3   Q    What led you to believe that?

4   A    He provided information voluntarily to me.  I typically

5   didn't have to ask him very many questions at all, he was

6   very eager to talk to me.

7   Q    Can you describe generally the defendant's demeanor

8   during your interactions with him?

9   A    Yes.  He was cooperative.  He, as I said, seemed to

10  enjoy our conversations.  He would seek me out on the unit

11  when he saw me and say hello.  And he remembered me, and he

12  remembered me from one meeting to the next.  He remembered

13  lots of things that occurred.  For example, he would tell me

14  what a medical doctor had told him or he would tell me that

15  he had an appointment, that sort of thing.

16  Q    In your view, did the defendant understand why he was

17  at Butner?

18  A    Yes.

19  Q    Why?  What led you to that conclusion?

20  A    We discussed it many times.  He knew he was having an

21  evaluation and he was also getting factual information

22  throughout the course of the study in his competency

23  restoration group that gave him that information.

24  Q    In your interactions with him did he ever forget who

25  you were?

1  A    He did not.

2  Q    Did he ever forget why he was at Butner that you were

3  aware of?

4  A    Not to my knowledge.

5  Q    In your interactions with him did he appear to forget

6  conversations that you had had with him?

7  A    No, he did not.

8  Q    Now, you interviewed the defendant at intake; is that

9  correct?

10 A    Yes.

11 Q    And do you recall if the defendant complained of memory

12 problems and reported to you that there was -- that his

13 father had Alzheimer's disease?

14 A    He did.

15 Q    Did he volunteer that information?

16 A    He did.

17 Q    Did you prompt him for it?

18 A    I did not.

19 Q    So did he recall that on his own?

20 A    Yes.

21 Q    Did you also note in your intake report that he had

22 been prescribed OxyContin in the community?

23 A    He noted that, yes.

24 Q    Did he tell you that?

25 A    I don't know if he told me that at intake, but it came

1    up during the initial nursing screening the same day

2    everyday after.

3    Q     Did he remember the word OxyContin?

4    A     He said Oxy five.

5    Q     What does that mean to you, if anything?

6    A     It's a high dose of OxyContin, five milligrams.

7    Q     So he had -- he remembered both the name of the drug

8    and the dosage independently?

9    A     Yes.

10   Q     Now, you -- I think you testified on direct that the

11   defendant had at some point a tendency to get lost in the

12   housing unit; is that right?

13   A     He did.

14   Q     Can you elaborate on that a little bit?

15   A     Yes.  During the first week or week and a half the

16   officers reported to me that he was having trouble locating

17   his cell.  They all look alike; and on this particular

18   housing unit, they did not have pictures as they do on some

19   of the units or their register numbers or their name.  And

20   he had trouble remembering which cell was his.

21            So as a result of that the staff -- to be helpful,

22   they put a reindeer -- it was around Christmastime, so they

23   put a reindeer above his cell so he could find his cell.

24   Q     Once they did that, did he have any other trouble

25   finding his cel?

1   A    He had no trouble finding his cell.  And, in fact,

2   early on he had no trouble finding the recreation yard, the

3   chow hall and other places in the institution, it just took

4   him a week or so to acclimate.

5   Q    Did you, in your observations of Mr. Bumagin, did you

6   see -- did he display memory problems?

7   A    No.

8   Q    In other words, did you see evidence of memory

9   problems?

10  A    I personally did not see them during my interactions

11  with him.

12  Q    Did he -- did other evaluators see them?

13  A    Yes.

14  Q    Did he present were those memory problems consistent

15  across evaluators?

16  A    They were not.

17  Q    How were they inconsistent?

18  A    Well, for instance, I said he didn't present with

19  memory problems.  I remember a situation where he told me he

20  was not going to competency restoration groups or he told

21  one of the members of the team -- it's been so long, it's

22  hard for me to remember all the details -- but he told one

23  of the members of team he--

24          MS. DOLAN:  I'm going to object to this.

25          THE COURT:  What's the basis of the objection?

1          MS. DOLAN:  Hearsay, and she doesn't remember

2    anyway.

3          THE COURT:  Do you remember?

4          THE WITNESS:  I remember the situation, I just

5    don't remember if he told me or if he told my colleague.

6          MS. DOLAN:  Well that -- now I'm really going to

7    object.

8          THE COURT:  You don't remember if he talked to you

9    or your colleague, I'm going to sustain the objection.

10   That's just too vague.  Move on to another area.

11   BY MR. TROWEL:

12   Q    The original question, Dr. Grant, was how his memory

13   problems were presented inconsistently.  Without repeating

14   the antidote you were giving us, can you address that

15   question?

16   A    Yes.  He would forget a colleague's -- one of my

17   colleague's names and then later remember it.  He went to --

18   he remembered one of the social workers, he said he did not

19   remember who she was, that he had never been to the group,

20   but then he was able to describe her in detail and addressed

21   her by name when she walked in.

22   Q    Did you have a discussion with Mr. Bumagin about

23   Russian restaurants in Brooklyn?

24   A    Yes.

25   Q    What happened in the course of that discussion?