J. GRANT - CROSS/MR. TOWEL                120

1   A    Well, he volunteered the information that there were a

2   lot of good Russian restaurants in Brooklyn, and then he

3   proceeded to give me the recipe for beet soup.

4   Q    Were you able to -- was that interaction relevant to

5   your assessment of Mr. Bumagin?

6   A    Well, it showed me that he had pretty good memory at

7   least for some -- good, long-term memory.

8              THE COURT:  What did he tell you about the recipe

9   for beet soup, what did you do remember about that other

10  than beets?

11             THE WITNESS:  Beets and water.  He told me it

12  was --

13             THE COURT:  Other than beets and water.

14             THE WITNESS:  I can't remember the exact

15  ingredients.

16             THE COURT:  Well how about generally.

17             THE WITNESS:  I can't remember them, but he could.

18  He said they were just amazingly very few ingredients and it

19  tasted so good and I needed to try it.

20             THE COURT:  What did he tell you about beet soup

21  other than beets and water?

22             THE WITNESS:  My memory is not good for beet soup.

23             THE COURT:  Okay.  Next question about the beets

24  soup.  Go ahead.

25  Q    How did the defendant get along with other inmates in

1    the facility?

2    A    Very well.

3             MS. DOLAN:  Objection.  I think that --

4             THE COURT:  Overruled.

5             MS. DOLAN:  I'm going to object.

6             THE COURT:  I'll take it for what it's worth.

7    Q    Now, you spoke on direct examination about a conference

8    call you had or that you were a part of with the defendant,

9    his counsel and other doctors at the facility; is that

10   correct?

11   A    Yes.

12   Q    And can you describe how the defendant interacted with

13   his counsel in the course of that call; not the content of

14   the discussion, if you don't want, but just how he

15   interacted with the defense counsel?

16   A    He listened attentively.  I can't remember if he asked

17   very many questions or not, but I think he did.  And he

18   appeared to pay attention and understand what was being

19   said.

20   Q    Did the defendant report to you any issues that he had

21   in dealing with his attorney, any problems?

22   A    He did not.

23   Q    During the conference call, did he have any difficulty

24   communicating with his attorney?

25   A    Not that I observed.

1   Q    Did he recall who she was during the call?

2   A    Yes.

3   Q    Now, during one of your interviews of the defendant,

4   did you ask him about the charges in his case?

5   A    Yes.

6   Q    Did you -- were you in the courtroom earlier when

7   Dr. Brauman testified?

8   A    Yes.

9   Q    Did you hear her testify that she also asked about the

10  charges in the case?

11  A    Yes.

12  Q    What question did you ask the defendant, if you recall?

13  A    I asked him if he knew what he was charged with.

14  Q    And how did he respond to that?

15           MS. DOLAN:  Objection.

16           THE COURT:  Did he respond?

17           THE WITNESS:  He did.

18           THE COURT:  What did he say?  Overruled.

19           THE WITNESS:  He said, possession of a gun.

20  Q    Did you ask a follow-up question?

21  A    I did.

22  Q    What did you ask?

23  A    I asked why would that be a criminal charge or why was

24  that wrong.

25  Q    And how did he respond to that?

J. GRANT - CROSS/MR. TOWEL                        123

1  A    He said because he had a criminal --

2            MS. DOLAN:  Objection.

3            THE COURT:  Why did you ask him that question?

4            THE WITNESS:  Because I was trying to determine if

5  he had a rational understanding.

6            THE COURT:  I'm going to sustain the objection.

7  Ask another question.

8  Q    Did there come a time when the defendant described to

9  you his view of the facts of the case?

10 A    He did.

11           THE COURT:  That answers that question.

12           MS. DOLAN:  Yeah.

13 Q    Did you specifically ask him about the facts of the

14 case?

15 A    I did not.

16           THE COURT:  Did you ask him generally about the

17 facts of the case?

18           THE WITNESS:  I did not.

19 Q    Other than asking him about the charges, did you ask

20 him at any point about the facts of the case?

21 A    I did not.

22 Q    The questions that you asked, are those consistent with

23 the professional literature on competency exams?

24 A    Yes.

25 Q    And do you routinely ask them in the course of your

J. GRANT - CROSS/MR. TOWEL                    124

1   competency exams?

2   A    Yes.

3   Q    And restoration evaluations?

4   A    Yes.

5   Q    What is -- why do you ask that question about the

6   charges in the case?

7   A    I don't believe I can come to an opinion about an

8   individual's competency if I don't know that they are aware

9   of the charge and why it may be a criminal charge.

10  Q    At any time did you discuss with the government the

11  questions you were going to ask the defendant about the

12  charges in the case, did you consult with the prosecutors

13  about this discussion?

