1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,          :  11-CR-00800(WFK)
                                   :
                                   :
                                   :
       -against-                   :  United States Courthouse
                                   :  Brooklyn, New York
                                   :
                                   :
SEMYON BUMAGIN,                    :  Tuesday, June 30, 2015
                                   :  9:30 a.m.
          Defendant.               :
                                   :
                                   :

- - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
BEFORE THE HONORABLE WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:  KELLY T. CURRIE, ESQ.
                       Acting United States Attorney
                       Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201
                     BY:  KEVIN M. TROWEL, ESQ.
                        JAMES D. GATTA, ESQ.
                        Assistant United States Attorneys

For the Defendant:  LAW OFFICE OF ZOE JAYDE DOLAN
                        154 Grand Street
                        New York, New York 10013
                     BY:  ZOE J. DOLAN, ESQ.

Court Reporter:      SHERRY J. BRYANT, RMR, CRR
                        225 Cadman Plaza East
                        Brooklyn, New York 11201

Proceedings recorded by mechanical stenography, transcript
produced by Computer-Assisted Transcript.

1          (In open court.)

2          (Defendant enters courtroom.)

3          COURTROOM DEPUTY:  Criminal cause for hearing,

4   Docket Number 11-CR-800, USA versus Bumagin.  Counsel, please

5   state your appearances and spell your names for the court

6   reporter.

7          MR. TROWEL:  Good morning, Your Honor.  Kevin

8   Trowel, T-r-o-w-e-l, for the United States.  I'm going to be

9   joined by AUSA James Gatta, G-a-t-t-a, who just went to grab a

10  bottle of water.  And we're also joined by Marissa Gluck,

11  G-l-u-c-k, who's an intern in our office this summer, if

12  that's okay with Your Honor.

13         THE COURT:  Absolutely.  Where are you in school?

14         MS. GLUCK:  I'm at Fordham, Your Honor.

15         THE COURT:  Excellent.  I went to Fordham Prep.

16  Couldn't get into the law school.  You're welcome.  Please be

17  seated.

18         THE DEFENDANT:  Good morning.

19         THE COURT:  Good morning.

20         MS. DOLAN:  Zoe Dolan, D-o-l-a-n, for the defendant

21  Semyon Bumagin, who is present in custody.  Good morning, Your

22  Honor.

23         THE COURT:  Good morning.  Good morning, Mr.

24  Bumagin.  You may be seated as well.  Do we have an

25  interpreter here today?  Do we need an interpreter here today?

USA v Bumagin                                            3

1       THE DEFENDANT:  I don't think so, Your Honor.  I'm

2   pretty good with English.

3       THE COURT:  All right.  Ms. Dolan, does that work

4   for you or do we need an interpreter?

5       MS. DOLAN:  I don't think that we need an

6   interpreter.  I don't use one with Mr. Bumagin.

7       THE COURT:  Okay.  Thank you.  All right, we are

8   here for a continuation of the competency hearing we have been

9   teeing up for quite some time.  Are we ready to proceed?

10      MR. TROWEL:  We are, Your Honor.  The government is

11  happy to begin with the government calling Dr. Drob.

12      THE COURT:  Is that acceptable to you, Ms. Dolan?

13      MS. DOLAN:  The defense has an objection.  The

14  government did not notice Dr. Drob as an expert.

15      THE COURT:  It did not notice him as an expert, but

16  the Court appointed him as an expert and they indicated that

17  they wished to examine him.  Would you like an opportunity to

18  take his deposition during the luncheon recess or to examine

19  him in some other fashion before he takes the stand today?

20      MS. DOLAN:  No, I do not need to do that.  I simply

21  object to the government calling him as a witness.

22      THE COURT:  What's the basis of the objection?  I'm

23  sorry, I'm not --

24      MS. DOLAN:  The basis of the objection is that the

25  government didn't notice him as a witness and did not provide

1    a summary of his testimony.  I don't believe that he's

2    properly construed as a government witness.

3             THE COURT:  What's your response?

4             MR. TROWEL:  Just to clarify, Rule 614 concerns the

5    calling of an expert witness that the Court has appointed.

6    The rule indicates that the Court may call a witness on its

7    own or at a party's request, and each party is entitled to

8    cross-examine the witness.

9             And that stands to reason because here Your Honor

10   selected this individual to do an evaluation.  The parties

11   both have the report that he created.  And the Court, per Your

12   Honor's order of a few months ago, is having the hearing in

13   conformity with the statute, which says that we should have an

14   opportunity to ask him questions, essentially.

15            THE COURT:  Yes, Ms. Dolan.

16            MS. DOLAN:  I have a broader objection that I'll get

17   to in a moment, but the Court's essential holding in its April

18   10th decision was that even considering Dr. Drob's report,

19   based on the Court's observations of Mr. Bumagin in Court, the

20   Court finds Mr. Bumagin to be competent.

21            So I'll get to the matter of relevance in a moment.

22   But, again, this is a Court witness.  The Court has not called

23   this witness.  In fact, the Court has determined that even

24   considering the witness's potential testimony, that is to say

25   everything that's contained in the report, the Court has still

1    drawn the conclusion that it has.

2              And so, therefore, first of all, because the Court

3    hasn't called this witness; and, second of all, even if the

4    Court did call this witness -- and I get to my relevancy

5    objection -- it wouldn't be relevant, because the Court has

6    already determined that even considering Dr. Drob's report

7    that the Court has still found Mr. Bumagin to be competent.

8              THE COURT:  I'm willing to reconsider that.  That's

9    one of the reasons we're here today.  So I'm going to allow

10   both parties to examine the doctor and who knows where we'll

11   come out.  We've had many twists and turns.

12             One thing that's not coming in is a report from

13   Butner, as we talked about before.  It's not coming in

14   sideways.  It's not coming in as a demonstrative.  I can go

15   through the whole Dr. Seuss litany, but, Mr. Gatta, nice to

16   see you here today, but don't even try it.  You're very

17   creative, but I'm very consistent.  So just to be clear, that

18   report is out, stays out.

19             MR. TROWEL:  Your Honor, just to clarify one issue,

20   Your Honor in an order ordered BOP to turn over documents to

21   Dr. Drob, and he, of course, considered those in his

22   evaluation.

23             THE COURT:  Yes, I knew that was how you were going

24   to try to get it in.  It's not coming in that way.

25             MR. TROWEL:  No, Your Honor.  We are not going to

USA v Bumagin                                             6

1   try to get the report in.

2           THE COURT:  Good.

3           MR. TROWEL:  There will be certain questions when

4   I'll ask him about what he reviewed in reaching his

5   conclusion, I'll discuss certain documents with him, but we

6   will at no point seek to admit the report or those documents,

7   but I think they're relevant insofar as they form part of the

8   basis of his opinion.

9           THE COURT:  Well, let's see if they do, because he

10  obviously came out opposite the Butner doctors and found that

11  the defendant was, in fact, not competent.  So I don't know

12  that we're -- we'll go question by question, but I just wanted

13  to forestall any anxiety either side might have had about

14  whether or not the Butner report is coming in.  It's not.

15          MS. DOLAN:  Just based on what Your Honor just said

16  about -- I'm not quite sure where we are in this phase of

17  things, whether this is some sort of reconsideration, but just

18  so the --

19          THE COURT:  Consider it a reconsideration.

20          MS. DOLAN:  Just so the record is clear, the defense

21  maintains all of its prior objections under the Second

22  Circuit's rule of reasonableness with respect to the duration

23  of these proceedings and everything else that the defense has

24  argued.

25          THE COURT:  I must say the proceedings have been

1    lengthy.  And if it's the Court's fault, the Court accepts

2    responsibility for that.  If it's the fault of others, as the

3    Pope says, who am I to judge?  All right.

4           MR. TROWEL:  Thank you, Your Honor.  So we'll begin

5    with Dr. Drob.  I believe he's sitting out front.

6           (Witness sworn.)

7           THE COURT:  Good morning, Doctor.

8           THE WITNESS:  Good morning, Judge.

9           THE COURT:  I'm the one who got you enmeshed in all

10   of this.  I appreciate your being here today as a

11   Court-appointed expert.  I'm going to ask you to spell your

12   name, first and last name for the reporter, and then counsel

13   will have an opportunity to question you with respect to your

14   report.  So I will ask you to do that now.

15          THE WITNESS:  My name is Sanford Drob, and it's

16   S-a-n-f-o-r-d, last name D-r-o-b.

17          THE COURT:  Thank you.  You may proceed, Counsel.

18          MR. TROWEL:  Thank you, Your Honor.

19   **SANFORD DROB,**

20   Called by the Government, having been first duly sworn, was

21   examined and testified as follows:

22   DIRECT EXAMINATION

23   BY MR. TROWEL:

24   Q    Good morning, Dr. Drob.

25   A    Good morning.

DROB - DIRECT / TROWEL                                    8

1   Q    You're a clinical psychologist; is that right?

2   A    A clinical and forensic psychologist.

3   Q    And you're licensed in the state of New York?

4   A    That is correct.

5          THE COURT:  Doctor, I'm going to ask you to move

6   that microphone -- it actually moves -- right in front of you.

7   Do you hear the difference?

8          THE WITNESS:  Yes, I do.

9          THE COURT:  Go ahead.

10  Q    And you've previously qualified as an expert in both

11  clinical and forensic psychology?

12  A    That is correct.

13  Q    And you've qualified both in this district, in the

14  Eastern District, also in the Southern District, and then in a

15  number of state jurisdictions?

16  A    Yes.

17  Q    Your career primarily has been focused on forensic

18  psychology; is that right?

19  A    Yes.

20  Q    And in general, it's fair to say that forensic psychology

21  is the application of clinical psychology to issues that arise

22  in the judicial system?

23  A    Yes.

24  Q    Now, just generally by way of background, can you tell us

25  how you became involved in this case?

DROB - DIRECT / TROWEL                                    9

1    A    I believe that one of the clerks of the Court called me

2    and asked me if I would do a competency evaluation.

3    Q    And there was a court order asking you to do that?

4    A    That is correct.

5    Q    And then pursuant to that order, did you actually conduct

6    an evaluation of the defendant?

7    A    Yes.

8    Q    I'm showing you --

9              MR. TROWEL:  Your Honor, can I approach just to show

10   him his report?

11             THE COURT:  Why don't you do it with the Elmo, if

12   you don't mind doing that, or have Mr. Jackson bring it

13   forward.

14   Q    Showing you what's been marked as Government Exhibit 11.

15   Can you see that on your monitor up there?

16   A    It was there momentarily, but it disappeared.

17             COURTROOM DEPUTY:  Give it a couple of seconds, a

18   few seconds.

19             THE COURT:  Can you see it now, Doctor?

20             THE WITNESS:  Yes.

21   Q    Is this the report that you created?

22   A    Yes.

23   Q    I'm just flipping through it here.  You can see it goes

24   back to page 22.  Is that the complete report?

25   A    It appears to be, yes.

1          MR. TROWEL:  The government moves to admit

2    Government Exhibit 11 into evidence.

3          MS. DOLAN:  No objection.

4          THE COURT:  It's admitted.

5          (Government Exhibit 11 received in evidence.)

6    Q    Now, in the course of your evaluation, did you meet with

7    the defendant personally?

8    A    Yes.

9    Q    How many times did you meet with him, as you recall?

10   A    Three occasions.

11   Q    And were those meetings on January 29th, February 11th

12   and March 20th of 2015?

13   A    That is correct.

14   Q    On each of those occasions, approximately how long did

15   you meet with the defendant?

16   A    I'm being very approximate here, but probably a couple of

17   hours.  Two to three hours.

18   Q    On each occasion?  Or just to clarify, you mean two to

19   three hours each time or two to three hours total?

20   A    Well, I'm saying two to three hours each time, very

21   approximately.

22   Q    I understand, thank you.  And where did those meetings

23   take place?

24   A    They took place at the Metropolitan Detention Center in

25   Brooklyn.

DROB - DIRECT / TROWEL                                    11

1   Q     Where within the facility?  Was there a particular place

2   that you met with him?

3   A     In one of the lawyer's rooms within the visiting room

4   right on the first floor.

5   Q     Now, as part of your evaluation, did you conduct

6   interviews with the defendant during those meetings?

7   A     Yes.

8   Q     And did you also administer neuropsychological tests?

9   A     I administered psychological tests and some tests that

10  would be called neuropsychological, yes.

11  Q     Did you also collect data from some previous evaluations

12  conducted by BOP doctors?

13  A     Yes.  I collected and reviewed that data and reports.

14  Q     And in general, those -- did you compare their data to

15  your data in the course of your evaluation?

16  A     Yes.

17          THE COURT:  You have to let the lawyer finish the

18  question before you answer yes, because he might sneak

19  something in there that you don't want to agree to, like you

20  shot JFK or something.  So let him finish the question.

21          THE WITNESS:  Fair enough.

22          THE COURT:  Not this lawyer.  Not that lawyer, but a

23  lawyer.

24  Q     In general -- just to make sure the record is clear on

25  that, in general, you compared the results of the prior

SHERRY BRYANT, RMR, CRR

1    doctors to your results in reaching your ultimate conclusion?

2    A    That was one of the things that I did, yes.

3    Q    As part of your evaluation?

4    A    Yes.

5    Q    Now, let's begin with the interviews of the defendant.

6    You first met with him on January 29th; is that right?

7    A    Yes.

8    Q    And then you met with him, the second time was about two

9    weeks later on February 11th?

10   A    Yes.

11   Q    At that second meeting, he recognized you; is that right?

12   A    Yes.

13   Q    And he recalled that you were a doctor, though he thought

14   you were a psychiatrist rather than a psychologist; is that

15   right?

16   A    Well, as I recall, he recalled that I was a doctor at

17   times.  At other times he asked me if I was a social worker,

18   and at other times he asked me who I represented.  He told me

19   I was -- asked me if I was a lawyer at one point.  But each

20   time I was able to reorient him and he understood what my role

21   was.

22   Q    I'm referring specifically to February 11th, and I'm just

23   drawing your attention now to Government Exhibit 11.  Right

24   here I'm pointing to the second full paragraph on the page.

25   On February 11th, he recognized you and he recalled that you

DROB - DIRECT / TROWEL                            13

1   were a doctor, but he thought you were a psychiatrist rather

2   than a psychologist; is that correct?

3   A    Yes.  In reviewing my report, that is correct.

4   Q    And then the next time you met with him was about five

5   weeks later on March 20th; right?

6   A    That is correct.

7   Q    And at that point, he recognized you again and he agreed

8   to be interviewed; is that right?

9   A    That is correct.

10  Q    You had never met the defendant before January 29;

11  correct?

12  A    No.

13  Q    So it's fair to say that who you were and your role and

14  all that information, that was all new to him as of January

15  29th; correct?

