

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG:KMT/MKP
F. # 2011R01816

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 22, 2015

By Hand and ECF

The Honorable William F. Kuntz, II
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Semyon Bumagin
              Criminal Case No. 11-800 (WFK)

Dear Judge Kuntz:

      On September 17, 2015, the defendant submitted a response to the government's motions in limine.  (Letter Dated September 17, 2015 ("Def. Ltr.").)  In the response, defense counsel again asserts that the defendant is incompetent to stand trial and is unable to assist in his own defense.  (Id. at 1.)  According to defense counsel, she is unable to provide the defendant with constitutionally adequate representation insofar as she claims "it is not possible to develop a workable trial strategy, or for the case to proceed within the mandates of Due Process and the Sixth Amendment right to counsel."  (Id. at 2.)  "In light of" this issue, defense counsel has refused to respond to four of the government's six motions in limine on the schedule set by the court in its July 27, 2015 scheduling order.  (Id.)

      In light of the defendant's September 17, 2015 letter, as set forth below, and as set forth in the government's previous submissions dated September 17, 2015 (Dkt. No. 148) and September 22, 2015 (Dkt. No. 159), the government respectfully requests that the Court: (1) conduct a hearing at the pretrial conference scheduled for September 30, 2015 to determine whether defense counsel will discharge her professional and ethical duty to provide constitutionally adequate assistance to the best of her ability to the defendant and, if she is unable to do so, appoint new counsel pursuant to the Criminal Justice Act; (2) preclude the defendant from introducing expert testimony as to the defendant's purported dementia; (3) preclude the defendant from cross-examining law enforcement witnesses to elicit hearsay in violation of the Federal Rules of Evidence; and (4) grant each of the government's motions in limine.

I.      **The Court Should Conduct a Hearing Regarding Defense Counsel's Ability To Represent Defendant at Trial**

Defense counsel's September 17, 2015 letter to the Court is in direct contravention of two Court orders.  First, on July 27, 2015, the Court issued a scheduling order, directing the parties to file pretrial motions and expert disclosures by September 10, 2015, responses by September 17, 2015 and replies by September 22, 2015.  As noted above, defense counsel has not met these deadlines as to four of the government's motions in limine. In addition, defense counsel's asserted reason for failing to meet the Court-ordered deadline – that her client is incompetent to stand trial – is contrary to the Court's July 15, 2015 order, finding, as a matter of fact, that the "[d]efendant is competent to stand trial and to assist in his own defense."  (Dkt. No. 124.)   In that order, the Court found that the defendant "likely has some degree of dementia as a result of his age," but that "malingering is 'the chief reason for the symptoms he displays.'"  (Id. at 6 (quoting United States v. Gigante, 996 F. Supp. 194, 201 (E.D.N.Y. 1998).)

In spite of the Court's factual finding and pretrial scheduling order, defense counsel continues to assert that her client is incompetent and that she therefore cannot and will not effectively represent him.  (Def. Ltr. at 2.)  Under these circumstances, her continued representation of the defendant would be a violation of Rule 1.1 of the New York State Unified Court System Rules of Professional Conduct, which instructs that "[a] lawyer should provide competent representation."  Defense counsel's refusal to meet deadlines set by the Court, provide relevant legal authorities, and address arguments made by the government as a result of the defendant's purported incompetence may also constitute a violation of Rule 1.1(c)(1), which instructs that a lawyer "shall not intentionally . . . fail to seek the objectives of the client through reasonably available means permitted by law and these Rules," and Rule 3.3(f)(4), which instructs that, "[i]n appearing as a lawyer before a tribunal, a lawyer shall not . . . engage in conduct intended to disrupt the tribunal."

Judge Garaufis recently addressed a similar situation in United States v. Ashburn, et al., 11 CR 303 (E.D.N.Y.), and conducted a hearing to resolve the issue.  In Ashburn, prior to trial, defense counsel "categorically objected" to certain pretrial rulings the Court made regarding statements the government intended to introduce at trial.  See id. at 1 (1/21/15 Memorandum & Order ("Mem.") (Dkt. No. 288)).[1]  As a result of counsel's disagreement with the rulings, counsel informed the Court that he "may have no choice but to refuse to partake" in various stages of the trial "so that the inevitable conviction would be reversed for ineffective assistance of counsel . . . ."  Id. at 1.

In response to counsel's assertion that he would not provide constitutionally adequate representation to the defendant, Judge Garaufis conducted a hearing in which he provided a reminder to defense counsel that is equally relevant in this case:

---

[1] The Court's Memorandum and Order is attached as Exhibit A.

> Here is the point that I want to make. I'm sure that you,
> [defense counsel], want to aggressively represent your client's
> interests, as you should. The fact is that the solution to any
> mistake that I might make, which may result in something that
> you oppose, for instance, a conviction, if I am wrong, you have
> your rights before the Second Circuit, to raise these issues in the
> Second Circuit.

(1/21/15 Transcript at 6.)[2] The Court then directly addressed defense counsel and asked him if he would fulfill his ethical obligation to fully and zealously represent his client within the bounds of the law.[3] (Id. at 6-18.) Defense counsel agreed that he would and the trial proceeded on schedule. (Id.)

The government respectfully submits that the Court should employ a similar procedure in this case. In order to ensure that the defendant receives constitutionally adequate representation at trial, the government respectfully requests that, at the September 30, 2015 hearing, the Court inform defense counsel that she cannot decline to abide by the Court's orders because she disagrees with the Court's factual finding that the defendant is competent to stand trial. The Court should then inquire as to defense counsel's willingness to provide adequate representation at trial within the bounds of the law. If defense counsel maintains that she is unable to provide constitutionally adequate representation, the government respectfully requests that she be relieved and new counsel be appointed pursuant to the Criminal Justice Act.