14  A    No.

15  Q    Did you did that before the discussion?

16  A    No.

17  Q    Did you do it after the discussion?

18  A    I did not.

19        THE COURT:  Did you have any concerns at all about

20  inquiring of the witness or the defendant about the facts of

21  the case?  Did you have any concerns at all of inquiring of

22  the defendant about the facts of the case, not the charges

23  of the case, the facts of the case?  Did you have any

24  concerns at all?

25        THE WITNESS:  Yes.

J. GRANT - CROSS/MR. TOWEL                    125

1      THE COURT:  What concerns did you have about

2  discussing the facts of the case with the defendant?

3      THE WITNESS:  Well, I had concerns about asking

4  him facts directly.  I didn't feel like it was my place to

5  go into detail about that with him.

6      THE COURT:  Putting aside directly versus

7  indirectly, directly versus elliptical, did you have any

8  reservations about discussing the facts of the case with

9  this defendant?

10     THE WITNESS:  Yes.

11     THE COURT:  What were your concerns about

12  discussing the facts of the case with this defendant;

13  directly or indirectly?

14     THE WITNESS:  Well, my concerns would be that he

15  could provide information that would be somewhat damaging to

16  his defense or his attorney working him later to prepare a

17  defense.

18     THE COURT:  And how did you guard against

19  eliciting such facts, since you were concerned about it?

20     THE WITNESS:  I did not ask him about the facts of

21  the case.

22     THE COURT:  How did you guard against him

23  volunteering such facts?  Did you stop when he started to go

24  down a road that might elicit facts of the case by saying,

25  we're not going to go down that road, I'm asking you about

1    charges, don't talk to me about the facts, or did you let

2    him volunteer to discuss the facts of the case?

3              THE WITNESS:  I did not stop him.

4              THE COURT:  You did not stop him.  Did you realize

5    that he was discussing facts of the case at some point as

6    opposed to charges?

7              THE WITNESS:  Yes.

8              THE COURT:  Did you --

9              THE WITNESS:  I understood that he was giving me

10   his version.

11             THE COURT:  Did you understand at some point that

12   he was discussing the facts of his case with you beyond the

13   charge?  Did you understand that, doctor?

14             THE WITNESS:  I did.

15             THE COURT:  And you continued to let him do that;

16   is that right?

17             THE WITNESS:  Yes.

18             THE COURT:  Okay.  Go ahead.

19   BY MR. TROWEL:

20   Q    Dr. Grant, did you -- were you in the room when

21   Dr. Brauman testified a few moments ago?

22             MS. DOLAN:  Your Honor, if I could interrupt just

23   briefly.  My expert, Dr. Rivera Mindt was planning on

24   leaving at 5:00, because she has a family issue to take care

25   of.

1            THE COURT:  Yes.

2            MS. DOLAN:  I think that my direct of her could be

3     two or three minutes, and it's really only to admit the

4     report.  I think we can do her right now, if the Court

5     wouldn't mind taking her out of order.  I would just propose

6     that.  Otherwise, she has to come back on CJA money.  I'm

7     happy to call her tomorrow, but I think it's more

8     expeditious.

9            THE COURT:  Do you object to taking this witness

10    for this limited purpose out of sequence so we can get her

11    on and off?

12           MR. TROWEL:  I do, your Honor.  I think we should

13    continue with Dr. Grant.

14           THE COURT:  Okay.  The objection is overruled.

15    Let's get the other person on and off.

16           You may step down for a minute, Doctor, and then

17    I'm going to give the other witness on and off in five

18    minutes.

19           MR. TROWEL:  I also have a cross-examination of

20    the defendant's witness that may talk longer than two

21    minutes, your Honor.

22           THE COURT:  Okay.  We're going to get her on and

23    get her off when you're done.  If you take five hours,

24    that's how it goes.  I'm a Wall Street guy, I don't care,

25    let's get it done, okay?

J. GRANT - CROSS/MR. TOWEL                128

1           MS. DOLAN:  Okay.  Unfortunately, there won't be
2   time to do the cross.
3           THE COURT:  Okay.  Well then, let's get the
4   witness back on the stand.
5           MR. TROWEL:  So we'll have to come back tomorrow.
6           THE COURT:  You'll have to come back tomorrow,
7   sorry about that.  Let's have the same doctor come back to
8   the stand.  Doctor, you're still under oath.  Please read
9   back the last question and the last answer.
10          (The last question was read back.)
11          THE COURT:  Go ahead.
12          THE WITNESS:  Yes.
13  BY MR. TROWEL:
14  Q    Did you hear Dr. Brauman testify that on occasion
15  she'll ask a defendant about the facts of a case if she
16  thinks it's relevant to her analysis?
17  A    Yes.
18  Q    In what way was the defendant's answer to these
19  questions relevant to your analysis?
20  A    Well, I did not ask him about the facts of the case.
21  But he provided his -- he provided me some information as he
22  saw it.  And what it did was it helped me rule out if he had
23  a thought disorder that would preclude him from organizing
24  point A to point B.  He appeared --
25          MS. DOLAN:  Objection, because of the cross that

1   this has to open up.