16              THE COURT:  New to him or new to the doctor?

17              MR. TROWEL:  New to the defendant as of January

18  29th.

19  A    No, he didn't know me prior to the 29th.

20  Q    But he retained some information at least about who you

21  were and he recognized you from meeting to meeting; is that

22  right?

23  A    Yes.

24  Q    Now, in the course of your interview, you asked the

25  defendant if he had experienced physical or sexual abuse;

Case 1:11-cr-00800-WFK-JO  Document 121  Filed 07/02/15  Page 14 of 104 PageID #: 1644

1    right?

2    A    Yes.

3    Q    And he told you he had not?

4    A    Correct.

5    Q    But during that conversation, he volunteered that he had

6    been involved in several accidents; is that right?

7    A    That is correct.

8    Q    And he spontaneously offered that information to you?

9    A    I may have asked him if he had any head injuries or

10   accidents, but he answered that he had.

11   Q    And he told you that he has a history of heavy drug use,

12   including the use of crack cocaine and heroin?

13   A    Correct.

14   Q    And he also spontaneously offered that information to

15   you?

16   A    Yes.

17   Q    Now, he told you about one particular accident he had a

18   number of years ago when he was driving the wrong way on a

19   highway; is that right?

20   A    Yes.

21   Q    And in the course of describing that for you, he

22   remembered the make and model of the car he was driving; is

23   that right?

24   A    I don't recall, but if it's in my report he did, yes.

25   Q    Just to refresh your recollection, I'll again show you

1  what's been marked as Government Exhibit 11, showing you page

2  2, the last full -- the last paragraph on the page.  I'm just

3  indicating here.

4  A    Yes.

5  Q    And so he told you he'd been driving a Lincoln Mark III

6  at the time; is that right?

7  A    That is correct.

8  Q    And he said following the accident that he was

9  unconscious for several days?

10  A    Yes.

11  Q    And then he recalled another accident in Germany when he

12  was young and he said he fell from a building when he was

13  running from the police; is that right?

14  A    That is correct.

15  Q    And he again told you that he injured his head when he

16  fell?

17  A    Yes.

18  Q    And then in the course of the interview, he also added

19  that his father had Alzheimer's disease; is that right?

20  A    Yes.

21  Q    In the course of your interview, did he spontaneously

22  offer those stories to you?

23  A    Well, in the case of the stories about the accidents,

24  they were in response to questions.  I believe that he

25  spontaneously told me that his father had Alzheimer's disease

1  several times in the course of the various interviews.  He

2  made a joke to that effect.

3  Q    But in other words, just to clarify, you didn't have any

4  preexisting knowledge of --

5            MS. DOLAN:  Objection to interrupting the witness in

6  the middle --

7            THE COURT:  Had you finished your answer, Doctor?

8  Why don't we read the question and answer back to the

9  interruption and the doctor can complete the answer.

10            (Question and answer read.)

11            THE COURT:  Had you completed your answer, Doctor?

12            THE WITNESS:  I suppose.  I think I was going to say

13  specifically what he said.  He indicated to me that his

14  father, instead of leaving him a million dollars, left him

15  with Alzheimer's disease.

16  Q    Thank you.  I apologize for interrupting.  What I meant

17  to ask in the course of that question was that you didn't have

18  any preexisting knowledge of those accidents, for example; is

19  that right?

20  A    There was some mention of I believe one accident in the

21  previous reports.  So I guess I was aware of that, but not in

22  the details that he told me, no.

23  Q    So you didn't ask him, for example, tell me about the

24  accident in Germany?

25  A    No.

1  Q    He just volunteered information about an accident in

2  Germany that he recalled?

3  A    That is correct.

4  Q    Now, it's fair to say in general that heavy drug use

5  might have an effect on one's mental capacity?

6  A    Yes.

7  Q    And it's fair to say also that head injuries might have

8  an effect on one's mental capacity?

9  A    Yes.

10  Q    And is it also fair to say that a family history of

11  Alzheimer's disease might be relevant to one's mental

12  capacity?

13  A    Yes.

14  Q    And then, as you noted, in the course of the interview,

15  he on a number of occasions spontaneously told you that he had

16  issues, quote, in the memory department; right?

17  A    That is correct.

18  Q    Is it fair to say that during the interviews he

19  spontaneously and voluntarily provided you with information

20  that he believed was relevant to your assessment of his

21  competency?

22  A    Well, the question of spontaneous is something that I

23  think I need to clarify.  In the course of my interviews, I'm

24  asking him questions that are relevant to any history that

25  might be important with regard to evaluating memory.  So I

1    asked him if he had accidents or head traumas.  I asked him if

2    he had any history of substance abuse.  Those responses that

3    he gave me were in response to my questions.

4            In the case of Alzheimer's disease, before I had an

5    opportunity to perhaps ask him if there was any history of

6    Alzheimer's -- any history of, you know, of mental or nervous

7    trouble in his family, he spontaneously, as you put it,

8    offered that his father had Alzheimer's and had transmitted it

9    to him.

10   Q    But in response to your general questions about head

11   injuries or substance abuse, he provided you with narrative

12   information that was responsive to your question; is that

13   correct?

14   A    That is correct.

15   Q    And you didn't lead him on those questions, that was

16   information that he was providing to you from memory?

17   A    That is correct.

18   Q    Now, he also -- you've mentioned that you reviewed the

19   prior reports in the case; right?

20   A    Yes.

21   Q    And that includes a report created by Dr. Rivera-Mindt?

22   A    You know, I'm not certain if I saw Dr. Mindt's report.  I

23   saw summaries of that report in the report by Dr. Grant, but

24   I'm not certain that I reviewed Dr. Mindt's report.

25   Q    Insofar as her report was discussed in other reports, you

1    refer to her tests and you refer to some of her conclusions;

2    is that right?

3    A    That is correct.

4    Q    And you also reviewed a report created by Dr. Brauman at

5    MCC?

6    A    Correct.

7    Q    And then you reviewed a report created by Dr. Grant at

8    Butner?

9    A    Yes.

10   Q    And in each of those reports, there was a discussion of

11   his -- the defendant's drug use; correct?

12   A    Yes.

13   Q    He told those doctors about his drug use?

14   A    Yes.

15   Q    And in each of those reports, there was a discussion of

16   the defendant's self-report of Alzheimer's in his family;

17   correct?

18   A    I believe so, yes.

19   Q    And then he told Dr. Rivera-Mindt and Dr. Brauman about

20   head injuries also; is that right?

21   A    I'm not sure if he told them the precise ones that he

22   told me, but he did speak about them, yes.

23   Q    Just without getting into which ones, in general, he told

24   Dr. Rivera-Mindt and Dr. Brauman about head injuries that he

25   had suffered?

DROB – DIRECT / TROWEL                                20

1   A    That is correct.

2   Q    Now, you spoke to the defendant's sister by phone; is

3   that correct?

4   A    Yes.

5   Q    And you spoke to his son by phone also; is that right?

6   A    That is correct.

7   Q    And then you reviewed some transcripts of phone calls

8   from 2011 and 2012 that -- transcripts of phone calls the

9   defendant made from jail; is that right?

10  A    Yes, I did, that were provided to me, yes.

11  Q    And in those transcripts, you concluded that, quote:

12  It's clear that he, the defendant, believes that by

13  demonstrating he has cognitive deficits he will gain an

14  advantage in this case.

15  A    Yes.

16  Q    That was a conclusion you drew from those calls?

17  A    That's my conclusion, yes.

18  Q    Now, in those calls it's fair to say, isn't it, that the

19  defendant was encouraging his family to provide information

20  that he believed would further that goal?

21  A    Yes.

22  Q    Now, it's fair to say in general, too, isn't it, that his

23  sister and his son are -- they're interested parties; is that

24  right?

25             MS. DOLAN:  Objection.

1          THE COURT:  Sustained.

2    Q    They're not unbiased sources?

3          MS. DOLAN:  Objection.

4          THE COURT:  Sustained.

5    Q    In your experience -- in your experience as a forensic

6    psychologist, you collect collateral information about your

7    patients; is that right?

8    A    Yes.

9    Q    And one source of collateral information oftentimes is to

10   interview family members or others who have some interaction

11   with your patient; right?

12   A    Yes.  The word "patient" I would change to the person I'm

13   examining, the examinee.  I'm not treating them.  But yes.

14   Q    So you will speak to friends or family, coworkers, things

15   of that sort?

16   A    That is correct.

17   Q    And that information --

18          THE COURT:  You have to let him finish or the court

19   reporter is going to have trouble.  Go ahead.

20   Q    And that information is relevant to your ultimate

21   determination, because those sources can tell you things that

22   you can't personally observe; correct?

23   A    Relevant, yes.

24          MS. DOLAN:  Your Honor, I need to request two

25   seconds.

DROB - DIRECT / TROWEL                                    22

1          THE COURT:  Of course.

2          (Pause.)

3          MS. DOLAN:  Thank you.

4    Q    So those collateral -- those interviews with friends,

5    family or coworkers, those can be relevant; correct?

6    A    Yes.

7    Q    When you take those interviews, do you assess the

8    perspective of that source in determining how much weight to

9    give their opinion?

10   A    Yes.

11   Q    So, in general, what kind of weight or how do you adjust

12   for things that family members tell you?

13   A    Well, I think it's different in each case.  But in

14   general, a family member would be sympathetic to whatever goal

15   the client has, in general.  That's not always the case, but

16   in general it is.

17          And so, because of that sympathy, I would maintain I

18   guess what I would call a healthy skepticism about things that

19   they might say and not necessarily distrust them, because my

20   experience is, in general, family members don't collude with

21   defendants' efforts to lie to me, but sometimes they might and

22   so I have some skepticism towards them.

23   Q    In this case, you also spoke to defense counsel; is that

24   right?

25   A    That is correct.

DROB – DIRECT / TROWEL                    23

1   Q    In general, what weight do you give to defense counsel

2   when you speak to them?

3   A    I give it significant weight.  Generally, I'm less

4   skeptical certainly towards defense counsel's reports about

5   their interactions with a client than I would be with regard

6   to other people.

7   Q    But it's fair to say that counsel, defense counsel is not

8   an objective observer; right?

9        MS. DOLAN:  I'm going to object to that and I'm also

10  going to object to this line of questioning.

11       THE COURT:  Well, what's the purpose of asking this

12  doctor about the roles of prosecutors and defense counsel?  I

13  mean really?

14       MR. TROWEL:  The point, Your Honor, is that there

15  are a number of collateral sources that the doctor relied upon

16  reasonably and I think it's important to note that, in

17  general --

18       THE COURT:  I have no problem with you asking the

19  doctor if he spoke with you, if he spoke with defense counsel,

20  if he spoke with family members.  But let's not get into the

21  characterizations.  I think that's where Ms. Dolan correctly

22  objects, and I'm going to sustain the objection.

23       So you can establish with whom he spoke and why

24  don't we move it along.  If he hadn't spoken with the various

25  lawyers, I would have been surprised and disappointed in my

1    court-appointed expert.  Let's move it along, all right?

2              MR. TROWEL:  Thank you.

3              THE COURT:  You're welcome.

4    Q    So you said you spoke to defense counsel?

5    A    Correct.

6    Q    And then you spoke to myself and my colleague in the U.S.

7    Attorney's Office as well; right?

8    A    That is correct.

9    Q    Did you speak to anyone at MDC about their interaction

10   with the defendant?

11   A    No.

12   Q    And did you speak to anyone at Butner, I'm not referring

13   to doctors, but staff or others who may have interacted with

14   him there?

15   A    I think I had -- no, not with anyone other than the

16   doctors.

17   Q    Now, since 2012, the defendant has been evaluated several

18   times, that's fair to say, right?

19   A    That is correct.

20   Q    And for each of those evaluations he was given

21   performance validity tests?

22   A    That is correct.

23   Q    In general, validity tests are administered to help the

24   testing doctor determine whether the subject is giving his

25   full effort on the test; is that right?

1    A    That is correct.

2    Q    And in general, if a person fails a validity test, at a

3    minimum, the evaluator then has a reason to doubt that the

4    results in the test represent that subject's best efforts.  Is

5    that fair to say?

6    A    Well, he or she would have reason to potentially doubt

7    that, and presumably it might also extend towards other tests

8    that were given at the same time.

9    Q    In general, when a subject fails a validity test, the

10   higher scores in the testing battery represent the floor of

11   that person's ability; is that right?

12   A    I'm not sure I understand the question.

13   Q    So, to give you an example, if a subject gives poor

14   effort and you've concluded that he's given poor effort but he

15   scores in the average range on a particular test, that score

16   represents the floor of his ability, not the ceiling; correct?

17   A    That is correct.

18   Q    And if an individual or subject's efforts are

19   inconsistent or poor, then his true abilities may be higher

20   than is represented in the tests that you've given?

21   A    That is correct.

22   Q    And they may even be significantly higher?

23   A    They may be.

24   Q    In other words, and I think maybe you just said this, but

25   the -- under those circumstances, the examiner can't tell what

1    the ceiling is for that subject's efforts or abilities --

2    withdrawn.

3              Under those circumstances, the examiner can't tell

4    what the ceiling is for that subject's abilities?

5    A    Yes, I would agree with that.

6    Q    This defendant failed validity tests that were

7    administered by Dr. Rivera-Mindt in 2012; right?

8    A    Well, he did poorly on some validity tests and scored in

9    the normal range on others.  So over the course of these

10   examinations, yes, he did poorly on some that were

11   administered by her.  I'd have to check which ones, but yes.

12   Q    But when you say "did poorly," isn't it true that these

13   tests have cutoffs?

14   A    They have cutoffs which suggest potential invalidity, and

15   he scored below the cutoff on some tests.

16   Q    And he scored below the cutoff on some tests administered

17   by Dr. Rivera-Mindt in 2012?

18   A    Correct.

19   Q    He scored below the cutoff on some validity tests

20   administered by Dr. Brauman in 2012?

21   A    Well, I believe Dr. Brauman only -- as I recall, only

22   administered one test, but he scored below the cutoff on that

23   one, yes.

24   Q    And then he failed validity tests administered by

25   Dr. Pennuto at Butner in 2013?

DROB – DIRECT / TROWEL                                    27

1  A    Well, again, he scored in a range, for example, on the

2  validity indicator profile, which would suggest that he might

3  not have been putting forth his full effort but put some

4  effort into the test.

5           On some of the other tests, like the Logical Memory

6  Test of the Wechsler Memory Scale, yes, he failed it.  And

7  then there were other tests that were administered where he

8  scored perfectly within the normal range.  So I think that

9  that's a nuanced presentation here that to simply say he

10 failed tests doesn't quite get at.

11 Q    I understand.  I'm asking I think a simpler question,

12 though.  Dr. Pennuto administered a battery of tests; correct?