II.    The Defendant Should Be Precluded From Introducing Expert Testimony Regarding the Defendant's Mental Disease or Defect

Notwithstanding defense counsel's suggestion that she was unable to respond to the government's motions in limine because of her client's asserted incompetence, counsel opposes the government's motion to preclude defendant from introducing expert testimony regarding the defendant's purported mental disease or defect. For the reasons set forth in the government's September 17, 2015 filing (Dkt. No. 159), the defendant is precluded, as a matter of law, from offering such testimony as to the "general intent" crimes charged in Counts Two, Three and Four of the indictment. Assuming the crime charged in Count One requires the government to prove "specific intent," the defendant has failed to explain why his is one of the rare cases in which such testimony is appropriate, how the proposed

---

[2] The transcript of the January 21, 2015 appearance before Judge Garaufis is attached as Exhibit B.

[3] In the Court's written order in Ashburn, the Court set forth the many ethical and professional rules implicated by a defense counsel's refusal to provide effective assistance at trial. See Mem. at 5-8.

testimony would negate the <u>mens</u> <u>rea</u> of the months-long conspiracy charged in Count One, and he has not met the disclosure requirements of Federal Rule 16(b)(1)(C).[4]  For the reasons set forth at length in the government's previous submissions, the government respectfully submits that the Court should preclude this testimony.

III.    The Defendant Should Be Precluded From Cross-Examining Law Enforcement
        <u>Witnesses to Elicit Hearsay</u>

The defendant's argument regarding his statements to law enforcement officers is unsupported by law and should also be rejected.  In opposing the government's motion <u>in limine</u>, the defendant cites three cases, none of which is relevant to the application of the Federal Rules of Evidence to a defendant's statements under the circumstances presented in this case.  (9/17/15 Def. Ltr. at 3.)  It is well-settled that the defendant may not cross-examine law enforcement witnesses in an attempt to elicit purportedly exculpatory statements made to law enforcement.  <u>See</u>, <u>e.g.</u>, <u>United States v. Vrancea</u>, No. 12-CR-198 (WFK), 2013 WL 549099, at *4 (E.D.N.Y. Jan. 4, 2013) (quoting <u>United States v. Marin</u>, 669 F.2d 73, 84 (2d Cir.1982), for the proposition that "[w]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible" ).  The government respectfully submits that its motion <u>in</u> <u>limine</u> should be granted.

---

[4] The deficiencies in the defendant's expert notice and disclosures are made even clearer in the defendant's second expert notice, dated September 17, 2015.  (Dkt. No. 158.)  In that disclosure, the defendant "assumes" the presence of dementia during the unidentified "relevant periods," and suggests that the Court should admit the proffered testimony based on a "likelihood" that the defendant's "mental state" was impacted.  (<u>Id.</u> at 1-2.)  It is plain from this conditional, hypothetical disclosure that the defendant does not in fact know how the identified experts will testify about the effect of his purported dementia on his ability to form the <u>mens</u> <u>rea</u> for the crime charged in Count One.  The defendant's attempt to distract, confuse and mislead the jury with this proposed expert testimony should be rejected.

III.    <u>Conclusion</u>

For the reasons set forth above and those set forth in the government's submissions dated September 10, 2015 and September 17, 2015, the government respectfully requests that the Court conduct a hearing on September 30, 2015 to determine whether defense counsel will discharge her professional and ethical duties to represent the defendant. The government also respectfully requests that the Court grant each of its motions <u>in limine</u> and deny the defendant's request to introduce expert testimony regarding his purported dementia.

Respectfully submitted,

KELLY T. CURRIE
Acting United States Attorney

By:    _____/s/_____
Kevin Trowel
Moira Kim Penza
Assistant U.S. Attorneys
(718) 254-6351/6454

cc:    Zoe Dolan, Esq. (by ECF)

5

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
   UNITED STATES OF AMERICA

         -against-

   YASSER ASHBURN, JAMAL LAURENT, and
   TREVELLE MERRITT,

                   Defendants.
-------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**11-CR-0303 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

      Counsel for Defendant Trevelle Merritt has filed a letter indicating that Merritt

"categorically opposes" the introduction of any statements Merritt has made to law enforcement

in which all specific references to his co-defendant, Jamal Laurent, or "Tails," have been

replaced with "the guy" or similar language. (Jan. 19, 2015, Def. Merritt's Ltr. (Dkt. 283).)  In

the letter, counsel states that in the event these modified statements are introduced into evidence,

he "may have no choice but to refuse to partake in jury selection, refuse to open, refuse to cross

examine witnesses[,] and refuse to give a closing argument so that the inevitable conviction

would be reversed for ineffective assistance of counsel and the defendant Merritt will get a retrial

wherein his ad nauseam statements to law enforcement would not be denuded of their meaning."

(Id. at 1-2.)

      First, the court is compelled to clarify which statements the court has already ruled are

admissible, in modified form, and those with respect to which the court has not yet issued a

decision.  In its December 30, 2014, Memorandum and Order (the "Order"), the court held

admissible modified versions of the five statements regarding the murder of Dasta James that the

Government indicated it sought to admit at trial.  (See Gov't Mem. in Opp'n to Def. Laurent's

Omnibus Pre-Trial Mots. (Dkt. 180) at 22.)  These statements include: (1) an oral statement

1

made to New York City Police Department ("NYPD") Detective Steven Orski at 9:15 p.m. on April 6, 2011; (2) a handwritten statement, signed at 11:15 p.m. that same night; (3) a second handwritten statement, signed at 12:45 a.m. on April 7, 2011; (4) an audio record of a statement provided to a Kings County Assistant District Attorney at 1:19 p.m. on April 7, 2011; and (5) an oral statement made to Federal Bureau of Investigation Special Agent Christopher J. Campbell and NYPD Detective William Vanpelt on April 19, 2011.[1] (Order (Dkt. 252) at 24.) The court has not yet, however, ruled on the admissibility of a proposed modified version of a handwritten statement Merritt signed at 1:55 a.m. on April 7, 2011, regarding a cell phone robbery that allegedly took place on January 12, 2011. (See Gov't Reply in Supp. of Mot. to Admit Evid. of Other Acts, Ex. A (Dkt. 230-1).)