2          THE COURT:  I'm going to overrule the objection.

3   Go ahead with the speech.

4   A    He -- I'm trying to remember where I was.  He -- it's

5   important for me to be able to reach an opinion about

6   someone's rational understanding in the case; and that means

7   being able to give events as they see them, to know that

8   they would have to develop an appropriate defense.  Just,

9   I'm talking generally now, but all of those things are

10  important, because I have to see what their thought process

11  is like.  If someone is delusional, if they have

12  disorganized thinking, that would all come out in that

13  discussion, and then it would really have a bearing on my

14  opinion about competency.

15  Q    So what conclusion or what conclusions could you draw

16  from this particular discussion with the defendant?

17  A    Mr. Bumagin was very organized in his discussion, and

18  he appeared to know that he would need a defense or a reason

19  for doing what he said he knew was wrong to do or against

20  the law.

21         MS. DOLAN:  Objection.

22         THE COURT:  Sustained.  I'll strike it.

23         MR. TROWEL:  On what basis, your Honor?

24         THE COURT:  Oh, no, we're not doing this.

25         MR. TROWEL:  I just -- we're just making a record.

1           THE COURT:  You got a record.  You got a good

2    record.  You'll be back.  Maybe.  Let's go.

3    Q    Dr. Grant, you testified on direct that you had a

4    conversation with the defendant where he asked you if it was

5    better to be competent or incompetent; do you recall that?

6    A    Yes.

7    Q    What if anything -- why, if at all, was that

8    conversation relevant to your analysis?

9    A    Well, it let me know that he understood there was a

10   difference between the two concepts, and he -- it led me to

11   believe that he was evaluating the different -- the status

12   of each in his own mind.

13   Q    And why is that relevant?

14   A    Because it tells me that he has a rational

15   understanding of what's going on and how things could

16   proceed in his case, depending on being found competent or

17   incompetent.

18   Q    In the course of the evaluation, did you work with

19   other doctors?

20   A    Yes.

21   Q    What other doctors contributed to the evaluation?

22   A    To this particular evaluation, our psychiatrist

23   Dr. Volin, our staff neuropsychologist Dr. Pennuto, and we

24   also considered information from a medical service.

25   Q    Did Dr. Correa also contribute?

1    A     And Dr. Correa.

2    Q     Did you consult -- Dr. Volin you mentioned, what was

3    her role, generally?

4    A     She was our team psychiatrist.

5    Q     And did you consult with her before reaching your

6    ultimate conclusion, your ultimate opinion in this case?

7    A     Yes.

8    Q     Did she disagree with your opinion?

9    A     She did not.

10   Q     What was your -- Dr. Pennuto's role?

11   A     Dr. Pennuto is a staff neuropsychologist, and I

12   consulted with her to do some testing that she saw warranted

13   in this case.

14   Q     And did she conduct the testing?

15   A     She did.  She did a battery of tests.

16   Q     Did she convey the results to you?

17   A     She did.

18   Q     Did you consult with her before reaching your ultimate

19   opinion?

20   A     I did.

21   Q     Did she disagree with you?

22   A     She did not.

23   Q     Finally, Dr. Correa, what was her role?

24   A     She also conducted some testing under the supervision

25   of Dr. Pennuto.

J. GRANT - CROSS/MR. TOWEL                          132

1   Q    And did you consult with Dr. Correa before reaching

2   your ultimate opinion?

3   A    Yes.

4   Q    Did she disagree with your ultimate opinion?

5   A    She did not.

6   Q    I'm just going to step back very briefly for one

7   moment, Dr. Grant.  When you had a discussion with the

8   defendant about the charges that we spoke about a moment

9   ago, do you recall that discussion?

10  A    Yes.

11  Q    And you said that he gave you some facts or his view of

12  the facts in the case; is that correct?

13  A    Yes.

14  Q    And did you record that discussion in notes, the

15  substance of the discussion?

16  A    Yes.

17  Q    Showing you what has been admitted as Defense Exhibit 2

18  admitted into evidence, do you recall this document?

19  A    Yes.

20  Q    Okay.  And you discussed this with define counsel on

21  direct?

22  A    Yes.

23  Q    I'm turning to page three of the document.

24       I see that defense counsel has removed the final

25  page of the document.  I apologize, your Honor.  I'm showing

1  you what's been marked --

2          MS. DOLAN:  Objection to that characterization,

3  the document was complete.

4          THE COURT:  I thought I saw three pages.  Do you

5  not have three pages there, counsel?