13 A    I'm sorry, Doctor?

14 Q    Dr. Pennuto at Butner.

15 A    Okay, yes.

16 Q    She administered a battery of tests?

17 A    That is correct.

18 Q    Among those tests there were validity tests?

19 A    That is correct.

20 Q    And on some validity tests he scored below the cutoff?

21 A    That is correct.

22 Q    And then you also administered validity tests?

23 A    That is correct.

24 Q    And he scored below the cutoff with you as well?

25 A    Well, he scored below the cutoff on the TOMM.

1          MS. DOLAN:  Objection.

2          THE COURT:  What's the objection?

3          MS. DOLAN:  I'm going to object to the question and

4    the testimony about Dr. Pennuto and move to strike.  That

5    report is not in evidence and it's been precluded.  So that's

6    not relevant.

7          THE COURT:  The objection is sustained.

8          MR. TROWEL:  Your Honor, the reason I asked about

9    this is because it was something that he considered, Dr. Drob

10   considered in the course of his evaluation, number one.

11         And number two, Your Honor will recall that even

12   though Your Honor did not bring the report in, which we're not

13   trying to do now, Dr. Pennuto, in fact, testified about her

14   tests and the results before Your Honor last July.

15         THE COURT:  And obviously, what you're doing is

16   going over well-plowed ground that we heard from the actual

17   doctor.  There's no need to ask this doctor about another

18   doctor's conclusions when I allowed you to question that

19   doctor about the conclusions even though the report didn't

20   come in.  So there's no need to go through it.

21         MR. TROWEL:  He's already explained to Your Honor

22   that he -- that some of this informed his decision.  That's

23   the only reason I'm asking.  I'm happy to move on, Your Honor.

24         THE COURT:  Good.  So do it.

25   Q    Now, you -- as we discussed, you obtained information

DROB - DIRECT / TROWEL                              29

1   about Dr. Rivera-Mindt's tests through the reports that you

2   considered; correct?

3   A     Yes.

4   Q     Dr. Rivera-Mindt administered the Rey 15 Memory Test;

5   correct?

6   A     I believe so, yes.

7   Q     And the Rey 15 test has 15 items laid out in very simple

8   patterns; is that right?

9   A     Yes.

10  Q     The defendant is shown those items, he's asked to study

11  them; right?

12  A     Yes.

13  Q     And then the items are taken away and he's asked to

14  recall what the printout or what the test says; right?

15  A     That is correct.

16  Q     The patterns are very simple; is that fair to say?

17  A     Well, they're repetitive patterns, so they're grouped in

18  a way that makes them relatively easy to recall.

19  Q     And they're things like A, B, C and one, two, three?

20  A     Yes.

21  Q     Now, in Dr. Rivera-Mindt's testing, he got just three of

22  15 of those correct; is that correct?

23  A     That is correct.

24  Q     And that's a very, very low score?

25  A     Yes.

1  Q    Dr. Rivera-Mindt also administered the CVLT-II

2  Forced-Choice Recognition Trial; is that right?

3  A    Yes.

4  Q    And on that test, the subject is required to choose one

5  of two --

6           MS. DOLAN:  I'm going to -- pardon me.

7           THE COURT:  Go ahead.

8           MS. DOLAN:  I didn't mean to interrupt Mr. Trowel.

9           THE COURT:  That's all right.

10           MS. DOLAN:  I'm going to object to all of this on

11  Dr. Rivera-Mindt.  Dr. Rivera-Mindt -- Dr. Drob has testified

12  he didn't review her report.  Essentially, what's happening

13  here is the government is trying to challenge

14  Dr. Rivera-Mindt's evaluation and her findings and

15  conclusions.  Those are not at issue in this hearing.

16           THE COURT:  I'm going to sustain the objection.  The

17  purpose of examining this doctor is to ask this doctor what he

18  determined, how he determined it, what tests he gave.  So why

19  don't you limit your questions to what this doctor did with

20  respect to the defendant and we can really move this along.

21           I've heard extensive testimony from the other

22  doctors in this case and asking this doctor to regurgitate

23  what those doctors did is not really advancing the ball.  So

24  why don't you question this doctor about what he did, when he

25  did it.  One of the reasons he's here is the staleness of the

DROB - DIRECT / TROWEL                    31

1    earlier reports in terms of time.  And we can move on.

2          So, with that friendly suggestion, the objection is

3    sustained.  Let's ask this doctor about what he did, when he

4    did it, and then he can get back to his life.  Go ahead.

5          MR. TROWEL:  Your Honor, I understand Your Honor's

6    ruling.

7          THE COURT:  It's pretty clear.

8          MR. TROWEL:  Just to preserve the record --

9          THE COURT:  Your record is very well-preserved.

10          MR. TROWEL:  I'm not sure it is on this issue and I

11    just want to --

12          THE COURT:  Okay, go right ahead.  I'm reconsidering

13    my earlier decision, but go right ahead and make your record.

14          MR. TROWEL:  I appreciate that, Your Honor.

15          THE COURT:  I'm glad you appreciate it.

16          MR. TROWEL:  The only reason I'm asking these

17    questions is because these are things that Dr. Drob referred

18    to in his report.  They formed, along with the testing and the

19    interviews --

20          THE COURT:  All right.  Dr. Drob, what did you do

21    and when did you do it with respect to this defendant?  What

22    examinations did you conduct?  Please take us through your

23    report and what you did and when you did it.

24          THE WITNESS:  Sure.  I examined the defendant on

25    January 29th, February 11th and March 20th.  I conducted

1    interviews and mental status examinations.

2            THE COURT:  Stop right there.  Tell us about the

3    interviews and then tell us about the mental status

4    examinations that you conducted.

5            THE WITNESS:  With your permission, Your Honor, I'll

6    refresh my memory.

7            THE COURT:  Please.  It's in evidence and it was

8    offered by the government.  I'm sure they have no problem with

9    that.

10           MR. TROWEL:  No objection.

11           THE COURT:  I'm glad.  It would have been overruled.

12   Go ahead.

13           THE WITNESS:  He told me that he was born and he

14   gave me his birth date of August 6, 1947 in Minsk, Belarus.

15   He told me the names of his parents.

16           THE COURT:  By "he," you mean the defendant?

17           THE WITNESS:  The defendant, yes.

18           THE COURT:  Go ahead.

19           THE WITNESS:  He said he couldn't recall.  I asked

20   him when or how his parents died and that's when he first told

21   me that he had problems in what he described as the memory

22   department.

23           He then indicated to me by way of explanation as to

24   why he might not recall all of these biographical details that

25   his father had Alzheimer's disease and he believed that he had

1    inherited it from him.

2             He told me that his father died at some point when

3    he, the defendant, had been incarcerated, and that his family

4    had moved to the United States at some point but he could not

5    recall when.  He told me that he had a sister who was 11 years

6    younger than him who lived in Brooklyn.  He told me that he

7    grew up in the Soviet -- former Soviet Union, that he was

8    treated well as a child and that he came from a nice Jewish

9    family.

10            I remember early on in the conversation he asked me

11   in Yiddish if I spoke Yiddish and I said to him back in

12   Yiddish a little bit.  He at times then answered some of my

13   questions in Yiddish, but I told him that I didn't understand

14   it well and refocused him.

15            He said that his father had worked for the Red Cross

16   and that his mother was a secretary for the KGB.  He told me

17   that he had been divorced from his second wife and he told me

18   he had two children.  He named the children.  He complained

19   that they didn't visit him.  He said that one of the children,

20   that his daughter was a doctor and he thought she might be a

21   psychologist who works with retarded children.  He said that

22   his son Martin is a nice son who's about 30 and who had been a

23   sniper in the U.S. military and had been in Iraq for two to

24   three years.  He told me that he had a grandson that he

25   believed was about a year and a half old.

1        He denied any history of physical or sexual abuse in

2   his life.  He -- then when asked about accidents, he told me

3   the story that we went through already about him crashing his

4   Lincoln Mark III by driving the opposite direction in the

5   highway.  He also reported the accident that occurred in

6   Germany when he was a very young man and injured his head when

7   he jumped from the third floor of the building when police

8   were chasing him in order to arrest him.

9        He was -- I would characterize his demeanor during

10   the interview as easygoing, friendly, and with efforts to make

11   humor.  He made jokes.  He told me that he had been his

12   grandmother's favorite child and told me stories about things

13   that she told him that he didn't do, which he feels he's now

14   paying for, but all with a kind of sense of humor.

15        He told me that he had graduated from high school in

16   Minsk and attended technical college and said that he studied

17   IBM, quote, unquote, there.

18        MR. TROWEL:  Your Honor, could I ask a question

19   about this portion of the interview?

20        THE COURT:  Well, let's let him go through the

21   interview and then what he did, and then if there are

22   questions we can go back.  So why don't you continue in this

23   narrative form.

24        THE WITNESS:  Am I giving too much detail?

25        THE COURT:  No, you're not.  This is what you should

1    have been being asked about and this is what I want to hear

2    from you, the expert.  Go ahead.

3            THE WITNESS:  He indicated that he didn't recall his

4    employment history.  He said that he thought he was doing IBM

5    when he was in the Soviet Union.  He said that he later drove

6    a taxicab.  And one reason he did this was in order to learn

7    English.  And he told me with a certain pride that he spoke

8    several languages, including Italian, Spanish, Polish,

9    Ukrainian, Russian and English.

10           He told me, when asked, that he had been

11   incarcerated in several countries, Germany, Italy and Denmark

12   in the past.  And he said that he was a diamond dealer and he

13   acknowledged to me that in his early years he had been, as he

14   put it, a con artist who would switch diamonds and also a

15   moneyman, to explain his -- by way of explanation of his

16   incarcerations.  But he said that he had never engaged in any

17   acts of violence.

18           When asked about his drinking and drug history, he

19   told me he had been a social drinker, but that he wasn't an

20   alcoholic, but that he said that he also smoked marijuana

21   daily in the past and had used crack cocaine.  He said he

22   didn't remember the frequency of his crack use, but he said

23   that he used to use heroin to calm him down when he smoked

24   crack.  He also told me that he enjoyed gambling and, as he

25   put it, good exotic food.

1          With regard to his medical problems, he said that

2     they are very bad, that he believes he has bad medical

3     problems.  He told me that he had been diagnosed with liver

4     cancer but had received no treatments for it.  He also told me

5     that he had Alzheimer's disease and that he is constantly

6     losing his personal possessions, including his sneakers,

7     clothing, cup and radio.  When I asked him about the liver

8     cancer, he said that a second doctor told him that he was

9     cancer-free, and he added maybe God loves me with regard to

10    that.

11         When I asked him about his psychiatric history, as I

12    recall, he initially said that he didn't have any, but then

13    reported that at one point when he was a young man he had

14    become suicidal after losing a girlfriend but that he has no

15    suicidal thoughts now.  I think he later told me that his

16    father had gone into a psychiatric hospital at that point.  He

17    repeated at that point that he's been divorced, and he said

18    that he felt that God was punishing him for disobeying his

19    grandmother and marrying outside of the faith.

20         Now, with respect to his current charges, he told me

21    more things than were in my report.  They were spontaneous

22    utterances about his case, but which I did not include in the

23    report because they weren't things that I had asked him about

24    and I didn't, particularly after speaking with defense counsel

25    and hearing her concerns about it, I didn't put the details.

1          But he did tell me a version or his version of the

2    charges.  He indicated to me that he had been charged, as I

3    put it in my report, like a mafia boss with organized crime.

4    He says, I don't even know what they have charged me with, but

5    that the state was withholding the prosecution because of his

6    memory problems.

7          And then he clarified and said that he was arrested

8    for gun possession and, again, without my inquiring, he

9    provided an account of the events that led to his arrest which

10   he regarded as exculpatory.  He said that the kinds of things

11   he's been charged with are completely inconsistent with his

12   prior behavior.  He said that in the past he had smuggled

13   diamonds and was a con but he was, as he put it, not a mafia

14   boss or not somebody who he -- he also said not somebody who

15   committed violent acts.

16         He told me that he gets along well with his lawyer,

17   Ms. Dolan, who he described as the public defender, and he

18   expressed the desire that she should have his case dismissed.

19   He again repeated that he had Alzheimer's disease and couldn't

20   be held responsible for his case.  At that point is one of the

21   times when he asked me if I was a social worker.  I told him

22   that I was a psychologist.  And he also repeated several times

23   that he has Alzheimer's disease.

24         I then proceeded to ask him about the key figures in

25   the courtroom or in a legal case.  He told me that an

1   attorney's role is to defend me, that the prosecutor's role is

2   to, quote, "prove that I did the crime," that the judge's role

3   is, quote, "to protect me."  And when prompted for more, he

4   said:  "Find out if I am guilty or not guilty."  I asked him

5   what a jury was and he said:  "Oh, they're also to find out if

6   I am guilty or not guilty."  He told me that a witness's role

7   is to, quote, "to prove what I am guilty, lying or not lying,

8   supposed to tell the truth."  That should be an end quote in

9   my report.  That's missing.

10          He expanded upon his answers in each case to then

11  talk about witnesses and details of the case, but it remained

12  clear to me that he understood the concepts that were

13  involved.  When I asked him if he understood what a plea

14  bargain was and to describe it, he says -- he spontaneously

15  said that the judge had informed him that he would not be

16  prosecuted because of his Alzheimer's disease, but then said

17  nobody offered me something, which suggested to me that he

18  understood what a plea offer would be or a plea bargain is.

19          It's clear from what he volunteered that he

20  understood the meaning of plea bargain.  I asked him to

21  explain the concept of perjury, and he said to, quote,

22  "fixity," using his own neologistic word, "to fixity documents

23  or phony papers."  But then when I told him, well, it could be

24  more than that, it could be any lying to the Court, he quickly

25  agreed with me and seemed to understand.

1           When I asked him what evidence was he said, quote,

2   "proving if you're lying or telling the truth," and then again

3   went on to speak about this case.  As I indicated in my

4   report, he evidenced a not perfect but fairly good knowledge

5   of these court figures.

6           So my mental status exam, he had what I would

7   describe as a normal level of arousal.  He was there in the

8   room and he was clearly able to engage in conversation.  He

9   had some difficulty, at least on its face, being oriented to

10  time, place and person.  He couldn't recall the year or said

11  he couldn't recall the year and he said two thousand, two ten,

12  eleven twelve.  And when I asked him who the mayor of New York

13  was, he said Koch.  He was aware of the purpose of the

14  examination but, as I mentioned earlier, he had to be reminded

15  periodically about my profession.

16          He spoke with a Russian accent and at times

17  mispronounced or used incorrect words.  My conclusion, though,

18  was that his English language receptive and expressive

19  language skills were adequate for the interview.