Second, counsel's letter notwithstanding, the court finds no reason to revisit the decision in its Order applying Bruton v. United States, 391 U.S. 123 (1968), and its progeny in the Second Circuit, particularly United States v. Taylor, 745 F.3d 15, 28 (2d Cir. 2014), and United States v. Jass, 569 F.3d 47, 55 (2d Cir. 2009), to the facts of this case. In its Order, the court explained that under Taylor and Jass, the test for whether a modified statement complies with Bruton is whether: (1) the redacted statement gives any indication to the jury that the original statement contained actual names, and (2) whether the statement standing alone otherwise connects co-defendants to the crimes. Jass, 569 F.3d at 58 (noting the concern is whether there is an "overwhelming probability that a jury will not follow a limiting instruction that precludes its consideration of a redacted confession against a defendant other than the declarant").[2] With

---

[1] Referring to the date referenced in the Government's brief, the December 30, 2014, Memorandum and Order indicated that the date of this fifth statement was April 11, 2011, which was apparently in error. (See Gov't Mem. in Opp'n to Def. Laurent's Omnibus Pre-Trial Mots., Ex. C (Dkt. 180-3) at 9.)

[2] See also Gray v. Maryland, 523 U.S. 185, 195 (1998) (holding that redactions that replace a proper name with an obvious blank or the words "deleted" or "redacted," "are similar enough to Bruton's unredacted confessions to warrant the same legal results").

respect to the five modified statements at issue, the court answered both questions in the negative (see Order at 39), and determined that the modified statements were admissible at trial consistent with Defendant Laurent's Sixth Amendment right to confrontation under Bruton. Counsel has not suggested any basis for finding this decision was in error, and the court discerns none.

The court also addressed Merritt's and Laurent's motions to sever in its Order. (See Not. of Mot. (Dkt. 171); Oct. 2, 2014, Def. Merritt's Ltr. (Dkt. 191).) In denying the motions, the court found that Defendants had failed to demonstrate that introduction of the modified statements would generate "substantial prejudice" "sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials," a determination committed to the "virtually unreviewable" discretion of the district court. (Id. at 41 (quoting United States v. Sampson, 385 F.3d 183, 190 (2d Cir. 2004); United States v. James, 712 F.3d 79, 104 (2d Cir. 2013)).) Counsel's letter suggests no grounds for concluding that the court abused its discretion.

Instead, twenty days later, counsel raises—for the first time—the argument that because the substitutions make it appear as though Merritt refused to name his co-conspirator, "[t]he proposed changes . . . will result in the conviction of [Merritt] because it will appear that he is holding out or being coy with law enforcement when was, rather, entirely forthcoming." (Jan. 19, 2015, Def. Merritt's Ltr. at 1.) In response, the Government points out that the Second Circuit has previously addressed similar claims by defendants who argue that such redactions are overly prejudicial because they violate the rule of completeness. (Jan. 20, 2015, Gov't's Ltr. (Dkt. 286) at 2.) In those cases, the court has held that the rule of completeness is violated "only where admission of the statement in redacted form distorts its meaning or excludes information substantially exculpatory of the declarant." United States v. Alvarado, 882 F.2d 645, 651 (2d Cir. 1989), overruled on other grounds by Bailey v. United States, 516 U.S. 137 (1995); see also

3

United States v. Mussaleen, 35 F.3d 692, 696-97 (2d Cir. 1994) (district court did not abuse its discretion in admitting redacted version of a statement that "did not unfairly distort the original, and certainly did not exclude substantially exculpatory information").

Here, the court agrees with the Government that there is little or no risk of prejudice to Merritt in admitting the five modified statements the court has already ordered are admissible in this case.[3]  As an initial matter, the Government indicates that it "will not claim at trial that [] Merritt withheld information regarding the identity of his co-conspirator." (Jan. 20, 2015, Gov't's Ltr. at 2.)  More critically, Merritt has failed to establish that the redactions unfairly distort the original statements or exclude substantially exculpatory information. See Alvarado, 882 F.2d at 651.  Indeed, the original statements are just as damaging to Merritt as the redacted version. See Mussaleen, 35 F.3d at 696.  The fact that Merritt readily disclosed the name of his co-conspirator in his statements to law enforcement does not tend to negate his guilt with respect to the murder of Dasta James, to which he repeatedly confessed his involvement. (See generally Gov't Mem. in Opp'n to Def. Laurent's Omnibus Pre-Trial Mots., Ex. C (Dkt. 180-3).)

Furthermore, in conducting this analysis—a matter that is committed to the court's discretion—the court must consider the non-declarant's right to confront the witnesses against him, as well as the interests of judicial economy advanced "by allowing for a joint trial of two defendants whose alleged criminal conduct arose from the same set of facts." Alvarado, 882 F.2d at 651.  In this case, Laurent's Sixth Amendment right to confrontation, as well as the judicial economy to be achieved through conducting a joint trial, surely outweigh Merritt's interest in proving to the jury that when he confessed to committing multiple crimes he also sold

---

[3] The court does not address in this Memorandum and Order the admissibility of the proposed redacted version of Merritt's statement to law enforcement signed at 1:55 a.m. on April 7, 2011, regarding a cell phone robbery that occurred on January 12, 2011.  This issue, on which the court expresses no opinion at this point, will be addressed in a forthcoming Memorandum and Order.

out his co-conspirator.[4]  Therefore, Merritt's request to introduce unaltered versions of these five statements is DENIED.

What concerns the court more than Merritt's eleventh-hour argument,[5] however, is counsel's threat to intentionally deprive his client of his constitutional right to the effective assistance of counsel. (See Jan. 19, 2015, Def. Merritt's Ltr. at 1-2.)  At a status conference on January 21, 2015, counsel told the court, "I am not going to shrink from my responsibility to defend [Merritt] down to the ground." (Jan. 21, 2015, Hr'g Tr. ("Hr'g Tr.") at 17:8-9; see also id. at 17:20-24 ("If I didn't use the words, we accept . . . the use of the nomenclature that the Court with others had decided upon.").)  Accepting what counsel has stated on the record at face value, the court understood counsel to mean that despite what he wrote in his letter, he will zealously advocate for his client during all phases of the trial. (See id. at 16:7-10 ("Anyone who has a concern about this can read my lips.  In 30 years, I've never shrunk from this responsibility and the trial of this cause is not going to be the first time that I have shrunk from my responsibility.").)  In other words, counsel represented that he will participate in jury selection, will make an opening statement, will cross-examine the Government's witnesses, and will make a closing argument. (Cf. Jan. 19, 2015, Def. Merritt's Ltr. at 1-2.)