6          MR. TROWEL:  I do, your Honor.

7          MS. DOLAN:  I'm just objecting to the

8  clarification.  I did not remove any pages of the

9  questionnaire, I removed the notes.

10          THE COURT:  Are the notes in evidence or not?

11          MS. DOLAN:  No.

12          MR. TROWEL:  They are not, your Honor.

13          THE COURT:  All right.  So you're objecting to the

14  mischaracterization of the notes as being in evidence?

15          MR. TROWEL:  Withdrawn.

16          THE COURT:  Because that would be an improper

17  characterization of what the evidence is, and that would be

18  something that would not be appropriate --

19          MR. TROWEL:  I understand, your Honor.

20          THE COURT:  -- in any, way, shape or form in any

21  record.  So obviously, we're not going to talk about the

22  notes which are not in evidence and they're not going to

23  come into evidence, because they deal with the facts.  So if

24  you're going to offer the page and not the notes, there will

25  be an objection, I'm going to sustain the objection.  You're

1   not going to get to question this witness about her notes,

2   because the notes talk about the facts and that's not coming

3   in, so can we move on.

4          MR. TROWEL:  I understand, your Honor.  I wasn't

5   going to offer them as evidence, I was going to make a

6   record.

7   BY MR. TROWEL:

8   Q    Dr. Grant, are these your notes, page four of what's

9   been marked for identification as 3500-JG-03?

10  A    Those are my notes.

11  Q    Okay.  Those are the notes of the discussion that you

12  had with the defendant wherein he discussed the facts of his

13  case with you; is that correct?

14  A    That's correct.

15  Q    Okay.  And did you also incorporate that discussion

16  into your final report?

17  A    Yes.

18  Q    And that again is the report that was marked for

19  identification, but not admitted as Government Exhibit 1; is

20  that correct, your April 3rd report?

21  A    Yes.

22  Q    Now, we were talking a moment ago about the testing

23  that Dr. Pennuto and Correa conducted on the defendant.  Do

24  you recall that discussion?

25  A    Yes.

1    Q    Did they administer tests to determine whether the

2    defendant was providing adequate effort on those tests?

3    A    Yes.

4    Q    And what did they conclude, if anything, about his

5    effort?

6    A    They concluded that his effort was either poor or

7    inconsistent at times.

8    Q    What does that mean?  Why is that relevant?

9    A    He did not give good effort on some of the tests, and

10   it was in -- his effort was inconsistent.  And it's relevant

11   because it means that we can't put false stock into the test

12   results.

13   Q    Did you conduct tests of the defendant's effort

14   yourself?

15   A    I did not.

16   Q    In your analysis, did you determine that although

17   Mr. Bumagin may have some genuine symptoms of memory

18   deficits, his presentation of those deficits was likely

19   exaggerated?

20   A    Yes.

21   Q    And what was that based on that conclusion?

22   A    It was based on the inconsistency in his report between

23   evaluators, different context and different times.

24   Q    Can you expand on that a little bit?

25   A    Yes.  I believe I gave an example a few minutes ago

1    where he said he forgot going to competency group, he didn't

2    know who the social worker was, but then later he identified

3    her by name in front of me, and before that time, described

4    her, she's small in stature and wears a uniform, and he was

5    able to describe her in detail, that's an example.

6    Q    Why was that relevant?

7    A    Well, because it was inconsistent, his report was

8    inconsistent.

9    Q    And could that inconsistency have been evidence of a

10   deficit?

11   A    It's possible, but we saw it across contexts and also

12   in the testing results.

13   Q    And so what did that mean to you, if anything?

14   A    That he did that routinely, would report something and

15   then report something else or say he had a problem and then

16   not follow-up with medical about it, for example.

17   Q    And the fact that he did it routinely what, if

18   anything, did that indicate to you?

19   A    That it was a pattern.

20   Q    But why is the pattern significant?

21   A    Well, it's significant because it's difficult to reach

22   a definite diagnosis for somebody or to know exactly what's

23   going on, they're not being completely honest or putting

24   forth good effort.

25   Q    Can you describe for the Court where the defendant was

1  housed during this evaluation?

2  A    He was housed on an inpatient mental health unit.

3  Q    Was he under observation during that period?

4  A    He was.

5  Q    By whom?

6  A    By psychiatric nurses and correctional officers and

7  myself and other medical personnel, and I think that's it.

8  I think that's --

9  Q    Is it fair to say at Butner, during his time at Butner

10 he was under it 24-hour observation?

11 A    Yes.

12 Q    Did you communicate with the nursing staff about their

13 observations of the defendant?

14 A    I did.

15 Q    How were their observations communicated to you?

16 A    They were communicated by phone, in person and by

17 E-mail.

18 Q    What information did you learn from nursing staff?

19 A    I learned initially that he was having trouble finding

20 his cell, and I learned that from the custody staff as well.