20          He was spontaneous.  His grammar and enunciation

21  were at times, you know, impacted by the fact that English is

22  not his first language, but they were all generally reported

23  appropriate for his reported life history and his reported

24  level of education.

25          He had problems with newly acquired information or

1  at least appeared to, because he frequently asked me what my

2  profession was and asked me on multiple occasions whether I

3  spoke Yiddish.  He also told me things, for example, that he

4  had liver cancer, spontaneously on multiple occasions,

5  seemingly not aware that he had already told me this.

6       He had some difficulty with simple numerical

7  calculations, although when I later on in my examination

8  provided him with simple numerical calculations where there

9  was a forced choice between correct and incorrect answers, on

10  one occasion he got 21 out of 25, on another occasion 24 out

11  of 25 correct.

12       His thinking was generally logical and goal-directed

13  and coherent.  There wasn't anything that appeared to me to be

14  psychotic.  He wasn't hallucinating.  He didn't appear to be

15  delusional, although he had some what I would call fixed false

16  beliefs.  And those included repeat, or at least expression of

17  these beliefs included expressing on multiple occasions the

18  notion that he had liver cancer, even though multiple doctors

19  and the record supports the notion that he had a benign

20  problem with his liver.

21       And also, the idea that the judge had already

22  informed him that he would not be prosecuted in the case

23  because of his Alzheimer's disease, which, taken at its face

24  value, if he believed that would be considered a fixed false

25  belief, because he repeated it a number of times even when I

 1    corrected him.

 2            He denied that he had any suicidal thoughts.  He

 3    said that he felt fine when I examined him, although he'd like

 4    more fresh air and exercise.  He told me that he had knee

 5    surgery and that he needs a cane to walk.  He denied that he

 6    was nervous.  He said that he had normal sleep and appetite.

 7    He said that he was angry about his case and then he again

 8    provided spontaneously an account of circumstances that he

 9    believes completely exonerate him in the case.  He said

10    that he -- he became somewhat agitated and said that "I'm

11    asking for immediate release because of my innocence."

12            He again complained of memory problems.  He said

13    that he had been sent to Butner by the judge, where he was

14    prescribed the medication Aricept for his dementia.  He told

15    me that he had heard that there was a new very expensive drug

16    that would be better for his Alzheimer's disease and was

17    wondering why it hadn't been given to him and he would like to

18    have it.  He said that he was disappointed that he did not get

19    that prescription.  I asked him if he knew the name of the

20    medication.  He couldn't tell me.

21            I asked him to explain the proverb what goes around

22    comes around, and he answered:  "If you do something bad, it's

23    going to be bad for you."  I asked him to explain the proverb

24    people in glass houses shouldn't throw stones, and his

25    response was "because you're going to break the house."  I

1   should note that that response is concrete and incorrect, but

2   I had to take into consideration the fact that he probably

3   wasn't exposed to that expression as a person growing up in

4   the United States would have been and would probably have more

5   difficulty with it.

6          I asked him what he should do if he found an

7   envelope in the street that's sealed and addressed and has a

8   new stamp on it.  He responded that he'd put it in the

9   mailbox.

10         I asked him what he would do if he was the first

11  person to see smoke and fire in a crowded theatre, and he

12  said:  "I'd get away from the theatre."

13         When asked why he needs a doctor's prescription to

14  purchase certain drugs, he said:  "So I gonna feel better."  I

15  asked him, well, why do you need the prescription?  And he

16  said:  "How am I going to buy the drugs," and made a gesture

17  expressing a question.

18         He seemed confused regarding certain facts related

19  both to his case and also to his medical history.  I mentioned

20  those already.  When I told him that the judge was reserving

21  decision on the question of whether or not he would find him

22  unable to stand trial because of what he described as a brain

23  memory problem he seemed to understand it, but a half hour

24  subsequent to my explaining that to him he repeated again that

25  the judge was going -- had already told him that the case

1    would be dismissed.  The same with the liver cancer.  He

2    seemed to agree and even state that one of the doctors had

3    told him that he didn't have liver cancer, but then again

4    later on in the interview and also subsequent interviews

5    restated that.

6           He asked me several times who it was that I

7    represent, and I explained to him on each occasion that I was

8    a psychologist who had been appointed by the judge and

9    asked -- and I'd been asked to do an evaluation of his

10   competency to stand trial.  He seemed to understand this when

11   I told him, he agreed, but then appeared at times later on to

12   be confused again as to my role.

13          When I saw him on February 11th, he recalled who I

14   was.  I asked him what my profession is and he said a

15   psychiatrist.  I am, in fact, a psychologist, but that is an

16   error that I often hear.  He told me that he knew that I had

17   came to see him before and he asked me why it took me so long

18   to visit him again.  In fact, I had told him at the original

19   meeting that I would be back in about two weeks and this was

20   about two weeks later, so, you know, I said, I think I'm here

21   when I said I would be, and he didn't protest.  I again

22   reminded him of my role and I proceeded to do some testing at

23   that point.

24          So that's essentially the interview that I conducted

25   with the defendant.

1          THE COURT:  Did you come to a conclusion with

2   respect to his ability, in terms of his competence?

3          THE WITNESS:  At that point or in general?

4          THE COURT:  In general.

5          THE WITNESS:  I did.

6          THE COURT:  What was your conclusion and what was it

7   based on?

8          THE WITNESS:  Well, my conclusion is that the

9   defendant is incompetent to stand trial on -- and it's based

10  on a number of things.  I have to say that this is a difficult

11  case and I struggled with this issue, and there was certain

12  information that I would like to have had in this case and

13  certain procedures that I would have liked to have undertaken

14  that I was unable to do so.  And if you'd like me to describe

15  those --

16         THE COURT:  Well, why don't you tell us what you

17  concluded and then talk about what you wished you would have

18  had.

19         THE WITNESS:  Very good.  I concluded that while the

20  defendant is and was inconsistent in the effort that he made

21  on some psychological tests, that the pattern of his

22  responding to psychological tests, beginning in two thousand

23  and I believe 11 when he was first examined and in 2013 when

24  he was examined a second time with me, was generally

25  consistent with a decline, a progressive decline in his

1  cognitive functioning.

2          He particularly had difficulty with assimilating or

3  responding to new material that he would need to retain in

4  memory while responding.  He did better on material that was

5  right in front of him.  So if you asked him to work with

6  blocks or to look at pictures and make judgments about them,

7  he had an easier time because it was in front of him.  He had

8  much more difficulty when he had to recall digits or recall

9  images, recall figures or recall words or stories.

10          The issue in the case for me -- there were two

11  issues -- three issues:  One, does he suffer from a dementing

12  process.  In other words, are there genuine deficits and

13  progressive deficits in his cognitive functioning.  And based

14  upon all of the information that I was able to review,

15  including the prior reports, my own testing, my own

16  examination of him, my speaking with collateral sources, my

17  conclusion is yes, that he has a progressive decline in his

18  cognitive functioning.  I cannot say what the origin of that

19  decline is, but it may be multiply caused.

20          One factor that leads me to this conclusion, apart

21  from the results of an ostensive decline both in his

22  reported -- in his memory process when you interview him and

23  also on psychological testing is the fact that he had been --

24  I'm not a neurologist so I can only take the prior reports at

25  their face value.  When he had been examined and brain scans

1    done, reports had indicated that there was findings on MRI

2    that were consistent with both potential Alzheimer's disease

3    and also placed him at risk for some cerebral

4    circulatory-based dementia.

5              Another issue that came up -- so all of the

6    conditions you've seen and even those who thought that he was

7    malingering in the past have all concluded that he is at least

8    probably, if not definitely, suffering from some memory

9    decline.  The people who saw him in 2013 saw him as partially

10   exaggerating his symptoms, partially having memory decline,

11   but marginally or just kind of over the borderline to be

12   incompetent.

13             Everything that we know about dementia, both of the

14   cerebrovascular type and of the Alzheimer's type, is that it's

15   progressive and it tends to get worse over time.  I saw him

16   two years later.  His test performance and general demeanor

17   was worse.  The report from his family, the report from his

18   lawyer indicated a progressive decline in his functioning.

19   And he particularly declined progressively on those tests such

20   as those that assess processing speed that are the ones that

21   are most sensitive to neuropsychological decline or

22   progressive dementia.

23             So all of that is consistent.  When you bring in the

24   fact that he had these brain scans that were consistent with a

25   dementing process, I concluded that it was fair to conclude

1    that, in fact, he does have some form of cognitive decline,

2    probably a progressive dementia.

3           The question then arises, if he does have the

4    dementia, does he nevertheless have enough brain power, if I

5    can use the term, or enough mental power to nevertheless be

6    competent and be tried.  So that's a second question.

7           And a third question is, is it possible that he may

8    be exaggerating his symptoms so as to appear worse than he

9    actually is and, therefore, bring him below the threshold of

10   competency.

11          So with regard to the second question, which is does

12   he have enough cognitive capacity to be competent, this is an

13   area that I felt a little handicapped in, and I'll describe it

14   later.  But based upon at least his presentation, the report

15   of his attorney, his answers to my questions about his case,

16   these suggested to me that he had such a problem in retaining

17   new information and maintaining a mindset about information

18   that had been given to him, both by me and by counsel, as to

19   make it extremely difficult for him to function in his own

20   defense.

21          Now, there are two prongs to the competency test.

22   The first prong is does he understand -- does he have rational

23   understanding of court procedure, and the second is can he

24   assist counsel with a reasonable degree of rationality in his

25   own defense.

1          Well, with regard to the first prong, it appears to

2    be throughout all of the examinations that he does meet that

3    threshold.  He understands the role of the lawyer.  He

4    understands the role of the prosecutor.  He is somewhat more

5    limited in his understanding of the role of the judge, but, in

6    a general way, he understands that the judge is there to

7    protect his rights and also is in some way involved in helping

8    to determine his guilt or innocence.  He knows that the jury

9    is there to help to determine his guilt or innocence.

10          He understands what evidence is.  He understands

11   what testimony is.  He understands, at least by what he says,

12   not necessarily in terms of his definitions, but it's clear

13   that he understands what a plea offer is, what a plea bargain

14   is.  He also provides a general description of at least some

15   of the charges that he is charged with, and when he's told

16   specifically what they are he seems to grasp them.

17          But he has difficulty focusing on how he might

18   defend himself, and he provides -- at least in my limited

19   understanding of the facts of this case, he provides facts

20   about the case in his own defense that are completely

21   inconsistent with the evidence against him.  And he

22   consistently goes back to those and also consistently goes

23   back to rulings that the judge he says has made that are

24   counterfactual.

25          So all of that taken together leads me to conclude

1    that, at least on its face, he can't assist appropriately with

2    counsel.

3            The next question and the most difficult question

4    is, is what is the -- how much of this is exaggeration and how

5    much of this is genuine?  And this is the -- to me, the second

6    issue is also somewhat difficult and I'll explain why later,

7    but the third issue is the most difficult issue in this case.

8            And the reason for this is that malingering is a

9    form of lying.  It's a way in which an individual --

10   malingering is the conscious willful production of false

11   psychological or medical symptoms.  It's lying.  It's very

12   difficult scientifically to determine whether somebody is

13   lying or whether someone is malingering.

14           And the approach that I take is I guess I would call

15   it what I would call a Wittgensteinian approach.  The

16   philosopher Wittgenstein has this notion of how to look at a

17   person's intentions, and that's to look at all -- the widest

18   possible context of their behavior and try to determine, based

19   on looking at that wide as possible context, what their

20   intention is or what action they are taking as opposed to

21   simply focusing on one aspect of their behavior.

22           And when we look at the widest context, at least the

23   context that was available to me, the weight of the

24   information suggests that while he may be exaggerating some of

25   his symptoms at times and at times doesn't put forth full

DROB – DIRECT / TROWEL                    50

1   effort on psychological testing, the weight of the evidence to

2   me, in my experience, speaks against malingering being the

3   major component in his incompetent presentation.

4           My reasons, I've already expressed some of them, but

5   some of the other reasons are as follows.  My experience is

6   when people malinger in competency, they usually go right for

7   the questions that relate to the competency examination.

8   Someone who wants to malinger in competency, the easiest thing

9   for them to do would be to say, I don't know what I'm charged

10  with, or to be confused about the role of their attorney or to

11  say that the judge is conspiring against them.  And I've done

12  hundreds of these, literally, over the years and I find people

13  doing that sometimes.  Sometimes people genuinely say those

14  things, but people who are exaggerating their symptoms often

15  do that.

16          He does not do any of that.  In fact, in all of the

17  examinations that have been conducted, including my own, he

18  passes that prong of the competency examination.  He tells me

19  what a judge is.  He tells me what a lawyer is.  He tells me

20  that he likes his lawyer.  He says that he can cooperate with

21  counsel.  He tells me that he likes the judge.  He doesn't say

22  that people are conspiring against him.  He understands

23  generally what the charges are against him and is able to talk

24  generally about them.

25          If he was malingering, it would be a kind of a

DROB - DIRECT / TROWEL                    51

1   subtle move for him.  It's possible he could do this, to say,

2   I'm going to give the doctor good answers on the competency

3   questions, but I'm going to go round the edges in places

4   where, you know, it wouldn't be obvious and show deficits

5   there.

6            It's harder for me to believe that he's doing that

7   than to believe that he genuinely understands what the charges

8   are but he has problems assimilating new information, which is

9   consistent with everything else that I've seen in terms of at

10  least some of the testing and the reports of counsel, who

11  describe to me how over the years that she's known him at

12  first he would not remember something from two meetings ago,

13  then it was from the last meeting, and then it was from within

14  a particular meeting.

15           I found when I examined him that he had problems

16  remembering things from within a particular meeting with him.

17  I would tell him things and he would then repeat

18  misinformation within that same meeting.  He would have to be

19  a pretty subtle malingerer to titer his decline in the way

20  that he did, both progressively declining on certain cognitive

21  tests that were administered to him and also progressively,

22  not radically but progressively declining in his presentation

23  to counsel, and also, if you go and read the reports, to his

24  presentation to me to progressively decline in such a way as

25  to look like the decline of an Alzheimer's patient in the slow

1    but progressive decline that they have.  I haven't seen

2    malingerers do that.  That's a pretty concerted effort over an

3    enormous period of time.

4         The third thing here that relates to the issue of

5    malingering has to do with what the family has told me.  Now,

6    I agree that and I became very skeptical about this client

7    when I heard those phone conversations.  The phone

8    conversations do not show Mr. Bumagin telling his family

9    members to lie, at least as I read them.  He's not saying to

10   them that they should make things up, but he's encouraging

11   them to get information from other medical providers to show

12   that he has total Alzheimer's disease, which at that point in

13   2012 or whenever these phone calls were made would have

14   probably been an exaggeration; but if he had been seen by

15   doctors, which apparently he had been, who told him that he

16   might have Alzheimer's or might have a dementia, it might not

17   be unreasonable for him to try to marshal that information.