If, however, counsel's view of zealous advocacy requires him to ignore this court's Order—applying binding case law from the Supreme Court and the Second Circuit—and to deprive his client of his Sixth Amendment right to effective assistance of counsel, counsel is hereby warned that he would place himself in jeopardy of violating the rules of professional

---

[4] In light of the number of statements Merritt made to law enforcement, as well as the amount of detail he provided, the court questions the marginal value Merritt would obtain from further emphasizing his cooperation to the jury.

[5] The court notes that these statements were the subject of Defendant Laurent's Omnibus Pre-Trial Motion, which was fully briefed on October 7, 2014. (See Reply Mem. of Law in Further Supp. of Def. Laurent's Omnibus Pre-Trial Mots. (Dkt. 199).)  While counsel's arguments are therefore over three months late, this extreme delay is inconsequential to the court's decision.  Rather, even if counsel had made this argument when the court was considering Defendant Laurent's Omnibus Pre-Trial Motion, the court would have reached the same result.

conduct. For example, the American Bar Association Model Rules of Professional Conduct (the "ABA Model Rules") instruct that as an advocate, a lawyer is to "zealously assert[] the client's position under the rules of the adversary system." Model Rules of Prof'l Conduct Preamble [2] (1983). The ABA Model Rules further provide that a lawyer "shall provide competent representation to a client," Rule 1.1, and that a lawyer "shall act with reasonable diligence . . . in representing a client," Rule 1.3. While a lawyer is not "bound . . . to press for every advantage that might be realized for a client," nor does a lawyer's duty to act with reasonable diligence require the use of "offensive tactics," a lawyer "must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf." Model Rules of Prof'l Conduct R. 1.3 cmt [1].

Furthermore, the New York State Rules of Professional Conduct provide that a lawyer "shall not intentionally: (1) fail to seek the objectives of the client through reasonably available means permitted by law and these Rules; or (2) prejudice or damage the client during the course of the representation except as permitted or required by these Rules." N.Y. Rules of Prof'l Conduct R. 1.1(c) (2009); see also id. R. 1.3 cmt. [1] ("A lawyer must also act with commitment and dedication to the interests of the client and in advocacy upon the client's behalf."). These Rules also instruct that a lawyer "may exercise professional judgment to waive or fail to assert a right or position of the client," but only "when doing so does not prejudice the rights of the client." Id. R. 1.2(e). And intentionally depriving a client of the effective assistance of counsel—especially in a criminal case in which the defendant faces possible life imprisonment if convicted (see Hr'g Tr. at 14:2-3)—would create a serious risk of prejudice to that client's rights under the Sixth Amendment of the Constitution.

6

Should counsel fail to carry out his responsibilities under these rules, he may be subject to disciplinary proceedings for misconduct. See Model Rules of Prof'l Conduct R. 8.4(a) ("It is professional misconduct for a lawyer to . . . violate or attempt to violate the Rules of Professional Conduct . . . ."); N.Y. Rules of Prof'l Conduct R. 8.4(a) (same). Cf. N.Y. Rules of Prof'l Conduct R. 8.4 cmt [4] (2011) ("A lawyer may refuse to comply with an obligation imposed by law if such refusal is based upon a reasonable good-faith belief that no valid obligation exists because, for example, the law is unconstitutional, conflicts with other legal or professional obligations, or is otherwise invalid. . . . [A] lawyer may not disregard a specific ruling or standing rule of a tribunal, but can take appropriate steps to test the validity of such a rule or ruling."). Moreover, in wholly and intentionally neglecting his duties to his client, and ignoring a lawful Order from this court, counsel may also be subject to sanctions, including criminal contempt under Federal Rule of Criminal Procedure 42. See also 18 U.S.C. § 401 (establishing power of a federal court to impose fines, imprisonment, or both, at its discretion, for contempt of its authority).

While the ABA Model Rules and New York Rules of Professional Conduct indicate that a criminal defense lawyer "may nevertheless so defend the proceeding as to require that every element of the case be established," Rule 3.1, it is also clear that a lawyer may not intentionally prejudice his client by refusing to engage in any form of advocacy, with the stated goal of depriving his client of his right to effective assistance of counsel in order to obtain a reversal on appeal.  Counsel is so warned.[6]

SO ORDERED.

Dated: Brooklyn, New York
      January 21, 2015

s/ Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

---

[6] In light of Defendant Laurent's letter dated January 21, 2015 (see Jan. 21, 2015, Def. Laurent's Ltr. (Dkt. 287) at 2), counsel is further warned that at trial, he may not suggest to the jury or intimate in any way that "the guy" or "the other guy" mentioned in Merritt's statements is, in fact, Laurent.  To do so would violate Laurent's Sixth Amendment right to confrontation under Bruton, and potentially even serve as grounds for a mistrial.  In this context, counsel is reminded that the rules of professional responsibility also prohibit a lawyer from engaging in conduct "intended to disrupt the tribunal," or that is otherwise "prejudicial to the administration of justice."  See N.Y. Rules of Prof'l Conduct R. 3.3(f)(4), R. 8.4(d); see also id. R. 3.3 cmt. [2] (noting lawyers have "special duties . . . as officers of the court to avoid conduct that undermines the integrity of the adjudicative process"); id. R. 8.4 cmt. [3] ("The prohibition on conduct prejudicial to the administration of justice is generally invoked to punish conduct, whether or not it violates another ethics rule, that results in substantial harm to the justice system comparable to those caused by obstruction of justice, such as advising a client to testify falsely, paying a witness to be unavailable, altering documents, repeatedly disrupting a proceeding, or failing to cooperate in an attorney disciplinary investigation or proceeding.").