21 And then I learned that he was getting along with other

22 inmates pretty well, they seem to like to interact with him

23 on the unit.  He -- they also told me that he had several

24 different medical complaints, and that they were referring

25 him for sick call to see the physician and that to get

1   follow up with different things.

2   Q    How were those observations relevant to you, if at all?

3   A    Well, they were relevant because I tried to consider

4   all the information coming in.  I wanted know how he's doing

5   on a day-to-day basis, is he able to take care of his needs,

6   is he able to find the chow hall and get proper nourishment,

7   is he bathing himself and doing the things that we would

8   expect someone to be able to do intently.

9   Q    Did you communicate with the security staff at Butner?

10  A    I did.

11  Q    And what -- how were their observations conveyed to

12  you?

13  A    They talked to me in person when I was on the housing

14  unit, and they were the first ones who were concerned about

15  his inability to find his cell and they intervened.

16  Q    And that was shortly after he was admitted; is that

17  right?

18  A    Yes.

19  Q    And after that you -- we spoke earlier about the

20  reindeer that was put on the door; is that right?

21  A    Yes.

22  Q    And after that, did he have any further trouble finding

23  his cell?

24  A    No.  I was told that he was doing well.  He said he

25  goes to the rec yard often.  The way the process is there,

1    the inmates have to give their ID to get a pass to go off

2    the unit and he was taking full advantage of the opportunity

3    to move about and get outside.

4    Q    You mentioned this earlier, did he have any trouble

5    finding the rec yard?

6    A    He did not.

7    Q    Or the chow hall, as you've referred to it?

8    A    No.

9    Q    You mentioned earlier that during the restoration

10   evaluation the defendant received -- there is a treatment

11   component as well, correct?

12   A    Yes.

13   Q    I think you mentioned that the defendant was enrolled

14   in a competency restoration class; is that right?

15   A    Yes.

16   Q    Did you speak to the Butner employee who was conducting

17   the class?

18   A    Yes.

19   Q    Do you recall what she told you about the defendant's

20   behavior in the class?

21   A    Yes.  She told me she didn't --

22            MS. DOLAN:  Objection.

23            THE COURT:  I'll allow it.

24   A    Yes.  She told me that he when he was called upon in

25   the group, he always provided the correct information.

1  Sometimes he did not appear to pay attention very well and

2  was distracting, but most of the time he was cooperative.

3  Q    Before you evaluated the defendant, had he been

4  evaluated by other psychologists?

5  A    Yes.

6  Q    And did you review their reports in the course of your

7  evaluation?

8  A    Yes.

9  Q    Did you recall -- did you review a report prepared by

10 Dr. Monica Mindt Rivera?

11            MS. DOLAN:  Rivera Mindt.

12            MR. TROWEL:  Rivera Mindt, I'm sorry.

13 A    Yes.  I reviewed that report briefly, and then I went

14 over it with our neuropsychologist.

15 Q    And that -- when you say you went over it with a

16 neuropsychologist, do you mean contemporaneous with your

17 evaluation of Mr. Bumagin?  So at the time of your

18 evaluation?

19 A    Yes.

20 Q    Do you recall what type of report Dr. Rivera Mindt

21 created?

22 A    It was a neuropsychological evaluation.

23 Q    What was her conclusion, if you recall?

24 A    I don't believe she rendered an opinion about

25 competency, but she indicated that he had cognitive

1   impairment, that he had a dementia, and that she didn't feel

2   that he would be able to return to work in the same

3   capacity.

4   Q    Was Dr. Rivera Mindt's report -- did she conduct a

5   competency evaluation of the defendant?

6   A    No.

7   Q    And did she reach an opinion about his competency?

8   A    No.

9   Q    Did you review a report prepared by Dr. Dana Brauman

10  from the Metropolitan Correctional Center in Manhattan?

11  A    Yes.

12  Q    If you recall, what type of report did Dr. Brauman

13  create?

14  A    That was a competency evaluation.

15  Q    What, if you recall, was her conclusion?

16  A    It was her opinion that he was not competent, but that

17  she felt he should be sent to a medical center for

18  competency restoration.

19  Q    The report recommended a restoration evaluation; is

20  that right?

21  A    Yes.

22  Q    What differences -- did he then come to FMC Butner

23  following his evaluation by Dr. Brauman?

24  A    Yes.

25  Q    What differences, if any, were there between your

1  evaluation and Dr. Brauman's evaluation?

2  A    Well, our evaluation included a full neuropsychological

3  battery of test results.  Our evaluation included a pretty

4  lengthy medical section.  He had a pretty big medical workup

5  at our institution.  My opinion was different than hers.