18   Nevertheless, it suggested to me that he might be prone to

19   pressuring family members and I became concerned about that.

20        I did call two of his family members, his sister and

21   his son.  And in each case, they told me on the telephone with

22   what I regarded to be appropriate, not feigned affect, meaning

23   the sister Marina was crying to me on the telephone about her

24   experience with her brother and how he's declined

25   progressively to the point that at times he couldn't even

1    remember that his mother was gone or that he had a grandchild

2    while at other times he could, which, by the way, is not

3    inconsistent with someone with a dementia.  They have good

4    days, bad days, sometimes good hours and bad hours.  And she

5    told me -- it would have been a huge acting performance for

6    her to have spent the 20 minutes or so that she did on the

7    telephone in tears talking about the decline of her brother.

8         The son, whose name is Martin, who I understand both

9    from Martin himself, from the defendant and also from doing a

10   Google search on Martin, is a decorated Iraq war veteran and

11   who seemed to me to be an individual who was somewhat angry

12   and skeptical towards his father, not someone who would be

13   conspiring with him to fake a dementia, he also described to

14   me a progressive decline in the defendant's cognitive

15   capacity, again, to the point where certain memories that he

16   had at some points he no longer had and where he seemed to be

17   really functioning very poorly.

18        Martin also described to me that initially he

19   thought that that decline was the result of his substance

20   abuse, and he said he doesn't know why he's declined now and

21   why it continues, but that it has gotten worse since he's been

22   in jail.

23        So, again, taking what the family members say,

24   unless I am going to completely discount what they say or

25   heavily discount what they say, they lay witness to the same

1    decline that his attorney says, which also suggests to me that

2    this is actually cognitive deficit that I'm looking at, a

3    progressive cognitive deficit that I'm looking at rather than

4    simply malingering or exaggerating.

5           And as I mentioned earlier, if he was marginally

6    competent in 2013 and he is, in fact, suffering from a

7    dementia, it stands to reason that he would further decline

8    over the two years, and that's exactly what it seems both the

9    collateral sources and generally my testing show.

10          Now, some of the psychological tests, even ones that

11   I administered, for example, the Test of Malingered Memory,

12   look like -- certainly were invalid, and all of that did give

13   me some pause.  But I should point out that these tests, while

14   they're very ingenious and very interesting, they are, you

15   know, relatively new.  We've been using them for 10 or 15

16   years and the jury is still out, in my view, as to how to

17   interpret them.

18          For example, the Test of Malingered Memory, on which

19   he did very well for Dr. Mindt but failed in my case, is a

20   good test, but recent research seems to suggest that it's good

21   except where Alzheimer's disease is suspected.  Well, in his

22   case Alzheimer's disease is suspected, so it leads me to be

23   somewhat skeptical regarding these tests.

24          In general, tests of malingering have difficulties

25   because malingering, as I pointed out, is lying.  It's not a

DROB - DIRECT / TROWEL                              55

1   diagnostic entity.  It's very, very hard to validate these

2   tests.  If you want to have a test for cancer, let's say, or

3   even a test for schizophrenia, cancer and schizophrenia are

4   stable disease entities or at least stable functional entities

5   that exist today and they exist tomorrow and they exist and

6   they've existed in the past and will for the foreseeable

7   future.

8           Someone can malinger in the morning and not malinger

9   in the afternoon.  It's lying.  It's a moving target.  It's

10  very, very hard to validate these tests.  And even those

11  individuals who are the creators of these tests warn against

12  simply making judgments on the basis of the tests.

13          And in Mr. Bumagin's case, in many instances he did

14  quite well on validity testing.  So, for example, after

15  flunking the Test of Malingered Memory, I then readministered

16  a 25-item arithmetic test, which I presented to him as a test

17  to see if he could remember how to do arithmetic.  And in this

18  test he's given 25 relatively simple arithmetic problems.  I

19  think, you know, 109 and 86 would be a difficult one on this

20  test.  And he proceeded then to get 24 out of 25 of them

21  correct.

22          In forced-choice testing, we have what's called a

23  smoking gun exaggerated profile when someone chooses the

24  majority of the time the wrong answer.  So if I give you 25

25  relatively simple arithmetic problems and you choose the wrong

DROB – DIRECT / TROWEL                    56

1  answer on 24 out of 25 of them, we know logically that you

2  knew the correct answer and you've chosen the wrong one.

3          Well, he didn't do that.  He got 24 out of 25 right

4  in the same situation where he did so poorly on the TOMM.  The

5  TOMM is a test that requires sustained attention.  It requires

6  an individual to sit and look at 50 pictures, each of which

7  are exposed for a couple of seconds.  And an individual whose

8  attentional processes are greatly impaired, just in my

9  experience, has enormous difficulty with this.  And it's more

10 consistent, in my view, with a serious attentional deficit

11 rather than an effort to feign that he did poorly on this

12 test.

13         But I am willing to acknowledge that there may be an

14 exaggeration component to his psychological profile, but when

15 you take into consideration the full picture, overall, I

16 concluded that he does suffer from progressive dementia, that

17 on the basis of his presentation that the presentation is one

18 of an individual who looks to be competent on the first prong

19 of the standard but who has problems really providing relevant

20 information and staying on point with counsel and, therefore,

21 is incompetent on the second point; and that while there may

22 be some exaggeration and there certainly is a motive, clearly

23 at this point a motive to be found incompetent and to be found

24 incompetent because he has Alzheimer's disease, in spite of

25 that exaggeration and in spite of that motive, on the whole,

1   the evidence suggests to me -- and I said before that this is

2   a difficult case -- that he's not -- the majority of his

3   presentation cannot be attributed to malingering and that it's

4   actually attributed to a progressive dementia.

5           THE COURT:  With that, we're going to take a

6   10-minute recess and I'm going to allow the government

7   attorney to resume his questions with that focus.  We'll take

8   a 10-, maybe 15-minute break.  Okay?  Thank you, Doctor.

9           (Recess.)

10           THE COURT:  All right, I interrupted your

11   examination.  You may continue your examination.

12           MR. TROWEL:  Thank you, Your Honor.

13   BY MR. TROWEL:

14   Q    Dr. Drob, I'd like to talk about some of the tests that

15   you administered in the course of your evaluation.  One test

16   you administered is the RBAN test, R-B-A-N; is that right?

17   A    R-B-A-N-S.

18   Q    R-B-A-N-S.  And on that test, the defendant got one out

19   of 12 questions right; is that correct?

20   A    Well, that's not correct.  I'm not sure what you're

21   referring to.  I mean, there are many more than 12 questions

22   on the RBANS.

23   Q    Do you have in your -- do you have the report with you?

24   A    Yes.

25   Q    Can you just tell me what his score was on the RBANS

1    test?

2    A    He had a score of 47.

3    Q    And where does that fall on the range of scores?

4    A    Lowest 0.1 percentile.

5    Q    So he scored in the lowest 10th of a percentile?

6    A    Yes.

7    Q    On the RBANS test?

8    A    That is correct.

9    Q    That's about the lowest score anyone could receive on the

10   test; is that right?

11   A    Well, when you get down that low you're down at a point

12   where there aren't enough people in the subject pool to get

13   norms that are lower.  His raw scores were not zero.  I've

14   seen people do poorer.  But when you get down that low you're

15   around -- that's as low as the test bottoms out in terms of

16   the norms.

17   Q    At that level, someone who scores at that level in the

18   RBANS might have trouble with daily tasks like dressing and

19   personal hygiene and things of that sort?

20   A    Not necessarily.

21   Q    Oftentimes?

22   A    Sometimes, yes.

23   Q    But you described the defendant as speaking to you

24   logically in a goal-oriented way; right?

25   A    That is correct.

DROB – DIRECT / TROWEL                    59

1   Q    You also said that you noted that in discussions with

2   you, he was pretty good or decent, at least, on stuff about

3   the Court and the role of the Court and the prosecution and so

4   forth?

5   A    That is correct.

6   Q    And he had been good on those things really going back to

7   the first evaluation, or good enough, anyway?

8   A    Yes, absolutely.

9   Q    And there wasn't any significant deterioration in his

10  ability to discuss those issues over the three years since his

11  first evaluation?

12  A    It's unclear to me whether or not it deteriorated, but it

13  was still good enough by the time I saw him.

14  Q    Did you note in your report anywhere that his discussion

15  of the Court or the prosecution had deteriorated, to your --

16  A    No.

17  Q    You also noted that during the interviews he made jokes

18  with you; right?

19  A    That is correct.

20  Q    And humor is a higher mental function; right?

21  A    Yes.

22  Q    It would be unusual, wouldn't it, for somebody who scores

23  in the lowest tenth of a percent to be someone who speaks

24  logically, coherently and jokes frequently?  Would it be

25  unusual?

1    A    Not in my experience.

2    Q    It's common?

3    A    Yes.  People score very, very low on this test very

4    commonly whose presentation is impaired, but not so impaired

5    that they can't act like a human being.

6    Q    Well, I didn't ask whether he was acting like a human

7    being.

8    A    Well, making jokes, having a conversation, being able to

9    have some memory of their past.  I've administered this test

10   hundreds of times and people sometimes score this low who have

11   a dementia or other serious cognitive deficit without showing

12   the kinds of severe deficits that you are suggesting would be

13   concomitant to that.

14   Q    It would be -- just as a yes-or-no answer, it would be

15   possible for somebody who speaks coherently and logically and

16   jokes and can recite a chronological and coherent history,

17   it's possible that somebody who has those features and yet

18   scores in the bottom tenth of a percent is exaggerating their

19   deficits on the RBANS test?

20   A    It is possible.

21   Q    Now, in general, isn't it fair to say that deterioration

22   in the quality, quantity and meaningfulness of speech in

23   verbal comprehension characterizes most Alzheimer's patients

24   relatively early on in the disease?

25   A    I think that's fair to say, yes.

DROB - DIRECT / TROWEL                             61

1   Q    But you said now three years after his initial evaluation

2   that his English language expressive and receptive skills were

3   adequate for normal conversation, verbal spontaneity, grammar,

4   enunciation, comprehension of speech were all generally

5   appropriate for his life history and level of education?

6   A    Yes.  With certain caveats, yes.

7   Q    Now, you administered the Test of Nonverbal Intelligence;

8   that is right?

9   A    I think I attempted to administer that, yes.

10  Q    And you also administered the Matrix Reasoning Test?

11  A    Yes.

12  Q    Now, both of those tests measure visual reasoning; is

13  that right?

14  A    That is correct.

15  Q    Now, it's the ability to think and reason without words?

16  A    Yes.

17  Q    Now, is it fair to say that those tests essentially

18  measure the same thing?

19  A    They're very similar tests.

20  Q    And on the Test of Nonverbal Intelligence, he scored in

21  the 32nd percentile?

22  A    I don't think he scored in the 32nd percentile.  It's

23  possible -- could you direct my attention to either my report

24  or the raw data?

25  Q    I don't actually have the raw data.  Only you have it.

1    But I will find it in here.

2    A    Okay, agreed, 32nd percentile.

3    Q    And that's generally the overall average range; right?

4    A    Somewhat below average, yes, but for his age, yes.

5    Q    But on the Matrix Reasoning Test, he scored in the lowest

6    1 percentile?

7    A    That is correct.

8    Q    Now, given that those two tests measure essentially the

9    same thing, it's fair to say that those are inconsistent

10   results; right?

11   A    Well, I can't answer that question with a yes or no.  I'd

12   have to explain.

13   Q    So it's possible that they are consistent results?

14   A    It's possible that they are consistent.

15   Q    Why don't you tell us.

16   A    Okay.  The Test of Nonverbal Intelligence is normed -- I

17   want to say this without bringing in issues that are

18   irrelevant to the case.  Many people who score very poorly on

19   the Wechsler Adult Intelligence Scale and even on the Matrix

20   Reasoning Test end up with scores that are much higher on the

21   TONI.  And the reason for this is that the population on which

22   the TONI is normed tends to do much more poorly in terms of a

23   raw score on this Matrix Reasoning Test than the people who

24   take the Wechsler.

25            I think there is some discrepancy here, but the

1    discrepancy is not as great as it would be between a 32

2    percentile and a 1st percentile.  I commonly give the TONI to

3    individuals who score in the mid 70s to 80 on this test who on

4    the Wechsler test score in the 50th -- score in the 50s or low

5    60s.  They essentially are scoring in the 10th, 15th, 20th

6    percentile on the TONI and scoring the lowest 1st percentile

7    on the WAIS.

8            So the inconsistency which appears on its face is

9    partly explicable on the grounds that there's a very different

10   type of sample utilized with the TONI.

11   Q    So you had patients who score in the sort of 10

12   percentile range on the TONI -- and that's the Test of

13   Nonverbal Intelligence; right?

14   A    10, 15 or 20.

15   Q    And then those people are also scoring down at the bottom

16   of the Matrix Reasoning Test?

17   A    That's true, yes.

18   Q    But those two scores are certainly more comparable than

19   the ones that you had from the defendant; correct?

20   A    Yes.  I think that there is something of a discrepancy,

21   although if you look at the TONI items that get you that 32nd

22   percentile, they're easier than even some of the items he got

23   on the Matrix Reasoning.

24           I really -- you know, I looked at this and I

25   wanted -- I don't think that the inconsistency is really

DROB - DIRECT / TROWEL                          64

1    there.  Very quickly you score -- on that TONI, it's amazing

2    how quickly you get up in the 20th and 30th percentile on that

3    test.

4    Q    So you said there are questions on the Matrix that

5    were --

6    A    Uh-huh.

7    Q    -- easier than ones on the TONI?

8    A    Yes.  I mean --

9         THE COURT:  You have to let him finish the question

10   and you can't go uh-huh, because uh-huhs don't translate into

11   yes or no.  Go ahead.

12   Q    You said that there were questions on the TONI easier

13   than questions on the matrix that he got right.  So a question

14   of comparable difficulty, he got it right on the Matrix and

15   wrong on the TONI.  You saw instances of that?

16   A    Let me take a look.

17   Q    I thought that was what you just said, but --

18   A    Yes, I did say that, but I want to make sure that I'm not

19   misspeaking.  (Reviewing.)  I can characterize it more

20   specifically.  He got -- he peaked out on the TONI at the

21   point where you would start administering this test to an

22   individual of normal intelligence who was ten years old.  He

23   didn't get any items -- he didn't get credit for items past

24   that point.

25        On the Matrix Reasoning, he got the first three

SHERRY BRYANT, RMR, CRR

1   items correct, which are extremely easy, and then bottomed out

2   at that point.  So what I'm saying is if you look at the raw

3   scores, he did terribly on both of these tests.  It translates

4   to a higher score on the TONI, but it doesn't translate into a

5   higher score on the Matrix Reasoning.