# EXHIBIT B

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - -   X

UNITED STATES OF AMERICA,    :    11 CR 303

                                      :

     -against-                :

                            United States Courthouse
                            Brooklyn, New York

TREVELLE MERRITT,           :

                            January 21, 2015
        Defendant.       :    11:00 o'clock a.m.

- - - - - - - - - - - -   X

TRANSCRIPT OF CONFERENCE
BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Government:        LORETTA E. LYNCH
                        United States Attorney
                        BY: DARREN LaVERNE
                            KRISTIN MACE
                            MARGARET LEE
                        Assistant United States Attorneys
                        271 Cadman Plaza East
                        Brooklyn, New York


For the Defendant:         HOWARD GREENBERG, ESQ.


Court Reporter:            Gene Rudolph
                        225 Cadman Plaza East
                        Brooklyn, New York
                        (718) 613-2538

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1          THE COURT:  Appearances, please.

2          MR LaVERNE:  Good morning, Your Honor.

3          Darren LaVerne, Kristin Mace and Margaret Lee for

4    the United States.

5          THE COURT:  Good morning.

6          MR. GREENBERG:  Howard Greenberg for the defendant.

7          THE COURT:  Good morning.

8          MR. GREENBERG:  What do you say, Judge?

9          THE COURT:  Very well.  Please be seated.

10         MR. GREENBERG:  Thank you.

11         THE COURT:  All right.  The first step I think is

12   there is a superseding indictment (S-5), is that right?

13         MR LaVERNE:  That is correct, Your Honor.

14         THE COURT:  Have you seen (S-5)?

15         MR. GREENBERG:  I have not.

16         THE COURT:  You haven't?

17         MR. GREENBERG:  I have not.

18         THE COURT:  I think you ought to get ahold of it and

19   share it with your client.

20         MR. GREENBERG:  Okay.  I ask for a copy of it now.

21         MR LaVERNE:  I have a copy printed out here.  I

22   can --

23         MR. GREENBERG:  Do you have two copies?

24         MR LaVERNE:  I just have one.

25         THE COURT:  There you go.

3

1          I'll tell you what, why don't we take a brief

2    adjournment and have you -- do you want to go over the -- is

3    there any fundamental change in this?

4          MR LaVERNE:  The changes, Your Honor, which were set

5    forth in a letter that we filed are as follows:

6          There is a change to the defendant Ashburn's first

7    name.  We have added two aliases for the defendant Ashburn.

8    There is a change with respect to one of the counts that

9    Mr. Laurent is named in.  It alleges now that he was robbed

10   through, the -- I'm sorry -- that the individuals who he

11   robbed were solicited through a website called solecollector

12   dot com as opposed to Craig's List we had previously.

13         MR. GREENBERG:  That was Laurent?

14         MR LaVERNE:  Also --

15         THE COURT:  That was Laurent.

16         MR LaVERNE:  That was Laurent.

17         It doesn't touch on Merritt.

18         The other change was that the allegation with

19   respect to the conspiracy, Hobbs Act conspiracy involving

20   jewelry stores against Mr. Laurent, the time period was

21   shortened so that it now ends in 2010 as opposed to 2011.

22   Again, it doesn't affect Mr. Merritt.

23         MR. GREENBERG:  Judge, we won't need a break because

24   none of those changes affect us.  Our case is the same as it

25   was under (S-4).

4

1          MR LaVERNE:  I should say that I think it merits

2     having Mr. Greenberg go over these changes with his client.

3          THE COURT:  Yes.  What I am going to do is, on the

4     day of jury selection, we are going to meet before the first

5     group comes in --

6          MR. GREENBERG:  Okay.

7          THE COURT:  -- to fill out questionnaires.

8          MR. GREENBERG:  Okay.

9          THE COURT:  At that time I will arraign all three of

10    the defendants on it so you will have a chance to read it,

11    share it with your client.

12         MR. GREENBERG:  Okay.

13         THE COURT:  And answer any questions that he has.

14         MR. GREENBERG:  Good.

15         THE COURT:  That way we do this in a more methodical

16    way.

17         MR. GREENBERG:  Yes.

18         THE COURT:  Thank you for the preview.

19         MR LaVERNE:  Yes.  As I said, those allegations name

20    Mr. Laurent, not Mr. Merritt.  But obviously they could bear

21    on the larger case.  Mr. Greenberg should review them with his

22    client.

23         THE COURT:  That's fine.  Very well.

24         All right.  Now I received a letter from Ms. Newman

25    about asking for six additional peremptory challenges for the

1  defense.  Are you planning to respond to that letter or are

2  you going to leave it up to me?

3          MR LaVERNE:  We were going to file a response.  We

4  can have it filed by tomorrow.

5          THE COURT:  Okay.  I won't do anything about it

6  until I hear from you then.

7          MR LaVERNE:  Thank you.

8          THE COURT:  As long as it is by tomorrow.

9          Okay.  I received a letter from Mr. Greenberg and

10 that is why I asked you all to come in today.  I think that

11 the letter is I think pretty clear and your response.

12          Have you seen the government's response?

13          MR. GREENBERG:  I have, Judge.  Thank you.

14          THE COURT:  Obviously, I am concerned about what

15 Mr. Greenberg said in his letter.  I've had a chance to review

16 my decision I think of December 30th and also consider some of

17 the government's arguments in the government's response.

18          The point is that I have a concern that the

19 possibility, and I understand it was posed as a possibility,

20 the word "may" was used, and I think that is encouraging to

21 me, as opposed to "will."  Because I think if it is a "will,"

22 then it's a --

23          MR. GREENBERG:  It is a different tone.

24          THE COURT:  It is a different beast, so to speak.

25          MR. GREENBERG:  Right.

6

1        THE COURT:  Here is the point that I want to make.

2   I'm sure that you, Mr. Greenberg, want to aggressively

3   represent your client's interests, as you should.  The fact is

4   that the solution to any mistake that I might make, which may

5   result in something that you oppose, for instance, a

6   conviction, if I am wrong, you have your rights before the

7   Second Circuit, to raise these issues in the Second Circuit.

8   The Second Circuit may, as you say, if I make a mistake in

9   handling the case, it could send the case back down for

10  another trial before another judge and that is fine.