6  Our diagnoses were similar; although, we believed -- we gave

7  him a rule out dementia not otherwise specified, because we

8  couldn't determine the -- we couldn't rule it in or rule it

9  out, we didn't have enough information because test results

10 indicated it's inconsistent effort, and he wasn't -- we

11 didn't feel like he was being truthful with us.

12 Q    So just to be clear, what does rule out mean?

13 A    It means that we believe there is a cognitive decline,

14 we don't know how extent -- how extensive it is, simply

15 because he provided inconsistent information to us, and so

16 we weren't able to say definitively if he had dementia.

17 Q    In the differences between your evaluation and

18 Dr. Brauman's, was your evaluation period longer?

19 A    Yes, our evaluation period lasted four months.

20 Q    And how long was Dr. Brauman's, if you recall?

21 A    30 days.

22 Q    Was Mr. Bumagin subject to more observation in the

23 course of your evaluation?

24 A    Yes.

25 Q    By whom?

J. GRANT - CROSS/MR. TOWEL                    143

1    A    By the members of the nursing staff, medical staff,

2    custody staff, as well as the primary -- or the evaluators

3    in the case.

4    Q    And were you in the room earlier when Dr. Brauman

5    testified that she conducted her evaluation of the defendant

6    alone?

7    A    Yes.

8    Q    And were you -- did you have other members of your

9    team --

10   A    Yes.

11   Q    -- in the course of your evaluation?

12   A    Yes.

13   Q    Now in your -- what was your diagnosis of the

14   defendant, if you recall?

15   A    I believe our diagnosis was dementia or rule out

16   dementia NOS.

17   Q    In your expert opinion, can a patient diagnosed with --

18   I'm sorry, withdrawn.

19           NOS, does that mean not otherwise specified?

20   A    It does.

21   Q    In your expert opinion, can a patient diagnosed with

22   rule out dementia not otherwise specified be found

23   competent?

24   A    Yes.

25   Q    In the course of your evaluation, do you ever consider

1    prison calls?

2    A    Yes.

3    Q    Why do you do that?

4    A    Sometimes we listen to telephone calls to -- it could

5    be for various reasons.  To see if the person has a rational

6    thought process, to see what their relationship is like with

7    their family, are they telling their family something

8    different than they are telling us.

9    Q    Did you do that in this case?

10   A    I did not.

11   Q    Why not?

12   A    I didn't feel it was necessary to reach an opinion.

13   Q    What do you mean by that?

14   A    I didn't feel like I needed that additional source of

15   data.

16   Q    And did you have -- you had enough data to reach your

17   conclusion, that what you're saying?

18   A    Yes.

19   Q    Now, in the course of your evaluation, were all the

20   questions that you asked part of a routine restoration

21   examination?

22   A    Yes.

23   Q    And was the purpose of each and every one of those

24   questions solely to determine his competency to strand

25   trial?

J. GRANT - CROSS/MR. TOWEL                          145

1   A    Yes.

2   Q    Was there any other reason that you asked those

3   questions, any question of the defendant other than to

4   determine his competency to stand trial?

5   A    We ask questions to be able to reach a diagnosis.

6   Q    So you asked questions to reach a diagnosis and to

7   determine whether he was competent to stand trial; is that

8   correct?

9   A    Yes.

10  Q    Any other purpose for any other questions that you

11  asked?

12  A    No.

13  Q    Dr. Grant, I show you Defendant's Exhibit 3.  Do you

14  recall discussing this a new moments ago?

15  A    Yes.

16  Q    What is this?

17  A    The treatment plan.

18  Q    When was this created?

19  A    It was created at our first treatment team meeting, and

20  typically occurs within two weeks of an individual's arrival

21  at the institution.  It looks like the date of this plan is

22  12/5.

23  Q    Had you reached an opinion about the defendant's

24  competency at the time of this plan?

25  A    No.

1    Q    When did you reach an opinion about the defendant's

2    competency, if you recall?

3    A    I reached an opinion very shortly before I wrote the

4    report.

5    Q    Why do you recall that?

6    A    Because we still had a lot of data to collect.  We had

7    neuropsychological test results, I felt like I wanted to

8    interview him again and talk again with nursing staff.

9    Q    In this plan on page two there is a heading that says,

10   problem one.  Is that right?

11   A    Yes.

12   Q    And what is a problem in this report?  What does

13   that --

14          MS. DOLAN:  Your Honor, I asked that precise

15   question.

16          THE COURT:  I know, maybe he didn't remember the

17   answer.

18   A    It's an area that we are assessing, we're looking at or

19   working on.

20   Q    So this is one of the issues that you're going to

21   evaluate in the course of your examination, correct?

22   A    Yes.

23   Q    And then on page three there are objectives listed; is

24   that correct?

25   A    Yes.

J. GRANT - CROSS/MR. TOWEL                    147

1   Q    Those are -- is it fair to say those are aspirational?

2   A    Yes.

3   Q    Is this what you hope to accomplish with the defendant?

4   A    Yes.

5   Q    These are not statements of your belief at the time of

6   this report; is that correct?