6           I don't think that I can say accurately that he got

7   more difficult items on the Matrix Reasoning than he did on

8   the TONI.  In that sense, I misspoke.  But he did very poorly

9   in terms of the actual looking at clinically what he did on

10  both tests.

11  Q    But you noted earlier that the difference is -- it's more

12  significant than you often see where you have patients who are

13  getting 10 or 15 and then 1 percent on the Matrix.  This is

14  more significant?

15  A    I would say that's fair, yes.

16  Q    And one possible explanation for that is that he was

17  giving inconsistent effort on one or the other or even both of

18  those tests?

19  A    One possible explanation.

20  Q    Now, you gave the Test of Memory Malingering; correct?

21  A    Yes.

22  Q    That's -- we'll call that the TOMM, T-O-M-M, test?

23  A    Yes.

24  Q    Now, in general, when you're giving a test, it's

25  important, I think, right, to follow the protocol of the test;

1   is that fair to say?

2   A    Yes.

3   Q    And typically on these kinds of tests, a publisher would

4   provide scoring sheets and other materials that you use when

5   you administer it; right?

6   A    That is correct.

7   Q    And is it fair to say that it's important to properly

8   score a test, because you need to make sure that it's going to

9   be interpreted correctly?

10  A    That is correct.

11  Q    So in this case, you've reviewed tests that other doctors

12  have done and it's important for you to be able to understand

13  the scores on those tests?

14  A    Yes.

15  Q    Now, the TOMM, that's the only validity test that you

16  administered?

17  A    Well, I administered the arithmetic procedure and I

18  administered the embedded forced choice memory procedure

19  within the RBANS.  So I administered three additional

20  procedures.  This is the only formal malingering test I would

21  say that I administered, yes.

22  Q    And he scored below the cutoff on all -- not only the

23  TOMM, but also those other embedded tests as well?

24  A    Well, he got 15 out of 20 on the RBANS.  Given the

25  general picture, I don't see that as a malingered or

DROB - DIRECT / TROWEL                    67

1   exaggerated score.  He got 15 out of 20 of them right.  As I

2   mentioned before, if he had scored less than chance on that, I

3   would have concluded that he was probably intentionally

4   malingering.  That score is a marginal score.  But if, in

5   fact, he has dementia, that's what I would expect.

6           With regard to the arithmetic tests, he didn't do

7   great.  I would expect somebody to get them all right if they

8   were a functioning adult, because they're easy arithmetic

9   problems.  He got 21 out of 25 right one time and 24 out of 25

10  right the second time.

11  Q    Now, it's true, isn't it, that an individual doesn't need

12  to fail multiple validity tests in order to raise a question

13  about their effort; right?

14  A    No.  Right.

15  Q    So even failure on a single validity test should for the

16  examiner call into question the results of the entire battery?

17  A    It makes you question it, yes.

18  Q    And -- withdrawn.  Now, you did three trials of the TOMM

19  test; correct?

20  A    Yes.

21  Q    Do you have the scoring sheet with you for the first

22  administration?

23  A    I think I do.  Okay, I have it.

24  Q    Is that the sheet that the publisher provides --

25  A    No.

DROB - DIRECT / TROWEL                      68

1    Q     -- to give the test?

2          THE COURT:  You have to let him finish.

3          THE WITNESS:  I'm sorry.

4    Q     Is it the sheet that the publisher provides?

5    A     No.

6    Q     Is it one that you created yourself?

7    A     Actually, I borrowed it from a colleague, because I was

8    out of sheets, and so I took this on that particular day.  I

9    realized that I didn't have it so I had created it.

10   Q     On this sheet for questions 2, 5, 6 and 12, did you note

11   whether the defendant got the question correct or incorrect?

12   A     Okay.  Those items, for those items -- and there were

13   seven of them -- he said he couldn't provide an answer.

14   Q     But you didn't indicate on the sheet what happened.  It's

15   just blank?

16   A     I left it blank.  And on the bottom he got seven of them

17   that he couldn't provide.  He got 18 correct and 25 wrong.

18   Q     But that's not sort of the proper way to score the test;

19   is that fair to say?

20   A     Well, it isn't, but the -- typically people will guess,

21   and even when asked to guess he wouldn't.

22   Q     But somebody trying to interpret that score would have a

23   difficult time understanding the score sheet you used, because

24   it's incorrect?

25   A     Fair enough.

DROB - DIRECT / TROWEL                              69

1  Q    And you determined that the defendant scored 23 out of 50

2  on that first trial; is that right?

3  A    Well, he actually only got 18 of the 50 on the first

4  trial.  The 23 is just the number -- the page number of my --

5  of the materials that I sent to your expert.

6  Q    So he got 18?

7  A    18 out of 50, that is correct.

8  Q    That's actually well below chance?

9  A    It's below chance.  25 out of 50 would be below chance,

10  yes.

11  Q    And to go that far below chance, you would expect that he

12  had deliberately avoided correct answers on some questions;

13  right?

14  A    He might have, yes.

15  Q    Now, do you have your scoring sheet for the second trial?

16  A    Yes.

17  Q    Is that another one that it's not the correct one?

18  A    That's not the correct one.  And actually, I realized

19  that the sheet my colleague gave me wasn't even correct for

20  trial two, so I had to just put the answers on the sides.

21  Q    Right.  So on that question, you circled some responses,

22  you crossed out others, but you didn't indicate whether it was

23  correct or not?

24  A    Well, after circling the responses and I realized that

25  this sheet wasn't made correctly, so I went and indicated on

1   the left questions 1 through 25 and on the right questions 26

2   through 50, a checkmark means it was correct and an X mark

3   means that he got it incorrect.

4   Q    That scoring system is not the proper protocol for the

5   test; right?

6   A    Correct or incorrect.

7   Q    But you're using the wrong sheet and you're doing it in a

8   way that it would be difficult for somebody else to interpret

9   that; right?

10  A    Well, yeah, I would say that, you know, I had to make do

11  with what I had, given that my materials were faulty.  But I

12  think that anyone who sees this, on trial two that he got 25

13  out of 50 is my score, and I think someone would be able to

14  see that.

15  Q    When you say your materials were faulty, you just mean

16  you didn't get the correct sheet?

17  A    I didn't have the correct sheet and the sheet that I

18  borrowed wasn't well done.

19  Q    As a certified, board certified professional, as a

20  licensee, those are things that you're -- you're expected to

21  follow these protocols test to test; right?

22  A    Yes.  I would say that this was, you know, an unfortunate

23  problem in my materials, but given the fact that I was there

24  already and needed to administer this test, I administered it

25  in the correct way for these first two trials and I did get

DROB – DIRECT / TROWEL                          71

1   scores that I believe are reliable.

2   Q    What was his score on the second?

3   A    25 out of 50.

4   Q    So he improved from the first test where he scored below

5   chance, on the second test he scored approximately chance;

6   correct?

7   A    That is correct.

8   Q    So that means that's a score consistent with someone

9   who's just guessing?

10  A    That would be true.  That doesn't have any information,

11  no.

12  Q    And then you gave it a third time; right?

13  A    Yes, I gave it a third time, but in this instance I

14  didn't wait -- I didn't use a retention -- I gave the

15  retention trial right away just to see how he would do on a

16  third trial.  This isn't really part -- this isn't the

17  retention trial.  This is the third trial that I administered

18  to see if he would improve with a third exposure to the

19  stimulus.

20  Q    And you just scored this just on a regular piece of

21  paper?

22  A    Yes.

23  Q    So not on the proper sheet?

24  A    That is correct.

25  Q    Can you just take a look and recount the number of

1  correct answers he scored on this?

2  A    It looks as if it's 32.

3  Q    You scored it in your report, though, as 35, I believe;

4  is that right?

5  A    That is correct.

6  Q    So there was an error in your scoring?

7  A    That is correct.

8  Q    But nevertheless, his scores went from 18 to 25 to 33

9  over the course of the three administrations?

10  A    It went to 32, yes.

11  Q    32, I'm sorry.  So he, in fact, improved over the course

12  of your administration of these three tests?

13  A    With more exposure to the memory stimulus, he got better.

14  Q    But on the first version you gave, he actually -- there's

15  some evidence at least that he intentionally avoided the

16  correct answer, correct, because he scored below chance?

17  A    Yes.  You know, if somebody was guessing, it's

18  conceivable that they would score below chance.  You're not

19  going to get exactly chance each time if they're just

20  guessing.

21  Q    Do you know what the odds of that are?

22  A    I don't know what the odds are.  But it's reasonable to

23  suggest that he might have chosen the incorrect answer on the

24  first --

25  Q    Dr. Drob, in administering these tests, the way that

1    they're scored, it's important to know the chances of getting

2    a particular score by just guessing.  That's something that

3    people who administer these tests typically know; right?  It's

4    relevant to your assessment?

5    A    I'm not sure -- there may be published norms on what the

6    chances are, of getting a 17 out of a 50 are.  I don't know

7    what they are.  It's not something that I typically would

8    know.

9    Q    But isn't that important to assessing what an 18 out of

10   50 means?

11   A    Fair enough.  In fact, if you have that information, I'd

12   certainly be happy to take it into consideration.

13   Q    Well, the question is not whether you'd take it into

14   consideration now.  The question is whether you took it into

15   consideration at the time of your exam; correct?

16   A    Well, my consideration, as I indicated in my report, it's

17   very possible that on this test he was attempting to present

18   himself as having dementia.

19           You know, given the research that says that the test

20   is unreliable with Alzheimer's disease or people who are

21   suspected of having Alzheimer's disease, something that I

22   learned subsequent to administering it to Mr. Bumagin, I tend

23   not to place that much emphasis and didn't go into a deep

24   analysis of this.  But yes, he failed this test and did very

25   poorly on it.

DROB – DIRECT / TROWEL                    74

1   Q    So let me ask you about that issue, Dr. Drob.  You said

2   you didn't learn that he was suspected of Alzheimer's until --

3   A    No.

4             MS. DOLAN:  Objection.

5             THE COURT:  Well, you have to let him finish the

6   question.  Give counsel a moment to object if she has an

7   objection, then I'll rule on it.  Please, finish the question,

8   then before you answer it I'll hear the objection.

9   Q    I may have misunderstood, so just to clarify.  Did you

10  learn that the defendant may have been suspected of having

11  Alzheimer's after you administered the TOMM or before?

12  A    Before.

13  Q    So, going in to administer validity tests, you selected a

14  test that, based on your own understanding, is not appropriate

15  for people who may have dementia?

16  A    Something I learned subsequently to administering it,

17  yes.

18            THE COURT:  The answer to the question he asked you

19  is yes?

20            THE WITNESS:  Yes.

21  Q    So the only validity test -- the only formal validity

22  test you gave is one that you now believe is not appropriate?

23  A    Well, the embedded test within the RBANS is a formal

24  validity test, but it's the only self-contained formal

25  validity test that I administered, yes.

1   Q    Are you aware of the American Academy of Clinical

2   Neuropsychology's recommendation that, if possible, you give

3   multiple validity measures covering multiple domains?

4   A    Yes.

5   Q    And are you also aware that the American Academy of

6   Clinical Neuropsychology recommends that if you can't use

7   multiple validity indicators, you explain why in your report?

8   A    Yes.

9   Q    Did you do either of those things?

10  A    Well, I did use multiple validity indicators.  I

11  administered several forced-choice validity indicators in

12  addition to the TOMM.  And I'm not sure if I explained why in

13  my report that I chose not to administer anything further.  I

14  indicated that given how terribly poorly he did on the

15  cognitive testing, tests that I did administer, I didn't see

16  any point in administering any further cognitive testing.

17           I don't, on the basis of those cognitive testings,

18  draw the conclusion that he either has dementia or cognitive

19  deficits.  I think that you have to discount those cognitive

20  tests, and I didn't see any point in, you know, getting

21  further information to indicate that.

22  Q    But when you were describing earlier your ultimate

23  assessment of this case, I think you placed -- you raised as

24  an issue the question of whether he's exaggerating or not?

25  A    That's true, yes.

1   Q     And that was an important issue for you to resolve in

2   this case?

3   A     It is, yes.

4   Q     And, in fact, your conclusion that he's not exaggerating

5   in a way that sort of makes sense to you is something that

6   tipped this in favor of finding him incompetent, correct,

7   because you described it as a close call or difficult case?

8   A     Yes, it is a close call.  It is a difficult case.  And my

9   conclusion was that in spite of some problems all along with

10  regard to validity testing, on balance, I believe that there

11  is evidence of a cognitive decline, yes.

12  Q     But the validity testing, the results of the validity

13  testing was or would have been important to your assessment of

14  that ultimate conclusion, like how you reach that conclusion;

15  right?

16  A     It potentially could have been.  My experience with these

17  formal validity tests is that when you're dealing with

18  somebody who is really seriously compromised, their capacity

19  to sustain attention to do them is so limited that it reduces

20  the value of administering them.

21        As I mentioned in the case of the TOMM, he has to

22  focus on 50 pictures that are given a couple of seconds at a

23  time; and he just wasn't able, in my experience sitting there

24  with him, to maintain his attention on those 50 pictures.

25  Q     Dr. Drob --

DROB - DIRECT / TROWEL                          77

1   A     And so further -- let me explain.  Further validity

2   testing would have -- formal validity testing like the VIP

3   would have required even further sustained attention of the

4   type that he didn't appear to have to me.

5   Q    But isn't that -- when you make that assessment, aren't

6   you assuming that the appearance of a lack of ability to focus

7   is true rather than feigned or exaggerated?

8   A     Well, I'm not necessarily making that assumption.  But

9   I'm saying that I think I need to look at other things apart

10  from his performance on these tests to make that -- to

11  ascertain that.

12  Q    Just so I understand, you testified that you didn't feel

13  additional testing was appropriate because he didn't appear to

14  have the focus or wherewithal to do additional testing;

15  correct?

16  A     Well, right, and he wasn't focusing.  So if I had taken

17  out another test that required a similar amount of effort and

18  focus and engagement, it was my conclusion he wouldn't focus

19  again.

20         The question still remained up in the air in my mind

21  as to whether or not he was feigning or whether or not he

22  wasn't feigning, but it didn't seem to me to be a fruitful

23  enterprise to continue administering tests that he, at least

24  on the face of it, was not paying attention to.  So that was

25  my reasoning process.

1    Q    But your conclusion, even though at that moment you

2    couldn't know whether his lack of focus or ability in that

3    moment was true or feigned, even though you didn't know that

4    at the moment, you decided to stop with the testing and then

5    you ultimately concluded that he was incompetent?

6    A    Yes, for the reasons I've stated.

7    Q    Should you have given another validity test?

8    A    In this case, I don't think so, because I think it would

9    be like reading the same article in the same newspaper.  I

10   would just have gotten more of the same.