11       But it is important, since the likelihood of that

12  happening is not terribly great absent a complete abuse of

13  discretion on my part, that you aggressively represent your

14  client within the limits of propriety in this litigation.  I

15  appreciate that you are making your record.

16       I have again looked at the changes to meet the

17  requirements of Bruton and the Second Circuit cases like

18  US v. Taylor and US v. Jass.  The conclusion I have come to,

19  again -- and I will put it in writing so you have that as

20  well -- is that nothing in those changes significantly or even

21  minimally undermines any claim of exculpatory material

22  regarding your client.  I think that is one of the important

23  points that is made in all of these cases.

24       In making the changes that are needed to protect the

25  rights of another defendant in the same trial, one has to be

7

1    mindful that the changes not have the effect of undermining

2    any exculpatory material regarding your client.  In this case,

3    I don't think that's the case.  We have reviewed it.  We have

4    reviewed it yet again, because of your submission, and I think

5    that my decision is in keeping with the Second Circuit's

6    previous decisions in these cases, including the ones that

7    have been mentioned by the government in its submission.

8          So I don't think -- and I might be wrong, and if the

9    Second Circuit has to review my decision at some point, the

10   Second Circuit might disagree -- I don't believe that anything

11   that you have submitted establishes that the redactions

12   exclude substantially exculpatory information.  The fact is,

13   that the standard is abuse of discretion on my part and I

14   think I am well within my authority to make the determinations

15   that I have made.

16         Now, if you tell me that, nonetheless, you may do

17   something like not participate in portions of the trial, then

18   there is more for us to discuss.

19         MR. GREENBERG:  Right.  I understand.

20         When you are ready, I will answer you, Judge.

21         THE COURT:  Yes.  Sure.

22         MR. GREENBERG:  First thing I want to say today, did

23   you want to put the cuffs on me now or wait until the trial?

24   Just kidding.  I know you've got a good sense of humor.

25         THE COURT:  I have a good sense of humor.  It is

8

1   just that I am concerned about your client.

2          MR. GREENBERG:  Of course.

3          THE COURT:  I'm sure you are concerned about your

4   client.

5          MR. GREENBERG:  As well you should, which is why I

6   put in writing what my concerns were.

7          THE COURT:  Go ahead.

8          MR. GREENBERG:  I am going to address the third

9   point in the government's letter first and sort of the point

10  you mentioned under the rubric of the word "may" rather than

11  "will."

12         First of all, if I stood mute, if I stood -- if I

13  remained mute during the entire trial, that would not disrupt

14  anything.  And if I remained mute out of a sense of a higher

15  duty to him so that he could get a retrial, where everything

16  he said would -- a full and fair airing of what he said may

17  come out, I may be putting myself at risk but I would be doing

18  that to protect him.  So that's how I respond to that point.

19         But I did say "may," and for good reason.  I mean,

20  these folks know me and I know them.  In 30 years I've never

21  stood mute in the defense of anybody who was sitting next to

22  me and I hope that my performance will be sufficient so that

23  the government at the end will give me a good grade for --

24         THE COURT:  I am not concerned about the grade the

25  government gives you.

1          MR. GREENBERG:  Fair enough.  I get it, Judge.

2          So I don't think that's an issue we need to discuss

3     any further.  But I do think we need to discuss whether -- by

4     the way, you are using redactions.  You are saying redactions.

5     If it was just redactions, if it just boiled down to taking

6     out the name Jamal, taking out the name Laurent, taking out

7     the street name Tails, we'd have no issue.

8          We are talking about substituting language, roughly

9     up to 80 or 100 times, because I have counted all the

10    instances where he made a specific reference to a street name

11    or a government name, and we are talking about substituting

12    language that he never used for what he in fact said.

13         He in fact fingered the gunman, the shooter, the

14    murderer of Dasta James.  He in fact was entirely forthcoming

15    in talking to law enforcement up to what, eight, ten, eleven,

16    at least 12 times.  He didn't dance around any issues in this

17    fact pattern.  He was entirely forthcoming.

18         So if we substitute language like the other, quote,

19    the other guy, unquote, or quote, a guy I know, unquote, for

20    what he in fact said, when he never used those words, it makes

21    it appear that he's not entirely forthcoming.  It makes it

22    appear that he is being too clever by half, trying to cover

23    for somebody else in dealing with law enforcement.

24         That is under -- undermines his defense, the defense

25    of a young man who, A, was entirely forthcoming and, B, never

1    used these words.  So we are talking about putting language in

2    his mouth that he never uttered, not once, in 11, 12, 13

3    statements, whatever it was, and on an audiotape.  I forgot

4    that one, did he ever say the other guy or a guy that I knew.

5    He never said it.

6              As you can imagine, I've been thinking about this

7    and I have come up with, in my mind, a result that would

8    satisfy me with regard to my concerns.  I am suggesting that,

9    first of all, if we are just redacting there is nothing to

10   discuss.  Because then the agent says, blank, blank and goes

11   on.  And he doesn't say Jamal, doesn't say Laurent.  He

12   doesn't say Tails.  If that's where we are, you are not going

13   to get a complaint from me.

14             Failing that, and everyone will understand in the

15   room, will understand what is covered by A to Z blank, A to Z,

16   A prime to Z prime after the blank.

17             So it occurred to me that a way to solve this that

18   would take care of all my concerns is if the government, if

19   they talk about the Dasta James murder first, whoever the

20   agent is, when he gets to that point where we are going to

21   deal with Jamal or Laurent or Tails, the government just says

22   a third-party.  That's it.  A -- the agent says a third-party.

23   And then if subsequent to talking about the murder of Dasta

24   James first they talk about earlier in time events concerning

25   January 12th or January 14th, the agent would say, the same

1    third-party.  That's it.  Instead of either Jamal or Laurent

2    or Tails.  If they talk about them in chronological order,

3    January 12 first, January 14 first, January 23rd last.  They

4    will say, a third-party vis-a-vis January 12th and/or 14th,

5    and then when they get to the 28th, they will say the same

6    third-party.  That's it.