7   A    That's correct.

8   Q    Now, you discussed with defense counsel the defendant's

9   ability to explain the legal options and that that was one

10  of the things you hoped he would be able to do at the end of

11  the restoration period; is that correct?

12  A    Yes.

13  Q    And did you conclude that -- at a certain point did you

14  conclude that he was able to do that?

15  A    Yes.

16  Q    And when did you reach that conclusion?

17  A    I can't recall exactly when I reached that conclusion.

18  They discussed that as a routine part of their competency

19  group, and I'm not sure exactly where that falls within the

20  course of their meetings.

21  Q    Was it later in the evaluation period, later than --

22  A    Yes.

23  Q    -- later than the creation date of Defense Exhibit 3?

24  A    Yes.

25          MR. TROWEL:  One moment, your Honor, please?

J. GRANT - REDIRECT/MS. DOLAN                148

1    Thank you.

2            THE COURT:  Of course.

3            (Pause.)

4    BY MR. TROWEL:

5    Q    Dr. Grant, in the course of your evaluations, have you

6    kept records about the percentage of defendants who you

7    concluded were competent?

8            MS. DOLAN:  Objection, not relevant.

9            THE COURT:  Sustained.  She's not here as a

10   statistical witness.

11           MR. TROWEL:  Nothing further, your Honor.

12           THE COURT:  Thank you.  Your witness.

13   REDIRECT EXAMINATION

14   BY MS. DOLAN:

15   Q    Dr. Grant, Mr. Trowel was just asking you about the

16   treatment plan goals, correct?

17   A    Yes.

18   Q    And earlier throughout the course of your

19   cross-examination he discussed something known as a

20   restoration evaluation, correct?

21   A    Yes.

22   Q    Okay.  And at one point either you or he said there was

23   a treatment component to a restoration evaluation, correct?

24   A    Yes.

25   Q    And is there?

J. GRANT - REDIRECT/MS. DOLAN                    149

1   A    Yes.

2   Q    Now, you were ordered by the court to evaluate

3   Mr. Bumagin, correct?

4   A    Yes.

5   Q    Was there anything in that order that directed you to

6   conduct a restoration evaluation?

7   A    Yes.  I believe the order referenced the federal

8   statute 4241(d).

9   Q    And does 4241(d) discuss a restoration evaluation?

10  A    Yes.

11  Q    What does it say?

12  A    It uses the language of treatment and evaluation

13  period.  And, in fact, I included a statement about 4241(d)

14  in the initial paragraph of my report.

15           It's my understanding that it -- the language --

16  Q    I'll ask the questions.

17           Looking at Defendant's Exhibit 3, does 4241(d) say

18  anything about clearly and realistically discussing the

19  evidence against a defendant and possible legal defense

20  strategies?  Does it say anything about that?

21  A    I don't believe so.

22  Q    It only talks about a treatment and evaluation, does it

23  not?

24  A    Correct.

25  Q    Now, at one point you use the phrase, "appropriate

1    defense."  Do you recall that?

2    A    I don't.

3    Q    You don't recall saying that?

4    A    I don't.  I could have said that, I don't recall my

5    exact words.

6    Q    What --

7    A    I think it's possible that I said that.

8    Q    What is an appropriate defense?

9    A    I think that would depend on the case, it would depend

10   on an individual consulting with their defense attorney,

11   it's variable, it's a case-by-case thing.

12   Q    Do you have a legal education?

13   A    No.  No, I don't.

14   Q    And so you've never represented an individual facing

15   criminal charges?

16   A    No.

17   Q    So what is your understanding of an appropriate defense

18   based on?

19   A    It would be -- I don't know that I can make that

20   determination.  But when I'm talking with an individual

21   about their thoughts about their case, I want to see if

22   their thinking process is rational.  And if they, for

23   example, tell me that they were completely crazy or

24   psychotic at the time of the offense and all the evidence

25   points that that's not the case, because I have the

J. GRANT - REDIRECT/MS. DOLAN                    151

1  discovery in front of me, I would say that it's probably not

2  a rational or an appropriate defense if they believe they

3  can plead not guilty by reason of insanity, for example.

4  Q    Have you ever read any cases?

5  A    Pardon me?

6  Q    Have you read any caselaw?

7  A    Yes.  A long time ago.

8  Q    How long?

9  A    Well, I completed a forensic tract in my predoctoral

10 program.  And occasionally -- and we visited caselaw at that

11 point, we had seminars.  And I also periodically attend the

12 forensic seminar that's conducted weekly with our

13 predoctoral interns, but I don't claim to be a legal expert.

14 Q    And you also testified on cross that Butner conducted a

15 complete medical workup?