11   Q    In other words, you believe he would have failed another

12   validity test?

13   A    Look, he passed the validity tests that were simple

14   enough for him to deal with.  The ones that are formalized and

15   used in practice are much more complex, require much more

16   sustained attention, and I think he would have not done well

17   on them.

18   Q    So just to discuss that issue for a moment, the third

19   TOMM trial, there are 50 questions in that trial; right?

20   A    That is correct.

21              THE COURT:  You have to wait and you have to use a

22   microphone.

23              THE WITNESS:  Okay.

24   Q    And on the first 20, he actually got 17 correct; right?

25   A    That's true.

DROB – DIRECT / TROWEL                          79

1    Q     That 17 out of 20, just taking those 20 sort of out of

2    the broader testing, that's a much higher percentage of

3    correct answers than he had gotten on certainly either of the

4    two prior tests; correct?

5    A     Yes.

6    Q     That's 85 percent; right?

7    A     That is correct.

8    Q     And then in the last 30, he scored roughly chance, he got

9    18 out of the last 30; right?

10   A     That is correct.

11   Q     One explanation for that, isn't it true, is that he just

12   stopped halfway through?  Just yes or no?

13   A     I'm not sure what you mean by stopped halfway through.

14   Q     Stopped giving effort halfway through and guessed.

15   A     It's possible that he may have lost focus and guessed for

16   the rest of the procedure, yes.

17   Q     And on those first 17, though, getting 85 percent is a

18   strong indicator that he has the ability to answer the

19   questions, isn't it?

20   A     Yes.

21   Q     When you were describing your experience giving tests in

22   the past, you said -- I think one of the things you said was

23   that this defendant's -- if it's an attempt to seem

24   incompetent, it's not the kind that you typically see.  Is

25   that fair?

DROB – DIRECT / TROWEL                    80

1   A    Yes.

2   Q    Because typically, a defendant will come in and say, the

3   judge is out to get me or it's a conspiracy or something like

4   that; correct?

5   A    Or not remember what those key figures are or remember

6   what the charges are, yes.

7   Q    And usually that happens sort of right off the bat when

8   you start to talk to somebody?

9   A    Well, I usually don't ask those questions in the first

10  few minutes of the interview, but it would happen in the

11  course of the interview, yes.

12  Q    Is it fair to say that in the first part of your

13  interview with the defendant, though he didn't raise those

14  issues, he did tell you he had problems in the memory

15  department?

16  A    Yes.

17  Q    He told you he had head injuries?

18  A    Yes.

19  Q    He told you his father had Alzheimer's disease?

20  A    That is correct.

21  Q    And those things all happened sort of right at the front

22  end of your interview?

23  A    Well, at the front end of the interview, he appeared to

24  have difficulty remembering various things, and by way of

25  explanation he told me that he had problems in the memory

DROB – DIRECT / TROWEL                     81

1   department and that his father had Alzheimer's disease.

2          The head injuries, the substance abuse, the

3   accidents only were revealed, as I recall, once I asked him

4   questions that elicited them.  Both questions were asked

5   relatively early in the interview, but they were in response

6   to questions.

7   Q    Now, over the course of -- you reviewed a pretty

8   significant file in this case.  He's been evaluated a number

9   of times; right?

10  A    That is correct.

11  Q    By a number of doctors?

12  A    Yes.

13  Q    And he's taken a lot of tests over that period; right?

14  A    Yes.

15  Q    And he's done a lot of interviews as well?

16  A    Yes.

17  Q    I don't know if you know this or not.  Do you know --

18          MS. DOLAN:  Objection.

19          THE COURT:  Well, let's hear the question.

20  Q    Do you know whether he's appeared in court?

21          THE COURT:  You can answer that yes or no.  Do you

22  know?

23  A    Well, you told me --

24          THE COURT:  Do you know?

25          THE WITNESS:  He's appeared in court, yes.

DROB – CROSS / DOLAN                    82

1   Q    Now, is it possible for somebody -- just yes or no, is it

2   possible for somebody to learn through this process answers

3   that would lead a doctor to conclude one thing or another?

4            MS. DOLAN:  Objection.

5            THE COURT:  Calls for speculation.  Sustained.

6            MS. DOLAN:  The government --

7            THE COURT:  Sustained.  I sustain your objection.

8            MS. DOLAN:  I object to those force orders.  I want

9   that on the record.

10           MR. TROWEL:  Nothing further, Your Honor.  Thank

11  you.

12           THE COURT:  Any questions?

13           MS. DOLAN:  Briefly.

14  CROSS-EXAMINATION

15  BY MS. DOLAN:

16  Q    Dr. Drob, the government just asked you about a bunch of

17  tests and validity measures.  Did you adjust for validity in

18  this evaluation?

19  A    I took the results of both my tests and the formal

20  validity tests into consideration, and in coming to my

21  ultimate conclusion I guess you could say adjusted for them.

22  Q    And did you incorporate validity testing in some measure

23  in your evaluation?

24  A    Yes.

25  Q    And if I -- and then the government just asked you

DROB - CROSS / DOLAN                    83

1   whether it's common practice to explain why you didn't conduct

2   further validity testing within the report.

3   A    Yes.

4   Q    Could I direct your attention to the bottom of page 17 of

5   your report and the top of page 18.

6   A    Okay.

7   Q    And did you there essentially explain why you did not

8   conduct further testing?

9   A    Yes.

10  Q    And if I could just direct your attention to the first

11  full paragraph there on page 18, could you put that paragraph

12  into layman's terms?

13  A    I'm reviewing it.  If you give me a moment.  (Reviewing.)

14  Well, there are a number of things that are in that paragraph.

15  You want me to summarize them?

16  Q    Yes, please.

17  A    Well, he had -- these are transcripts of --

18          THE COURT:  Whoa, whoa.  Whenever one reads one

19  tends to speed up.

20  Q    No, I'm talking about the first full paragraph right

21  above the -- starts with "overall."

22  A    Oh, I'm sorry.  (Reviewing.)  Well, in layman's terms,

23  that my assessment is that, overall, if you look at all the

24  testing and all the evaluations that were done that the

25  defendant appears to be exhibiting a decline in his cognitive

DROB – CROSS / DOLAN                    84

1    functioning.

2           While there are some indications, for example, on

3    the TOMM that he's exaggerating cognitive deficits on testing,

4    that these are not sufficiently probative or sufficient to

5    outweigh my conclusion that he is, in fact, declining

6    cognitively and certainly not for me to conclude that this

7    decline is a result of voluntary behavior on his part.

8    Q    And the way that you express that conclusion or those

9    findings in the report, does that incorporate validity

10   measuring?

11   A    Oh, it incorporates my review of mine and other's

12   validity measuring, yes.

13          MS. DOLAN:  Nothing further.

14          THE COURT:  Anything else?

15          MR. TROWEL:  Not from the government, Your Honor.

16          THE COURT:  Thank you, Doctor, I appreciate it.  You

17   may step down.

18          THE WITNESS:  Thank you.

19          THE COURT:  Do you have another witness?

20          MR. TROWEL:  We don't, Your Honor.  We just have

21   some calls that I think we're going to introduce by

22   stipulation.  There are some prison calls that I think we

23   would offer to the Court if we had the opportunity.

24          THE COURT:  Have you spoken with Ms. Dolan about

25   that?

DROB - CROSS / DOLAN                              85

1           MR. TROWEL:  We did speak before the hearing, Your

2    Honor.  I think she has an objection she'd like to preserve.

3           MS. DOLAN:  I just would like to preserve an

4    objection if they're ever introduced at trial.  I'd like to be

5    able to verify their authenticity and accuracy.

6           THE COURT:  Well, is there any reason to take them

7    in now if you're not going to agree that they're accurate now?

8           MR. TROWEL:  I think we're agreeing for the purposes

9    of the hearing that they're accurate and that Your Honor --

10          MS. DOLAN:  I'm not objecting for the purposes of

11   this hearing.

12          THE COURT:  I just want to be clear what you are

13   objecting and what you're reserving on for my friends on the

14   17th floor, who would ask me why I didn't make that clearer

15   for them.  Okay.

16          MR. TROWEL:  Your Honor, just for the record, they

17   are transcripts that are marked Government's Exhibit 12, 13,

18   14 and 15 and then a disk containing the phone calls

19   underlying those transcripts marked as Government Exhibit 16.

20          THE COURT:  Any objection to those being admitted

21   for purposes of this hearing?

22          MS. DOLAN:  Subject to the same understanding.

23          (Government Exhibits 12, 13, 14, 15 and 16 received

24   in evidence.)

25          THE COURT:  All right.  Do we have any other

1    witnesses?

2              MR. TROWEL:  Not from the government.

3              MS. DOLAN:  Yes.  The defense calls Martin Bumagin.

4              THE COURT:  Please come forward, sir, and be sworn.

5              (Witness sworn.)

6              THE COURT:  Thank you.  Please be seated, sir.

7    Thank you.  I'm going to ask you to state and spell your name

8    and speak into this microphone.  That way everyone will be

9    able to hear you.  All right?  The microphone right in front

10   of you.  What is your name and please spell it, sir.

11             THE WITNESS:  Sergeant Martin Bumagin, M-a-r-t-i-n

12   B-u-m-a-g-i-n.

13             THE COURT:  All right.  You may inquire, Counsel.

14             MS. DOLAN:  Thank you.

15   **SERGEANT MARTIN BUMAGIN,**

16   Called by the Defense, having been first duly sworn, was

17   examined and testified as follows:

18   DIRECT EXAMINATION

19   BY MS. DOLAN:

20   Q    Mr. Bumagin -- well, if I can just call you Martin so

21   that we don't have any confusion.  Mr. Bumagin will refer to

22   Semyon Bumagin, my client.

23             THE COURT:  That's fine.  You can call him Sergeant

24   since he introduced himself that way and there's no jury here.

25   If Sergeant works, that works for me.  Does that work for you,

SERGEANT M. BUMAGIN - DIRECT / DOLAN          87

1    sir?

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  Thank you.  So Sergeant it will be.

4    Q    Sergeant, are you currently employed?

5    A    No.

6    Q    And have you previously been employed?

7    A    Yes.

8    Q    And when were you most recently employed?

9    A    September 24th, 2012.

10   Q    And where were you employed?

11   A    I was in the Wounded Warrior Unit at West Point,

12   recovering from my tour of duty.

13   Q    And where was your tour of duty?

14   A    In Iraq.

15             THE COURT:  Sir, I'm going to ask you -- see this

16   microphone in front of you, sir?  Just pull it a little closer

17   to you, it will move, and that way we can hear you better.

18   Okay?

19             THE WITNESS:  Yes, Your Honor.

20             THE COURT:  Thank you.  Please continue.

21   Q    And how long were you in Iraq?

22   A    For about a year.

23   Q    And where were you prior to that?

24   A    I was attached to the 69th Infantry Battalion here in New

25   York.

SERGEANT M. BUMAGIN - DIRECT / DOLAN                88

1  Q    And during the general period between about 2007 to the

2  present, have you been in New York most of that time?

3  A    Yes.

4  Q    Basically, what years have you been in New York?

5  A    I was released from the U.S. Marines in 2008, and since

6  that time I was attached to the -- to the Reserve component.

7  So I spent a lot of time in New York.  I had intermediate time

8  where I was activated for training and then the rest of the

9  time I was in New York.

10  Q    Okay.  And other than that tour of duty, you were in New

11  York for the balance of the time?

12  A    And also I was with my father in Florida.

13  Q    And when were you with your father in Florida?

14  A    That was I believe 2008 till about 2009.

15  Q    And just so the record is clear, your father is who?

16  A    My father is Semyon Bumagin.

17  Q    Who is in this courtroom?

18  A    Yes, ma'am.

19  Q    Now, are you currently in school or studying?

20  A    Yes, ma'am.

21  Q    And what are you studying?

22  A    I'm studying biology and prerequisite courses to go to

23  medical school.

24  Q    Now, have you maintained a relationship with your father

25  throughout your life?

SERGEANT M. BUMAGIN - DIRECT / DOLAN                89

1    A    Yes, ma'am.

2    Q    And did there ever come a time when you began to notice a

3    decline in his memory or his cognitive function?

4    A    Yes, ma'am.

5    Q    And about when was that?

6    A    That was in the time period starting around 2009.

7    Q    And what did you notice?

8    A    I noticed that he was very forgetful.  I noticed that he

9    couldn't accomplish tasks or remember to accomplish tasks.  He

10   would constantly lose his -- lose his keys.  He would lose the

11   car.  He would forget where he would park the car.  There's an

12   enormous record of parking tickets in the DMV, an enormous

13   record.  That it just -- I felt like I was -- I felt like I

14   was losing my father, because I was losing him mentally.  I

15   wasn't able -- I'm sorry, it's difficult for me to find the

16   words.

17   Q    And how did you know there were parking tickets?

18   A    They would come to the home of record, which was 2930

19   West Fifth Street, and him and my mother would argue about it

20   frequently.  And he just couldn't remember where he was

21   parking the car and where he left the car.  He would walk

22   around searching in a panic for the car and this sort of

23   behavior.

24   Q    And, again, about which year did this behavior begin?

25   A    This was in two thousand -- 2009, and already a little

1    bit earlier I started to see signs.

2    Q    You mentioned that you were in Florida with your father

3    at some point?

4    A    Yes.

5    Q    And when exactly was that?

6    A    That was starting in 2008, and I started noticing

7    cognitive impairment.  And my father also suffers from severe

8    depression and I believe that he self-medicates with drugs.

9    Q    Now, did you notice any effects of memory issues while

10   you were with your father in Florida in 2008?

11   A    Yes, ma'am, I did.

12   Q    And can you give those examples or an example?

13   A    We were working in a restaurant.  We had a small

14   partnership.  We had a partnership in a restaurant.  We were

15   working in the restaurant.  And he would be asked to get stuff

16   from Restaurant Depot and he would not be able to remember

17   what he had to get.  He would not be able to find his way.

18            And it came to the point even where we had a

19   navigation system that was set up for the home, meaning the

20   home, our home in New York, and he got into the car and he

21   didn't know how to get home to where we were living in

22   Florida.  So he pressed "home" and he just started driving

23   basically to New York for hours.

24            So that was like a real red flag, because he

25   doesn't -- he was yelling at the navigation system.  And just

1  can you imagine a person just driving for hours in Florida but

2  thinking he's driving home in Florida but he's following the

3  navigation to New York because he doesn't realize what's going

4  on.

5  Q    Now, when were you deployed?

6  A    I was last deployed in 2010 to 2011.

7  Q    And was your father aware of your deployment at the time?

8  A    I felt that -- I felt that he was aware, but he didn't

9  really understand what was going on with me.  And after the

10 deployment when I was in the hospital in the Wounded Warriors

11 Unit, he really couldn't understand what happened or what's

12 going on with me.  And I would often plead with him to please

13 go to see a psychiatrist.  And it took a tremendous -- it took

14 a tremendous emotional toll on me.  It causes me a lot of

15 emotional pain.