7              And then everyone will know that that is a device

8    which serves the purpose for which it is intended.  And if it

9    comes in that way, it doesn't make him look like he wasn't

10   entirely forthcoming when he was.  It doesn't substitute

11   language for his that he didn't use, and it -- I forgot what

12   my other point was.

13             THE COURT:  I hear you.

14             MR. GREENBERG:  You understand where I am coming

15   from.

16             THE COURT:  I understand.

17             MR. GREENBERG:  And coupled with that, it occurred

18   to me that the Court could instruct the jury that that turn of

19   phrase is being used pursuant to a Court's directive involving

20   a legal issue that doesn't concern them.  If you do that, I

21   have no concerns and I will go to the mat to defend the

22   defendant Trevelle Merritt.  And that's where we are coming

23   from, Judge.

24             THE COURT:  Thank you.

25             MR LaVERNE:  Your Honor, I think we have -- there

1   are two different issues going on here.  One I view is sort of

2   very concerning; the other I think the answer is very clear.

3          The question as to which the answer is clear is the

4   merits question of a Bruton and how we deal with the situation

5   there.  Under the case law of Bruton, it's very clear, that

6   Mr. Greenberg's proposed solution is not allowed because the

7   jury is not supposed to know that something was redacted

8   because it raises the suggestion in their minds conceivably

9   that it was redacted because it refers to a codefendant.  So

10  that's clearly out.

11         The bigger issue here, which I think Your Honor was

12  trying to get at and I hope we can resolve here today, I think

13  everyone wants to resolve, is this sort of specter that

14  Mr. Greenberg has raised that he's somehow not going to

15  represent his client zealously at this trial.  I think

16  Mr. Greenberg -- look, I mean, we are about to embark on a

17  long, intense trial.  A lot of resources are about to be spent

18  by the court, the government, by the defendants.  I don't

19  think anyone wants to be in a situation where we are part way

20  through the trial and there is some doubt in our minds and

21  perhaps in the minds of someone else who looks at this case

22  down the road that Mr. Greenberg was intentionally not trying

23  his hardest to represent his client and was doing that for

24  strategic reasons.

25         I think what we need here today at a minimum is a

1  representation from Mr. Greenberg that he is going to

2  represent his client zealously and comply with his ethical

3  duties at trial.  I think if we get that, and it is an

4  unequivocal representation, I think we can proceed.

5        But if we are going to walk out of here today with

6  Mr. Greenberg sort of hemming and hawing about whether he is

7  going to comply with his ethical duties and may and we will

8  see and I have a higher duty, then we have an issue that we

9  need to deal with.

10        THE COURT:  Anything else?

11        MR. GREENBERG:  Judge, I think I satisfied your

12  concerns about it.

13        THE COURT:  Well, no, I don't think you have.

14        MR. GREENBERG:  Okay.  What do you want me to do?

15        THE COURT:  And the reason is, that the Court is

16  following the law as it has been put down by the Supreme

17  Court.  You would like the law to be otherwise.  You would

18  like the Court to have the option of using some other

19  nomenclature in order to achieve what you think is in the best

20  interests of your client.  That is fine.  You have a right to

21  have that view.

22        But you don't have the right to say, if I don't get

23  it my way on this issue, then I am going to sit and do nothing

24  at trial and before trial and so forth, and then take it up to

25  the Second Circuit -- have somebody else take the case up to

1   the Second Circuit if my client should be convicted of a crime

2   which carries -- what's the penalty?

3              MR LaVERNE:  Conceivably, life.

4              THE COURT:  Conceivably life in prison on the

5   possibility that the Second Circuit is going to say, you know,

6   Mr. Greenberg had a point.  So we are going to reverse even

7   though the district court followed the Bruton decision of the

8   Supreme Court, which is the law of the land, and the Court did

9   not abuse its discretion in the way in which it followed the

10  Bruton decision.

11             So what are we left with then?  We are left with you

12  made your claim of principle on behalf of your client and your

13  client ends up with possibly a life sentence not having had

14  the benefit of an aggressive defense at the trial level.  That

15  I think is the reason why, while I understand your point, I

16  appreciate your concerns and I think that it has the sound of

17  reason, it's not going to work because you have a higher duty.

18  The higher duty, as a lawyer who has accepted this brief, is

19  to aggressively and properly represent your client at a trial.

20  If I am wrong, and if your client is convicted, then the

21  Second Circuit will give you another trial.

22             I am willing to accept that burden, but you have

23  already accepted your burden and you can't shrink from working

24  very hard to meet your burden.  I am perfectly willing to be

25  wrong at the end of the day, but I think I am right, and I am

15

1   perfectly willing to have you take an appeal if you are not

2   successful, if you don't get an acquittal.

3          It is really a situation where you are saying, I

4   don't like the way the Supreme Court has ruled on this, and

5   the Circuit Court, and they should take another look.  Well,

6   they will have a chance to take another look if you lose at

7   the trial level.  Your client has the right, will have the

8   right, to appeal if he is convicted.  That's the place you

9   seek those kinds of nuanced changes in how Bruton is

10  implemented.

11         You have an ethical responsibility to follow through

12  and actively represent your client at trial.  That is  really

13  where we are here.  I am not going to read you the ABA Model

14  Code or the New York State Rules of Professional Conduct.  I

15  will put that in the decision on your motion in writing.

16         But the long and short of this is that I can't, as a

17  trial judge, change the law that I am obligated to fulfill.

18  You can't as an attorney and counselor at law decide that the

19  Supreme Court hasn't handled it right and then just decide

20  that you may not participate in a trial where your client

21  faces a life sentence potentially.

22         MR. GREENBERG:  When you are ready, I will be heard,

23  Judge.

24         THE COURT:  That's where we are.  I respect your

25  opinions.  I respect your competence and your intelligence,

1    and your arguments are always well stated.  But I can't accept

2    the possibility that you won't aggressively actively represent

3    your client in a trial.