16 A    Yes, I believe they did a pretty comprehensive job.

17 Q    And that included at least one MRI?

18 A    Yes.

19 Q    I'm showing you Defense Exhibit H.

20 A    I'm thinking two MRI's actually.

21 Q    Showing you Defense Exhibit H, which is a report from

22 December 20th, 2012 by Dr. Volin, and it notes Mr. Bumagin's

23 MRI shows atrophy is also consistent with Alzheimer's

24 disease, correct?

25 A    Yes.

J. GRANT - RECROSS/MR. TROWEL                    152

1    Q    And that was part of the medical workup, correct?

2    A    That was a piece of it, yes.

3    Q    And finally, you mentioned that in order to orient

4    Mr. Bumagin to his cell, you placed a reindeer on his door,

5    correct, or somebody did?

6    A    Somebody did.

7    Q    Are you aware that Mr. Bumagin is Jewish?

8    A    Yes.

9            MS. DOLAN:  Nothing further.

10           THE COURT:  Your witness.

11           MR. TROWEL:  Your Honor, one brief question, your

12   Honor.

13   RECROSS-EXAMINATION

14   BY MR. TROWEL:

15   Q    Dr. Grant, in your expert opinion, could somebody who

16   has an MRI that's consistent with Alzheimer's disease

17   nevertheless be found competent?

18   A    Yes.

19           MR. TROWEL:  Nothing further.

20           THE COURT:  Your witness.

21           MS. DOLAN:  Nothing further for this witness.

22           THE COURT:  Doctor, please step down.

23           (Witness leaves the witness stand.)

24           THE COURT:  Next witness?

25           MR. TROWEL:  Your Honor, my next witness was

```
                          PROCEEDINGS                    153
```

 1   Dr. Monica Rivera Mindt, who -- the schedule for 5:00 when

 2   the hearing was initially set forth.  As I mentioned, she

 3   has a family issue, so she had to leave at 5:00.  I'm ready

 4   to resume tomorrow.

 5            THE COURT:  Is that acceptable to the government?

 6            MR. TROWEL:  It can be.  The Government is also

 7   prepared to call a witness if your Honor would like to

 8   proceed.

 9            THE COURT:  Well, since it's 5:30 and since we're

10   on the defense case, why don't we adjourn until tomorrow

11   morning.

12            What time do we start tomorrow, Mr. Jackson?

13            COURTROOM DEPUTY:  1:30, Judge.

14            THE COURT:  1:30.  So we'll start promptly at 1:30

15   and we'll take it from there.

16            Do I need to sign any orders to make sure that

17   we're all here tomorrow or is that going to be an issue?

18            MR. TROWEL:  Your initial order, your Honor,

19   covered both today and tomorrow.

20            THE COURT:  I'm assuming if we go past tomorrow,

21   that I'll just to have to sign another order so we can move

22   smoothly along.

23            I would hate to think we're going to go past

24   tomorrow, but then, I don't go by the hour anymore, so it's

25   okay with me if we go past tomorrow.

PROCEEDINGS                             154

1            MR. TROWEL:  Your Honor, I think you set aside an

2    hour tomorrow.

3            THE COURT:  We can go as late as we need to go

4    tomorrow.

5            MR. TROWEL:  Great.

6            THE COURT:  How late do we need to go tomorrow?

7            MS. DOLAN:  I'd like to complete my direct in five

8    minutes, if possible.  Although, I may have to ask some more

9    questions, my direct examinations have been at least ten

10   minutes, if not half of Mr. Trowel's cross.

11           THE COURT:  So far.

12           MS. DOLAN:  So far.

13           MR. TROWEL:  The government would anticipate

14   calling I think two witnesses tomorrow, who are also on the

15   evaluation team at Butner.

16           THE COURT:  All in, how long do you think the

17   government case will take tomorrow and how long do you think

18   the defense case will take.  I won't hold you to it, I just

19   want approximations.

20           MR. TROWEL:  I think the Government will probably

21   finish its direct in --

22           THE COURT:  Just, how many hours.

23           MR. TROWEL:  90 minutes probably.

24           THE COURT:  90 minutes.  How long do you think

25   your case will take?

1          MS. DOLAN:  Direct, between five and 30, and then
2   I really don't know.
3          MR. TROWEL:  I think my cross of defense's
4   witnesses, I don't know if -- even know if it's 30 minutes.
5          THE COURT:  In other words, see you tomorrow at
6   1:30.
7          MR. TROWEL:  Thank you, your Honor.
8          MS. DOLAN:  Thank you.
9          (Proceedings adjourned at 5:33 p.m.)
10
11                          * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1

2                                    **CERTIFICATION**

3

4

5       I certify that the foregoing is a correct transcript from the

6       record of proceedings in the above-entitled matter.

7

8

        _____

9        Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

157

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25