16 Q    Well, when you say that he didn't understand, could you

17 explain what you mean by that?

18 A    He didn't understand that I was wounded.  He didn't

19 understand that I was in the Wounded Warrior Unit.  He didn't

20 understand -- he didn't even understand that I'm in the

21 hospital, I'm in the Wounded Warrior Unit at West Point.  He

22 doesn't know where I was.  He does not know -- he does not

23 know where I was.  He does not know that I demobilized.  He

24 does not know what I was doing.  He just doesn't know

25 everything that I've been through.

SERGEANT M. BUMAGIN - DIRECT / DOLAN          92

1    Q    Was your deployment notable in any way?

2    A    Yes, it was notable.  I -- I was attacked and a shell

3    landed next to me and it didn't detonate, and I spilled the

4    Gatorade -- it was an old Soviet shell.  I spilled the

5    Gatorade out of my bottle and I put the sand inside the bottle

6    to keep it for the rest of my life, because I felt that I

7    was -- that God saved me.

8           And it had a really dramatic impact on me because I

9    faced death multiple times.  I was attacked multiple times.  I

10   deployed in 2004-2005 as a U.S. Marine, a part of the 33rd

11   Marine Expeditionary Unit to Anbar Province, to Fallujah, in

12   support of Operation Phantom Fury, and it was a very bloody

13   time.

14   Q    Now, did you share experiences with your father at any

15   point?

16   A    Yes.  Yes, ma'am, I did.

17   Q    And did he appear to retain that information?

18   A    No, ma'am.  He doesn't appear to retain any information.

19   He probably would not be able to recall --

20   Q    Well, I don't want you to speculate.  Just if you could

21   confine your answer to what you observed.

22   A    Yes, ma'am.  He does not retain information.

23   Q    And those life-altering events -- well, the events that

24   you described, did he retain those?

25   A    Negative.

SERGEANT M. BUMAGIN - DIRECT / DOLAN                    93

1    Q      Memories?

2    A      Negative.

3    Q      And you said you were deployed in Phantom Fury Operation?

4    A      Operation Phantom Fury, ma'am.

5    Q      And was that a big deal, little deal, not --

6    A      It was a big deal for the entire country.  It was the

7    first time that Marines have conducted house-to-house fighting

8    since Hue City in Vietnam.

9    Q      And is that operation something that, as a matter of

10   normal course, the parents of a Marine would recollect?

11   A      Absolutely, ma'am.

12   Q      And did your father appear to recollect it?

13   A      Negative.

14   Q      And, again, which year was that?

15   A      2004-2005.

16   Q      Are you aware of any drug problems that your father

17   suffered?

18   A      Affirmative.  Yes, ma'am.

19   Q      And can you just describe those?

20   A      I believe that my father abused marijuana, crack and

21   heroin.

22   Q      And how did you come to that belief?

23   A      When I came back home, there were people around the

24   neighborhood that would come up to me, random people.  Some of

25   them were my friends.  And they said, oh, we saw your dad,

SERGEANT M. BUMAGIN - DIRECT / DOLAN                94

1   he's not doing well, seems really depressed.  He was -- he was

2   on drugs.  He's really high.  He seems like -- they would say

3   like I'm worried that he can overdose and he doesn't know

4   what's going on with it and he's in really, really bad shape.

5   Q     Did you ever see him when he was high?

6   A     He would be ashamed.  He would be ashamed to be high in

7   front of me, but I did notice drug paraphernalia.  When I went

8   to my grandmother's house, I noticed that.

9   Q     And how often did you see your father during this period?

10  A     For me and my father, we had a few years that I saw him.

11  And when we lost the restaurant, when we lost the business and

12  he fell on hard times and he really didn't have any money, he

13  would ask my mom for $20.  And my mom would feel bad and she

14  would give it to him, and then she would say that -- she would

15  hear in his voice that he was getting high with the last

16  money.  It was just a very sad and desperate situation.

17  Q     Well, just to return to the question, about how

18  frequently did you see him over this period of time?

19  A     I would stop -- I would see him maybe -- I can't recall

20  exactly how frequent.  There was no set pattern of time that I

21  would see him.  I did not see him on a daily basis, because I

22  had a lot of things going on in my life, but when I would come

23  home for a period of time I would stop by.  I would visit him.

24  I would see him.

25              And let's say in a matter of two weeks, if I would

1  come to my grandmother's house four times, I would see -- I

2  would talk to him and I would say -- I would actually ask him

3  to leave my mother's house and live with my grandmother,

4  because of the amount of stress that my mother was getting

5  from his alcohol abuse and drug abuse, because he really

6  suffered from alcoholism.

7         So in order to protect my mother, like I didn't want

8  her to see him like this.  I didn't want her to see him so

9  depressed and I didn't want him to -- I didn't want him to --

10  I didn't want my family to be suffering like this and I wanted

11  him to get help.

12         But he was unable to recognize that he really needed

13  help, so he was trying to self-medicate, because I can't

14  really -- it was hard for me to -- I would say like I really

15  want you to go see a psychiatrist.  I said that many times to

16  him.  But he's a person that doesn't feel -- doesn't believe

17  that psychiatrists could help him.  That's just....

18  Q    Did he recollect those conversations that you had with

19  him each time you had them?

20  A    Are you asking me if he would remember --

21  Q    Did he appear to remember the conversations that you had

22  about this topic with him from time to time?

23  A    I don't believe that he even remembered that I -- I would

24  call him, even I would call him when I was overseas and when I

25  demobilized, I would call him and I would say, Pa, you got

SERGEANT M. BUMAGIN - DIRECT / DOLAN                96

1   to -- you are suffering from depression, maybe you need to get

2   antidepressants so you can stop drinking and abusing drugs.

3   And then I would call him again, and I don't believe that he

4   remembered that we had that conversation.

5   Q    On those instances, did he always know where you were?

6   A    No, ma'am.

7   Q    Did your father ever engage in a change in behavior in

8   public?

9   A    Yes.  In public, he would -- he would -- he cannot -- he

10  cannot go a period of time without urinating, so he would

11  urinate in public.  He would have to stop the car.  He would

12  have to stop the car and he would urinate.

13  Q    And did he always do that?

14  A    No, not -- throughout my entire life he didn't do that

15  until later on, until later on in life when I believe he was

16  suffering -- his body was suffering.  His entire body was

17  suffering.

18  Q    About when did that start happening, do you remember what

19  year?

20  A    That started happening around after 2008-2009, that's

21  when --

22  Q    So subsequent to Florida, in those months?

23  A    Yes.  It was -- yes, ma'am.

24  Q    Now, do you still talk to your father?

25  A    Yes, ma'am.

SERGEANT M. BUMAGIN - DIRECT / DOLAN          97

1  Q    How often?

2  A    Very often.  Almost every day.

3  Q    And you speak to him in jail?  He's in jail; correct?

4  A    Yes.

5  Q    Do you notice him forgetting any information from

6  conversation to conversation?

7  A    Yes, ma'am.  He actually even forgets that we speak.

8  When the conversation starts, he says, thank God, there's a

9  God, I was able to get through to you.  And I said, Pa, I just

10  told you an hour ago that I have a final exam and I'm in

11  school and I can't pick up the phone.  I just told you this,

12  please don't call me because I have to be in class and I have

13  to study for my exam, and I just told you this an hour ago.

14          And I'm like, you have to write it down.  You have

15  to take a piece of paper with you and start writing things

16  down on paper because it's going to destroy me.  I can't -- it

17  really has a terrible effect on me emotionally that he cannot

18  remember that and he calls me in an hour.  And then I'll just

19  say, Pa, it's destroying me emotionally that you can't

20  remember this.  I have to focus on this exam.  And then an

21  hour will pass, he'll call me like nothing happened, like

22  completely nothing happened.  He doesn't remember that we had

23  that conversation.

24  Q    Does he appear to remember what you study from

25  conversation to conversation?

1  A    It doesn't -- he doesn't appear -- he doesn't appear to

2  remember that I'm in school.  Even though I tell him I have

3  school from this hour to this hour to this hour and don't call

4  me at this hour, he doesn't even remember that I have school.

5  Q    And are you married?

6  A    Yes.

7  Q    And you have a wife?

8  A    Yes, ma'am.

9  Q    And does your father forget anything about her?

10 A    Yes, ma'am.  He forgets -- he forgets -- he cannot

11 remember what her parents' names are.  He doesn't remember

12 that he met her parents.  He doesn't remember that she does

13 not speak Russian.  Every single time that he calls, he

14 says -- I say, oh, she's right next to me.  He starts talking

15 to her in Russian.  I'm like, Pa, again, how many times do I

16 have to tell you, my wife is not Russian.  She doesn't speak

17 Russian.

18 Q    And how long have you been together?

19 A    We've been together for a long time.  We've been together

20 for four years.

21 Q    Does he remember your age?

22 A    I don't believe he remembers my age right now.

23 Q    Well, have you had conversations with him where he seems

24 to have forgotten your age?

25 A    He forgets my age.  He forgets my sister's age.  He

SERGEANT M. BUMAGIN - DIRECT / DOLAN                99

1    forgets that she graduated from Columbia.  He forgets that he

2    wasn't at the graduation.  He probably can't remember what

3    school I graduated from.  He can't remember what high school I

4    graduated from.  He doesn't remember that.

5    Q     And where did your sister graduate from?

6    A     She graduated from Columbia.

7    Q     And was that a momentous moment in the family?

8    A     We were all very proud of her.  We were all extremely

9    proud of her.  She worked very hard, and he can't remember --

10   he doesn't know what profession she has.

11   Q     And do you know whether your father has any previous

12   convictions?

13   A     Yes.

14   Q     And have you had any conversations about those

15   convictions with him?

16   A     Yes.  Over the phone, he actually called me and he told

17   me -- I received a phone call from him and I even received a

18   phone call from another inmate and they said, come pick up

19   your father, he's getting out of here on Monday.  I had a

20   couple of phone calls like this.  Oh, come pick up your

21   father, he's getting out on Monday.  And he said, the

22   honorable judge -- the honorable judge released me, come pick

23   me up, bring me a sweat suit.  He's like, I knew this would

24   happen.  And he's like, the honorable judge released me, bring

25   me a sweat suit.

1          And I didn't -- I kind of lost it at that point and

2    I called -- I called the prison and -- I called the Bureau of

3    Prisons and I said -- an officer picked up.  I said, I'm -- I

4    said, can you please help me, I'm a veteran and my father just

5    called me and he said to come pick him up and it's

6    unbelievable because nobody told me anything that's happening.

7    They didn't tell me he's being released and he told me to come

8    pick him up on Monday.

9          And the person that picked up the phone, he said,

10   oh, he also served in the military, so he went to the computer

11   and he's like, don't worry, I'll check in the computer.  He

12   checked in the computer and he said, the release date, he

13   said, for your father's release date it says unknown in the

14   computer.  And he's like, trust me, your father is not being

15   released, because we would see it in the computer.

16   Q    Has your father discussed his case with you over the

17   telephone at MDC?

18   A    He just says stuff like when he goes to court -- when he

19   -- he thinks -- he calls it Crucifixion Day.  He says

20   Crucifixion Day is coming up and stuff like that.  And he

21   said, just pray for me, because I believe the honorable judge

22   can let me go and stuff like that.  Just for me to pray for

23   him.  And he says he's praying day and night.

24   Q    And has he ever discussed his memory condition with you

25   over the phone?

SERGEANT M. BUMAGIN - DIRECT / DOLAN          101

1  A    He has discussed his memory condition, because he also

2  thinks that he wasn't convicted before.  He thinks that -- and

3  when I told him that he spent a significant amount of time in

4  prison, he's shocked.  He's like, no, I never spent that

5  amount of time in prison.  There's many phone calls where he's

6  like, what, I never had any convictions before.  And I'm like,

7  no, you were in prison for a long time.  He's like, no, what

8  are you talking about?  He's like -- he's telling me I have

9  Alzheimer's.

10 Q    Has he ever asked you to fabricate any information?

11 A    Negative.

12 Q    Has he ever asked you to make anything up --

13 A    Negative.

14 Q    -- for your testimony today?

15 A    Negative.

16 Q    Or anything in relation to this case?

17 A    Negative.

18           MS. DOLAN:  Nothing further.

19           THE COURT:  Your witness.

20           MR. TROWEL:  Nothing from the government, Your

21 Honor.  Thank you.

22           THE COURT:  Sergeant, you may step down and thank

23 you for your service to the country.

24           THE WITNESS:  Thank you, Your Honor.  Thank you for

25 your service.

USA v Bumagin                                102

1          THE COURT:  Thank you.  Any other witnesses?

2          MS. DOLAN:  Not from the defense, Your Honor.

3          THE COURT:  Any other witnesses?

4          MR. TROWEL:  Not from the government, Your Honor.

5          THE COURT:  All right.  I'm going to reserve

6    decision.  I'm going to ask the lawyers do you wish to have

7    any additional time for briefing in light of today's hearing?

8          MR. TROWEL:  I would, Your Honor.  I could submit

9    something in a week or ten days, I think, but....

10         MS. DOLAN:  I oppose any further protraction of

11   these proceedings.

12         THE COURT:  You don't wish to submit anything?

13         MS. DOLAN:  I'll have a look at Mr. Trowel's papers.

14   The defense has argued these issues into the ground.  I feel

15   that my perspective and that the defense position was

16   adequately made months and months ago, so I don't anticipate

17   that I have anything further to submit.  I oppose any further

18   delay and that's my position.

19         THE COURT:  All right.  I'll give you one week for

20   any additional submission, one week from today on ECF; and,

21   Ms. Dolan, you will have one week beyond that to respond to

22   any submission from the government on ECF; and I will then

23   render my decision promptly thereafter.

24         Is there anything else?

25         MR. TROWEL:  Not from the government, Your Honor.

1          MS. DOLAN:  Not from the defense.  Thank you.

2          THE COURT:  Thank you.  All right.  We're adjourned.

3          (Whereupon, the proceedings were adjourned.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

104

I N D E X

WITNESS

FOR THE GOVERNMENT

SANFORD DROB                                        7

   DIRECT EXAMINATION                              7

   BY MR. TROWEL

   CROSS-EXAMINATION                               82

   BY MS. DOLAN

FOR THE DEFENSE                                     86

SERGEANT MARTIN BUMAGIN

   DIRECT EXAMINATION                              86

   BY MS. DOLAN

EXHIBIT

FOR GOVERNMENT

Government Exhibit 11                               10

Government Exhibits 12, 13, 14, 15 and 16          85