4           MR. GREENBERG:  When you are ready, I will be heard,

5    judge.

6           THE COURT:  Go ahead.

7           MR. GREENBERG:  Anyone who has a concern about this

8    can read my lips.  In 30 years I've never shrunk from this

9    responsibility and the trial of this cause is not going to be

10   the first time that I have shrunk from my responsibility.

11          THE COURT:  Don't point at my, please.

12          MR. GREENBERG:  Well, I am -- it is a gesture,

13   Judge.  It is not pointing at you.

14          THE COURT:  Go ahead.

15          MR. GREENBERG:  So in 30 years I have never shrunk

16   from it and the trial of this cause is not going to be the

17   first time that I have shrunk from it.

18          All I did was ask for an alternative.  That's what I

19   asked, proposing third-party or the same third-party.  I

20   didn't say well, if you don't do it, I am -- I am doing it for

21   you.

22          THE COURT:  That is where I started, where you said

23   you may do something, that you might.

24          MR. GREENBERG:  No.  The may had to do with standing

25   mute.

1          THE COURT:  Yes.

2          MR. GREENBERG:  We are passed that point?

3          THE COURT:  We are?

4          MR. GREENBERG:  I think I just made my position

5    clear.

6          THE COURT:  No.  I'm sorry.  You went beyond "may"

7    and where are you now?

8          MR. GREENBERG:  I said, I am not going to shrink

9    from my responsibility to defend him down to the ground.  I

10   also said that a couple of minutes ago.

11         THE COURT:  Okay.  But I don't understand what that

12   means in the context of your letter if I don't change the

13   nomenclature that I already established.

14         MR. GREENBERG:  We'll live with it.

15         THE COURT:  Okay.

16         MR. GREENBERG:  We'll live with it.  That's it.

17         THE COURT:  Okay.  You have your exception.

18         MR. GREENBERG:  Yes.

19         THE COURT:  Clearly.

20         MR. GREENBERG:  If I didn't use the words, we

21   except --

22         THE COURT:  I understand.

23         MR. GREENBERG:  -- to the use of the nomenclature

24   that the Court with others had decided upon.

25         THE COURT:  Okay.

1          MR LaVERNE:  I -- just so we are clear, I don't want
2   to belabor this, what I hear Mr. Greenberg saying is
3   consistent with his 30 years of practice he will participate
4   in this trial fully, aggressively and zealously represent his
5   client to the best of his ability throughout the course of the
6   trial.
7          THE COURT:  That's what --
8          MR. GREENBERG:  I said my piece.  I am not answering
9   that.
10         THE COURT:  You don't have to.  I understand that's
11  your understanding.  It is also my understanding.
12         If I am wrong, Mr. Greenberg will inform me by a
13  letter or some other means of communication.
14         Look, I have great respect for Mr. Greenberg.  This
15  is all part of his effort to aggressively represent his
16  client, and I appreciate that.  It's time-consuming, but it is
17  understandable.
18         Okay.  Having said that, my understanding is your
19  understanding, and that's what I heard Mr. Greenberg say and I
20  am putting it in writing and if he disagrees with what I write
21  he will let me know.  That way we are all on the same page, so
22  to speak.
23         The next time we meet I am going to arraign the
24  three defendants.  That's on the date that we start selecting
25  the jury.  All right.  What will happen then -- I will give

1    you a preview since you are here out of respect to you and

2    your client and the government.

3            We are going to have 250 people or so come in and

4    they are going to fill out a questionnaire.  I have made

5    certain minor revisions to it but it's ready to go.  It's

6    going to be printed and they are going to fill out the

7    questionnaire in the Ceremonial Courtroom.  You are going to

8    all be present.  You will be introduced to the venire and then

9    you will have a certain number of days to have -- I am going

10   to have the government reproduce the questionnaire and then

11   provide two copies to each of the defendants so that the

12   defendant has one and the attorney has one.  So we don't do a

13   lot of extra copying here.

14           Then we are going to have to establish a schedule

15   for the review of these.  So that you all can discuss in

16   increments of 100, I would think, which of the proposed jurors

17   you agree should be struck for cause and the rest of them will

18   be interviewed by me, one at a time, here in this courtroom,

19   with all the defendants and all their lawyers and all of the

20   government lawyers present at the same time.

21           What I am going to ask you to do is to give me a

22   list of questions that you would like me to ask to each of the

23   specific individuals.  I don't promise to ask all the

24   questions but I promise to consider asking the questions.  I

25   would like that a day in advance of the voir dire that we are

1    going to do.  In that way I will go through them and we will

2    see what we need to ask in order to round out your

3    understanding of who they say people are.

4              Okay?  I will mention this also at the meeting that

5    we are going to have at 11:00 o'clock on Tuesday?  Is that

6    right?

7              THE CLERK:  Yes.

8              THE COURT:  11:00 am.

9              MR. GREENBERG:  What date, Judge?

10             THE COURT:  The day that we start.

11             MR. GREENBERG:  Is that 1/27?

12             THE COURT:  1/27.

13             MR. GREENBERG:  Yes.

14             THE COURT:  At 11:00 am.

15             MR. GREENBERG:  Okay.

16             THE COURT:  In this courtroom to discuss the

17   process.

18             MR. GREENBERG:  There was something about 1:00

19   o'clock on this day?

20             THE COURT:  1:00 o'clock is the time that the jurors

21   are coming in to fill out the questionnaires.

22             MR. GREENBERG:  1/27, at 11:00 am.

23             THE COURT:  We will all adjourn to the courtroom at

24   1:00 pm to introduce ourselves to the potential jurors.

25             MR. GREENBERG:  Got you.  Thank you.

21

1          THE COURT:  Okay.  Anyone have any questions?

2          MR LaVERNE:  I think we are good to go.  Ready to

3     roll, Judge.

4          THE COURT:  All right.  Thank you very much.  Thank

5     you, marshals.

6          We will see you next Tuesday.

7          (Matter concludes.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

GR      OCR      CM      CRR      CSR